ANDERSON YEH PC
  Edward M. Anderson (STATE BAR NO. 198183)
edward@andersonyehlaw.com
  Regina Yeh (STATE BAR NO. 266019)
regina@andersonyehlaw.com
1055 E. Colorado Blvd. Ste 500
Pasadena, California  91106
Telephone: (626) 204-4092  Facsimile: (888) 744-0317

Attorneys for Plaintiff
ALCON ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware Limited Liability Company,<br><br>            Plaintiff,<br><br>    v.<br><br>TESLA, INC., a Texas Corporation; ELON MUSK, an individual; WARNER BROS. DISCOVERY, INC., a Delaware Corporation;<br><br>            Defendants. | CASE NO.  2;24-CV-09033-GW-RAO<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1) DIRECT COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**2) VICARIOUS COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**3) CONTRIBUTORY COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**4) FALSE AFFILIATION AND/OR FALSE ENDORSEMENT [15 U.S.C. § 1125(a)(1)(A)]**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Alcon Entertainment, LLC ("Plaintiff" or "Alcon"), through its attorneys, hereby alleges its First Amended Complaint ("FAC") against defendants Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI") (collectively, "Defendants" and each separately a "Defendant"):

## SUBJECT MATTER JURISDICTION

1.      The Court has federal question subject matter jurisdiction per 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331 and 1338(a) and (b), and on the grounds that this is a civil action arising under the laws of the United States.  Plaintiff seeks relief under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, *et al.*, and the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A), in interstate commerce.

## SUMMARY OF DISPUTE

2.      This is a case about a car maker improperly borrowing the storytelling power of a Hollywood movie for a car advertisement.  That is an old, long-prohibited kind of scheme.  In a sorcerer's apprentice kind of way, Musk and Tesla opened their artificial intelligence spell book to do it faster and more cheaply than perhaps any car maker had before them.  However, the fact that artificial intelligence ("AI"), in its ubiquity, now makes it so much faster and easier for scurrilous actors to violate creator rights often simply means old wrongs are just dressed up in new twenty-first century clothes.  Such is the case here.

3.      Defendants requested permission to use an iconic still image (Exhibit A) from Alcon's "Blade Runner 2049" motion picture ("BR2049" or the "Picture") to promote Tesla's new fully autonomous cybercab in an October 10, 2024 event titled "We Robot."  The event was to be, and was in fact, livestreamed worldwide from WBDI's Burbank, California studio lot.  When Alcon was informed just hours prior to the commencement of the event that Defendants wanted BR2049 to somehow be wrapped into it, Alcon refused all permissions.  More than that, Alcon adamantly objected to Defendants suggesting any affiliation whatsoever between BR2049 or Alcon on the one hand, and Tesla, Musk or any Musk-owned company,

DEMAND FOR JURY TRIAL

on the other.  Musk and Tesla used an admittedly AI-generated image to do it anyway, and WBDI facilitated or ratified the bad conduct.

4.     Musk and Tesla wanted to leverage BR2049 to advertise cars, specifically including BR2049's main character and the Picture's iconic "Las Vegas Sequence."  In the sequence, the artificially intelligent android main character K (played by Ryan Gosling) explores the irradiated, orange-lit ruins of a post-apocalyptic Las Vegas, seeking answers to existential questions about his own past.  He also seeks the truth about the human-AI social compact in the Picture's story: a human-as-god-like-master/AI android-as-slave compact which the Picture both presents and calls into question.  In Las Vegas, K hopes to find and confront the long-lost Deckard -- the lead character from the original 1982 "Blade Runner" motion picture ("1982 Picture"), played in both works by Harrison Ford.  Exhibit B shows sample still images from BR2049's Las Vegas Sequence.

5.     After Alcon refused permission to use the Exhibit A still image, Musk and Tesla used an AI image generator to create their own near-photo-realistic illustration of K exploring the ruined Las Vegas.  (Exhibit C.)  Musk put Exhibit C into his presentation as the second slide, and displayed it full screen for 11 seconds on the global livestream feed as his presentation opener.  Lest anyone in the live or livestream audience not understand what Exhibit C was a picture of, Musk in his opening voiceover clearly identifies the image as an illustration of the "Blade Runner" movie set in a world which has suffered a "bleak apocalypse," where "he" (meaning the particular blade runner in question) is wearing a "duster" (trench coat) while he surveys the distinctly orange-lit ruins of a city in the apocalyptic space.  That description, especially in connection with the visual elements present in Exhibit C, only matches a single motion picture in all of Hollywood, or anywhere else: BR2049.  There is also only one blade runner character that fits that description: K.

///

---

FIRST AMENDED COMPLAINT

6.      Musk tried awkwardly to explain why he was showing the audience a picture of BR2049 and K and talking about them, when he was supposed to be talking about his new product.  He really had no credible reason, or none that doesn't come back to wanting to borrow the storytelling power and expression of that particular Hollywood motion picture to sell cars and the car company.  Musk ostensibly invited the global audience to think about the cybercab's possibilities in juxtaposition to BR2049's fictional future.  But it all exuded an odor of thinly contrived excuse to link Tesla's cybercab to strong Hollywood brands at a time when Tesla and Musk are on the outs with Hollywood.[1]  Which of course is exactly what it was.

7.      It was hardly coincidental that the specific Hollywood film which Musk actually discussed to pitch his new, fully autonomous, AI-driven cybercab was BR2049 – a film which just happens to feature a strikingly-designed, artificially intelligent, fully autonomous car throughout the story.  Especially where Defendants had asked Alcon's permission to use BR2049 and been so firmly refused, this was clearly all a bad faith and intentionally malicious gambit by at least Musk and Tesla to misappropriate BR2049's storytelling power and BR2049 and Alcon's brand goodwill to advertise, market and sell Tesla's automobiles and Tesla as a company.  Indeed, the rest of the opening was stilted and stiff.

8.      Musk and Tesla's idea to borrow from or link to Hollywood motion pictures to advertise cars is far from new.  The motivations behind it, and why the law does not allow even seemingly short or limited references to famous motion pictures in car ads without permission, have to do with the especially powerful

_____

[1] *See, e.g.,* Brett Berk, "Hollywood Can't Ditch Its Tesla's Fast Enough: 'They're Destroying Their Leases and Walking Away,'" *The Hollywood Reporter*, September 20, 2024, https://www.hollywoodreporter.com/lifestyle/lifestyle-news/tesla-robotaxi-warner-bros-reveal-hollywood-rejection-elon-musk-1236007945/.

nature of Hollywood movies, and how easy it can be to evoke the full influencing power of a famous movie with even just one reference.

9.     Historian Yuval Noah Harari[2] teaches that, more than using tools or harnessing fire, humanity's transcending evolutionary superpower is the ability to engage in persistent exercises of shared imagination.  Through the power of stories, transmitted first by oral tradition, and later by technologies like books and movies that tangibly capture expression, humans have the unique ability to build and maintain worlds and constructs that may not exist in the physical universe.  Yet, these worlds and constructs nonetheless can endure as powerful intersubjective realities in the shared consciousness of millions or even billions of individual human beings.

10.     Powerful stories can organize, inspire, manipulate or even control huge numbers of people, sometimes separated by vast distances of space or even time.  Through the power of stories captured in printed materials, or transmitted over radio, or broadcast over television, or carried by innumerable other media, the work of talented creators has been used for thousands of years to build global empires, maintain religious institutions, and send people to the moon.

11.     For at least several decades, salesmen have specifically used the storytelling power of popular Hollywood motion pictures to sell cars, including through product placement, where a car makes a branded appearance within a motion picture.  Carmakers also do the inverse, borrowing story elements from Hollywood movies and incorporating them into car commercials through agreements with motion picture rights owners:

> The car commercial used to be a pretty predictable affair: a shiny new
> sedan driving through a downtown Los Angeles tunnel or across Big

---

[2] Yuval Noah Harari, *Sapiens: A Brief History of Humankind* (HarperCollins 2015) and *Nexus: A Brief History of Information Networks From the Stone Age to AI* (HarperCollins 2015).

> Sur's Bixby Bridge, unencumbered by traffic, or a celebrity espousing the gadget-laden features of an SUV or minivan. … [¶] Many tried product placement deals, but such deals don't guarantee prime exposure for a company's product. … [¶] [I]n the latest series of campaigns, a variety of carmakers have put a twist on the typical product placement deal.  They've appropriated hit films and popular film characters, making them the focus of the spots.

M. Graser, "Car Commercials Borrow From Movies to Make Their Own Stories," *Variety*, March 31, 2014 https://variety.com/2014/film/features/1201150512-1201150512/

12.     Mr. Graser's *Variety* piece is from 2014, but the practice of automakers evoking famous Hollywood motion picture properties in their car ads started at least nineteen years earlier.  Automakers tried to do it without permission from, or any payment to, the motion picture creators, but the judiciary quickly shut that down.  *See, e.g., Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F.Supp. 1287 (C.D. Cal. 1995) (granting injunction against Honda and its ad agency for evoking MGM's James Bond motion pictures in television advertisements for the then-new Honda Del Sol).

13.     Responsible car makers and ad agencies now ask permission from studios first, and, if permission is granted, negotiate and pay meaningful compensation.  Because Hollywood motion picture storytelling power is so strong not just in the United States but globally, responsible car makers still covet it for their advertising campaigns even though they have to pay (a lot) for it:

> "You can't underestimate how the entertainment community influences audiences around the world." says Audi of America president Scott Keogh.  Connecting with entertainment keeps Audi "in the conversation," he says.

M. Graser, *supra, Variety*, March 31, 2014.

14.     The financial magnitude of the misappropriation by Defendants here was substantial.  Alcon has spent decades and hundreds of millions of dollars

building the BR2049 brand into the famous mark that it now is.  The words "Blade Runner 2049," the words "Blade Runner" used in contexts that specifically evoke BR2049 distinct from the original 1982 "Blade Runner" motion picture, visual images or audiovisual presentations which evoke BR2049's main character "K," and/or which evoke iconic sequences and settings from BR2049, are all protected marks and trade dress with secondary meaning.  All of these marks and trade dress connote BR2049 and its producer as the source of goods and services, or that there is an affiliation of the advertiser with BR2049 and the Picture's producer.

15.    Alcon's BR2049 marks and trade dress clearly have secondary meaning in the automotive market space.  Alcon has an established record of doing business with major automotive brands to affiliate themselves and their car products with Alcon and BR2049.  These deals have had total dollar price tags well into the eight figures, including at least one contract for direct cash payments to Alcon in the six figures (hundreds of thousands of dollars), plus guaranteed media spends for Alcon's benefit in the eight figures (tens of millions of dollars).[3]

16.    The financial stakes and complexity of BR2049 automotive brand affiliations were especially high at the time of the "We Robot" event.  As of October 10, 2024, Alcon was in talks with at least one automotive brand for partnerships on Alcon's BR2049-based *Blade Runner 2099* television series currently in production, and Alcon intends to try to resume such talks.  Defendants' conduct is likely to cause confusion among Alcon's potential brand partner customers, and may have already caused actual confusion with potential *Blade Runner 2099* car partners.

---

[3] The referenced contract was for an aggregate of ten (10) seconds of on-screen time in the relevant context there, and not a consecutive ten seconds, either.  Eleven consecutive seconds of on-screen time tying a car brand to a movie is a marketing and advertising eternity.

17.     Beyond these more ordinary commercial issues, there is the problematic Musk himself.  The unauthorized and unwanted association of Musk with BR2049 and Alcon is its own commercial problem.  Any prudent brand considering any Tesla partnership has to take Musk's massively amplified, highly politicized, capricious and arbitrary behavior, which sometimes veers into hate speech, into account.  If, as here, a company or its principals do not actually agree with Musk's extreme political and social views, then a potential brand affiliation with Tesla is even more issue-fraught.  Alcon did not want to be affiliated with Musk, Tesla, or any Musk company, for all of these reasons.

18.     All of this happened because WBDI contracted with Tesla, essentially loaning Tesla the studio lot for the "We Robot" event for what Plaintiff alleges was a highly lucrative deal.  That made it difficult and problematic for WBDI to keep Musk bounded by well-established rules of the business.  WBDI ultimately failed to do so when it could have, to Alcon's significant damage.

19.     Now BR2049 and Alcon unfortunately and falsely are so affiliated, and far beyond the 11 seconds of presentation time at the cybercab "We Robot" live event.  The event's worldwide livestream X feed, including Musk's BR2049-infused opening, was re-posted by Tesla, Musk, X and others thousands of times, with millions of total views.  The false affiliation between BR2049 and Alcon on the one hand, and Tesla and Musk on the other hand, is irreparably entangled in the global media tapestry, all as Defendants knew would inevitably happen.

20.     This was and is all highly offensive to Alcon's right to commercial and cultural self-determination.  It is also directly financial damaging to Alcon. The fair market value of the brand affiliation goodwill that Defendants stole -- and the damage to Alcon's BR2049 brand and goodwill -- is at least in the six figures and possibly much higher.  Defendants have also muddied the waters for Alcon's in-progress exploration of automotive brand partnerships for the upcoming BR2049-based *Blade Runner 2099* television series.

---

FIRST AMENDED COMPLAINT

21.    Alcon now seeks relief under the United States Copyright Act and the Lanham Act, for damages and to pry Musk and his co-Defendants away from Alcon's BR2049 brand and goodwill.

