UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-9033-GW-RAOx | Date | April 4, 2025 |
|---|---|---|---|
| Title | *Alcon Entertainment, LLC v. Tesla, Inc., et al.,* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

PROCEEDINGS:     **IN CHAMBERS - TENTATIVE RULINGS ON DEFENDANTS TESLA, INC. AND ELON MUSK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT [48]; and DEFENDANT WARNER BROS. DISCOVERY, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT [49]**

Attached hereto is the Court's Tentative Rulings on Defendants' Motions [48, 49], set for hearing on April 7, 2025 at 8:30 a.m.

Initials of Preparer     JG                     :

***Alcon Entm't, LLC v. Tesla, Inc., et al.***, Case No. 2:24-cv-9033-GW-(RAOx)
Tentative rulings on: 1) Defendants Tesla, Inc. and Elon Musk's Motion to Dismiss First
Amended Complaint, and 2) Defendant Warner Bros. Discovery, Inc.'s Motion to
Dismiss First Amended Complaint

## I. Background

Alcon Entertainment, LLC ("Plaintiff") has sued Tesla, Inc. ("Tesla"), Elon Musk
("Musk"), and Warner Bros. Discovery, Inc. ("Warner" and, together with Tesla and
Musk, "Defendants") due to events occurring in connection with promotion efforts
involving Tesla's planned "cybercab" product at, and using, Warner's facility/ies.   In
partial response to earlier-filed motions to dismiss, Plaintiff filed a First Amended
Complaint ("FAC") on February 13, 2025.   *See* Docket No. 37.   The FAC contains four
claims for relief:   1) direct copyright infringement [17 U.S.C. § 501]; 2) vicarious
copyright infringement [17 U.S.C. § 501]; 3) contributory copyright infringement [17
U.S.C. § 501]; and 4) false affiliation and/or false endorsement [15 U.S.C. §
1125(a)(1)(A)].   Defendants now move, pursuant to Federal Rule of Civil Procedure
12(b)(6), to dismiss the FAC with prejudice, with one motion filed on behalf of Tesla and
Musk, and another filed on Warner's behalf.

Plaintiff is an independent motion picture and television studio that produced the
motion picture "Blade Runner 2049" ("BR2049"), and that "owns the BR2049
[registered] copyright and the BR2049 marks and brand at issue in this action."   *See* FAC
¶¶ 3, 30-31, 125; *see also id.* ¶ 35.   Among other things, BR2049 "feature[s] a strikingly-
designed, artificially intelligent, fully autonomous car throughout the story."   *Id.* ¶ 7.[1]

---

[1] Plaintiff has provided a "non-exhaustive" list of what it believes are the copyright-protected elements of
BR2049.  They include: a) presumably *any* "[s]till images from [BR2049] which are iconic or sufficiently
recognizable to by themselves be identifiable as a still image from BR2049 versus any other motion
picture, and especially such still images which evoke one or more of the other protected elements" Plaintiff
has identified; the character "K," who Plaintiff asserts is the "story being told" in the film, and who is
"visually distinctive," particularly "as a duster-clad man with close-cropped hair viewed in silhouette or
near-silhouette, surveying or exploring a post-apocalyptic ruined cityscape bathed in orange light"; a
"theme" of "Urgent Human-AI Decision Point," specifically-expressed by use of "a visual relationship of
signaling with orange lighting in ruins, and from K's perspective," with "[a]utonomously capable
artificially intelligent cars vehicles [*sic*] taking the characters (us) alternatively toward and away from right
or wrong answers to the question" also being "part of the expression of the theme"; a "mood" of "Anxiety,
Fear and Urgency, and specifically about the Human-AI Decision Point"; a "setting" – which Plaintiff
asserts is, or should be, also subject to a "story being told" test – of "a post-apocalyptic urban ruin,
specifically as a place that holds answers or important information about the Human-AI Relationship
Question, bathed in orange light, and especially one that is about to be explored by a blade runner in a

According to Plaintiff, Musk – Tesla's "founder, largest shareholder and Chief Executive Officer," *id.* ¶ 33 – and Tesla "wanted to leverage BR2049 to advertise cars, specifically including BR2049's main character and the [film's] iconic 'Las Vegas Sequence.'" *Id.* ¶ 4. This particularly concerned an October 10, 2024 presentation at what was described as a "We Robot" event held (as part of a "highly lucrative deal") at Warner's Burbank, California studio lot. *See id.* ¶¶ 2-3, 5, 18.

Plaintiff alleges, on information and belief, that Tesla and Warner (or a Warner subsidiary "as the nominal contracting party, but with [Warner] in fact actively supervising and directing decision making about the relevant facts") entered into a contract "the essence of which" included Warner (or nominally a Warner subsidiary) leasing or licensing or otherwise providing studio lot space, lot access, infrastructure support and other resources to Tesla for the October 10, 2024 event. *See id.* ¶ 85. Warner "actively supervised and managed" the contractual relationship with Tesla. *See id.* The contract "necessarily would have required substantial financial compensation to be paid by Tesla to" Warner (or a Warner subsidiary, flowing directly into Warner's consolidated financial statements). *See id.*

Again on information and belief, Plaintiff alleges that the Tesla-Warner contractual relationship "included a promotional element or elements, whereby Musk and Tesla expected to be able to affiliate the cybercab with one or more motion pictures from [Warner's] motion picture library," or the library of its subsidiary, which was the domestic distributor for Plaintiff for the 2017 theatrical release of BR2049. *See id.* ¶¶ 86-87. But neither Warner's subsidiary nor any other Warner entity has or ever had sufficient rights to allow Tesla to exploit BR2049 or any of its elements, or any of Plaintiff's marks or goodwill, in connection with the globally livestreamed event at issue here. *See id.* ¶ 87.

On information and belief, Musk specifically wanted to associate the cybercab and Tesla with BR2049. *See id.* ¶ 90. Also on information and belief, Tesla and Musk asked Warner (or one or more of Warner's subsidiaries' employees who were being "actively managed and directed by" Warner on "event issues") for permission and rights

---

duster shown in silhouette or near-silhouette"; and a combination of the foregoing elements, "especially in the context of urgent human-AI relationship questions . . . especially if openly labeled or presented as 'Blade Runner'-related by the infringer." FAC ¶¶ 71(a)-(f), 128.

to use the image attached to the FAC as Exhibit A. *See id.* ¶ 90 & n.5; Docket No. 37-1. Yet, no one ever contacted Plaintiff about the brand affiliation proposal (or even a "clip license" proposal), and Plaintiff only learned of Defendants' interest in BR2049 on the day of the event, six hours prior to its scheduled commencement. *See* FAC ¶¶ 92-96.

Notwithstanding Defendants' desire to be able to make use of BR2049, Plaintiff refused them permission to use a still image from BR2049, the image attached as Exhibit A to the FAC. *See id.* ¶¶ 3, 5, 38, 80, 93-97; *see also* Docket No. 37-1. Plaintiff was specific in its communications with certain executives handling licensing attempts/efforts – with a request to relay this position to Warner, Tesla and X[2] (a request that was reportedly honored) – that "under no circumstances should there be any BR2049 affiliation, or any other [Plaintiff] affiliation, express or implied, with Tesla, X, Musk or any Musk-owned company in the course of the October 10, 2024 event, or ever." FAC ¶ 96; *see also id.* ¶¶ 3, 17 (alleging that, prior to the "We Robot" event, Plaintiff "adamantly objected to Defendants suggesting any affiliation whatsoever between BR2049 or [Plaintiff] on the one hand, and Tesla, Musk or any Musk-owned company, on the other," explaining that, beyond "ordinary commercial issues," Plaintiff specifically did not want any association with Musk, considering his "massively amplified, highly politicized, capricious and arbitrary behavior, which sometimes veers into hate speech"). On information and belief, Plaintiff alleges that, once informed that Plaintiff would not accede to Tesla's and Musk's desires, Warner "either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available." *Id.* ¶ 96; *see also id.* ¶ 97 (alleging that Warner "either bless[ed] Musk and Tesla to do it or [did] not stop[] them").

In contrast with the practice of what it describes as "[r]esponsible car makers and ad agencies," *id.* ¶ 13, the FAC asserts that Musk and Tesla "borrow[ed] the storytelling power" of the film anyway by way of their use of a slide at the "We Robot" event (a screenshot of which is attached to the FAC as Exhibit C), "display[ing the slide] full screen for 11 seconds on the global livestream feed as [their] presentation opener." *Id.* ¶¶ 2-3, 5, 18; *see also id.* ¶ 6 (alleging that Musk "want[ed] to borrow the storytelling power and expression of [BR2049] to sell cars and the car company"); *id.* ¶ 7 (alleging

---

[2] X is not a party to this action.

misappropriation of BR2049's "storytelling power" and BR2049 and Plaintiff's "brand goodwill to advertise, market and sell Tesla's automobiles and Tesla as a company"); Docket No. 37-3.  Musk and Tesla made use of artificial intelligence ("AI") to create the slide employed during the event.  *See* FAC ¶¶ 2-3, 5; *see also id.* ¶¶ 103-04.  Specifically, Plaintiff asserts that Musk and Tesla created "their own near-photo-realistic illustration" of the android main character from BR2049, named "K," "exploring the ruined Las Vegas.  *Id.* ¶ 5.

The event began with a Tesla representative taking the stage to note that the presentation "was being made from the Warner Bros. lot, the home of many science fiction films that show visions of the future," before explaining "that the event would involve Tesla showing a vision of the future, and who better than Musk to do it."  *Id.* ¶ 99.[3]  Once he arrived at the exact scene of the presentation (after being delivered there, through the streets of Warner's lot, by a cybercab), the FAC alleges (accurately, as confirmed by the Court's review of the presentation) Musk said:  "So you see a lot of sci-fi movies where the future is dark and dismal, where it's not a future you want to be in." *Id.* ¶ 101.  The livestream feed then shifted to a slide with an image of the Earth and the words "What Kind of World Do We Want to Live In?"  *Id.*

After two seconds showing that slide, the livestream changed to a second slide, which would ultimately be displayed for about 11 seconds.[4]  *See id.* ¶ 102.  Plaintiff describes this second slide as appearing at first "like a motion picture still photo (although it isn't)" displaying "a male figure seen from behind, with close-cropped hair, wearing a trench coat or duster, standing in almost full silhouette as he surveys the abandoned ruins of a city, all bathed in misty orange light."  *Id.*  The words "Not This" appear in the upper-left corner, superimposed on part of the orange sky.  *See id.*; Docket No. 37-3.