## PERSONAL JURISDICTION OVER DEFENDANTS

22.    Per Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, this Court has personal jurisdiction over any defendant who is subject to the jurisdiction of any California court of general jurisdiction.  California's long arm statute, *Cal. Code Civ. Pro.* § 410.10, allows courts in the state to exercise personal jurisdiction over parties to the full extent permissible under the United States Constitution. Personal jurisdiction over the Defendants here is thus proper if it comports with due process.  It does, including for the following reasons.

### *Personal Jurisdiction Over Tesla*

23.    General Personal Jurisdiction: The Court has general or unlimited personal jurisdiction over Tesla.  Tesla is currently incorporated under the laws of the State of Texas and its principal corporate office or headquarters is in Austin, Texas and has been since about December 2021.  However, California was Tesla's original principal corporate office home state, from Tesla's inception in about 2003 until the December 2021 move to Texas.  Tesla still maintains continuous and systematic contacts with California, including continuing to operate at least two major manufacturing plants in the state.

24.    Specific Personal Jurisdiction: Additionally and/or in the alternative, the Court has specific or limited personal jurisdiction over Tesla.  Alcon's claims arise out of Tesla's purposeful availment of the rights, privileges, and protections of doing business in California, and also arise out of Tesla's commission of tortious activity in California and purposeful direction of tortious conduct toward the forum state.  Tesla committed the acts of infringement alleged herein, or substantial portions of them, in preparation for and during the course of the October 10, 2024 cybercab product reveal event at WBDI's Burbank, California studio lot.  The

event was personally conducted by Musk who is Tesla's founder, principal and Chief Executive Officer.  Tesla's acts of copyright infringement and violations of the Lanham Act all constituted torts directed toward Alcon, a forum resident, and relate to the motion picture industry, which is of compelling interest to the forum state.  Exercise of personal jurisdiction over Tesla also is reasonable and fair.

### *Personal Jurisdiction Over Musk*

25.    The Court has at least specific or limited personal jurisdiction over Musk as an individual.  Plaintiff's claims against him arise out of his acts of purposeful availment of the benefits and privileges of conducting activities in California, including where he personally conducted the event from the WBDI lot in Burbank, California.  Plaintiff's claims also arise out of Musk's commission of tortious acts while physically present in the forum state.  His acts also constituted purposeful direction of tortious conduct to the forum, all for the same specific facts and reasons as described above regarding Tesla personal jurisdiction.  Exercise of personal jurisdiction over Musk as an individual also is reasonable and fair.  At any given time depending on stock market fluctuations, Musk is reportedly the richest man in the world and has ample resources to defend himself in California court.

### *Personal Jurisdiction Over WBDI*

26.    The Court has general or unlimited personal jurisdiction over WBDI. WBDI is incorporated under the laws of the State of Delaware and its principal corporate office or headquarters is in New York.  However, WBDI has continuous and systematic contacts with California, including owning and operating one of Hollywood's oldest major motion picture and television studios including the Warner Bros. Studios lot in Burbank, California.

27.    Additionally and/or in the alternative, the Court has specific or limited personal jurisdiction over WBDI.  Alcon's claims arise out of WBDI's purposeful availment of the rights, privileges, and protections of doing business in California. They also arise out of WBDI's commission of tortious activity in California and

1  purposeful direction of tortious conduct toward the forum state.  WBDI's

2  involvement in acts of copyright infringement and violations of the Lanham Act all

3  constituted torts directed toward Alcon, a forum resident.  They all relate to the

4  motion picture industry, an industry in which the forum state has a compelling

5  interest.  Exercise of personal jurisdiction over WBDI also is reasonable and fair.

**VENUE**

***28 U.S.C. § 1391(b)(2) Venue as to all Defendants***

8        28.    Venue is proper as to all Defendants pursuant to 28 U.S.C. §

9  1391(b)(2), because a substantial part of the events or omissions giving rise to

10 Alcon's claims occurred, or a substantial part of the property that is the subject of

11 the action is situated, within this judicial district.  The infringed property in

12 question includes Alcon's copyright in BR2049 and ownership of BR2049 marks

13 and goodwill, which property is all located within this district for venue purposes,

14 where Alcon has its corporate headquarters in Los Angeles, California.

***Additional Venue Bases***

16       29.    Venue also is proper as to WBDI and Tesla pursuant to 28 U.S.C. §§

17 1400(a) and 1391(d).  For venue purposes, Tesla and WBDI each reside in or may

18 be found within this district.  Tesla and WBDI each have continuous and

19 systematic contacts with the forum state and this district specifically, including

20 sufficient contacts with this district to establish personal jurisdiction in this district,

21 if this district were treated as a separate state.

**PARTIES**

***Plaintiff***

24       30.    Alcon is an independent motion picture and television studio whose

25 products are distributed worldwide.  Alcon is a limited liability company organized

26 under the laws of the State of Delaware, with its principal place of business at

27 10390 Santa Monica Blvd., #250, Los Angeles, California 90025.

28 ///

FIRST AMENDED COMPLAINT

31.     Alcon produced BR2049 and owns the BR2049 copyright and the BR2049 marks and brand at issue in this action.  Alcon has produced more than thirty other major motion pictures, including "The Blind Side" (which won the 2009 Academy Award for Best Actress), the "Dolphin Tale" series, the "Sisterhood of the Traveling Pants" series, "Book of Eli," "P.S. I Love You," "My Dog Skip," "Prisoners," and "The Garfield Movie."  Alcon also produces television, including the critically acclaimed television series *The Expanse.*  Alcon is currently in production on a "Blade Runner 2049" sequel or spinoff television series entitled *Blade Runner 2099*.

### *Defendants*

32.     Tesla: Tesla is a well-known developer and manufacturer of electric automobiles.  Some of Tesla's automobile products are marketed as partially or fully autonomous.  The idea of AI-controlled or otherwise autonomous automobiles is a Tesla brand focus.

33.     Musk: Musk is Tesla's founder, largest shareholder and Chief Executive Officer.  In addition to owning and operating Tesla, he also owns and operates the social media platform X (formerly Twitter) and the rocket and satellite company SpaceX, among other ventures.  Musk has become an increasingly vocal, overtly political, highly polarizing figure globally, specifically including U.S. consumers, and especially in Hollywood.

34.     WBDI: WBDI is one of the largest entertainment conglomerates in the world.  Plaintiff is informed and believes that WBDI is the specific corporate entity within the WBDI conglomerate which actually owns the Warner Bros. Studios lot in Burbank, California, including substantially all real property and improvements thereon, including without limitation telecommunications infrastructure and systems over which the October 10, 2024 We Robot presentation was transmitted. WBDI is currently run by its Chief Executive Officer, David Zaslav, a man who is both friendly with Musk and controversial in Hollywood in his own right.  Plaintiff

is informed and believes that the business relationship with Musk and Tesla and the October 10, 2024 We Robot events and related business arrangements were significant enough to the overall WBDI conglomerate, that even with respect to matters usually or sometimes left to WBDI subsidiaries and the employees of same, the event, at the very least as to the disputed matters that are the subject of this FAC, was actively monitored by, supervised by, and ultimately controlled by and directed by executives at the WBDI level, and not at a lower level of the WBDI conglomerate, such as lower level executives at Warner Bros. Pictures.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Infringed Work for Copyright

35.    Copyright Infringed Work.  Alcon is the owner and, as to all rights at issue herein, the exclusive copyright holder, of the BR2049 motion picture.  In copyright terms of art, BR2049 is both a "motion picture" and the "infringed work."  The Picture is registered with the United States Copyright Office under registration number PA0002056792 and has been since October 6, 2017.

36.    BR2049 is itself a "derivative work" in copyright terms.  It is a sequel to the 1982 Picture starring Harrison Ford as the lead character, Deckard, a professional "blade runner" -- a government sanctioned hunter and killer of replicants, or synthetic, artificially intelligent humans.  In or about 2011 (with some supplemental rights acquisitions after, but all completed years before the issues arising now), Alcon acquired a broad set of rights in the 1982 Picture and underlying properties.  Alcon's rights include substantially all rights to make any derivative works of the 1982 Picture in any manner or medium that appears relevant to the action.

37.    Exhibits A and B Relative to the Infringed Work.  The images in Exhibits A and B to this FAC are not themselves the copyright office-registered "infringed work" claimed, nor are they "photographs" or "pictorial, graphic, and sculptural works" in the copyright term of art context here.  It is true that some or

all of them properly qualify as "derivative works" in their own right, if taken on a standalone basis. An action theoretically could be pursued with some or all of them as themselves the "infringed work," separated from BR2049, and subject to perfection of the appropriate derivative work registrations. But that is not this action, at least not at present. Rather, as presently alleged, in the terminology of the United States Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*, the images in Exhibits A and B are examples of "still images" from the Picture – in particular from the core dramatic sequence that appears in BR2049 at runtime 1:36:28-1:37:59, and continuing at 1:40:48-2:01:50 ("Las Vegas Sequence"). The Exhibit A image appears in BR2049 at about 1:37:55 in the Picture's run time. The Exhibit B images are from points in the run time between 1:36:28-1:37:59, 1:40:48-1:43:35, and 1:51:30-2:01:50.[4]

38.    Exhibit A is the specific still image from BR2049 in which Defendants expressed licensing interest for the "We Robot" event.

39.    The Exhibit B images are examples of other actual still images from the Las Vegas Sequence referenced above, but only a tiny fraction of the still images actually in it. Motion pictures like BR2049 create the impression of motion through the persistence of vision principle. Still images are displayed rapidly in sequence, typically at the rate of 24 frames per second, which human vision perceives as an uninterrupted continuously moving image. BR2049's Las Vegas Sequence runs for about 1,414 seconds or about 33,936 frames. This makes it not practically feasible to attach captured still images of every one of the frames in the Las Vegas Sequence to the FAC, or even a quantitatively significant fraction.

40.    <u>Proper Analytic Framework For Identifying Protected Elements Where The Infringed Work Is A Motion Picture.</u> The distinction between "motion

_____

[4] Alcon has noted the respective run time references next to each image, directly on Exhibits A and B.

---

FIRST AMENDED COMPLAINT

picture still images" and "photographs" is more than a mere statutory technicality. The two types of tangible expression operate differently expressively in the real world, and they are treated differently analytically under copyright law.

41.    Still images recognizably from BR2049, especially if from qualitatively important scenes or sequences, are themselves protected elements of the Picture.  If one or more actual still images is literally copied (by, for instance, putting it into an AI image generator), the test for whether that is unlawful appropriation does not involve any extrinsic/intrinsic analysis of the infringed work (but testing unlawful appropriation in such a circumstance, and whether there is any fair use defense, may involve the "heart of the work" test).

42.    Still images recognizably from BR2049, especially if from qualitatively important scenes or sequences, are also <u>more</u> than just protected elements of the Picture that can be looked at alone: they are effective vehicles for quickly evoking <u>other</u> protected elements of the Picture.  As is true with many famous motion pictures, the display of a single image from, for example, BR2049's Las Vegas Sequence, can immediately evoke protectable elements of the Picture to the audience -- like the Picture's plot, theme, dialogue, mood, setting, pace, characters, and sequence of events – even if those elements cannot be visually identified directly in the still image in question.  An infringing work that <u>looks like</u> it is or might be a still image from BR2049, can powerfully evoke some or all of the entire Picture's plot, theme, dialogue, mood, setting, pace, characters and sequence of events in this same way -- especially if such an emulated image is openly characterized by the presenter as meant to be a still from or illustration of BR2049 or protected elements of its story (as happened here).

43.    That is a kind of expressive superpower that ordinary standalone photographs do not have.  Copyright explicitly recognizes that photographs and still images of motion pictures are not the same thing, in the Copyright Act's different statutory treatment of "motion picture still images" relative to the

statutorily separate category of "photographs."  *See, e.g.,* 17 U.S.C. §§ 101, 106. This distinction tracks to differences in their expressive power.

44.    Standalone photographs can be very powerful to evoke ideas, concepts, feelings and even whole social movements or histories, well beyond the shapes and colors within the four corners of the image – *see, e.g.,* Jeff Widener's 1989 photograph of Tiananmen Square's "Tank Man"; Alfred Eisenstadt's 1945 photograph "V-J Day Kiss in Times Square"; or the crew of Apollo 8's December 1968 "Earthrise."

45.    Still images from motion pictures (or emulations of such images, especially if held out by the infringer to the audience to be such) can do such things, too, but they can also do something else.  Even a single still image from a motion picture can evoke the motion picture's entire more specific set of expressive elements in the mind of the audience.  Consider for example a still image of a rumpled young Dustin Hoffman bisected by the nylon-stockinged leg of a woman who's face isn't shown: if it's the right one, we all know from just that one shot that the movie is 1968's "The Graduate," and that the woman is Ann Bancroft's Mrs. Robinson.  Or, of more recent vintage, a still image of a tension-wrought Zendaya in a blue dress, eyes masked by sunglasses, as she sits in a larger audience watching a contest or spectacle not shown: to anyone who has seen the movie, and perhaps even to many who only have familiarity that the movie exists, the recognition that the image is from 2024's "Challengers" is easy and immediate.

46.    This phenomenon of human perception goes beyond the audience just being able to identify which movie it is from a single still image.  A sufficiently recognizable motion picture still image goes further and evokes in the audience's mind some or all of the larger motion picture's story elements, like plot, themes, dialogue, mood, setting, pace, characters and sequence of events.  This is because tremendous creative resources were previously expended to have the movie come

///

---

FIRST AMENDED COMPLAINT

into tangible existence, as a powerful vehicle to move (and maintain) those elements in the audience's shared imagination.