During the 11-second display of this image, Musk added – according to the FAC (*almost* word-for-word correctly) – voiceover comments, saying "You know, I love

---

[3] The Court's review of the presentation reveals that the exact language used was:  "Just want to thank Warner Brothers for hosting us here.  As you know, this is the birthplace of many epic films – many of them depicting a vision of the future.  We're here tonight to experience that future, that is closer than you think.  And who better than Elon, right, to show us that future."  Docket No. 25.

[4] The second slide and the entire "We Robot" presentation are both said to be copyright-infringing works. *See* FAC ¶ 126.

'Blade Runner,' but I don't know if we want that future.  I believe we want that duster he's wearing, but not the, uh, not the bleak apocalypse."  FAC ¶ 106.  The FAC elsewhere *characterizes* Musk's voiceover accompanying the presentation as having "clearly identifie[d] the image as an illustration of the 'Blade Runner' movie set in a world which has suffered a 'bleak apocalypse,' where 'he' (meaning the particular blade runner in question) is wearing a 'duster' (trench coat) while he surveys the distinctly orange-lit ruins of a city in the apocalyptic space," a description which the FAC asserts "only matches a single motion picture in all of Hollywood, or anywhere else: BR2049." *Id.* ¶ 5.[5]  The FAC also asserts that "[t]here is also only one blade runner character that fits that description: K." *Id.*[6]

Plaintiff asserts that Musk's reference to "Blade Runner" in his voiceover was "clearly specifically meant to evoke BR2049 rather than the original 1982 Picture," at least in part because Plaintiff believes the context and worldwide goodwill of BR2049 is much more relevant – in part due to "artificially intelligent autonomous cars like the Tesla cybercab being pitched at the event" – to Tesla's and Musk's aims than is the original "Blade Runner" film.  *Id.* ¶¶ 107-12, 118.  Plaintiff believes that the presentation's second slide was intended "to read visually either as an actual still image from BR2049's iconic sequence of K exploring the ruined Las Vegas," or as a "minimally stylized copy of or illustration of such a still image," or "otherwise as an illustration of a scene from BR2049 and specifically its Las Vegas Sequence." *Id.* ¶ 103.  It takes the position that the slide "does in fact objectively read like one or all of these,"

---

[5] In its Opposition to Tesla's and Musk's motion, Plaintiff likewise asserts that "Musk's accompanying voiceover implicitly, but nonetheless plainly, identifies the image as a scene from BR2049," Docket No. 52, at 2:12-13, and "effectively stated to the audience that the Exhibit C image was <u>supposed to be</u> an illustration of BR2049," *id.* at 7:1-3. *See also id.* at 17:5-6 ("Where the defendant <u>says</u> – especially to the audience – that the work is based on plaintiff's, . . . ."); *id.* at 17:22-23. The Court has reviewed the presentation itself.  It is factually-accurate to say that Musk *referenced* "Blade Runner," or at the very most suggested or intimated "Blade Runner" was depicted. See Docket No. 25.  It is inaccurate to assert that he either "clearly" or "plainly" "identified" the slide as a scene from, or illustration of, Blade Runner (or BR2049).  Whether he "effectively" did so is an issue that is not particularly relevant at this point in time in this case.

[6] Plaintiff alleges that "K's trench coat or 'duster' is the dominant feature of his wardrobe or costume," and notes that, "[t]hroughout [BR2049], K travels in, and is assisted by, his artificially intelligent, quasi-sentient flying car, or 'spinner,' which is capable of autonomous action."  FAC ¶ 57.  The film's "Las Vegas Sequence" "follows K as he leaves the spinner . . . and walks in his duster toward and through the misty orange urban desert ruins, often viewed by the camera from behind or in silhouette."  *Id.* ¶ 60.

and was likely created with the assistance of an AI image generator, on information and belief making specific reference to K and the Las Vegas Sequence of BR2049 and/or "to add 'Elon Musk in a duster in the foreground,' or similar direction." *Id.* ¶¶ 103-04.

Plaintiff further asserts, on information and belief, that the slide was generated "by an employee or agent of one or more of [Warner], Tesla . . ., or even possibly by Musk himself." *Id.* ¶ 105. It also alleges that "[a]ll of the Defendants participated in its creation, and in its display in the presentation at the event, from a [Warner]-owned building and studio lot, on [Warner]-owned video screens, and otherwise using [Warner]-owned technology infrastructure." *Id.* [7] Alternatively, any defendants who did not so actively participate still "ratified the conduct and knowingly accepted the benefits of it." *Id.* In addition, according to the FAC, Warner "actively monitored . . ., supervised . . ., and ultimately controlled . . . and directed" the "We Robot" event, "at the very least as to the disputed matters that are the subject of" the FAC. *Id.* ¶ 34. However, as part of the "We Robot" event, it was "difficult and problematic" for Warner "to keep Musk bounded by well-established rules of the business," "ultimately fail[ing] to do so when it could have." *Id.* ¶ 18.

Tesla, Musk and others re-posted the "We Robot" livestream, including the "BR2049-infused opening," thousands of times, with millions of total views, such that the false affiliation between Plaintiff, BR2049, Tesla and Musk "is irreparably entangled in the global media tapestry." *Id.* ¶ 19.

Exhibits A and B to the FAC "are examples of 'still images' from [BR2049],"[8] but Plaintiff acknowledges that it is BR2049 itself that is the subject of the registered

---

[7] As noted *infra*, Footnotes 13 and 16, these allegations in paragraph 105 of the FAC regarding *Warner's* responsibility for, or participation in, creation of the slide may be ignored.

[8] The FAC places these images in "story context." FAC ¶¶ 69-70. Exhibit A – which Plaintiff alleges "was the image used as the lead visual image for numerous marketing, promotional and publicity press pieces about [BR2049] preceding [the film's] October 2017 initial theatrical release" and is still "to this day the image that appears as the cover image to the official BR2049 marketing and promotional trailer as that trailer appears on YouTube" – "is an image positioned from behind K, with his close-cropped hair, garbed in his distinctive trench coat or 'duster,' as he stands next to his spinner, facing away from the camera to survey the devastated orange-light-bathed Las Vegas cityscape." *Id.* ¶¶ 69, 80. The Exhibit B images – which Plaintiff asserts it also has and still does use "for marketing, promotion and publicity" for BR2049 – are "samples of still images from the Las Vegas Sequence," including "images from K's walk through the ruins to encounter Deckard [the main character from the original Blade Runner film], and from when K is in Deckard's aerie looking out the picture windows at the ruined city." *Id.* ¶¶ 70, 81.

copyright and alleged "infringed work" at issue in this case. *See id.* ¶¶ 35, 37, 125; *see
also* Docket Nos. 37-2, 37-3. However, Plaintiff's theory in the FAC is that, "for
instances of copying that go beyond literal copying or bodily appropriation of protected
elements, identification of protected elements of BR2049 has to involve some level of
consideration of the entire Picture,[9] including its plot, themes, dialogue, mood, setting,
pace, characters, and sequence of events." FAC ¶ 51. Thus, in Plaintiff's view, still
images, "especially if from qualitatively important scenes or sequences," are themselves
protected elements of the BR2049 copyright. *Id.* ¶ 41. In fact, they are "also <u>more</u> than
just protected elements of [BR2049] that can be looked at alone: they are effective
vehicles for quickly evoking <u>other</u> protected elements of [BR2049] to the audience," like
the film's plot, theme, dialogue, mood, setting, pace, characters, and sequence of events,"
"even if those elements cannot be visually identified directly in the still image in
question." *Id.* ¶ 42; *see also id.* ¶¶ 45-46.[10] According to Plaintiff, this is also true of
"[a]n infringing work that looks like it is or might be a still image from BR2049, . . .
especially if such an emulated image is openly characterized by the presenter as meant to
be a still from or illustration of BR2049 or protected elements of its story (as happened
here)." *Id.* ¶ 42.

Musk and Tesla allegedly directly-infringed Plaintiff's reproduction right via
"literal copying of the entirety of BR2049 or of protectable elements of BR2049 such as
still images like those in Exhibits A and B [to the FAC], or a partial videorecording of
BR2049, to an AI image generator" or by "literal copying of an unauthorized derivative
work . . . which itself was generated by literal copying of the entirety of BR2049 or of
protectable elements of BR2049 such as still images like those in Exhibits A and B [to

---

[9] "BR2049" and "Picture" are both defined as the same thing – "Alcon's 'Blade Runner 2049' motion
picture" – in the FAC. FAC ¶ 3. As a result, it is unclear what distinction is meant by Plaintiff's use, in
this sentence, of both "BR2049" and "Picture."

[10] Plaintiff characterizes motion picture still images as having an "expressive superpower" that "ordinary
standalone photographs do not have," and takes the position that the Copyright Act offers a "different
statutory treatment" of "motion picture still images" as compared to the separate category of photographs."
FAC ¶ 43. But it does not explain what this proposed "different statutory treatment" consists of or how
motion picture still images are "to be treated analytically differently" than photographs apart from asserting
that the protectable elements of motion picture still images are somehow different than the protectable
elements for photographs. *See id.* ¶¶ 48, 50. In the end, the Court is not entirely sure of the purpose of this
thread in the FAC; if it is part of an effort to persuade that motion picture still images *should be* treated
differently under the Copyright Act, the best audience for that contention is located in Washington, D.C.,
not this courtroom.

the FAC], or a partial videorecording of BR2049, to an AI image generator. *Id.* ¶¶ 127(a)-(b). They also allegedly violated Plaintiff's right to prepare derivative works, with the second slide from the "We Robot" presentation impermissibly incorporating a host of allegedly protected elements of BR2049. *See id.* ¶¶ 127(d)-(e). They also allegedly violated Plaintiff's right to display BR2049 publicly. *See id.* ¶ 127(f). Plaintiff also asserts that Warner is a direct infringer of Plaintiff's public display rights with the presentation having been "conducted on, and transmitted over, [Warner]-owned or [Warner]-controlled property, infrastructure and systems." *Id.* ¶¶ 127, 127(f).