47.    As Harari might put it if he were a copyright lawyer, both a standalone photograph and a single still image from a motion picture can transport the audience to a specifically shared intersubjective reality, bringing them together or otherwise influencing them (a kind of "gating," one might say).  From a copyright law perspective though, the way the gating occurs is very different as between the two types of works (photographs and motion picture still images).  The photograph gates to ideas, concepts, feelings, social movements or histories that may exist in a human shared imagination at some level (and probably do), but not as specifically as with a motion picture still image, and also, extremely relevant to copyright law, not preserved in a specifically copyright-protected space.  In contrast, a still image from a motion picture gates to a shared imagination that is more specifically delineated (by the motion picture and its elements), and that also actually exists captured in a tangible form of expression which copyright law <u>does</u> protect (a "motion picture").

48.    Existing copyright law as literally applied already dictates that motion picture still images are to be treated analytically differently than photographs.  The two were consciously placed by Congress in different statutory categories: in section 101 of the Copyright Act, movie still images are defined as and treated as parts of "audiovisual works," rather than as "pictorial, graphic and sculptural works," where "photographs" in contrast specifically are "pictorial, graphic and sculptural works."

49.    Substantiality similarity comparison case law similarly makes clear that the elements of a work to look at analytically to determine what is protected and what is not, depend on what kind of "work" the "infringed work" statutorily is.  For example, under the Ninth Circuit's extrinsic/intrinsic analytical test, if the infringed work is a "motion picture," the extrinsic test must be analyzed in the

context of elements like plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.  In contrast, if the infringed work is a "photograph," the extrinsic test is analyzed under a different set of elements: subject matter, pose, lighting, camera angle, depth of field, and others (and the outcome for photographer plaintiffs in copyright infringement cases tends to be more Draconian).

50.    Alcon respectfully submits that Congress meant what it said, and so does existing case law: motion pictures (and still images from them) and photographs are two different categories of works, and they must be treated analytically differently, including as to identification of protectable elements. Alcon also respectfully submits that makes sense, too, because of the difference in storytelling gating power that the different types of images have in the real world, as discussed above.

51.    For these reasons, for instances of copying that go beyond literal copying or bodily appropriation of protected elements, identification of protected elements of BR2049 has to involve some level of consideration of the entire Picture, including its plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.  To facilitate that, it helps to summarize or discuss the story of work and its overall elements in the pleading, as below.

52.    <u>BR2049 Story Summary Overview</u>.  BR2049 is a sequel to the 1982 Picture, and specifically a post-apocalyptic one (to the original's mere dystopia). An overview of BR2049's elements is first helpfully informed by discussion of the 1982 Picture.

53.    <u>1982 Picture - Story Overview</u>.  The 1982 Picture is set in a fictional 2019 Los Angeles.  Artificially intelligent androids or replicants exist, but only essentially as slaves who must stay away from Earth, in off-world colonies, on penalty of death.  The 1982 Picture's story opens in a Los Angeles saturated by constant advertising, shrouded in perpetual darkness and light rain, and with the

city being stalked by four rogue replicants who escaped to Earth in search of their human maker.  Blade runners are tasked with finding the rogue replicants and "retiring" (killing) them.

54.    In the 1982 Picture, after the blade runner initially assigned to the case is hospitalized by one of the rogue replicants, Deckard is conscripted from an ambiguous state of retirement or inactive duty by his former superiors in the Los Angeles Police Department to find the rogue replicants and retire them.  To aid his search by better familiarity with current replicant technology, Deckard is sent to the corporate headquarters of the replicant maker (Tyrell) and introduced to Rachel.

55.    Rachel is a new replicant model – one even more difficult to distinguish from humans than earlier models, and implanted with a full set of false human memories.  The illusion is so effective that Rachel is herself unaware she is a replicant, until Deckard's testing of her empathy responses reveals the truth to her.  Rachel becomes a fugitive replicant, whom Deckard's superiors add to his target list.  Deckard and Rachel become lovers.  The 1982 Picture is famously ambiguous about whether Deckard is or is not himself a replicant.  If Deckard is a replicant, he is unaware of it; however, the possibility gnaws at him at varying levels depending on the particular cut of the film (there are several).  After the original four rogue replicants are all terminated, the 1982 Picture ends with Deckard and Rachel fleeing as fugitive lovers, leaving their future undetermined.

56.    The initial theatrical version of the 1982 Picture sets the mood of Rachel and Deckard's future as sunny and hopeful.  However, in Ridley Scott's director's cut, Rachel and Deckard's future is left ominously ambiguous.  The different versions of the 1982 Picture's ending amplified the tension and anticipation attached to the cliffhanger question it posed: what happens to Deckard and Rachel?  The 1982 Picture's fanbase had to wait an unusual thirty-five real-world years for the answer.

///

---

FIRST AMENDED COMPLAINT

57.    <u>BR2049 – Story Overview</u>.  Released in October 2017, BR2049 is the first, and so far only, motion picture sequel to the 1982 Picture.  BR2049 is set in a fictional 2049, thirty years after the 1982 Picture's fictional 2019.  BR2049 tells the story of the main character "K" (played by Ryan Gosling).  Like the 1982 Picture's Deckard, K is a professional blade runner.  Unlike Deckard, K from the beginning of BR2049 clearly understands himself to be an artificially intelligent android or replicant (though he becomes unsure in the middle act of the Picture).  K's human superiors put him on the track of pursuing the possible existence of a wholly or partially replicant child conceived by, and born to, a replicant mother (revealed ultimately to be Rachel).  If true, the phenomenon would re-order the entire societal relationship between humans and their artificially intelligent replicant creations. K's trench coat or "duster" is the dominant feature of his wardrobe or costume. Throughout the Picture, K travels in, and is assisted by, his artificially intelligent, quasi-sentient flying car, or "spinner," which is capable of autonomous action.

58.    K's love interest in BR2049 is Joi (played by Ana de Armas).  Joi is K's personal version of an apparently mass-produced and mass-advertised holographic, artificially intelligent, virtual home companion.  K buys an expensive emulator accessory to allow Joi to accompany him beyond her usual domestic boundaries.  Together, K, Joi and the artificially intelligent spinner travel to various locations in search of the seemingly miraculous replicant child, eventually leading them to a post-apocalyptic Las Vegas.

59.    By that point in the Picture, K has come to suspect that he might be the lost miracle child, now grown, and that, in searching for Rachel and Deckard, he might be searching for his own parents, a thing he previously thought impossible and only for humans.  Also by that point in the Picture, unknown to K, a corporate female replicant assassin ("Luv", the antagonist in the Picture, played by Sylvia Hoeks) has been tasked by her human superiors (Tyrell, the replicant maker)

///

---

FIRST AMENDED COMPLAINT

with finding the missing child before K does.  Luv has been stalking K's progress, knowing he has better information than she does about the child's location.

60.    <u>BR2049 Las Vegas Sequence</u>.  The Picture's Las Vegas Sequence shows K's arrival in, and exploration of, the orange-colored ruins of the Picture's abandoned Las Vegas, rendered uninhabitable by a dirty nuclear device many years prior to the story's timeframe.  The sequence follows K as he leaves the spinner (with Joi's genie-bottle like emulator in his pocket) and walks in his duster toward and through the misty orange urban desert ruins, often viewed by the camera from behind or in silhouette.  The sequence includes K's walk through the Las Vegas ruins, leading up to and foreboding the Picture's dramatic apogee: K's encounter with his predecessor Deckard (reprised by Harrison Ford) from the 1982 Picture.

61.    K follows signs of life (an apiary) to a ruined casino hotel.  K enters the building and finds an unfriendly Deckard, who tries to kill K.  Throughout the Las Vegas Sequence to this point, the lighting is distinctly orange, so that everything appears filtered through a kind of sweetened or radioactive sepia.

62.    The Las Vegas Sequence's lighting only changes when K's and Deckard's physical conflict takes them into the building's abandoned lounge or theater, where they have a one-sided fist-fight.  Initially pitch black, the lounge becomes partially lit by an apparently malfunctioning holographic entertainment system, which intermittently displays stuttering holograms of 1960s- and 1970s-era entertainers, including Marilyn Monroe, chorus line dancers, Liberace, and, most prominently, Elvis Presley.  As the holograms move in and out behind and among the combatants, Deckard tries vainly to knock out the inhumanly durable K with haymakers.  K refuses to fight back, letting Deckard exhaust himself.  As Elvis appears again singing "Can't Help Falling In Love," Deckard finally relents and invites K to have a drink instead.  K accepts.

63.    The distinctive orange lighting then resumes as K and Deckard retire to a private bar on an upper floor of the building -- Deckard's private nest or aerie.

Its exterior walls are floor-to-ceiling windows overlooking the Las Vegas ruins.  In Deckard's aerie, both before and after K and Deckard talk about Rachel and the missing child, the screen image is K in his duster, viewed from behind or in three-quarter view, in dark silhouette, taking in the ruined Las Vegas through the picture windows, all of it bathed in orange light.  (*See, e.g.,* Exhibit B, final four images.)

64.    After Deckard makes emotional revelations about Rachel and the missing child, he retires to a room off-screen.  K explores more of the room and its contents.  He causes a jukebox to display a miniature, holographic Frank Sinatra who performs "One More for My Baby (And One More For the Road)," while trapped in a glass bottle or dome.  The genie-Sinatra is distinctly gray, black and white, not orange or orange-lit like the rest of the scene.  As the genie-Sinatra sings, K wistfully examines small animal wood carvings clearly made by Deckard. They match a small wood carving of a horse which K carries and which ties to an implanted memory he has.  K has come to suspect the memory might actually be an impossible-yet-real memory of his own childhood.  The presence of the carvings in the aerie bolster K's suspicion that he is the miracle child and that Deckard is his father and Rachel his mother.  As the genie-Sinatra continues to sing, K picks up a framed photographic portrait of Rachel and looks at it longingly.

65.    The Las Vegas Sequence concludes with the antagonist Luv catching up to K, assaulting Deckard's aerie with a mercenary force of flying cars, drones, and combat replicants.  K wakes up from a dream or sleep, briefly to see Joi captivated by Deckard's colorful hydroponic garden, which again stands out from the other visual elements in the scene as not being orange-lit, while everything else is.  Deckard returns from some other room and raises the alarm that there are incoming hostile forces.  The lighting turns even more deeply orange as Luv's forces violently assault the Deckard aerie.  In the assault, Deckard tries to reach his old 1982 Picture spinner where he has it parked in another room of the building.  K follows him, but Luv arrives too soon.  She and her forces destroy Deckard's

original 1982 Picture spinner and kidnap Deckard.  Luv defeats K in hand-to-hand combat. She then smashes the Joi emulator, effectively killing Joi, while K has to watch helplessly.  Right before being killed, Joi tells K that she loves him.  Luv and her forces leave K lying defeated in the rubble, ending the Las Vegas Sequence.

66.    <u>BR2049 Third Act</u>.  The third act of the Picture plays out broadly as follows: A joint human/replicant resistance movement (seeking to topple the current replicants-as-slaves social regime) rescues K.  They reveal to him that they know who the miracle child is, and that K is not the child (disappointingly re-establishing to K that he is a replicant and not human).  The resistance asks K to help them by going after the captive Deckard and killing him, so that the information he has about the child cannot be used against the resistance.  After K leaves the resistance hideaway and ponders the choice, K interacts with a giant holographic advertisement of the Joi virtual companion product.  The giant Joi hologram tries to sell itself to him again – presenting K with the choice of going back to his old life status quo, in the form of literally replacing Joi.  In parallel, Luv's master (Tyrell, the head of the corporate replicant maker) makes the captive Deckard a similar offer – Tyrell presents Deckard with a rebuilt Rachel, and offers her to Deckard if Deckard will voluntarily help Tyrell find the child, for the purpose of improving Tyrell's replicant technology to further entrench the human-as-god-like-master/AI-replicants-as-slaves status quo.

67.    K and Deckard both reject the respective temptation offers.  Tyrell directs Luv to take Deckard off-world where Tyrell has better tools for torturing Deckard into cooperation, and she commences to do so.  K chases them down in his own flying spinner, shoots their spinner out of the sky, and rescues Deckard after a battle with Luv in the crashing surf where the ocean meets a giant retaining wall built against rising sea levels.  K kills Luv, but is severely wounded himself, possibly fatally.  Deckard rescues K from drowning, and Deckard expresses readiness to die (implicitly for the same reasons given by the resistance).  Instead

FIRST AMENDED COMPLAINT

of K killing Deckard per the resistance plan, K suggests that they both agree to the fiction that Deckard died in the surf, and that Deckard actually instead live secretly and meet his missing child (a daughter, a memory maker character whom K encountered earlier in his quest).

68.    K takes Deckard in K's flying spinner to Deckard's daughter's location, as snow falls.  Before Deckard goes inside alone to meet his daughter, he asks K for an explanation as to why K is helping Deckard.  K gives no answer, but does say "your daughter makes the best memories."  In the penultimate scene, K is left alone with the spinner, laying on a set of stairs looking skyward, as snow falls down on him.  The scene is ambiguous about whether K survives his injury from the battle with Luv or dies.  In the final scene, Deckard and his daughter see each other for the first time, and the movie ends with them reaching out to touch hands.

69.    <u>Exhibit A Image in Story Context</u>.  The Exhibit A image is from shortly after K's, Joi's and the Spinner's arrival in Las Vegas.  It is an image positioned from behind K, with his close-cropped hair, garbed in his distinctive trench coat or "duster," as he stands next to his spinner, facing away from the camera to survey the devastated orange-light-bathed Las Vegas cityscape.  In the Exhibit A Image, K is surveying the ruins as he prepares to set out on the walk through them that will lead him to the long-lost and mysterious Deckard – the most highly anticipated encounter in the Picture.