If Defendants are not each liable for *direct* copyright infringement, Plaintiff asserts that they are each *vicariously* liable for the direct infringements committed by "individual agents, contractors, or other infringers presently unknown," because they each had the right and ability to supervise the infringing activity. *Id.* ¶¶ 141-42. As to Tesla and Musk, those defendants could have refrained from creating the presentation slide in question or including it in the "We Robot" presentation. *See id.* ¶ 142. As to Warner, Plaintiff alleges that it used "its shared services licensing department to perform clearance work for the presentation" and thus, on information and belief, it "had the right and ability to tell the Direct Infringers that their infringing conduct was not acceptable and could not be part of the presentation." *Id.* This is especially the case if the "direct infringers" were "individual agents, employees or contractors of [Warner], or of one or more subsidiaries of [Warner] over which [Warner] exercised actual or practical control."

Musk and Tesla obtained direct financial benefit from the infringement by virtue of the infringing material constituting part of the draw they intentionally used "to sell cars and the Company," increasing consumer interest in Tesla cybercabs, leading to selling more of them or receiving more pre-orders for them. *Id.* ¶¶ 143-45. As to Warner, on information and belief, Musk and Tesla's belief that they could use one or more Hollywood motion picture properties – including BR2049 – at no extra meaningful charge – in contrast to the ordinary 6- to 8-figure charge – was part of the draw for Musk and Tesla to agree to make the payments that Tesla contracted to make to Warner for the event. *See id.* ¶ 146. Plaintiff also alleges, on information and belief, that Warner had a financial incentive to avoid any claims of breach of contract or adjustment of contract price when Musk/Tesla learned they would not be able to achieve the desired brand

affiliation.  *See id.* ¶ 147.

In addition to direct and vicarious infringement theories, Plaintiff also lodges a *contributory* infringement theory.  It asserts that Tesla and Musk intentionally included Exhibit C in the presentation and could plainly see that it was not an actual still image from BR2049 but rather a stylized copy that would likely be found infringing.  *See id.* ¶ 162.  Those defendants also knew that Plaintiff had refused permission.  *See id.*  In its use of its shared services licensing department, Plaintiff asserts on information and belief that Warner was at least being shown image options, including Exhibit C, in advance of the event.  *See id.*  Musk and Tesla materially contributed to the infringement by including Exhibit C in the presentation.  *See id.* ¶ 163.  Warner materially contributed to it because the event display, distribution and public performance aspects of the infringement occurred at its studio lot, and with the use and support of its facilities and technology.  *See id.*  Also on information and belief, Plaintiff asserts that Warner induced the infringement by convincing or encouraging the direct infringers, Tesla and Musk, that Plaintiff's denial of permission "could be circumvented by generation and use of an AI-generated copy of iconic BR2049 imagery."  *Id.*

For purposes of its Lanham Act claim, Plaintiff alleges that it owns an unregistered trademark in the words "Blade Runner 2049," which it asserts is "broad enough to include the words 'Blade Runner' in contexts that refer to or include BR2049 (such as, for example, the words 'Blade Runner' not followed by the number '2049,' but alongside iconic images from BR2049, or other callouts to specific scenes or elements of BR2049)."  *Id.* ¶ 73.  It also asserts that "[s]till images from iconic scenes in BR2049, and audiovisual clips of iconic scenes from BR2049" also serve as "trade dress."  *Id.* ¶ 74.  Also included as an unregistered mark and/or protectable trade dress, according to Plaintiff's allegations, are "[t]he character 'K,' including descriptions of K, and visual[] images that look like or evoke the character K, and/or that are held out to be the character K, either explicitly or implicitly."  *Id.* ¶ 75.  Finally, Plaintiff asserts that it has "a protectable Lanham Act interest (mark, brand or trade dress)" in "combinations of elements which evoke or tend to evoke BR2049 in the eyes of the ordinary consumer," including "showing an image like Exhibit C [to the FAC] with an accompanying voiceover discussing a 'post-apocalyptic' 'Blade Runner' movie, especially in an overall

context of robots (replicants are sometimes recognized as a variation of robots) and artificially intelligent, semi-autonomous or wholly autonomous cars." *Id.* ¶ 76.

Plaintiff alleges that Tesla and Musk "have engaged in false representations which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Tesla and Musk with [Plaintiff] or as to the sponsorship or approval of Tesla's or Musk's goods, services, or commercial activities by [Plaintiff]." *Id.* ¶¶ 177, 180.  Specifically, Musk and Tesla used or evoked Plaintiff's BLADE RUNNER 2049 mark, Plaintiff's mark or protectable goodwill in the character K, Plaintiff's protectable trade dress in iconic or recognizable still images from BR2049 (such as those attached as Exhibits A and B to the FAC) such that the presentation slide (Exhibit C to the FAC) appeared to be either an actual still image from BR2049 or a lightly-stylized illustration of K about to enter the irradiated Las Vegas, or a protectable combination of the foregoing. *See id.* ¶ 179.  According to Plaintiff, the conduct has the effect of falsely representing that Tesla's and Musk's goods and services are licensed, sponsored, endorsed, or otherwise authorized by Plaintiff, and/or is at the very least misleading on these points. *See id.* ¶¶ 181-82.  Plaintiff is informed and believes that discovery will reveal that Warner aided and abetted Tesla's and Musk's alleged Lanham Act violations, during or after those violations. *See id.* ¶ 187.

Plaintiff asserts that it "has spent decades and hundreds of millions of dollars building the BR2049 brand into the famous mark that it now is." *Id.* ¶ 14.  It further contends that:

> [t]he words "Blade Runner 2049," the words "Blade Runner" used in contexts that specifically evoke BR2049 distinct from the original 1982 "Blade Runner" motion picture, visual images or audiovisual presentations which evoke BR2049's main character "K," and/or which evoke iconic sequences and settings from BR2049, are all protected marks and trade dress with secondary meaning.

*Id.*  According to the FAC, this secondary meaning "clearly" exists "in the automotive market space," at least in part because Plaintiff "has an established record of doing business with major automotive brands to affiliate themselves and their car products with [Plaintiff] and BR2049." *Id.* ¶ 15.  Plaintiff asserts that at the time of the "We Robot" event, Plaintiff "was in talks with at least one automotive brand for partnerships on [Plaintiff's] BR2049-based *Blade Runner 2099* television series" that is currently in

production, meaning that Defendants' conduct is likely to cause confusion among
Plaintiff's potential brand partner customers and may have already caused actual
confusion with potential *Blade Runner 2099* car partners. *Id.* ¶ 16.

## II. Analysis

### A. Procedural Standard & Appropriately-Considered Materials

Under Rule 12(b)(6), a court must (1) construe a complaint in the light most
favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as
well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State
Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th
Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Dismissal pursuant to
Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or
the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v.
Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside
Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Bell Atlantic Corp.
v. Twombly*, 550 U.S. 544, 561-63 (2007) (dismissal for failure to state a claim does not
require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in
support of its claim that would entitle it to relief).

In its consideration of the motion, a court is generally limited to the allegations on
the face of the complaint (including documents attached thereto), matters which are
properly judicially noticeable and "documents whose contents are alleged in a complaint
and whose authenticity no party questions, but which are not physically attached to the
pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Branch
v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruling on other grounds recognized
in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Nonetheless,
"while a court must generally refrain from considering extrinsic evidence in deciding a
12(b)(6) motion, it may [also] consider documents on which the complaint '*necessarily
relies*' and whose 'authenticity . . . is not contested.'" *Warren v. Fox Family Worldwide,
Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (emphasis added); *see Marder v. Lopez*,
450 F.3d 445, 448 (9th Cir. 2006) ("A court  may consider evidence on which the
complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the
document is central to the plaintiff's claim; and (3) no party questions the authenticity of

the copy attached to the 12(b)(6) motion."); *see also Steinle v. City & Cty. of S.F.*, 919 F.3d 1154, 1162-63 (9th Cir. 2019); *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042 (9th Cir. 2015) ("'[W]e may consider materials incorporated into the complaint . . . .'") (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).

Here, the parties agree that the Court may consider – along with the FAC's allegations and other attachments – BR2049, the "We Robot" presentation in its entirety, and the second slide of that presentation (attached as Exhibit C to the FAC) in connection with these Rule 12(b)(6) proceedings. *See, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1123 (9th Cir. 2018); *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945). However, Plaintiff has filed objections to the Court's consideration of certain other materials in connection with both motions. *See* Docket Nos. 53, 55.

First, the Court sustains Plaintiff's objection to consideration of what Warner contends is the actual, *and only*, contract between Warner and Tesla in connection with the "We Robot" event, along with the earlier-filed (in connection with the motion to dismiss the original Complaint) Declaration of Rachel Jennings (and attached exhibits), Docket No. 23-2, attempting to introduce that contract. Plaintiff has not given any indication in the FAC that this document is the contract supporting its allegations about the binding obligations on Warner in connection with the event, though Warner insists that it is (and that it is therefore – in Warner's view – both referenced in, and central to, Plaintiff's FAC). Warner is not the party that gets to tell that story, at least at this procedural stage. Whether construed as an objection to the document's authenticity or a factual assertion that there is something more out there that governs the Warner-Tesla relationship and obligations, the Court cannot rely upon Warner's assertions regarding the full scope of that relationship on this motion. More-generally, the Court obviously cannot credit Defendants' factual assertions that contradict factual assertions Plaintiff makes in the FAC (including the attempted introduction of an image that Tesla asserts it *actually licensed* in the creation of the slide attached as Exhibit C to the FAC). *See* Docket No. 53, at 6:1-8:12; Docket No. 55, at 3:15-20, 4:25-5:12.