70.    <u>Exhibit B Image in Story Context</u>.  The Exhibit B images attached hereto and incorporated herein by reference are samples of still images from the Las Vegas Sequence.  They include images from K's walk through the ruins to encounter Deckard, and from when K is in Deckard's aerie looking out the picture windows at the ruined city.

71.    <u>Non-Exhaustive List of Protected Elements of BR2049</u>: Original protected elements of BR2049 include, but are not limited to:

      a. Still images from the Picture which are iconic or sufficiently

recognizable to by themselves be identifiable as a still image from BR2049 versus any other motion picture, and especially such still images which evoke one or more of the other protected elements below.

b. The character K.  Especially under storytelling theory where a "story" tracks the emotional development of a character through challenging periods of transition, K is the "story being told" in BR2049.  K is also distinctively delineated, including visually.  Indeed, he is at his most visually distinctive (iconically so) when depicted as a duster-clad man with close-cropped hair viewed in silhouette or near-silhouette, surveying or exploring a post-apocalyptic ruined cityscape bathed in orange light.  K is also the only character in all of motion pictures to Plaintiff's knowledge who can be described as a duster-clad blade runner who surveys or explores an orange-lit post-apocalyptic ruined city.

c. Urgent Human-AI Decision Point Theme.  Science fiction is always about the present in its themes and messages, and BR2049 is no exception.  One of BR2049's main themes is that of society being at a critical decision point as to how humans and artificial intelligence relate to each other, and specifically that there are extremely consequential choices about that which must be made with urgency. Part of the theme is specifically that the wrong decisions will lead to apocalyptic ruin.  BR2049's specific expression of the theme uses a visual relationship of signaling with orange lighting in ruins, and from K's perspective.  For instance, in the Las Vegas Sequence, positive elements of a more happy and hopeful past or future (especially with an element of nostalgia) stand out from the rest of the sequence lighting in that the orange lighting is absent, either from a fragment of

the rest of a scene (genie-Sinatra, Deckard's hydroponic garden), or for a full fight scene (K's non-fight with Deckard in the malfunctioning hotel casino holo lounge).  In contrast, the consequences of bad decisions or pressures of the human-AI relationship question going unresolved driving the characters and society to ruin is expressed in the orange lighting of the ruin setting, with the orange lighting becoming darker and more intense as the pressure and urgency of the human-AI relationship question intensifies.  Autonomously capable artificially intelligent cars vehicles taking the characters (us) alternatively toward and away from right or wrong answers to the question is also part of the expression of the theme.

d.  Mood of Anxiety, Fear and Urgency, and specifically about the Human-AI Decision Point: BR2049 uses story elements of apocalyptic event back story, combined with specific visual elements such as orange lighting, urban ruin, and the K figure in silhouette or near-silhouette surveying or exploring the ruined post-apocalyptic landscape (especially with the sense that, even in the ruin, there are still worse things that could or might happen), all to create a mood of anxiety, fear and urgency, specifically around the gravity of the Human-AI Decision Point question, and the importance of making the right decisions about it.

e.  Setting: The setting of a post-apocalyptic urban ruin, specifically as a place that holds answers or important information about the Human-AI Relationship Question, bathed in orange light, and especially one that is about to be explored by a blade runner in a duster shown in silhouette or near-silhouette.

f.  Combination of Elements: Even if one or more aspects of the above

1         protected elements list is unprotected, their use in combination,

2         especially in the context of urgent human-AI relationship questions, is

3         protectable, especially if openly labeled or presented as "Blade

4         Runner"-related by the infringer.

5      72.    Protected elements identification is discussed further herein in this

6  FAC in the context of Defendants' acts of infringement.

**Infringed Property for Lanham Act Context:**

**Alcon's BR2049 Marks, Brand and Trade Dress**

9      73.    <u>Alcon's "Blade Runner 2049" Mark</u>.  Alcon owns, and has

10  continuously owned since prior to 2024, an unregistered trademark in the words

11  "Blade Runner 2049."  The claimed mark is broad enough to include the words

12  "Blade Runner" in contexts that refer to or include BR2049 (such as, for example,

13  the words "Blade Runner" not followed by the number "2049," but alongside

14  iconic images from BR2049, or other callouts to specific scenes or elements of

15  BR2049).  The words "Blade Runner 2049" are fanciful or arbitrary or suggestive

16  and thus inherently distinctive.  Even if only descriptive, they have nonetheless

17  achieved secondary meaning through years of continuous use in commerce by

18  Alcon, beginning no later than 2017.  This includes without limitation uses in

19  motion pictures, DVDs, comic books, video games, and other merchandise items,

20  all such that the BLADE RUNNER 2049 mark is widely recognized by the general

21  consuming public of the United States as a designation of source of the goods and

22  services of Alcon (or of a single source).  As detailed further below, the BLADE

23  RUNNER 2049 mark is also recognized by both the general consuming public and

24  by major car manufacturers and car brands as connoting affiliation with or

25  sponsorship by Alcon when used in connection with automobiles and automobile

26  brands (including both real automobiles, and concept automobiles).

27      74.    <u>Alcon's "Blade Runner 2049" Brand and Trade Dress</u>.  Still images

28  from iconic scenes in BR2049, and audiovisual clips of iconic scenes from BR2049

**FIRST AMENDED COMPLAINT**

have also achieved secondary meaning as trade dress widely recognized by the general consuming public of the United States as a designation of source as to the goods and services of Alcon (or a single source) in all of the categories identified above for the BLADE RUNNER 2049 mark.  As detailed further below, BR2049 itself, and still images from iconic scenes from it and audiovisual clips of iconic scenes, are also specifically recognized by both the general consuming public and by major car manufacturers and car brands as having secondary meaning connoting affiliation with or sponsorship by Alcon (or a single source) when used in connection with automobiles and automobile brands (including both real automobiles, and concept automobiles).

75.    Alcon's Mark or Protectable Brand Good Will in the Character "K". The character "K," including descriptions of K, and visuals images that look like or evoke the character K, and/or that are held out to be the character K, either explicitly or implicitly, are unregistered marks and/or protectable trade dress of Alcon.  They have also achieved secondary meaning as trade dress widely recognized by the general consuming public of the United States as a designation of source as to the goods and services of Alcon (or a single source) in all of the categories identified above for the BLADE RUNNER 2049 mark.  Including because of the close connection between K and his flying spinner in the BR2049 Picture, Alcon's K marks and trade dress are especially recognized by both the general consuming public and by major car manufacturers and car brands as having secondary meaning connoting affiliation with or sponsorship by Alcon (or a single source) when used in connection with automobiles and automobile brands (including both real automobiles, and concept automobiles).  Sample visual images of K can be seen in Exhibits A and B.

76.    Alcon's Protectable Lanham Act Interest in Combinations of Elements Evocative of BR2049.  Alcon also has a protectable Lanham Act interest (mark, brand or trade dress) in combinations of elements which evoke or tend to evoke

BR2049 in the eyes of the ordinary consumer, in relevant markets in which Alcon does business or intends to do business, including without limitation in the sense of licensing affiliation rights or advertising rights to car companies and car brands. Pertinent here, Alcon's protectable rights in this regard extend to showing an image like Exhibit C with an accompanying voiceover discussing a "post-apocalyptic" "Blade Runner" movie, especially in an overall context of robots (replicants are sometimes recognized as a variation of robots) and artificially intelligent, semi-autonomous or wholly autonomous cars. That combination of elements evokes BR2049 under the "total effect of [the infringer's] product and package on the eye of the ordinary purchaser test" applied in cases such as *Warner Bros. Entertainment v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 2012 WL 6951315 at *8 (C.D. Cal. 2012).

77. <u>Alcon's Development of the Marks and Trade Dress</u>. The above marks and trade dress and other identified protectable Lanham Act interests of Alcon have achieved at least secondary meaning, and in some cases famous mark status, not merely accidentally, but because of Alcon's extensive and expensive efforts. Beginning no later than 2011 and on a continuing basis ever since, Alcon expended and continues to expend vast resources, in excess of $200 million to date, from original acquisition of relevant underlying rights, to development, production, marketing, and distribution of BR2049, to ongoing brand development and active policing of infringements, to development, production and distribution of numerous derivative works, including without limitation television series, comic books, and video games. Alcon also specifically has been in the business of engaging in license agreements where car companies and brands license rights to affiliate their car brand with BR2049's marks and brands, since no later than 2016.

78. The Picture was theatrically released globally on a day-and-date basis in October 2017. It received an 89% positive audience reaction on well-known film review site Rotten Tomatoes. Among numerous other awards, BR2049 was

nominated for five Academy Awards, and it won two: Best Cinematography and Best Visual Effects.  IGN gaming website named BR2049 the Best Movie of the Year for 2017, the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie of 2017, and the 2018 Saturn Awards named it the Best Science Fiction film.  BR2049 is regularly identified as one of the best science fiction movies of all time on lists of such movies generated by journalists, critics, and consumers.

79.    Alcon's efforts thus have generated robust consumer goodwill and brand recognition for BR2049 and its elements, specifically including the Exhibit A Image and the Exhibit B Images in the Lanham Act context, and the other marks, trade dress and Lanham Act protectable elements identified in foregoing paragraphs.  Both the Exhibit A Image and some of the Exhibit B Images, have been, and still are, prominently used by Alcon in the marketing, promotion and publicity of BR2049.

80.    The Exhibit A Image was the image used as the lead visual image for numerous marketing, promotional and publicity press pieces about the Picture preceding the Picture's October 2017 initial theatrical release.  It is still to this day the image that appears as the cover image to the official BR2049 marketing and promotional trailer as that trailer appears on YouTube.  It is the back cover image for *The Art and Soul of Blade Runner 2049*, the coffee table book celebrating the Picture's visual design elements.  It thus is one of the most iconic images from the Picture, and also one of the most commercially significant in a marketing sense.  It immediately evokes BR2049 and everything the Picture stands for, without any words or other references.  It is the image which Defendants specifically requested to use (and were refused by Alcon).

81.    Images from BR2049's same Las Vegas Sequence also have been, and still are, used by Alcon for marketing, promotion and publicity for the Picture.  As just one example, the front cover of the same *The Art and Soul of Blade Runner 2049* coffee table book about the Picture is from the Exhibit B Images set (K's

1  duster-garbed silhouette moving alone through misty orange-lit emptiness).

2  Exhibit B Images and similar images from the same sequence in the Picture

3  consistently appear at, or near, the top of search engine queries about the Picture.

4  Exhibit B Images and those like them from the Las Vegas sequence -- of a

5  silhouetted trench coat-garbed (or duster-garbed) man moving through a misty

6  orange-colored ruinous urban desert landscape -- are immediately evocative of

7  BR2049, without any other cues or references required.

8      82.    The Picture and its brand (including specifically the words "Blade

9  Runner" even without the year "2049," when used in contexts that evoke BR2049

10  distinct from the 1982 Picture, and specifically including the Exhibit A Image and

11  Exhibit B Images) all have especially high resonance as to artificial intelligence,

12  advanced automotive technology, and the combination of the two.  K's spinner has

13  been recognized culturally as one of the most famous vehicles in motion picture

14  history.  For example, the Petersen Automotive Museum in Los Angeles featured

15  one of the full-scale prop models of K's spinner prominently in the museum's

16  extended run of its "Hollywood Dream Machines: Vehicles of Science Fiction and

17  Fantasy" special exhibit which ran from 2019 to 2020.  The BR2049 K spinner was

18  one of only three vehicles selected to be on the marketing one-sheet poster for the

19  Petersen exhibit, along with the time-traveling DeLorean from the "Back to the

20  Future" movies and a light cycle from "Tron: Legacy."

21      83.    Numerous major automotive brands expressed substantial interest in a

22  co-promotion brand partnership with Alcon on BR2049 prior to the Picture's initial

23  theatrical release.  K's spinner as it appears in BR2049 is in fact visibly branded

24  under a major global automotive brand.  The contract price for that theatrical

25  release co-promotion was well into the eight figures (broken up into hundreds of

26  thousands of dollars in direct cash payments to Alcon, and tens of millions of

27  dollars in guaranteed co-promotional media spend for Alcon and the Picture's

28  ///

---

FIRST AMENDED COMPLAINT

benefit), with the length of on-screen visible branding involved being only ten (10) non-consecutive seconds.

84.    BR2049 is a commercially living property, with an ongoing active market for automotive brand partnerships in particular.  For instance, as already mentioned, Alcon is currently in production on *Blade Runner 2099*, a BR2049-derived sequel or spin-off television series.  At the time of the "We Robot" event, Alcon was actively in the process of engaging with automotive brands for brand partnerships on that project, and intends to resume such efforts if possible.

### *The October 10, 2024 Tesla Marketing Event and Alcon's Express Denial of Defendants' License Requests and Clear Objections to Any Affiliation*

85.    Some of what happened among the Defendants is not yet known to Plaintiff, and likely will not be known until and unless Plaintiff is allowed discovery.  Based on news reports, the nature of the event, and industry custom and practice with respect to studio lot events, and partial information provided by WBDI agents or representatives, Plaintiff makes the allegations in this paragraph 85 on information and belief and subject to the need for discovery: At some point prior to October 10, 2024, Tesla and WBDI (or a WBDI subsidiary as the nominal contracting party, but with WBDI in fact actively supervising and directing decision making about the relevant facts alleged herein) entered into a contractual agreement, the details of which are unknown to Alcon, but the essence of which necessarily included that WBDI (or nominally a WBDI subsidiary being actively directed and supervised by WBDI) would lease or license or otherwise provide studio lot space, lot access, infrastructure support and other resources to Tesla for the October 10, 2024 cybercab event and preparations leading up to it.  The event involved substantial WBDI resources and lot access, and regardless of who the nominal WBDI contracting entity was, the business and contractual relationship with Musk and Tesla was important enough that it was actively supervised and managed by WBDI.  Pre-event preparations were significant and started weeks or

months prior, including Tesla vehicles repeatedly driving the studio lot to map it beforehand, so that about fifty fully autonomous Tesla cars could navigate the lot carrying Musk and event attendees on fully driverless rides as part of the event. The contract necessarily would have required substantial financial compensation to be paid by Tesla to WBDI (or a WBDI subsidiary, but flowing directly into WBDI's consolidated financial statements), in at least the high six figures and possibly in seven figures.