As to whether or not Plaintiff owns the word mark, "Blade Runner," the Court may observe that Plaintiff has *not* alleged ownership of such a mark, *see* FAC ¶¶ 73-75,

179, though Plaintiff now professes that it *could* allege that it "in fact own[s] a Lanham Act-cognizable ownership interest in the ['Blade Runner'] word mark," *see, e.g.*, Docket No. 55, at 5:23-6:1.  Thus, the Court will not consider the truth of Defendants' position as to whether or not Plaintiff *in fact* has such an ownership stake, but may consider the limitations in the FAC as to what Plaintiff alleges it *does* own in the way of marks.  To the extent Warner makes an assertion about who *actually* owns rights associated with the original "Blade Runner" film, the Court may *not* consider those contentions.

Third-party car branding in the theatrical release of BR2049 is not conceivably relevant to the resolution of these motions.  As such, Plaintiff's limited "caveat" to the Court's consideration of the DVD version of the film is neither here nor there.

Finally, published rulings issued in other cases, concerning Rule 8 compliance or otherwise, may always be considered pursuant to at least principles of judicial notice.

Now that there is an understanding of what the Court concludes it may consider in connection with these motions, it turns to the parties' arguments regarding the FAC's specific claims.

B.  Direct Copyright Infringement

Plaintiff's first claim for relief is for "direct copyright infringement."  To prevail on a standard copyright infringement claim, Plaintiff "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010) (quoting *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) and *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc); *see also Skidmore*, 952 F.3d at 1064 (describing the second element as copying "protected aspects of the work"); *Corbello v. Valli*, 974 F.3d 965, 973 (9th Cir. 2020) (same).  Beyond this basic, and oft-repeated observation, several years ago the Ninth Circuit, sitting *en banc* in *Skidmore*, clarified the process for analyzing claims of copyright infringement.

*Skidmore* clarifies that there are two separate components to copyright infringement's second prong of "copying protected aspects of the work":  "copying" and "unlawful appropriation." *Skidmore*, 952 F.3d at 1064.  In contrast to copying, "unlawful

appropriation" requires that works "share *substantial* similarities." *Skidmore*, 952 F.3d at 1064.  Substantial similarity is a fact-specific inquiry, but it "'may often be decided as a matter of law.'"  *Benay*, 607 F.3d at 624 (quoting *Funky Films*, 462 F.3d at 1076 and *Sid & Marty Krofft Tele. Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977)).  Musk's and Tesla's motion primarily focuses on this issue so far as Plaintiff's direct infringement claim is concerned.  As to that motion, it is this relatively-restricted scope of their argument as to that claim that is the decisive point.

### 1. The Limits of Tesla's/Musk's Argument

Tesla's and Musk's argument – up until their Reply, which is too late[11] – is almost-exclusively only that Plaintiff's direct copyright infringement claim cannot succeed because Plaintiff cannot show substantial similarity between its copyrighted work and the "We Robot" presentation or the 11-second slide used therein.  *See* Docket No. 48-1, at 4:12-14:2.  With a minor exception, their argument did *not* timely cover Plaintiff's "literal copying" theory of direct copyright infringement based upon the allegation that Plaintiff's copyright was infringed because – according to Plaintiff's allegations – Musk/Tesla fed a literal copy of Plaintiff's copyrighted work into an AI-driven image generator in order to achieve the ultimate slide displayed during the "We Robot" event.  *See* FAC ¶¶ 127(a)-(b).  Musk's and Tesla's limited discussion of Plaintiff's "literal copying" theory is to highlight that Plaintiff's allegations in this regard are based "on information and belief," that the theory is not plausible because Tesla has already told Plaintiff how it claims to have created the 11-second slide image used during the presentation, and because a review of BR2049 and the "Accused Work" (*but see* Footnote 4, *supra*) somehow makes it clear that Tesla/Musk did not "literally copy" BR2049 in the manner Plaintiff asserts.

Musk and Tesla concede that "pleading on information and belief is permissible where the facts are peculiarly within the defendant's possession," among other situations.  *See* Docket No. 48-1, at 14:4-5; *see also Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("'The *Twombly* plausibility standard . . . does not prevent a plaintiff from

---

[11] The Court does not address arguments raised for the first time in a Reply brief where there is no reason those arguments could not have been set forth in initial motion papers (thereby giving an opponent an opportunity to respond).  Clearly, Tesla and Musk were aware of the "literal copying" aspect of Plaintiff's direct infringement claim at the time they filed their motion.

pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'") (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).[12]  They do not explain how that does not exactly describe the situation here, where Plaintiff is certainly not in a first-hand-knowledge position to know exactly how Musk/Tesla created the image in question (apart from Tesla's simple say-so).

Moreover, as noted above, "a plaintiff may plead facts on information and belief 'where the belief is based on factual information that makes the inference of culpability plausible.'"  *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) (quoting *Soo Park*, 851 F.3d at 928 (9th Cir. 2017)); *see also* Stevenson & Fitzgerald, *Rutter Group Prac. Guide:  Federal Civ. Pro. Before Trial* (The Rutter Group 2024), ¶ 8:128.22, at 8-34 – 35 (indicating that "information and belief" allegations simply require "some factual content," whereas "conclusory allegations based on nothing more than 'information and belief' will not suffice"); *cf. Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 493-94 (9th Cir. 2019) ("Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9 . . . the pleader is not required to allege facts that are 'peculiarly within the opposing party's knowledge,' and allegations 'based on information and belief may suffice,' 'so long as the allegations are accompanied by a statement of facts upon which the belief is founded.'") (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)).  Here, there is sufficient factual information to do just that, and therefore to permit Plaintiff's "information and belief" allegations on the topic of how Exhibit C to the FAC was created.

---

[12] In its own motion, Warner asserts that "in a more recent opinion, the Ninth Circuit explained that *Soo Park* did not create an exception to federal pleading standards for allegations made on information and belief."  Docket No. 49-1, at 11:1-3 (citing *Reaper v. Ace Am. Ins. Co.*, No. 23-15178, 2024 WL 810697 (9th Cir. Feb. 27, 2024)); *see also* Docket No. 56, at 3:17-20 (Tesla's and Musk's Reply brief making a similar contention).  *Reaper* is an unpublished "memorandum" disposition, not a Ninth Circuit "opinion."  *See* Ninth Cir. R. 36-1.  Though there is no prohibition on it citing *Reaper*, *see* Fed. R. App. P. 32.1(a), Warner's brief on this point reflects a fundamental misunderstanding both with respect to the distinction between a memorandum disposition and an opinion in terms of their precedential status and with respect to the limitations placed on a three-judge panel of the Ninth Circuit overruling or taking a different approach from an earlier three-judge Ninth Circuit *actual* opinion.  *See* Ninth Cir. R. 36-3(a); *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1151 (9th Cir. 2024) ("As a three-judge panel, we are, of course, bound by circuit precedent.").  *Soo Park* is binding Ninth Circuit law (along with the other Ninth Circuit opinions the Court has cited above that bear upon the practice of information-and-belief allegations).

In particular, Plaintiff has alleged that Musk and Tesla attempted to get permission to use BR2049, but that attempt was denied just hours before the "We Robot" presentation was to begin (with at least *the late-nature* of that denial apparently due to the fact that no one attempted to approach Plaintiff about the inquiry until that very day). Plaintiff also has placed before the Court the ultimate image used and samples of still images taken from BR2049. It is not controversial to observe that there are certainly several similarities (though the Court does not address the topic of "substantial similarity" here) between the ultimate image Musk and Tesla used and the source material Plaintiff alleges they used. Given the tight timeframe Musk and Tesla were working with in light of their last-minute request – and the resulting last-minute denial – to make use of BR2049, it is not at all implausible for Plaintiff to allege on information-and-belief that they made use of an AI image-generator to come up with the finished product. In addition, the images are not so different that the Court can conclude Tesla and Musk could not possibly have literally copied in the manner so-alleged. Thus, each of Tesla's and Musk's timely-raised limited arguments regarding the "literal copying" theory fail.

Because Musk and Tesla did not enunciate a way to successfully dispose of Plaintiff's "literal copying" theory in their motion, at a bare minimum it – and the direct copyright infringement claim in general – survives this motion against them. This Court does not typically "dismiss" theories, or parts of claims in connection with a Rule 12(b)(6) motion. As such, Musk's and Tesla's "substantial similarity"-directed argument, and the numerous ways in which Plaintiff believes it survives those arguments, are not resolved at this time.

### 2. Warner's "Volitional Conduct" Argument

Apart from relying on Musk's/Tesla's arguments for why Plaintiff's direct copyright infringement claim should be dismissed, Warner makes the additional argument that Plaintiff has not and cannot plead any causation, or "volitional conduct," by Warner. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) ("*Giganews*") ("To establish a prima facie case of direct infringement, a plaintiff 'must show ownership of the allegedly infringed material' and 'demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17

U.S.C. § 106.'  In addition, direct infringement requires the plaintiff to show causation (also referred to as 'volitional conduct') by the defendant.") (omitting internal citation) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)). Plaintiff concedes that it must plead this element when a copyright holder's display right is at issue.  *See* Docket No. 54, at 10:5-9.

Warner asserts that Plaintiff's only theory on this point is that the alleged violation of Plaintiff's public display rights "was conducted on, and transmitted over, [Warner]-owned or [Warner]-controlled property, infrastructure and systems (specifically including [Warner's] livestreaming infrastructure systems)."  Docket No. 49-1, at 7:16-24 (citing FAC ¶ 127).[13]  Warner likens this situation to the conduct alleged in *Giganews*, which was insufficient to meet this requirement of a direct infringement claim.

Plaintiff responds that Warner is "reading the 'volitional conduct' requirement too strictly" and ignoring what the FAC actually says Warner did.  Plaintiff relies on *Bell v. Wilmott Storage Services, LLC*, 12 F.4th 1065 (9th Cir. 2021), for the first point.

*Bell* explained that the Ninth Circuit had "held that a website or service that provides only a platform for third-party users to upload, download, and share content, *i.e.*, merely using the platform as a vehicle, has not engaged in volitional conduct in [the relevant] sense, because it is the users who cause infringement."  *Id.* at 1081.  "By contrast, one who 'exercised control' or 'selected any material for upload, download, transmission, or storage' has acted volitionally."  *Id.* (quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019)).