86.    Based on what actually happened at the event and the communications from WBDI agents and representatives to Alcon on the day of the event, as well as the absence of any substantial brand affiliation negotiation communications to Alcon at earlier dates or at all, Alcon is informed and believes and subject to the need for discovery thereon makes the allegations in this paragraph 86: The Tesla-WBDI event contract (or another associated contract or set of understandings) included a promotional element or elements, whereby Musk and Tesla expected to be able to affiliate the cybercab with one or more motion pictures from WBDI's motion picture library, or the motion picture library of WBDI's subsidiary Warner Bros. Pictures, a division of WB Studio Enterprises Inc. ("Warner Bros. Pictures").

87.    Warner Bros. Pictures was Alcon's domestic distributor for the 2017 theatrical release of BR2049 and still has some domestic distribution rights, but not without limitations and restrictions.  Warner Bros. Pictures has some limited and ongoing "clip licensing" rights in the domestic market only, and not at all for a livestream television feed.  Moreover, neither Warner Bros. Pictures nor any other WBDI entity owns the copyright in BR2049 or any of the Picture's marks or goodwill.  No WBDI entity has or ever had any non-domestic rights or permissions for the Picture.  Thus, neither Warner Bros. Pictures nor any other WBDI entity has or ever had sufficient rights to allow Tesla to exploit BR2049 or any of its elements, or any of Alcon's marks or goodwill in connection with the globally livestreamed cybercab reveal event.

FIRST AMENDED COMPLAINT

88.    Warner Bros. Pictures has a longstanding course of dealing with
Alcon generally and on BR2049 specifically.  Pursuant at least to that course of
dealing, and custom and practice in the industry, Warner Bros. Pictures is required
to, expected by Alcon to, and in fact actually does consult with Alcon and seek
Alcon's approval prior to brand affiliation licensing of any BR2049 elements for,
*inter alia*, a substantial, high-profile, and highly commercial brand affiliation,
especially if the affiliation is potentially controversial or politically charged, and
even if for only the domestic market.

89.    Neither Warner Bros. Pictures nor any other WBDI entity or
representative ever communicated with Alcon at all about any potentially
contemplated BR2049 brand affiliation with the Tesla cybercab or the event.
(Even the communications that occurred from WBDI's representative to Alcon on
the day of the event were disingenuously in the context of a purported relatively
routine "clip license" request, never as the much more significant brand affiliation
really at issue.)  That failure is inconsistent with the above long-standing course of
dealing, and with custom and practice in the industry.

90.    Based on what actually happened at the event and the communications
to Alcon from WBDI representatives on the day of the event and since, as well as
the absence of certain communications to Alcon at earlier dates or at all, Alcon is
informed and believes and, subject to the need for discovery, makes the allegations
in this paragraph 90: Musk communicated to WBDI, either before Tesla entered
into a contract or contracts about the event, or at some point in the event planning
process, that Musk specifically wanted to associate the cybercab and Tesla with
BR2049.  Musk believed (incorrectly) that in connection with the event, WBDI or
Warner Bros. Pictures was going to be able to authorize Musk and Tesla's
exploitation of BR2049 in connection with the event, or otherwise that WBDI or
Warner Bros. Pictures could and would grant Tesla worldwide BR2049
exploitation rights to affiliate BR2049 with the cybercab during the event.  Among

other BR2049 brand affiliation rights, Tesla and Musk asked WBDI (or one or
more Warner Bros. Pictures employees who were being actively managed and
directed by WBDI on event issues) for specific permission and rights to use the
Exhibit A Image.  The specific Tesla employees, contractors or agents tasked with
executing on these issues included David Adametz ("Adametz") (a video
production marketing executive at Tesla) and Shara Lili ("Lili"), a Manager of
Video Content for Tesla (also a video production marketing executive at Tesla).
One or both of Adametz and Lili were in direct contact with the WBDI executives
(or Warner Bros. executives acting under the direction of WBDI about event
issues) about the BR2049 brand affiliation, and one or both of Adametz and Lili
were also in direct or indirect contact with Musk about it, too.

91.    Based on similarly-founded information and belief, and subject to the
need for discovery, Alcon further makes the allegations in this paragraph 91: At the
request of one or all of the Defendants (possibly made by Adametz or Lili on
behalf of Tesla and Musk), WBDI's shared services rights clearance department
commenced clearance checks on the planned BR2049 brand inclusion in the
October 10, 2024 cybercab event.[5]  For reasons not yet fully known to Alcon,
WBDI's shared services rights clearance department commenced (incorrectly) to
clear the use as only involving a need for a "clip license" (typically a relatively

---

[5] Shared services departments at Hollywood studios and their affiliated larger
corporate conglomerates have personnel (often legal, financial, accounting, or
human resources professionals) who may be ostensibly employed by, receive their
paychecks from, and have titles only with, a single corporate entity in the larger
conglomerate, but who in fact render services upon request or direction to a range of
entities within the conglomerate.  Here, Plaintiff is informed and believes and on
that basis alleges that the WBDI shared services licensing department personnel
involved in this matter included an individual executive who is based in Burbank,
California and ostensibly an employee of Warner Bros. Pictures, but who on request
or direction renders licensing and clearance services to WBDI or on its behalf.

small dollar value and innocuous type of rights license and distinct from a brand partnership or brand affiliation license), and only to the Exhibit A Image.

92.     Alcon does not yet know all of what actually happened internally at WBDI, or in WBDI communications with Musk and Tesla, as to why none of them ever contacted Alcon about the larger brand affiliation proposal that was really effectively at issue.  Alcon is unlikely to know without litigation discovery. However, Alcon does know at least the following three things: a) the magnitude and nature of the cybercab event, and the contemplated BR2049 use in it, meant that the issue was well beyond a mere "clip license," but rather involved a more substantive brand affiliation, requiring significant business discussions with Alcon to proceed; b) none of the Defendants or anyone acting on their behalves ever made any contact with any Alcon representative about the cybercab event prior to the actual day of the event, not even for a "clip license"; and c) none of them ever made any larger brand affiliation outreach to Alcon at all, even on the day of the event.  Instead, Alcon learned about Defendants' interest in BR2049 on the day of the event, only six hours prior to the event's scheduled commencement, as follows:

93.     Shortly after 12:00 p.m. PDT (noon) on October 10, 2024, the day of the event, a WBDI shared services clip licensing executive based in Burbank and engaged in the WBDI-Tesla-Musk BR2049 rights clearance process realized that WBDI's shared services licensing personnel could not ever clear the proposed BR2049 cybercab event affiliation without reaching out to Alcon and/or Alcon's international distribution partner, including because the event required global rights, not only domestic, since the event would be livestreamed globally.  On information and belief, the WBDI shared services clip licensing executive communicated the problem directly or indirectly to WBDI executives and to Tesla's Adametz or Lili, informing them that either Alcon and/or Alcon's international distribution partner would have to grant permissions, or the BR2049 affiliation could not occur, since international rights were involved.

94.    The WBDI shared services clip licensing executive then sent an email "heads up" to their counterpart at Alcon's international distribution partner that they might be getting an emergency rush basis BR2049 rights permission request for "a Tesla even[t] happening today on our lot (sorry)." The shared services licensing executive at Alcon's international distribution partner communicated that they would be unable to help without Alcon's direct involvement, resulting in contact finally being made with Alcon for the first time (just several hours before the event's scheduled commencement), by looping in an Alcon legal and business affairs executive into a portion of the clearance communication chain.

95.    In a resulting combination of telephonic and email communications among a) Alcon's legal department and b) the above-referenced two shared services clip licensing executives at WBDI and Alcon's international distribution partner, Alcon sought further information about the proposed BR2049 rights actually being requested. Although the information given was sparse, Alcon learned enough information for Alcon's co-CEOs to consider the proposal and firmly reject it, which they did.

96.    By no later than about 2:00 p.m. PDT on October 10, 2024, by a combination of emails and telephone communications, Alcon's legal and business affairs executive communicated back to the WBDI shared services clip licensing executive and the international distributor shared services clip licensing executive that: a) Alcon refused all permissions for the October 10, 2024 WBDI-Tesla event; b) Alcon was adamant that under no circumstances should there be any BR2049 affiliation, or any other Alcon affiliation, express or implied, with Tesla, X, Musk or any Musk-owned company in the course of the October 10, 2024 event, or ever (including a requirement to note Alcon's position and directions in Warner Bros. Pictures and WBDI databases); and c) the two shared services clip licensing executives were to please relay both of these a) and b) messages back to WBDI, Tesla and X, including so that there would be no mistakes in the conduct of the

event.  Both of the shared services clip licensing executives reported back to Alcon that they had communicated both messages as requested.  Alcon is informed and believes and thereon alleges that in fact they did.  However, Alcon is further informed and believes that the issue was then raised to a very high level within the WBDI organization, essentially to the effect that Musk and Tesla were not getting something that they want, and WBDI either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available.

97.    Alcon is thus informed and believes and thereon alleges that by no later than about 2:00 p.m. PDT on October 10, 2024, WBDI, Tesla and X all knew and understood that Alcon had not only refused any permissions to use any BR2049 copyrighted elements in connection with the WBDI-Tesla event, but Alcon had also expressly and clearly objected to any express or implied BR2049 affiliation with the event, or with Tesla, Tesla's cybercab, Musk, or X.  However, Alcon is also informed and believes and thereon alleges, subject to the need for discovery, that by the issue being raised to the high level within WBDI and WBDI either blessing Musk and Tesla to do it or not stopping them, Musk felt empowered to do it anyway.

98.    Musk was personally doing the event presentation and would have to know what he was presenting and the parameters.  Based on that reality and all the circumstances known to Alcon so far, Alcon is informed and believes, and on that basis and subject to the need for discovery, makes the allegations of this paragraph 98: At some point between about 2:00 p.m. PDT and the approximately 8:00 p.m. PDT actual start time of the event on October 10, 2024, Musk personally became aware of Alcon's permission denials and express objections (likely directly or indirectly through Adametz or Lili).  He thus personally knew and understood that to incorporate BR2049 into the event presentation at all would be improper and an unauthorized misappropriation of BR2049 goodwill.  He did it anyway.

*Defendants' October 10, 2024 Intentional Copyright Infringement*
*and Brand Misappropriation*

99.    The event was scheduled to begin at 7:00 p.m. PDT on October 10, 2024, but did not actually begin until about 8:00 p.m. PDT.  In a brief introduction of a minute or less, a Tesla representative named "Franz" took the stage.  Franz's only substantive remark was to note that the presentation was being made from the Warner Bros. lot, the home of many science fiction films that show visions of the future (a clumsily transparent excuse to attach Tesla and the cybercab to Hollywood brands).  Franz then quickly segued to saying that the event would involve Tesla showing a vision of the future, and who better than Musk to do it.  The livestream then shifted to a combination of aerial shots and ground cameras showing a cybercab arriving at an on-lot theater, some distance away from the presentation stage building.  Musk emerged from the theater and entered the cybercab after silently waving to a small crowd.

100.    The livestream tracked the Musk-bearing cybercab from various camera vantage points as it autonomously slowly rolled him to the presentation stage building at another part of the lot.  Musk exited and took the event stage.  He spent about another minute on welcoming remarks and explaining that there were 20 cybercabs and another 30 fully autonomous and driverless Tesla Model Ys at the event that attendees would be able to take a ride in.

101.    Then to commence the actual presentation, Musk said: "So you see a lot of sci-fi movies where the future is dark and dismal, where it's not a future you want to be in."  As he said this, the event's global livestream feed changed to a full screen display of a presentation slide with an image of the Earth from space at sunrise, with the words "What Kind of World Do We Want to Live In?"  This first slide stayed on the full-screen livestream feed for less than two seconds.

102.    Then, the livestream full screen display shifted to Musk's second slide, which the livestream displayed for about 11 seconds.  The second slide is an

image that looks (on a first initial visual read) like a motion picture still photo (although it isn't) of a male figure seen from behind, with close-cropped hair, wearing a trench coat or duster, standing in almost full silhouette as he surveys the abandoned ruins of a city, all bathed in misty orange light.  In the upper left corner the words "Not This" appear superimposed on part of the orange sky.  Exhibit C is a screenshot of this second slide image from Musk's presentation ("Presentation Slide 2 Image").