Plaintiff concedes that "a strictly passive supplier or passive owner of equipment" would not have sufficient "volitional conduct."  Docket No. 54, at 12:6-9.  But Plaintiff

---

[13] Warner takes the position that the Court can ignore the allegation in paragraph 105 of the FAC that "[a]ll of the Defendants participated in [the accused work's] creation" because that assertion is assertedly a "remnant" of Plaintiff's original Complaint, which Plaintiff indicated – in its Opposition to Warner's motion to dismiss the original Complaint (mooted by the filing of the FAC) – it was moving away from in the FAC, "reduc[ing the] scope [of its direct infringement claim] as to [Warner], relative to Musk and Tesla."  Docket No. 49-1, at 7:14-16 & n.5 (quoting Docket No. 39, at 5:16-17).  Plaintiff does not take issue with this contention – apart from stating that Warner has "correctly note[d]" that, as to Warner specifically, "the FAC limits the direct infringement claim to [Warner's] violation of Plaintiff's Section 106(5) display rights, by the unauthorized display of Exhibit C and the event captured in the We Robot Recording, from the [Warner] lot, over [Warner's] systems," Docket No. 54, at 10:22-26 – in its opposition to Warner's motion, which the Court interprets as a concession on the point.  As such, this allegation in paragraph 105 of the FAC does not weigh into the Court's consideration of the survival of this claim with respect to Warner.

also argues that Warner "fails to acknowledge . . . that if the equipment supplier or owner is more than strictly passive by, for example, 'exercising control' or by 'select[ing] any material for upload, download, transmission, or storage,' the volitional conduct requirement is satisfied." *Id.* at 12:11-15. Plaintiff believes that its allegations at paragraphs 86-98 of the FAC satisfy that standard: that Warner "actively worked on Musk and Tesla's behalf to try to get [Plaintiff] to give Musk and Tesla permission to use BR2049 for the marketing event." *Id.* at 12:18-20. Plaintiff also offers that, if needed, it could:

> amend to more expressly state that [Warner's] shared services personnel expressly <u>told</u> [Plaintiff's] personnel at the time (on the afternoon of October 10, 2024) that executives at the 'highest levels' of [Warner] 'not located in Burbank' had firmly directed the shared services personnel in Burbank to clear BR2049 for Musk and Tesla with urgency, because of the importance of the Musk-Tesla event to the larger [Warner] entity, and Musk (or Tesla) wanted BR2049.

*Id.* at 12:20-26. Plaintiff believes that "[i]t certainly seems that actively helping Musk and Tesla to use BR2049, a piece of content which Musk specifically wanted and expected to get as part of his expensive event at the [Warner]-owned Burbank studio lot, just hours before the infringement, adequately constitutes [Warner] 'exercising control' or 'select[ing] any material for . . . transmission.'" *Id.* at 12:26-13:4. However, Plaintiff cites no case law or other authority supporting that belief.

Warner responds that *Bell* is actually consistent with the point Warner is trying to make here. In contrast with *Bell* – where the infringing photo existed on the defendant's server hosting the website (which the defendant managed), *see* 12 F.4th at 1070, 1081, and where the Ninth Circuit explained that the defendant "did not merely function as an online platform where third-party users independently upload and share materials," *id.* at 1081 – here Warner is only alleged to be a passive supplier of equipment and/or means.

With respect to paragraphs 86-98 – cited by Plaintiff in response to Warner's volitional-conduct argument – Warner states that these allegations are limited to "discussions between the Defendants and that [Warner] tried to obtain permission from Plaintiff for Musk and Tesla to use BR2049." Docket No. 57, at 3:21-23. Warner points out that this (failed) clearance work has no apparent connection to any right or ability to supervise or control Musk's or Tesla's decisions concerning what Musk and Tesla

eventually used in connection with their "We Robot" presentation.  Warner also argues
that Plaintiff's proposed amendment on this topic would do nothing to move the ball on
the question of Warner's right or ability to control Musk's/Tesla's decision – "[t]he fact
that [Warner] was helping to clear BR2049 for use at the event merely shows that
[Warner] sought to go through the proper channels to obtain permission to use Plaintiff's
work."  Docket No. 57, at 4:11-13 (emphasis omitted).

     The Court must agree with Warner here, and disagree with Plaintiff's position that
Warner's argument amounts, simply and improperly, to "factual denial."  Docket No. 54,
at 13:5-6.  Warner has actually directly addressed the facts as Plaintiff has alleged them.
Warner's (failed) attempts to clear permission for Musk/Tesla were in no way
demonstrative of Warner "exercising control" or of Warner selecting any material that
actually wound up in, or contributed to, the "We Robot" event.  Nothing that Plaintiff has
indicated that it could add by way of amendment would make any difference to that
observation/conclusion, because that additional material still relates only to Warner's
(failed) efforts at clearance.  There is nothing *factual* (or that the Court must credit as
true) that Warner played any selection-role beyond that failure.  *See also* Footnote 20,
*infra*.

     At most, Plaintiff alleges that, after last-minute attempts to secure rights through
Plaintiff failed, Warner essentially "stood by" and did nothing, with Plaintiff asserting
that Warner "either effectively blessed Musk and Tesla to incorporate BR2049 in the
event anyway, and/or failed to take meaningful action to stop them, although such action
was available," "empower[ing]" Musk "to do it anyway."  FAC ¶¶ 96-97.  Even ignoring
that the allegation is made on information and belief (and on this particular point Plaintiff
does not have sufficient facts surrounding the allegation to make it in this manner), this is
not exercising control or selecting material.  And there is nothing akin to the website-
owner defendant's hosting of infringing content on its servers in *Bell*.  Instead, Plaintiff's
allegations reveal that Warner acted, at most, as a "platform for third-party users to
upload, download, and share content, *i.e.*, merely using the platform as a vehicle."  *Bell*,
12 F.4th at 1081.  As a result, unless it indicates it has something more to add that, for
some good reason, it has not already notified the Court about by way of its Opposition
brief, the Court is inclined to conclude that Plaintiff's claim for direct copyright

infringement against Warner must be dismissed without leave to amend.

The claim will survive against Tesla and Musk, however.

C.  Vicarious and Contributory Copyright Infringement

Plaintiff's second and third claims for relief are for vicarious and contributory copyright infringement.  To begin with, Tesla's and Musk's motion presents no argument with respect to the contributory copyright infringement claim other than that it would necessarily fail if their motion is successful in disposing of the direct infringement claim, *see* Docket No. 48-1, at 14:25-15:4, and Warner's motion explicitly *excludes* the claim from its scope, *see* Docket No. 49-1, at 1:5-7.  Because Tesla and Musk have not achieved their goal on this motion with respect to the direct infringement claim, Plaintiff's contributory infringement claim necessarily survives these motions.

As to the FAC's copyright claims, therefore, that leaves Plaintiff's claim for vicarious copyright infringement.  "Vicarious infringement occurs when one profits from direct infringement while declining to exercise a right to stop or limit it."  *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013).  More specifically, such liability "attaches if [a defendant] had both the (1) 'right and ability to supervise the infringing activity' and (2) 'a direct financial interest' in the activity."  *Id.* (quoting *A & M Records*, 239 F.3d at 1022); *see also Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1155 (9th Cir. 2012) ("To impose vicarious liability on a defendant for copyright infringement, 'a plaintiff must establish that the defendant exercises the requisite control over the direct infringer and that the defendant derives a direct financial benefit from the direct infringement.'") (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 729 (9th Cir. 2007) ("*Amazon.com*")); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) (identifying "right and ability to control" as required element).

1.  Tesla and Musk

Tesla's and Musk's motion as to this claim (at least beyond reliance on the contention – already addressed above – that Plaintiff's direct infringement claim must fail, that is) is limited to arguing that Plaintiff has not pled the existence of a *direct* financial benefit from any alleged infringing activity.  Insofar as published, precedential, authority is concerned, they rely exclusively on *Erickson Productions, Inc. v. Kast*, 921

F.3d 822, 829 (9th Cir. 2019).

In *Erickson Productions*, the Ninth Circuit vacated a jury's liability verdict that had been in favor of the plaintiffs on a vicarious infringement claim. *See Erickson Prods.*, 921 F.3d at 826. The defendant owned a real estate wealth management company, and had hired a website developer to redevelop his company's website. *See id.* Three infringing photos made their way onto the company's developmental website. *See id.* at 827 & n.1. The plaintiff's theory was that, by including unlicensed photos on the website, the defendant was both able to continue a business opportunity he desired and to avoid a required developmental licensing fee. *See id.* at 827. On appeal, the plaintiff identified what it saw as three "direct financial benefits": "(1) the photographs drew customers to purchase [the defendant's] services; (2) [the defendant] avoided paying licensing fees to [the plaintiff]; and (3) "[the defendant] was able to 'rush' the launch of his website." *Id.* at 829. The Ninth Circuit agreed with the defendant that the plaintiff had not presented any evidence "that could constitute a direct financial benefit as a matter of law." *Id.*

The Ninth Circuit began its analysis by announcing that "'[t]he essential aspect of the direct financial benefit inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps.'" *Id.* (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). At least in the context of a website,[14] however, infringing material must "'act[] as a draw for customers,'" as opposed to being "'just an added benefit.'" *Id.* (quoting *Ellison*, 357 F.3d at 1078-79). The plaintiff in the case did not contend that anyone visited the website in question "in order to view his photographs or purchased his services because they saw the photographs." *Id.* at 830. Beyond that note, perhaps more-importantly, the Ninth Circuit explained that "[i]f [the defendant] had a direct financial interest in every piece of content on this website that arguably made the website marginally more attractive or presentable, then the requirement of a causal link would be erased." *Id.* Thus, it concluded that the plaintiff had not argued that the photographs "were anything more, at best, than an 'added benefit' to visitors of [the defendant's] website." *Id.*

---

[14] As noted *infra*, Plaintiff has not addressed *Erickson Productions* at all. Therefore, it certainly has not argued that the case should be limited to the context of infringing material appearing on websites.