103.   The Presentation Slide 2 Image (Exhibit C) was clearly intended to read visually either as an actual still image from BR2049's iconic sequence of K exploring the ruined Las Vegas, or as a minimally stylized copy of or illustration of such a still image, or otherwise as an illustration of a scene from BR2049 and specifically its Las Vegas Sequence.  It does in fact objectively read like one or all of these.  From Alcon's examination, it seems likely to have been generated by: a) copying the Exhibit A Image and the Exhibit B Images (or similar images from the Picture's Las Vegas sequence), or even possibly the full BR2049 motion picture work (or qualitatively significant portions thereof) in audiovisual form, into an AI image generator, and b) then asking an AI image generation engine to make "an image from the K surveying ruined Las Vegas sequence of 'Blade Runner 2049,'" or some closely equivalent input direction.  On information and belief, and subject to the need for discovery, Alcon alleges that in fact this, or something closely akin to it, is how the Presentation Slide 2 Image (Exhibit C) was generated, and for the bad faith intentional purpose of affiliating BR2049 and its goodwill with Tesla's cybercab, over Alcon's denial of permission and express objections.  ("Exhibit C AI Image Generation Alternative Theory 1".)

104.   Alcon pleads the following alternative facts, on information and belief and subject to the need for discovery, and subject to alternative pleading rules: The Presentation Slide 2 Image was generated by Defendants or one of them first selecting or otherwise obtaining what Defendants claim is an (unidentified)

"licensed image" as a background and then directing an AI image generator to add "Elon Musk in a duster in the foreground," or similar direction.  On the same basis, Alcon further alleges that the unidentified "licensed image" was itself created in essentially the same way as described in Exhibit C AI Image Generation Alternative Theory 1 (and that thus the underlying "licensed image" was itself created by infringing Alcon's copyright in BR2049).  All on the same basis, Alcon alleges that Defendants generated Exhibit C in this way for the bad faith intentional purpose of affiliating BR2049 and its goodwill with Tesla's cybercab, over Alcon's denial of permission and express objections.  ("Exhibit C AI Image Generation Alternative Theory 2".)

105.   On information and belief, and subject to the need for discovery, Alcon makes the allegations in this paragraph 105: The Presentation Slide 2 Image was generated in the above way or ways by an employee or agent of one or more of WBDI, Tesla (possibly by Adametz or Lili), or even possibly by Musk himself, and this was done with knowledge of the improper nature and purpose of the image generation request.  All of the Defendants participated in its creation, and in its display in the presentation at the event, from a WBDI-owned building and studio lot, on WBDI-owned video screens, and otherwise using WBDI-owned technology infrastructure, operated by or in conjunction with Tesla employees, all acting in whole or in part subject to the direction and control of Musk, at least during the time of the event.  Defendants all acted with the knowledge and understanding that the X livestream or other equivalent video record of the event would be retweeted, reposted, or otherwise picked up and redistributed tens of thousands or even millions of times across the United States and the world immediately and continuing for days after the event.  In any event, all three of WBDI, Tesla and Musk knew and understood the unauthorized nature of the image and the improper purpose behind it, and encouraged or otherwise lent their support to the improper endeavor.  In the alternative, as to any and all Defendants who did not so actively

1   participate, such Defendants ratified the conduct and knowingly accepted the

2   benefits of it.

3       106.   If there were any doubt that Defendants intended to evoke BR2049

4   with the Presentation Slide 2 Image, Musk erased them with his voiceover

5   comments during the approximately 11 seconds that the infringing Presentation 2

6   Image was completely filling the livestream screen.  He said: "You know, I love

7   'Blade Runner,' but I don't know if we want that future.  I believe we want that

8   duster he's wearing, but not the, uh, not the bleak apocalypse."  The Presentation

9   Slide 2 Image then disappeared and Musk segued to talking about how what we all

10  should want is a happier looking future, and how happy and joyful his vision of

11  cities and highways filled with driverless robot cars will be and why.

12      107.   Although Musk said the words "Blade Runner" without the year

13  number (without "2049"), he clearly specifically meant to evoke BR2049 rather

14  than the original 1982 Picture, and he was motivated to do so.  The two films are

15  clearly related, but BR2049 has its own distinct brand and secondary meaning, and

16  BR2049's specific goodwill is far more relevant to Tesla's and Musk's cybercab

17  pitch and product.

18      108.   Although the 1982 Picture does prominently feature flying car

19  "spinners," the cars in the 1982 Picture are not shown to be wholly or even

20  partially autonomous, or even shown to employ artificial intelligence themselves in

21  any way.  None of the cars in the 1982 Picture play any role as a quasi-sentient

22  companion to the Deckard lead character in the 1982 Picture, like K's spinner does

23  for K in BR2049.  Pointedly, then, if you are a company (or own one) specifically

24  trying to market artificially intelligent, wholly or partially autonomous self-driving

25  cars (as Tesla and Musk are), the 1982 Picture has little or no specifically relevant

26  context.  In contrast, BR2049 has extremely relevant context and worldwide

27  goodwill in precisely the areas of artificial intelligence, self-driving capability, and

28  autonomous automotive capability that Tesla and Musk are trying to market.

109.   Musk did successfully evoke BR2049 specifically, including to consumers and potential car maker and car brand customers of Alcon, and that is true even though Musk only said the words "Blade Runner" without adding the year "2049."  For the reasons detailed in the next paragraphs below, Musk's act of displaying the Exhibit C Image -- an image of a man in near-silhouette, with close-cropped hair and wearing a duster, while he surveys an orange-light-bathed ruined and abandoned cityscape --  and displaying it for 11 seconds while Musk talks about "Blade Runner" and a specifically "apocalyptic" future – that is all specifically evocative of BR2049, and not of the 1982 Picture.

110.   While both the 1982 Picture and BR2049 show dystopian urban futures, only BR2049 has a specifically apocalyptic setting.  Only BR2049 has an abandoned and ruined city (Las Vegas) that has suffered an event of extreme destruction (the detonation by terrorists of a dirty nuclear device).  The ruined Las Vegas is where the most dramatically charged events of the BR2049 story take place (K's encounter with the long-lost Deckard).  The setting has striking color design, cinematography and other visual elements: it is distinctly bathed in "apocalyptic" misty orange light, just like the Presentation Slide 2 Image and which the 1982 Picture does not have in any comparable scene.  Throughout BR2049, there also are general references and story elements about civilization having semi-recently suffered a broader, apocalyptic nuclear conflict in the mid-range past, including electromagnetic pulse activity that destroyed many electronic records, making investigation of the past difficult.

111.   In contrast, the 1982 Picture is set in a dystopian urban landscape of a then-futuristic 2019 Los Angeles, but the 1982 Picture's setting is specifically not apocalyptic.  In the 1982 Picture, there has not been any dirty nuclear device, or nuclear electromagnetic burst which destroyed electronic records, or other apocalyptic destruction that has hit Los Angeles or Las Vegas or any other location.  If anything, the urban setting of the 1982 Picture is the opposite of

abandoned and ruined: it is overrun with too much ongoing industry and suffering from overpopulation.  It is not a stark, lonely, misty, orange, dry, radiated desert ruin like BR2049's Las Vegas or the Presentation Slide 2 Image, but rather is an overcrowded neon urban prison, where the citizens are trapped in constant night plagued by perpetual rain and an ever-present bombardment of consumer advertising.  In the 1982 Picture, neither the main character nor anyone else ever goes to any orange-colored post-apocalyptic ruined city or any other such location, in a duster or otherwise.  Further, while in BR2049, Deckard is (or was) a "blade runner" who appears in the Picture's Las Vegas Sequence setting, he never wears a duster in BR2049 at all: Musk's voiceover reference to a blade runner wearing a duster in a post-apocalyptic setting while directing the audience to the Presentation Slide 2 Image/Exhibit C, can only be a reference to K (not Deckard).

112.   Musk thus very clearly meant specifically to evoke to the audience including actual and potential purchasers and the consuming public, not the 1982 Picture, but rather BR2049 and everything that goes with it -- including artificially intelligent autonomous cars like the Tesla cybercab being pitched at the event.  He successfully did.

113.   Any argument that Musk and his co-Defendants only meant to talk broadly about the general idea of science fiction films and undesirable apocalyptic futures and juxtaposing them with Musk's ostensibly happier robot car future vision, and that they just used BR2049 by chance, without conscious awareness of and intent to appropriate BR2049's special secondary meaning in the context of trying to sell artificially autonomous cars, is not credible.

114.   First, as detailed in foregoing paragraphs, there is a clear record that WBDI and Tesla were specifically interested in BR2049, as late as mere hours before the event, and not just any BR2049 Image, but the Exhibit A Image prominently featuring K's artificially intelligent autonomously capable spinner.

///

---

FIRST AMENDED COMPLAINT

115.   Second, if Musk by his presentation was only trying to use an exemplary science fiction movie to make a rhetorical point, there were much better choices actually in the WBDI library (or the library of WBDI's subsidiary, Warner Bros.) for Musk to reference, given what his point ostensibly was.  Musk's ostensible point was "science fiction film futures look bleak and not thinking enough about transportation technology risks that kind of apocalyptic future; I can help us do better with my cybercabs, but you must actively choose to do that and take action about it."  If that was really the only point he was trying to make and his only aim, there are better films actually in the WBDI library (or the library of WBDI's subsidiary, Warner Bros.) to make that point and hit that mark.

116.   Every single one of the five "Mad Max" movies in WBDI's (or its subsidiary Warner Bros.'s) motion picture library ("Mad Max," "The Road Warrior," "Mad Max Beyond Thunderdome," "Fury Road," and "Furiosa: A Mad Max Saga") deals far more specifically than BR2049 with that ostensible message. Every one of the Mad Max movies is set in an apocalyptic future where gas-powered, non-autonomous vehicles not only played a part in bringing about civilization's end (wars over oil), but where gasoline and gas-powered non-autonomous cars continue to be what the remaining humans fight with and about in the post-apocalyptic wasteland.  Any of those "Mad Max" movies in the WBDI library (or the library of WBDI's subsidiary, Warner Bros.) thus would have made much more sense to use, if the true purpose of referencing a specific film was to make a rhetorical point.

117.   The entire opening and its forced references to science fiction films generally was never really for Musk to make a rhetorical point, though.  Franz's and Musk's Hollywood film rhetoric was just a contrivance for something else more economically valuable to the Defendants.  The WBDI lot location, and especially the strained science fiction film references, were all clearly an intentional effort to affiliate Tesla and its cybercab with Hollywood brands, and at

a time when Musk and Tesla are on the outs with Hollywood creatives and brands. It was all about appropriating desirable Hollywood associations, and if possible, Hollywood associations with special resonance to artificial intelligence and strikingly-designed autonomous cars.

118.    The "Mad Max" movies are great, and so are many other dystopian-future or apocalyptic-future movies actually in WBDI's library (or the library of WBDI's subsidiary Warner Bros. Pictures). But those movies don't have massive consumer goodwill specifically around really cool-looking (Academy Award-winning) artificially intelligent, autonomous cars. BR2049 does. It was the best and most relevant film brand for Tesla to appropriate, or one of the best.

119.    The art of advertising is at least partially about choosing expressive levers that will quickly and effectively move the audience emotionally, psychologically, and/or intellectually into a state where the seller can more easily influence them to do the thing or things the seller wants them to do. For example, in the Honda Del Sol car advertisements that were the subject of *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F.Supp. 1287 (C.D. Cal. 1995), Honda evoked MGM's James Bond character and other elements of the James Bond movies, because by doing so, Honda moved the Del Sol into a well-developed world of glamor, adventure, sex and danger – James Bond's world. The message Honda was going for seems likely to have been something like, "by a Honda Del Sol and your life will be more exciting." Honda could have just said that. But, it was likely more effective and much more nuanced, and sending many more channels of messaging, to appropriate elements of James Bond – a property someone else had already spent huge resources to develop and maintain.

120.    Here, especially when the entire context of the "We Robot" presentation is considered, part of Musk's and Tesla's goal was to try to convince the audience at the outset of the presentation that the decision that the presentation was going to put to them (whether or not to buy or bet on Musk's and Tesla's

artificially intelligent car products) was urgent and critical to the future of joint human/AI civilization.  Musk also wanted to instill a mood not only of curiosity, but also of fear, anxiety and urgency.  He also wanted strongly to suggest that there are right and wrong answers to the question, leading to good futures and bad futures (and that doing what Musk wants leads to the good futures).

121.   None of those themes or moods are themselves protectable by any intellectual property law.  But what Musk did was use the lever of BR2049's protectable elements as Musk's specific vehicle of expression to communicate those themes and moods, to move his audience into the emotional space Musk wanted the audience to be in for the presentation.  Whether or not Musk intended that, it was the objective effect.  That infringed Alcon's copyright in the Picture.

122.   Defendants' conduct also violated the Lanham Act, creating actual confusion or a likelihood of it in the relevant marketplaces, about BR2049 branding, including Alcon's marketing efforts with potential auto brand partners on the *Blade Runner 2099* television series, among other marketplace confusion and brand damage.  Alcon needs relief.

## FIRST CLAIM FOR RELIEF

### *Direct Copyright Infringement in Violation of 17 U.S.C. § 501, et seq.*
### *Against Defendants WBDI, Tesla and Musk*

123.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and in each paragraph of this Complaint hereafter, as if set forth herein in full.

124.   To the extent any of the allegations or theories in this First Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

125.   Plaintiff is the author and copyright owner of the motion picture "Blade Runner 2049," registered with the United States Copyright Office on ///

---

FIRST AMENDED COMPLAINT

1  October 6, 2017, registration number PA0002056792.  That is the registered

2  infringed work.