The Ninth Circuit next examined the plaintiff's argument that the defendant's *avoidance of licensing fees* could constitute a direct financial benefit. It rejected that argument too. *See id.* It took pains to first explain that, in the context of a claim for vicarious infringement, the avoided-license-fee theory must be that the alleged vicarious infringer received a direct financial benefit from the alleged direct infringer's avoidance of a licensing fee, but that the direct infringer's saving of money cannot satisfy the requirement of a direct financial benefit to the vicarious infringer. *See id.* "Otherwise, the requirement of a direct financial benefit would be rendered meaningless, since – at least where, as here, licenses are for sale – a direct infringer necessarily saves money by failing to obtain a license." *Id.* Yet, even if the direct-infringer website developer had "turned its lower costs from fee avoidance into lower prices for its website design services," this savings benefit to the alleged vicarious infringer "would not be 'direct,' since it would reach [that defendant] only incidentally, via [the website developer's] intervening decision to cut prices." *Id.* at 830-31.

Unfortunately, Plaintiff's single-paragraph response in connection with its vicarious infringement claim completely ignores *Erickson Productions*. *See* Docket No. 52, at 18:2-21. Instead, in an echo of its answer to Warner's volitional-conduct argument addressed *supra*, it simply argues that Tesla and Musk have read the rules regarding such a claim "too narrowly" and, citing an unpublished district court decision, that "all that is needed is a showing that 'there is a causal relationship between the infringing activity and *any* financial benefit a defendant reaps.'" *Id.* at 18:4-7 (emphasis added) (quoting *Dish Network LLC v. Jadoo TV, Inc.*, No. 20-cv-01891-CRB, 2023 WL 4004115, at *14 (N.D. Cal. June 13, 2023)[15]). Insofar as this ignores the requirement that such financial benefit be "direct," this is a clear misstatement – or at least understatement – of Ninth Circuit law on the topic.

Plaintiff also believes – without citation to supporting authority – that "[i]ntentionally using the infringing activity as the lead of an advertisement to semiotically move the audience to be more receptive to buying company stock and the

---

[15] The *Dish Network* case involved defendants who were sued for selling set-top boxes and mobile applications that consumers use to receive television channels. In other words, the whole purpose of the business was to transmit allegedly-infringing material. This is a far cry from the situation at hand here, involving a media presentation created for the ultimate purpose of promoting Tesla's and Musk's automobiles.

company's products is a *direct enough* causal relationship." *Id.* at 18:9-11 (emphasis added). It is unclear how it can make that argument in a way that is consistent with *Erickson Productions*. Plaintiff's allegations that the alleged infringing material itself acted as a "draw" are simply too conclusory.

In sum, it appears that Plaintiff has no response to *Erickson Productions*, that the allegedly-offending material in the "We Robot" event is indistinguishable from the mere "added benefit" described in that case, and that Plaintiff's vicarious infringement theory comes up short with respect to Tesla and Musk. Plaintiff has not explained how it could possibly amend around these observations, meaning that a dismissal of the claim as to Tesla and Musk is likely to be without leave to amend.

### 2. Warner

Unlike Tesla and Musk, Warner challenges Plaintiff's ability to successfully plead *either* of the required vicarious infringement elements.

#### a. Right/Ability to Supervise/Control

"A defendant 'exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so.'" *Range Road*, 668 F.3d at 1155 (quoting *Amazon.com*, 487 F.3d at 730).

With respect to the right/ability to supervise/control, Warner argues that Plaintiff's allegations are conclusory (and on information and belief), and/or are based on Warner's pre-event clearance efforts and mere awareness of the situation. Warner also relies on what it insists is the actual and only contract between itself and Tesla in order to contradict Plaintiff's allegations on this point but, as explained above, the Court will not consider that document in connection with these motions. Warner does correctly argue that the Court is not required to accept as true Plaintiff's allegations that any direct infringers were Warner's agents, employees, or contractors. Those allegations are entirely conclusory.[16] Warner also argues that Plaintiff's control/supervision allegations fall short of those present in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), a case that Warner also asserts was weakened by the later-decided *Amazon.com*.[17]

---

[16] In Reply, Warner accurately notes that Plaintiff has not responded on this point, giving the Court no reason to question Warner's position.

[17] The original decision in *Amazon.com*, 487 F.3d 701, was later superseded. *See* 508 F.3d 1146 (9th Cir. 2007).

The Court begins here with the observation that this is not a quintessential situation involving, for example, ownership of a music venue where infringing musical compositions are regularly performed (financially benefitting that venue and its owner). *See Range Road*, 668 F.3d at 1151-53, 1155; *Fonovisa*, 76 F.3d at 262 (referencing "dance hall cases"). Nor is this even a more-generally-described situation where continued, unquestionable, known infringement has occurred, and is continuing to occur, in a particular forum, and a defendant has the ability to block infringing users from accessing that forum. *See Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788, 803-04 (9th Cir. 2007) ("*Visa International*"); *A&M Records*, 239 F.3d at 1023.[18] As far as the FAC has identified, this was a one-time event, and Warner had no notice of any alleged infringing activity until the "We Robot" presentation was already up on the screen/livescreen. *See also* Footnote 20, *infra*. Were Musk and/or Tesla an alleged repeat offender/infringer using Warner's resources and instrumentalities for publication, there might be a different answer in this situation.

Instead, Plaintiff has alleged here[19] that Warner took certain steps in advance of the "We Robot" event in an attempt to obtain proper clearance of BR2049, but that those efforts failed. Beyond that, Plaintiff simply asserts – without citation to any facts supporting the assertion, making it an improper/insufficient information-and-belief allegation – that Warner "blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available," leaving Musk to feel "empowered" to use BR2049 anyway. FAC ¶¶ 96-97, 142. Plaintiff has made no effort to explain what "such action was available" means

---

[18] As Warner notes in support of its motion, "there was no dispute [in *Fonovisa*] that the swap meet operators were actually aware that their vendors were selling counterfeits of the plaintiff's recordings." Docket No. 57, at 6:1-4 (citing *Fonovisa*, 76 F.3d at 261); *see also Fonovisa*, 76 F.3d at 260 (explaining that setting was swap meet/flea market "where third-party vendors *routinely* sell counterfeit recordings") (emphasis added); *id.* at 261 ("There is also no dispute for purposes of this appeal that Cherry Auction and its operators were aware that vendors in their swap meet were selling counterfeit recordings in violation of Fonovisa's trademarks and copyrights.").

[19] As noted *infra*, Plaintiff has directed the Court to paragraphs 85-98 and 139-148 of the FAC in that portion of its response to Warner's motion that is relevant to this claim. These paragraphs reflect what the Court says about them above, nothing more (that is relevant here). Although paragraph 139 technically incorporates every other paragraph in the FAC, Plaintiff's specification of particular paragraphs seems to indicate that it does not ask the Court to fine-tooth-comb the entire FAC in search of a relevant factual allegation.

factually. *See also id.* ¶ 18 (alleging that Warner "ultimately failed" "to keep Musk bounded by well-established rules of the business" "when it could have"); *id.* ¶ 142 (alleging on information and belief that "the issue of whether or not Musk and Tesla should be allowed to use any aspect of the BR2049 property in the event and whether [Warner] should do anything to stop them from doing so was raised internally at [Warner] to a very high level [Warner] executive, such that [Warner] was actively aware of the issue, and did nothing to stop it"). The other allegations on this topic are entirely conclusory, meaning that the Court need not accept them as true. *See id.* ¶ 34 (alleging that the "We Robot" event "was actively monitored by, supervised by, and ultimately controlled by and directed by executives at" Warner); *id.* ¶ 142. Even if the Court were to accept as true Plaintiff's summary assertion that, because of its pre-clearance role/efforts, Warner must have had the right and ability to tell Tesla/Musk that their infringing conduct was not acceptable and could not be part of the presentation, *see id.*, Ninth Circuit authority indicates that being in that position is insufficient for purposes of this element.

In *Visa International*, the defendant payment network had certain rules and regulations that merchants and member banks had to agree to follow. *See* 494 F.3d at 802. Those rules "prohibit[ed] member banks from providing services to merchants engaging in certain illegal activities and require[d] members and member banks to investigate merchants suspected of engaging in such illegal activity and to terminate their participation in the payment network if certain illegal activity is found." *Id.* at 802-03. Though the plaintiff had notified the defendants that underlying copyright infringement was occurring and the defendants "could have stopped processing credit card payments to the infringing websites," these allegations still were not sufficient to support a finding of the defendant's "right and ability to control the infringing activity." *Id.* at 803.

The Ninth Circuit explained that the right "to affect . . . infringing acts to some degree" or the right to terminate an advertisement or sponsorship relationship still would not equate to a right to stop direct infringement, because the direct infringers can still "'continue to reproduce, display, and distribute its infringing copies'" even after such a termination occurs. *Id.* (quoting *Amazon.com*, 487 F.3d at 730). This was consistent with the Circuit's *Amazon.com* decision. *See* 508 F.3d at 1173-74. "[T]he mere ability to

withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires." *Id.*; *see also id.* at 804 ("[The defendants] cannot take away the tools the offending websites use to reproduce, alter, and distribute the infringing images over the Internet.  They can only take away the means the websites currently use to sell them."); *id.* ("[T]he ability to exert financial pressure does not give Defendants the right or ability to control the actual infringing activity at issue in this case. Defendants have no absolute right to stop that activity – they cannot stop websites from reproducing, altering, or distributing infringing images.").

The same is true here; there is nothing indicating that Warner had such a supervisory/controlling position or role *vis a vis* Tesla and Musk that it could have prevented Tesla and Musk from doing what it is that Plaintiff alleges those defendants did in creating the particular slide exhibited during the "We Robot" event.  A generic allegation that Warner "actively supervised and managed [the business and contractual relationship with Musk and Tesla]," FAC ¶ 85, is not the same as alleging – let alone *factually* – that Warner actively supervised and managed the selection of material to include in the "We Robot" presentation.  And there are no *facts* alleged that Warner had any foreknowledge concerning the particular image that Tesla and Musk were planning, and did, display.  *See also* Footnote 20, *infra*.  "Ratification" and knowing-acceptance of benefits, *id.* ¶ 105, are not the standard (at least not without a factual allegation that Warner's "ratification" was a required part of the process leading to the event).  Plaintiff has fallen short both with respect to Warner's "legal right" to stop Musk/Tesla and its "practical ability" to do so.