3      126.  Defendants Tesla and Musk created at least two infringing works: 1)

4  Exhibit C/Presentation Slide 2; and 2) the recorded October 10, 2024 "We Robot"

5  presentation (a copy of which recording is in the record of the action as Exhibit 2 to

6  the February 4, 2025 Omnibus Declaration of Chris Marchese) ("We Robot

7  Work").  The specifically infringing portions of the We Robot Work are the

8  approximately 11 seconds at the opening of the presentation where the Exhibit

9  C/Presentation Slide 2 is displayed and Musk's accompanying voiceover.

10     127.  Defendant Tesla and Musk are direct infringers, in that they violated

11 Plaintiff's exclusive rights in BR2049 in each of the following ways, with the

12 conduct alleged constituting both actual copying and unlawful appropriation in each

13 instance.  Defendant WBDI is a direct infringer in that the violation of Alcon's

14 public display rights as alleged in this FAC and paragraph 127f below was

15 conducted on, and transmitted over, WBDI-owned or WBDI-controlled property,

16 infrastructure and systems (specifically including WBDI livestreaming

17 infrastructure systems):

18         a.  Violation of Reproduction Right, 17 U.S.C. § 106(1).  Defendants

19             Musk and Tesla infringed this exclusive right of Alcon by the conduct

20             alleged in paragraph 103 in this FAC: literal copying of the entirety of

21             BR2049 or of protectable elements of BR2049 such as still images like

22             those in Exhibits A and B, or a partial videorecording of BR2049, to an

23             AI image generator.  These allegations are made on the same

24             information and belief and alternative pleading theory basis as set forth

25             in paragraph 103.

26         b.  Violation of Reproduction Right, 17 U.S.C. § 106(1).  Defendants

27             Musk and Tesla infringed this exclusive right of Alcon by the conduct

28             alleged in paragraph 104 in this FAC: literal copying of an

FIRST AMENDED COMPLAINT

1  unauthorized derivative work (the allegedly "licensed image"

2  referenced in Exhibit C AI Image Generation Alternative Theory 2),

3  which itself was generated by literal copying of the entirety of BR2049

4  or of protectable elements of BR2049 such as still images like those in

5  Exhibits A and B, or a partial videorecording of BR2049, to an AI

6  image generator.  These allegations are made on the same information

7  and belief and alternative pleading theory basis as set forth in paragraph

8  104.

   c.  <u>Violation of Reproduction Right, 17 U.S.C. § 106(1)</u>.  Under the law of

10  the Ninth Circuit as usually interpreted, all of the violations of Alcon's

11  right to prepare derivative works are also necessarily violations of

12  Alcon's reproduction rights.

   d.  <u>Violation of Right to Prepare Derivative Works, 17 U.S.C. § 106(2)</u>.

14  The Exhibit C/Presentation Slide 2 Image is an unauthorized derivative

15  work of BR2049, which impermissibly incorporates at least the

16  following protected elements of BR2049 (as the protected elements are

17  detailed in paragraph 71 of this FAC): i) the character K; ii) Urgent

18  Human-AI Decision Point Theme; iii) Mood of Anxiety, Fear and

19  Urgency, and specifically about the Human-AI Decision Point; iv)

20  Setting as alleged in paragraph 71e of this FAC; and v) Combination of

21  Elements, as alleged in paragraph 71f of this FAC.  <u>See</u> paragraphs 99-

22  121 of this FAC.  Alcon further alleges that the Exhibit C/Presentation

23  Slide 2 Image must be treated as an unauthorized derivative work,

24  because Musk by his commentary during the We Robot event and in

25  the We Robot Work effectively represents to the audience that it is

26  either itself a protected still image of BR2049, or a derivative work of

27  BR2049, and that Defendants should therefore be estopped to contend

28  otherwise.  *Id*.

---

FIRST AMENDED COMPLAINT

    e.   <u>Violation of Right to Prepare Derivative Works, 17 U.S.C. § 106(2).</u>
The We Robot Work is an unauthorized derivative work of BR2049,
which impermissibly incorporates at least the following protected
elements of BR2049 (as the protected elements are detailed in
paragraph 71 of this FAC): i) the character K; ii) Urgent Human-AI
Decision Point Theme; iii) Mood of Anxiety, Fear and Urgency, and
specifically about the Human-AI Decision Point; iv) Setting as alleged
in paragraph 71e of this FAC; and v) Combination of Elements, as
alleged in paragraph 71f of this FAC; and vi) incorporation of Exhibit
C/Presentation Slide 2 into the work. <u>See</u> paragraphs 99-121 of this
FAC. Alcon further alleges that the We Robot Work must be treated as
an unauthorized derivative work, because Musk by his commentary
during the We Robot event and in the We Robot Work effectively
represents to the audience that the Exhibit C/Presentation Slide 2 Image
incorporated into the We Robot Work is either itself a protected still
image of BR2049, or a derivative work of BR2049, and that
Defendants should therefore be estopped to contend otherwise. *Id*.

    f.   <u>Violation of Right to Display Work Publicly, 17 U.S.C. § 106(5)</u>. The
display of Exhibit C/Presentation Slide 2 Image at the live We Robot
Event and during the livestream of the event in the United States
violated Alcon's public display rights in BR2049 and its protected
elements, and all three Defendants have direct infringement liability.
Musk and Tesla actively conducted the event resulting in the display,
paragraphs 99-121, and the display occurred over WBDI-owned or -
controlled systems, *see* paragraph 105.

128.    Alcon alleges and contends that where substantial similarity analysis is
required, Defendants' acts of infringement above as to the character K are subject to
the "story being told," distinct delineation, and/or bodily appropriation tests

---

FIRST AMENDED COMPLAINT

applicable to characters, and that the character K satisfies them.  Alcon further alleges and contends that the element of Setting as described in paragraph 71e is an original location that is also subject to, or should be subject to, these same tests, and that the Setting as described in paragraph 71e satisfies them.  *See, e.g.,* K. Wright, Note, "Blueprints of Character: Applying the Distinct Delineation Test and Character Copyright Protection to Original Literary Places," 43 AIPLA Q.J. 221 (Winter 2015).

129.   The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, display, distribute and publicly perform BR2049 and its protectible elements.  Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

130.   Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

131.   Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

132.   Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

133.   Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to impoundment of all materials used to achieve the infringement, and records documenting Defendants' exploitation of their infringements, including without limitation all materials used by Defendants or any image generation tool employed by them to generate the Presentation Slide 2 Image.

134.   Plaintiff is entitled to recover and seeks its actual damages and any additional profits of Defendants WBDI, Tesla and Musk attributable to the infringements, under 17 U.S.C. § 504(b).

///

FIRST AMENDED COMPLAINT

135.   Plaintiff also is entitled to elect to recover and seek statutory damages under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more than $30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and believes and on that basis alleges that Defendants' acts of copyright infringement, as alleged above, were willful, intentional, and malicious.  Such acts subject Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000 per infringement.

136.   Within the time permitted by law, Plaintiff will make its election between actual damages and profit disgorgement, or statutory damages.

137.   Plaintiff also is entitled to a discretionary award of attorney fees under 17 U.S.C. § 505.

138.   Plaintiff seeks or reserves the right to seek any or all of the above forms of relief, in addition to prejudgment interest to the extent legally available and Plaintiff's costs.

## SECOND CLAIM FOR RELIEF

### *Vicarious Copyright Infringement in Violation of 17 U.S.C. § 501, et seq.*
### *Against Defendants WBDI, Tesla and Musk*

139.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

140.   To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

141.   If Defendants WBDI, Tesla and Musk are not each liable as direct infringers of BR2049, they are secondarily liable for the infringements directly committed by individual agents, contractors, or other infringers presently unknown (the "Direct Infringers") under the vicarious infringement doctrine.

///

---

FIRST AMENDED COMPLAINT

142.    Defendants WBDI, Tesla and Musk had the right and ability to supervise the infringing activity that all the Direct Infringers committed.  The facts and circumstances of the event make clear that at the very least Tesla and Musk could have refrained from creating Exhibit C/Presentation Slide 2 Image or including it in the We Robot Presentation or told their agents, employees or contractors not to include it.  Defendant WBDI was using its shared services licensing department to perform clearance work for the presentation at least related to film references.  Plaintiff is thus informed and believes and on that basis, and subject to the need for discovery, alleges that WBDI had the right and ability to tell the Direct Infringers that their infringing conduct was not acceptable and could not be part of the presentation.  Plaintiff is specifically informed and believes and thereon alleges that the issue of whether or not Musk and Tesla should be allowed to use any aspect of the BR2049 property in the event and whether WBDI should do anything to stop them from doing so was raised internally at WBDI to a very high level WBDI executive, such that WBDI was actively aware of the issue, and did nothing to stop it.  To the extent that the Direct Infringers were individual agents, employees or contractors of WBDI, or of one or more subsidiaries of WBDI over which WBDI exercised actual or practical control, then WBDI plainly had the right and ability to supervise the Direct Infringers' infringing conduct.

143.    Defendants obtained some direct financial benefit from the infringement of Plaintiff's rights in BR2049 by the Direct Infringers.

144.    With respect to Musk and Tesla, the Direct Infringements allowed the inclusion of the 11 seconds of infringing material in the We Robot presentation and We Robot Work, and featured sufficiently prominently in the We Robot presentation, and still does in the We Robot Work, that it constitutes part of the draw intentionally being used by Musk and Tesla to sell cars and the Company.  In that regard, Plaintiff incorporates the allegations of the FAC's paragraphs 8-13, 44-47, 93-98 and 104-121.

145.   Plaintiff further alleges that Musk similarly believed that the BR2049 reference and affiliation would increase consumer interest in Tesla cybercabs, and that Tesla would sell more of them or experience more pre-orders for them.  Musk is not only the largest shareholder in Tesla, but his compensation as CEO is directly tied to the Tesla stock price, as a substantial portion of Musk's compensation is grants of equity in Tesla.  Musk thus believed he would directly benefit financially from the infringement.

146.   As for WBDI, Plaintiff is informed and believes and on that basis alleges, subject to the need for discovery, whether it was a formal brand affiliation right built into the WBDI-Tesla event agreement contract(s) or not, Musk and Tesla's belief that they would be able to use one or more Hollywood motion picture properties in the library of WBDI's subsidiary Warner Bros., at no extra meaningful charge, was part of the draw for Musk and Tesla to agree to make the payments that Tesla contracted to make to WBDI for the event.  Further, Plaintiff is informed and believes and on that basis, and subject to the need for discovery, alleges that Musk and Tesla (inaccurately) believed that one of the motion pictures they could use in this way and that WBDI could cause to be provided in this way, and indeed the one which they saw as the most desirable, was BR2049.  Based on past actual brand affiliation contracts for automotive partners on BR2049, Tesla likely would have had to make significant expenditures – at least in the mid-six-figures (at least $500,000) and possibly into the eight figures ($10 million or more) to obtain a BR2049 brand affiliation with Tesla and the cybercab at market value, if Alcon had even been willing to do it at all.  Thus, that Musk and Tesla believed that they were going to get it essentially for free, as a throw-in to the event agreement, was a draw to Musk and Tesla for the money that they agreed to pay to WBDI for the event.

147.   With respect to WBDI, further and similarly, Plaintiff is informed and believes and on that basis, and subject to the need for discovery, alleges that the event contract between WBDI and Tesla, included either a formal or informal co-

promotional or brand affiliation element, and that prior to October 10, 2024, Tesla and Musk believed and relied on (inaccurately) that WBDI could deliver a brand affiliation with BR2049.  Plaintiff is informed and believes and on that basis, and subject to the need for discovery, alleges that when Tesla and Musk learned that was not true or not the same situation as they had believed, WBDI had a financial incentive to avoid any claims of breach of contract or adjustment of the contract price, and one way to do that was essentially to allow the fudging (questionable manipulation) of the situation by either suggesting, encouraging, or knowingly allowing Tesla and Musk's generation of and use of and conduct of the Exhibit C/Presentation Slide 2 Image and 11 infringing seconds of the We Robot presentation.

148.   Accordingly, all Defendants had an incentive to permit infringement by the Direct Infringers.

149.   The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, and publicly display BR2049 and its protectible elements. Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

150.   Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

151.   Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

152.   Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

153.   Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to impoundment of all materials used to achieve and records documenting Defendants' exploitation of, their infringements, including without limitation all materials used

1  by Defendants or any image generation tool employed by them to generate the
2  Presentation Slide 2 Image.

3       154.   Plaintiff is entitled to recover and seeks its actual damages and any
4  additional profits of Defendants WBDI, Tesla and Musk attributable to the
5  infringements, under 17 U.S.C. § 504(b).

6       155.   Plaintiff also is entitled to elect to recover and seeks statutory damages
7  under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more than
8  $30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and
9  believes and on that basis alleges that Defendants' acts of copyright infringement, as
10 alleged above, were willful, intentional, and malicious.  Such acts subject
11 Defendants to liability for statutory damages under Section 504(c)(2) of the
12 Copyright Act in the sum of up to $150,000 per infringement.

13      156.   Within the time permitted by law, plaintiff will make its election
14 between actual damages and profit disgorgement, or statutory damages.

15      157.   Plaintiff also is entitled to a discretionary award of attorney fees under
16 17 U.S.C. § 505.

17      158.   Plaintiff seeks or reserves the right to seek any or all of the above forms
18 of relief, in addition to prejudgment interest to the extent legally available and
19 Plaintiff's costs.

20                    **THIRD CLAIM FOR RELIEF**
21   ***Contributory Copyright Infringement in Violation of 17 U.S.C. § 501, et seq.***
22              ***Against Defendants WBDI, Tesla and Musk***

23      159.   Plaintiff repeats, re-alleges and incorporates herein by reference each
24 and every allegation set forth in all of the foregoing paragraphs, and each
25 paragraph of this Complaint hereafter, as if set forth herein in full.

26      160.   To the extent any of the allegations or theories in this Third Claim for
27 Relief are inconsistent with other allegations or theories pled in this Complaint,
28 they are pled in the alternative.