Moreover, Warner is correct that *Fonovisa* is at the very least distinguishable, and Plaintiff extends no effort to argue otherwise.  There, the swap meet-operator "retain[ed] the right to exclude any vendor for any reason, at any time, and thus [could] exclude vendors for patent and trademark infringement."  *Fonovisa*, 76 F.3d at 261; *see also id.* at 262 ("According to the complaint, Cherry Auction had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises.").  There is no equivalent allegation here.

Finally, if the line in Plaintiff's Opposition to Warner's motion that summarily asserts that Warner "was actively involved in trying to clear BR2049 and wrangling

Musk and Tesla," Docket No. 54, at 14:7-9, or the statement that Warner "was paying close attention to [Musk], and did not want to upset him," *id.* at 14:9-10, are attempts to satisfy the control/supervision requirement – the Court cannot conceive how they would be attempts to satisfy the direct financial benefit requirement – they fall short because Plaintiff has not remotely supported the proposition that a third party's attempt to clear rights or an avoidance of "upset" demonstrates a right to supervise or control an alleged first-party infringer's later act of infringement once that clearance attempt has failed (especially without any forewarning of such an upcoming infringement[20]).

Plaintiff appears to fall short with respect to this required element of its vicarious infringement claim against Warner, and it has not offered even a suggestion as to how it might amend in a relevant respect. This deficiency by itself is sufficient for the Court to dismiss this claim against Warner, and such dismissal likely would be without leave to amend.

Nevertheless, the Court will continue on to discuss the other required element of the claim as to Warner as well.

b.  Direct Financial Interest/Benefit

Like Tesla and Musk, Warner also challenges Plaintiff's attempt to make out a "direct financial benefit" allegation. Also like those defendants, Warner relies – insofar as published, precedential, Ninth Circuit decisions are concerned – only on *Erickson Productions*.

Warner specifically addresses Plaintiff's allegations that Musk and Tesla believed that they were going to get to use a Hollywood motion picture at no extra charge, and that this was a "draw" to Musk and Tesla for the money they paid Warner for the event. Warner provides reasons why this allegation does not identify a direct benefit, but a reason not given is more persuasive – and conclusive – to the Court on this point. The alleged infringement *had not even occurred* at the time Warner and Tesla were

---

[20] Though Plaintiff alleges, on information and belief, that Warner's "shared services licensing clearance department was at least being shown image options, including viewing the proposed Exhibit C/Presentation Slide 2 Image in advance of the event, and thus knew about the infringement," FAC ¶ 162, this information and belief allegation is not itself connected to, or supported by, factual information that makes the contention plausible, meaning that it is not the type of information and belief allegation that the Court must credit as true here. The same is true of the allegation in paragraph 163 of the FAC that it was Warner that convinced or encouraged Tesla and/or Musk that Plaintiff's non-cooperation "could be circumvented by generation and use of an AI-generated copy of iconic BR2049 imagery." *Id.* ¶ 163.

negotiating arrangements for the "We Robot" event, so how could this financial benefit possibly be a "direct" financial benefit tied to the infringement?  Any such "draw" in this respect would be connected to a "direct" benefit *from a promise or suggestion from Warner*, warranted or not, not from the *later* infringement actually allegedly committed during the "We Robot" presentation.  There must be a direct financial benefit *from the alleged infringement.  See Range Road*, 668 F.3d at 1155.  There is no direct financial benefit connection with any alleged infringement under this contractual-negotiation/terms "draw" theory.

Warner also addresses the theory that it allegedly had a financial incentive to avoid any claims of breach of contract from Tesla or an adjustment of the Warner-Tesla contract price, giving it reason to "allow" or suggest or encourage Tesla to use the allegedly-infringing work.  But, again, this is not a "direct" financial benefit *from the infringement*; it is from Warner's alleged non-action.  Moreover, at least where a contract is involved, this theory would effectively collapse the two required elements into one – any failure to exercise any contractual right to control/supervise would automatically amount to a direct financial benefit.  Plaintiff has not directed the Court to any case law – precedential or otherwise – that recognizes or allows such a theory.  Warner makes exactly this point in its Reply.  *See* Docket No. 57, at 6:15-21 (noting that Plaintiff "cites to no cases finding a direct financial benefit under circumstances similar to the convoluted theory alleged in the FAC, i.e., where the alleged vicarious infringer promised to provide a brand affiliation, was unable to, and avoided a claim of breach of contract or adjustment of the contract price based on that failure by 'suggesting, encouraging, or knowingly allowing' the direct infringer to use the allegedly infringing work anyway").

Plaintiff's response to Warner in connection with its vicarious infringement claim (as to both required elements, it appears, *see* Footnote 19, *supra*) is to assert that Warner is simply disregarding the allegations found in paragraphs 85-98 and 139-148 of the FAC and to point to other information that, on its face, has no apparent connection to either recognized required element for such a claim.  In that latter regard, Plaintiff asserts that

> [a]t places in the We Robot Recording like 00:47:21-00:47:31, there appears to be an event map visible where an entire section of the event space was turned into "West World," an important motion picture and television franchise centered around robots and artificial intelligence. . . .

> It looks like a brand affiliation where Musk and Tesla seem to be bringing
> what looks like hundreds of people onto the [Warner] studio lot and
> pushing Tesla car and robot products at them for hours while the attendees
> also get to enjoy being at the [Warner] lot and interacting with prominent
> entertainment brands in the [Warner] conglomerate library.

Docket No. 54, at 13:16-25.  Plaintiff offers no explanation for how this demonstrates, or even suggests, a right to supervise or control the alleged act(s) of infringement, or how it would show a direct financial benefit *from that infringement*.  Nothing in this passage has anything at all to do with the actual alleged act(s) of infringement, but instead with the "We Robot" event in general.[21]

Moreover, as with its response to Tesla's and Musk's motion in relation to this claim, Plaintiff again entirely avoids mention of *Erickson Productions*.  Instead, it simply claims that "[t]he FAC's alleged facts constitute vicarious copyright infringement under all of the cases that the [Warner] Motion cites," *id.* at 14:1-3, without actually explaining how that could possibly be true.

Plaintiff does say in his Opposition that Warner "took a large amount of money from Tesla for an event where Musk expected that as part of the price Tesla was paying, he was going to get at least one specific motion picture property included in his livestreamed car ad, and the one he wanted most of all (but could not have) was BR2049." *Id.* at 14:4-7.  But if that is the financial benefit supporting Plaintiff's claim against Warner, it is not a "direct" financial benefit *from the alleged infringement*.  It is a direct financial benefit from the alleged fact that Tesla and Warner entered into a contract/agreement.  *See* FAC ¶ 85 ("*The contract* necessarily would have required substantial financial compensation to be paid by Tesla to [Warner] . . . .") (emphasis added).  If somehow Warner failed to live up to its obligations to Tesla or Musk, that might give them a reason to sue Warner for breach of contract.  But an alleged act of copyright infringement by Tesla or Musk *in response to* any such alleged failure by Warner is not what provided Warner the financial benefit it obtained from the relationship, or the event.

As with the other required element, Plaintiff has not identified or even suggested

---

[21] As Warner states in its Reply, "these alleged circumstances are irrelevant because they still do not close the gaps in what is missing from this claim:  that [Warner] had the ability to supervise and control the allegedly infringing activity, or that [Warner] financially benefited directly from the alleged infringement." Docket No. 57, at 7:3-7 (emphasis omitted).

any way in which it might amend to supply what is missing here.  As such, the Court will
dismiss this claim against Warner, and will likely do so without leave to amend.

    D.  <u>Lanham Act</u>

    The FAC's final claim is for violation of the Lanham Act.  Specifically, Plaintiff's
Lanham Act claim references 15 U.S.C. § 1125(a)(1)(A).  To establish this setting for the
claim, the Court quotes what appears to be the pertinent part of that subsection:

> (a)    Civil action
>
> (1)    Any person who, on or in connection with any goods or services,
> or any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false designation of
> origin, false or misleading description of fact, or false or misleading
> representation of fact, which--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to
>> the affiliation, connection, or association of such person with another
>> person, or as to the origin, sponsorship, or approval of his or her
>> goods, services, or commercial activities by another person
>
> . . .
>
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  Plaintiff explains that this claim, in this case, is a "[f]alse
association" claim, which it asserts is "essentially synonymous with false designation of
origin claims."  Docket No. 52, at 18:15-26; Docket No. 54, at 14:20-21.[22]

    The defendants all advance numerous reasons why they believe Plaintiff is either
inappropriately attempting to rely upon the Lanham Act here, or why such a claim must
fail.[23]  The Court does not feel the need to address all of those arguments here.

    Under the statute Plaintiff cites, the Court presumably first has to identify the
"word," "term," "name," "symbol," "device," "false designation of origin," "false or

---

[22] The Court has not been able to locate any published Ninth Circuit or Supreme Court decisions defining
the elements of a "false association" claim pursuant to Section 1125(a)(1)(A).  If Plaintiff is correct in its
opening assertion(s), and such a claim is "synonymous with" false designation of origin claims, that latter
claim does have recognized elements:  (1) the defendant's use of a designation – any word, term, name,
device, or any combination thereof – or false designation of origin; (2) in interstate commerce; (3) in
connection with goods or services; (4) that is likely to cause confusion, mistake, or deception as to the
affiliation, connection, or association of defendant with another person, or as to the origin, sponsorship, or
approval of defendant's goods, services, or commercial activities by another person; and (5) the plaintiff
has been or is likely to be damaged by these acts.  *See, e.g.*, *JUUL Labs, Inc. v. Chou*, 557 F.Supp.3d 1041,
1053 (C.D. Cal. 2021).

[23] With one minor exception, the arguments as to this claim are the same in both motions.  As such, the
Court elects to discuss the claim collectively.

misleading description of fact," or "false or misleading representation of fact" that is at issue here. In terms of *words* Musk uttered, the only one relevant here is his use of the word "Blade Runner." As noted earlier, however, Plaintiff has alleged it has rights in BR2049, not the *original* "Blade Runner" film. At the same time, however, section 1125(a) liability can extend to where a defendant uses "the same *or similar* mark." *Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 860 (9th Cir. 1996) (emphasis added). It is therefore not entirely clear that an observation about Plaintiff's limited rights is a dispositive one.

Another point to note here, however, is that Tesla and Musk are looking to sell *cars*. Plaintiff is plainly not in that line of business. Yet, Section 1125 is concerned about the source of tangible goods sold in the marketplace. *See Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1249-50 (9th Cir. 2017); *EVIG, LLC v. Natures Nutra Co.*, 685 F.Supp.3d 991, 997 (D. Nev. 2023) (indicating that the focus of a Subsection A claim "is on whether the trade dress (or unregistered mark) causes confusion by leading consumers to think that two products from different sources actually come from the same source"). "If the court determines as a matter of law from the pleadings that *the goods* are unrelated and confusion is unlikely, the complaint should be dismissed." *Murray*, 86 F.3d at 860 (emphasis added). Thus, even if the Court were to conclude that Plaintiff had sufficient rights at stake notwithstanding Musk's use only of the term "Blade Runner," it is unclear how Plaintiff could turn that into a successful Lanham Act claim. Plaintiff's response – at least in one respect – appears to be that a "false association" claim is different in that it may encompass inappropriate suggestions of sponsorship or association. So far as published Ninth Circuit decisions are concerned, however, Plaintiff has directed the Court only to cases involving competitors. *See, e.g., First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987); *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240 (9th Cir. 1984).

But even if the Court were to conclude that Plaintiff had a sufficient-to-survive argument on *that* point, with respect to the use of the word/name "Blade Runner," the Court also would agree with the Defendants that Plaintiff cannot succeed under the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989), which continues to apply to Lanham Act claims involving expressive works where the word is not "used as a

mark." *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024). Under that test, the use in question must be "either (1) not artistically relevant to the underlying work or (2) explicitly mislead[] consumers as to the source or content of the work." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020). As to the second avenue, implicit endorsement/sponsorship is insufficient. *See Brown v. Elec. Arts*, 724 F.3d 1235, 1245 (9th Cir. 2013). Plaintiff plainly cannot make either showing here. The Court's review of the presentation demonstrates that this was an "expressive" promotional presentation where Musk employed "Blade Runner" for an "artistically relevant" purpose,[24] and clearly did not explicitly mislead any consumers as to source or content.[25]

The defendants also complain about what they perceive as a square-peg/round-hole effort on Plaintiff's part, perhaps best-enunciated in the Ninth Circuit's *Slep-Tone* decision. When a claim "is more accurately conceived of as attacking unauthorized copying, *Dastar* [*Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)] requires us to avoid recognizing a 'species of mutant copyright law' by making such claims cognizable under the Lanham Act." *Slep-Tone*, 845 F.3d at 1250. "If there is any confusion [here], it does not concern the source of the goods, as the Lanham Act requires." *Id.* "Instead, Defendants make allegedly unauthorized use of the *content* of Plaintiff's [film], which *Dastar* precludes as a trademark claim." *Id.*; *see also Shaw v. Lindheim*, 919 F.2d 1353, 1364-65 (9th Cir. 1990) ("Shaw's claim is not consistent with the Lanham Act's purpose of preventing individuals from misleading the public by placing their competitors' work forward as their own . . . . We decline to expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides an adequate remedy."). It is difficult to see how these concerns do not apply equally to the situation at hand here.

---

[24] In pointing to the movie Blade Runner, Musk was clearly referencing its dystopian depiction of a bleak future in comparison to the prospective utopian one which his product would supposedly usher in.

[25] Though it briefly references it in its Oppositions, Plaintiff does not explain what necessary role *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), has, if any, in application of the *Rogers* test to a proposed Lanham Act claim. The Court has not located any published Ninth Circuit opinion or Supreme Court decision that does so either. The Ninth Circuit's discussion of "purely commercial" speech in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002) – cited by Tesla and Musk in their motion, *see* Docket No. 48-1, at 24:27-25:3 – came in the context of an examination of a statutory exemption in the Federal Trademark Dilution Act, a statute that is not at issue in this case.

Plaintiff seemingly attempts to get around the fact that "Blade Runner" is the only possibly-problematic "word" or "name" mentioned in Musk's/Tesla's presentation by also advancing what it characterizes as a "trade dress" claim here. Included within the "word, term, name, symbol, or device, or any combination thereof" covered by Section 1125(a)(1)(A) is a product's "trade dress." *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28-29 (2001); *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1212 (9th Cir. 2023), *cert. denied*, 144 S.Ct. 550 (2024); *Millenium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1126 (9th Cir. 2016). This concept "'refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics.'" *Jason Scott*, 68 F.4th at 1212 (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)). "To obtain a judgment for trade dress infringement, a plaintiff must prove: '(1) that its claimed trade dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion.'" *Id.* (quoting *Clicks Billiards*, 251 F.3d at 1257); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). "Nonfunctional" means "that the product feature is not 'essential to the use or purpose of the article' or so long as 'exclusive use of the feature would [not] put competitors at a significant, non-reputation-related disadvantage.'" *Jason Scott*, 68 F.4th at 1212 (quoting *Clicks Billiards*, 251 F.3d at 1258). Elements of alleged trade dress "'must be clearly listed and described.'" *Id.* (quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed. 2022)).

Plaintiff does not appear to have directed the Court to any authority supporting the view that the content of a film may be understood as "trade dress,"[26] *see* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:4.50 (4th ed. 2015), nor explained how the "nonfunctional" concept would be applied thereto or how the elements of its purported trade dress could be listed with any definiteness in connection with a continuously-moving multi-hour product. To this Court's mind, this only reemphasizes

---

[26] Indeed, by the Court's count, Plaintiff's two Opposition briefs only use the term "trade dress" eight times in total.

that the proper conclusion here is that Plaintiff is attempting to wedge a copyright claim "foot" into a Lanham Act "shoe," but the resulting blisters are too many and too serious for a comfortable fit.[27]  *See, e.g.*, *LaChapelle v. Fenty*, 812 F.Supp.2d 434, 443, 448 (S.D.N.Y. 2011); *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.Supp.2d 556, 562-65 (C.D. Cal. 2005).

Though Plaintiff also alleges that the character "K" is protected by trade dress, it has not given the Court any principled guidance for how the depiction (in contrast with the *name*, *see* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 10:20, at 10-58 (4th ed. 2015)) of a character in a film can be protected by *both* the Copyright Act and the Lanham Act (via its coverage of trade dress), or where the dividing-line would lie.  The Court is not aware of any published federal appellate decisions supporting such coverage by the Lanham Act.  *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:4.50 (4th ed. 2015); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:89 n.3, at 27-250 (4th ed. 2015).  *But see Roblox Corp. v. WowWee Grp. Ltd.*, 660 F.Supp.3d 880, 892 (N.D. Cal. 2023) (finding sufficient trade dress allegations concerning character); *see also Fleischer Studios, Inc. v. A.V.E.L.A.*, 772 F.Supp.2d 1155, 1168 n.23 (C.D. Cal. 2009).

With respect to the Lanham Act claim, Warner adds the argument that Plaintiff has not identified any possible infringing act *by Warner*.  Instead, Plaintiff only conclusorily alleges that Warner aided and abetted Tesla's and Musk's alleged violations. Plaintiff's response to Warner's motion focuses on the arguments contained in Tesla's and Musk's motion (and adopted by Warner).  It offers nothing in response to Warner's additional contention about the lack of connection between Warner and any alleged Lanham Act violation.  The claim against Warner therefore must be dismissed for this additional reason.

For the foregoing reasons, the Court will dismiss Plaintiff's Lanham Act claim. In response to Defendants' motions, Plaintiff has not convinced the Court that it has any viable Lanham Act claim based on the allegations in the FAC.  Plaintiff has not suggested

---

[27] The Court is cognizant that certain filmmakers (*e.g.* Wes Anderson, Jean Pierre Jeunet) and particular films (*e.g. Eraserhead*, Tim Burton's *Alice in Wonderland*) have a visual aesthetic which is highly striking, unique and recognizable.  However, usually another filmmaker who attempts to adopt/copy that same aesthetic is considered to be paying homage to the original rather than being accused of misleading the public as to the source of the work.

a way in which it can amend its Lanham Act claim to overcome the foregoing analysis. Nor can the Court possibly envision any such way. As such, the dismissal of this claim is likely to be without leave to amend.

      E. <u>Conclusion</u>

      The Court will deny Tesla's and Musk's motion with respect to Plaintiff's first cause of action, but will grant Warner's motion with respect to that claim. The Court will grant both motions with respect to Plaintiff's second cause of action. The Court will deny Tesla's and Musk's motion with respect to Plaintiff's third cause of action (Warner's motion did not address that claim). The Court will grant both motions with respect to Plaintiff's fourth cause of action. To the extent the Court will grant one or both motions, it is unlikely that the Court will do so with leave to amend and, with respect to the Lanham Act claim, the claim will almost certainly be dismissed with prejudice.[28] None of the ways in which Plaintiff has suggested it might add to the FAC would appear to make any difference at all to the flaws identified herein, meaning such amendment(s) would be futile.

      The Court will *not*, however, make any of the Copyright Act dismissals *with prejudice* – should Plaintiff later uncover information that supports the viability of such claims, it may seek leave to amend at that point to attempt to "revive" them.

---

[28] If the Court were inclined to allow or invite any amendment of the FAC in any respect, it would note that it found the Defendants' Rule 8 criticisms very persuasive. Because those problems did not prevent the Defendants from meaningfully arguing the sufficiency of Plaintiff's claims in the FAC, and because other reasons were sufficient for dismissal where dismissal is occurring, the Court saw no need to delay things by issuing a Rule 8-based decision. However, if there was ever to be any future pleading in this case, Plaintiff would have to take those criticisms *very* seriously.