---

FIRST AMENDED COMPLAINT

1    161.   If Defendants WBDI, Tesla and Musk are not individually liable as

2  direct infringers of BR2049, they are secondarily liable for the infringements

3  committed by the Direct Infringers under the contributory infringement doctrine.

4    162.   Defendants WBDI, Tesla and Musk had, or should have had,

5  knowledge of the infringements of the Direct Infringers.  Tesla and Musk plainly

6  intentionally included the Exhibit C/Presentation Slide 2 Image in the October 10,

7  2024 Tesla presentation, and they could plainly see that it was not an actual still

8  image from BR2049, but rather a stylized copy likely to found infringing.  They

9  also all knew that Alcon had refused permission to use BR2049 or any of its

10  elements in the presentation or in connection with it.  Defendant WBDI was using

11  its shared services licensing department to perform clearance work for the

12  presentation at least related to motion picture references.  Plaintiff is informed and

13  believes and on that basis and subject to the need for discovery alleges that if

14  WBDI or its personnel were not Direct Infringers, WBDI's shared services

15  licensing clearance department was at least being shown image options, including

16  viewing the proposed Exhibit C/Presentation Slide 2 Image in advance of the event,

17  and thus knew about the infringement.

18    163.   Defendants WBDI, Tesla and Musk either materially contributed to or

19  induced the infringements.  Tesla and Musk materially contributed to the direct

20  infringements by including the Exhibit C/Presentation Slide 2 in Musk's

21  presentation.  Plaintiff is informed and believes and on that basis and subject to the

22  need for discovery alleges that Musk was determined specifically to reference

23  BR2049 and an image from it in the presentation, and his determination induced

24  the direct infringements by the Direct Infringers of creating the infringing

25  Presentation Slide 2 Image.  Defendant WBDI materially contributed to the direct

26  infringements at the very least in that the event display, distribution and public

27  performance aspects of the infringement occurred at WBDI's Burbank, California

28  studio lot, and with the use and support of WBDI's facilities and technology.

---

FIRST AMENDED COMPLAINT

Plaintiff is informed and believes and on that basis, and subject to the need for discovery, alleges that WBDI induced the infringement by convincing or encouraging the Direct Infringers and Tesla and Musk that Alcon's denial of any BR2049 permissions could be circumvented by generation and use of an AI-generated copy of iconic BR2049 imagery, as Alcon alleges the Presentation Slide 2 Image to be.

164.    The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, display, distribute and publicly perform BR2049 and its protectible elements.  Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

165.    Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

166.    Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

167.    Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

168.    Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to impoundment of all materials used to achieve and records documenting Defendants' exploitation of, their infringements, including without limitation all materials used by Defendants or any image generation tool employed by them to generate the Presentation Slide 2 Image.

169.    Plaintiff is entitled to recover and seeks its actual damages and any additional profits of Defendants WBDI, Tesla and Musk attributable to the infringements, under 17 U.S.C. § 504(b).

170.    Plaintiff also is entitled to elect to recover and seeks statutory damages under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more than

$30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and believes and on that basis alleges that Defendants' acts of copyright infringement, as alleged above, were willful, intentional, and malicious.  Such acts subject Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000 per infringement.

171.   Within the time permitted by law, Plaintiff will make its election between actual damages and profit disgorgement, or statutory damages.

172.   Plaintiff also is entitled to a discretionary award of attorney fees under 17 U.S.C. § 505.

173.   Plaintiff seeks or reserves the right to seek any or all of the above forms of relief, in addition to prejudgment interest to the event legally available and Plaintiff's costs.

## FOURTH CLAIM FOR RELIEF

### *False Affiliation and/or False Endorsement*

### *in Violation of 15 U.S.C. § 1125(a)(1)(A) against All Defendants*

174.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

175.   To the extent any of the allegations or theories in this Fourth Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

176.   Alcon owns the marks, trade dress and other Lanham Act-protectable interests identified in paragraphs 73-84 (together, "Alcon's Marks"), and has owned since prior to 2024.

177.   Defendants Tesla and Musk have engaged in false representations which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Tesla and Musk with Alcon or as to the sponsorship or approval of Tesla's or Musk's goods, services, or commercial

1    activities by Alcon.

2        178.   Plaintiff alleges that Tesla and Musk engaged in the following specific

3    conduct that together constituted false statements that constituted false

4    representations of the type described in the foregoing paragraph 177: the conduct

5    and statements made by Tesla and Musk at the October 10, 2024 Tesla-WBDI

6    event as described in paragraphs 85-122 above, and as further distributed and made

7    available to consumers thereafter by the wide dissemination to and ongoing

8    presence and availability of, the We Robot Work to consumers.

9        179.   As alleged in detail in paragraphs 85-122 above, in the about eleven

10   seconds of We Robot presentation on October 10, 2024 which included the Exhibit

11   C/Presentation Slide 2 Image and Musk's accompanying voiceover, Musk and

12   Tesla by their conduct used or evoked all of the following protectable Lanham Act

13   interest of Alcon: a) Alcon's BLADE RUNNER 2049 mark as it is described in

14   paragraph 73; b) Alcon's mark or protectable goodwill in the character K; c)

15   Alcon's protectable trade dress in iconic or recognizable still images from BR2049

16   such as Exhibit A and the Exhibit B images, specifically generating the Exhibit

17   C/Presentation Slide 2 Image and displaying it with accompanying voiceover by

18   Musk such that it appeared to be either an actual still image from BR2049's Las

19   Vegas Sequence, or a lightly-stylized illustration of K about to enter the irradiated

20   Las Vegas at or near the beginning of the sequence; and d) a protectable

21   combination as alleged in paragraph 76.

22       180.   Pointedly, Alcon's Lanham Act claim is <u>not</u> that Tesla and Musk were

23   using Alcon's marks to market or sell BR2049 itself (reverse passing off), or even

24   that Tesla and Musk violated the Lanham Act just by using a faked still image or

25   faked BR2049 illustration which they held out as an actual BR2049 still image or

26   licensed illustration (passing off, which they did do, also).  Rather, the Lanham Act

27   claim is centered around that Musk and Tesla used Alcon's marks and trade dress

28   to advertise cars and a car company.  The We Robot presentation was for all intents

and purposes a long livestreamed advertisement for Tesla and its products, and it reached a substantial set of the general consuming public in the United States, and of Alcon's potential auto brand partners on BR2049. Alcon is in fact in that business of licensing the BR2049 marks and trade dress to car makers for advertising affiliation.

181. Tesla's and Musk's unauthorized use of, and references, to Alcon's BR2049 marks and secondary meaning elements had and have the effect of falsely representing that Tesla's and Musk's goods and services are licensed, sponsored, endorsed, or otherwise authorized by Alcon, and/or is at the very least misleading as to these points, and in a business market (auto brand marketing partnerships on BR2049) in which Alcon is actually an established player.

182. Tesla's and Musk's conduct is likely to cause confusion or mistake and to deceive consumers and/or Alcon's relevant actual and potential business partners as to the endorsement, sponsorship, affiliation, connection, or association of Alcon with Tesla's and Musk's services and products. In this context, Alcon's relevant business partners include automotive brands with potential interest in brand affiliations with BR2049, including without limitation with the BR2049-based *Blade Runner 2099* television series currently in production by Alcon. They also include business partners in the Hollywood talent pool market where Alcon is active on an everyday basis, and which Hollywood talent pool market generally is less likely to deal with Alcon, or parts of the market may be, if they believe or are confused as to whether, Alcon has an affiliation with Tesla or Musk.

183. Tesla and Musk engaged in the above conduct intentionally and in bad faith, conspiring to and then executing a fraudulent scheme falsely to create a purported justification or excuse to feature Alcon's BR2049 prominently at the outset of Tesla's and Musk's cybercab product reveal presentation, and without paying Alcon any fee for doing so, for the purpose of using BR2049's goodwill to increase the interest level and cache of the new Tesla product pitch and product.

184.   All of the foregoing false endorsement uses of Alcon's BR2049 marks and goodwill were commercial speech, and not subject to any defense predicated on the nature of the use being a non-commercial use or non-commercial speech. Specifically, some or all of Tesla's and Musk's speech was either (a) core commercial speech in that it proposes a commercial transaction, or in the alternative, (b) was nonetheless commercial for purposes of false endorsement law and Plaintiff's claims herein, in that the communications were advertisements, made reference to a specific product, and the speaker had an economic motivation for the communication, all within the meaning of *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60 (1983) and its progeny.

185.   As a direct and proximate result of Tesla's and Musk's wrongful actions, Alcon has suffered damages in an amount to be proven at trial, but in excess of the jurisdictional minimum.

186.   Alcon further alleges that Tesla's and Musk's unauthorized use of Alcon's BR2049 marks and secondary meaning elements will continue unless and until Tesla and Musk are enjoined.  Alcon has no adequate remedy at law to prevent Tesla and Musk from continuing to wrongfully violate Alcon's rights, and Alcon will suffer irreparable harm unless Defendants are enjoined from continuing their wrongful conduct.

187.   Plaintiff is informed and believes and on that basis alleges that if afforded a reasonable opportunity for discovery, discovery will show that Defendant WBDI aided and abetted Tesla's and Musk's Lanham Act violations described herein, including in that WBDI aided, encouraged and/or lent meaningful support to Tesla and Musk before, during or after Tesla's and Musk's violations, and with knowledge by WBDI that the acts by them were improper.  In that regard, Alcon specifically refers to the allegations in paragraphs 34, 85-98 and 105.

188.   Defendants all had actual knowledge of the wrongfulness of their conduct and the high probability that such acts would cause injury and/or damage

to Plaintiff.  Despite their knowledge, Defendants intentionally pursued their course of conduct, resulting in injury or damage to Plaintiff.

### **Prayer for Relief**

WHEREFORE, Plaintiff prays judgment be entered in its favor and against Defendants, and each of them, as follows:

1. On the First Claim for Relief for Copyright Infringement:

   a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying, distributing, selling, or offering to sell BR2049 or protectible elements thereof in connection with Tesla or Musk, or making derivative works thereof for such purposes.

   b. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Exhibit C/Presentation Slide 2 Image and We Robot Work and underlying materials used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by the Defendants without Plaintiff's authorization—as well as all related records and documents.

   c. For actual damages and all profits that Defendants derived from the unauthorized use of BR2049 or, where applicable and at Plaintiff's election, statutory damages.

   d. For an award of attorneys' fees.

   e. For an award of pre-judgment interest as allowed by law.

   f. For costs of suit.

   g. For such further relief as the Court deems just and proper.

2. On the Second Claim for Relief for Vicarious Copyright Infringement:

   a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying, distributing, selling, or offering to sell BR2049 or protectible elements

thereof in connection with Tesla or Musk, or making derivative works thereof for such purposes.

b. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Exhibit C/Presentation Slide 2 Image, We Robot Work, and underlying materials used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by the Defendants without Plaintiff's authorization—as well as all related records and documents.

c. For actual damages and all profits that Defendants derived from the unauthorized use of BR2049 or, where applicable and at Plaintiff's election, statutory damages.

d. For an award of attorneys' fees.

e. For an award of pre-judgment interest as allowed by law.

f. For costs of suit.

g. For such further relief as the Court deems just and proper.

3. <u>On the Third Claim for Relief for Contributory Copyright Infringement:</u>

a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying, distributing, selling, or offering to sell BR2049 or protectible elements thereof in connection with Tesla or Musk, or making derivative works thereof for such purposes.

b. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Exhibit C/Presentation Slide 2 Image, We Robot Work, and underlying materials used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by the Defendants without Plaintiff's authorization—as well as all related records and documents.

c. For actual damages and all profits that Defendants derived from the

1           unauthorized use of BR2049 or, where applicable and at Plaintiff's

2           election, statutory damages.

3     d.  For an award of attorneys' fees.

4     e.  For an award of pre-judgment interest as allowed by law.

5     f.  For costs of suit.

6     g.  For such further relief as the Court deems just and proper.

7   4.  <u>On the Fourth Claim for Relief (False Endorsement in Violation of 15 U.S.C.</u>

8     <u>§ 1125(a)(1)(A))</u>

9     1.  For injunctive relief, including without limitation for an order mandating

10       that Defendants cease any further promotional or advertising use of

11       BR2049; that Defendants place a corrective notice or disclaimer on the We

12       Robot Work and all copies thereof putting viewers on notice that the

13       portions of the event referencing BR2049 false and misleading and that

14       BR2049 and Alcon have no relationship or affiliation with Tesla, Musk or

15       the cybercab product; and an order mandating that Defendants cease to

16       distribute any further copies of the We Robot Work or event livestream

17       that contains the BR2049 references and Presentation Slide 2.

18     2.  For compensatory damages;

19     3.  Defendants' profits;

20     4.  Attorney fees;

21     5.  Costs of suit;

22     6.  Prejudgment Interest; and

23     7.  Such other and further relief as the Court may deem just and proper.

24 DATED: February 13, 2025     ANDERSON YEH PC
                        Edward M. Anderson

25                         Regina Yeh

26                         By _____

27                         Attorneys for Plaintiff

28                         ALCON ENTERTAINMENT, LLC

---

FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2        Pursuant to Fed. R. Civ. P. 38, on its claims against Defendants Tesla, Inc.

3  ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI"),

4  Plaintiff Alcon Entertainment, LLC hereby demands a trial by jury of all matters

5  triable to a jury.

6

7  DATED: February 13, 2025        ANDERSON YEH PC
                                    Edward M. Anderson
8                                   Regina Yeh
9                                   By _____
                                    Attorneys for Plaintiff
10                                  ALCON ENTERTAINMENT, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT