ANDERSON YEH PC
  Edward M. Anderson (STATE BAR NO. 198183)
edward@andersonyehlaw.com
  Regina Yeh (STATE BAR NO. 266019)
regina@andersonyehlaw.com
1055 E. Colorado Blvd. Ste 500
Pasadena, California  91106
Telephone: (626) 204-4092  Facsimile: (888) 744-0317

Attorneys for Plaintiff
ALCON ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware Limited Liability Company,<br><br>            Plaintiff,<br><br>      v.<br><br>TESLA, INC., a Texas Corporation; ELON MUSK, an individual; WARNER BROS. DISCOVERY, INC., a Delaware Corporation;<br><br>            Defendants. | CASE NO.  2:24-CV-09033-GW-RAO<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1) **DIRECT COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>2) **VICARIOUS COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>3) **CONTRIBUTORY COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>4) **FALSE AFFILIATION AND/OR FALSE ENDORSEMENT [15 U.S.C. § 1125(a)(1)(A)]**<br><br>**DEMAND FOR JURY TRIAL** |

SECOND AMENDED COMPLAINT

Plaintiff Alcon Entertainment, LLC ("Plaintiff" or "Alcon"), through its attorneys, hereby alleges its Second Amended Complaint ("SAC") against defendants Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI") (collectively, "Defendants" and each separately a "Defendant"):

## SUBJECT MATTER JURISDICTION

1.      The Court has federal question subject matter jurisdiction per 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331 and 1338(a) and (b), and on the grounds that this is a civil action arising under the laws of the United States.  Plaintiff seeks relief against all Defendants under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, *et al.*  Plaintiff also seeks relief against Musk and Tesla under the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A), for conduct by Musk and Tesla in interstate commerce involving goods and services.

## NATURE OF THE ACTION

2.      WBDI entered into a business relationship with Musk and Tesla for a product reveal event entitled "We Robot," to launch Tesla's new fully autonomous Robotaxi and Optimus humanoid robot products, with the event to take place the evening of October 10, 2024 from the Burbank lot (the "Event").  The Event posed high risk of violating Alcon's exclusive rights on a science fiction motion picture property which Alcon and WBDI's subsidiary, non-party WB Studio Enterprises, Inc. dba Warner Bros. Pictures ("Warner Bros. Pictures"), have a relationship about, but which Warner Bros. Pictures does not own, and which Alcon owns exclusively.  The property is the copyrighted motion picture "Blade Runner 2049" ("BR2049") and related elements.  Musk and Tesla find the property irresistible. WBDI excluded Alcon from the Event process until six hours before the event was to begin, and handled the situation regarding Alcon's rights improperly.  Alcon's rights were predictably violated: Musk and Tesla used Alcon's exclusive property prominently in the Event, over Alcon's denial of permission and strong objections. As a result, Alcon became unwillingly affiliated with Musk and Tesla, which

Alcon wanted to avoid and dislikes.  Defendants refuse to remediate unless a court tells them they must.  Musk and Tesla are a further threat to repeat the infringing conduct in the future if a court does not say they cannot.

## **PARTIES**

### *Plaintiff*

3.      Alcon is an independent motion picture and television production company whose products are distributed worldwide.  Alcon is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 10390 Santa Monica Blvd., #250, Los Angeles, California 90025.

4.      Alcon produced BR2049 and has produced more than thirty other major motion pictures, including "The Blind Side" (which won the 2009 Academy Award for Best Actress), the "Dolphin Tale" series, the "Sisterhood of the Traveling Pants" series, "Book of Eli," "P.S. I Love You," "My Dog Skip," "Prisoners," and "The Garfield Movie."  Alcon also produces television, including the critically acclaimed television series *The Expanse.*

5.      Alcon was founded in or about 1997.  Since about 1998, Alcon and Warner Bros. Pictures (or predecessor entities to the current Warner Bros. Pictures) have had a close business relationship.  Warner Bros. Pictures has been at least the domestic distributor of most of the thirty-plus major motion pictures which Alcon has produced since Alcon's inception, including BR2049.

### *Defendants*

6.      <u>Tesla</u>: Tesla is the well-known developer and manufacturer of electric automobiles, and the world's largest automobile company by market capitalization.  Musk is its CEO and controlling shareholder.  Tesla's brand focuses on autonomous driving capabilities and artificial intelligence.

///

2

SECOND AMENDED COMPLAINT

7.     The specific Tesla employees, contractors or agents tasked with interacting with WBDI and executing for Tesla on the issues involved herein included David Adametz ("Adametz") (a video production marketing executive at Tesla) and Shara Lili ("Lili"), a Manager of Video Content for Tesla (also a video production marketing executive at Tesla).

8.     Plaintiff makes the allegations of this paragraph 8 on information and belief, subject to the need for discovery:  One or both of Adametz and Lili, and possibly other Tesla employees, were in direct contact with the WBDI executives (or Warner Bros. Pictures executives acting under the direction of WBDI) about the Event issues herein.  One or both of Adametz and Lili and possibly other Tesla employees were also in direct or indirect contact with Musk about the same issues.

9.     <u>Musk</u>: In addition to owning and operating Tesla, Musk also directly or indirectly owns and operates the social media platform X (formerly Twitter), the rocket and satellite company SpaceX, the neuroscience and cybernetics company Neuralink, and the artificial intelligence software development company X.AI Corp. ("X.AI"), among other ventures.  X.AI runs "Grok," described as "a free AI assistant … [which] offers real-time search, image generation, trend analysis, and more."  https://grok.com/.  At any given time, largely depending on Tesla's stock price, Musk is the richest man in the world.  Musk has become an increasingly vocal, overtly political, highly polarizing figure globally, specifically including U.S. consumers, and especially in Hollywood.  Alcon presciently recognized that this was happening and getting worse at the time of the Event.

10.     <u>WBDI</u>: WBDI is one of the largest entertainment conglomerates in the world.  WBDI is the specific corporate entity within the WBDI conglomerate which actually owns the Warner Bros. Studios lot in Burbank, California, including substantially all real property and improvements thereon, including without

///

SECOND AMENDED COMPLAINT

limitation telecommunications infrastructure and systems over which the Event presentation and its livestream were transmitted.

### *Relevant Non-Parties*

11.   <u>Warner Bros. Pictures</u>: Warner Bros. Pictures is currently a subsidiary of WBDI.  Warner Bros. Pictures (or predecessor entities thereto) has been one of the recognized "major" Hollywood motion picture studios for over a century. Warner Bros. Pictures became a WBDI subsidiary when WBDI was formed in or about April 2022, as part of a corporate spin-off and merger transaction between Warner Bros. Pictures' prior parent company AT&T Inc. and the reality television conglomerate Discovery, Inc.

12.   Warner Bros. Pictures and WBDI use "shared services" departments and they did so for the Event.  Shared services departments are common among Hollywood studios.  Shared services departments have personnel (often legal, financial, accounting, or human resources professionals) who may be ostensibly employed by, receive their paychecks from, and have titles only with, a single corporate entity in the larger conglomerate, but who in fact render services upon request or direction to a range of entities within the conglomerate.

13.   <u>WBDI and Warner Bros. Pictures Shared Services Licensing Executive Heath</u>: WBDI directed that the matters at issue herein with respect to Tesla and Alcon be handled at least in part by shared services licensing executive Julie Heath ("Heath").  Heath is based in Burbank, California.  Heath has been a studio contact and liaison for Alcon on motion picture licensing matters for many years, long before the 2022 creation of WBDI or the 2024 Event.

14.   Heath told Alcon that she works for both Warner Bros. Pictures and WBDI.  Heath's communications to the outside world generally, and to Alcon specifically, ostensibly reflect her to be a WBDI representative, and that is consistent with how motion picture studios use shared services personnel.  For

SECOND AMENDED COMPLAINT

instance, Heath's email address is a "wbd.com" address, reflecting the WBDI entity as opposed to the Warner Bros. Pictures entity, and the signature block on Heath's emails lists her company as WBDI and not as Warner Bros. Pictures, with the WBDI corporate logo, and not any logo of Warner Bros. Pictures.

15.    In any event, Heath renders licensing and clearance services to WBDI, or on WBDI's behalf or at its direction (all as opposed to on behalf of, or only on behalf of, or at the direction of, or only at the direction of, Warner Bros. Pictures). Heath stated to Alcon's legal department that she was doing so (acting for WBDI) in connection with Heath's communications with Alcon and others about the communications alleged herein, and Alcon alleges that in fact she was.

16.    SPE:  Sony Pictures Entertainment Inc. ("SPE") is another recognized major Hollywood motion picture and television studio and Alcon's international distribution partner for BR2049.  SPE had no involvement in the Event or the issues herein, except that SPE did address and deny an emergency Exhibit A international territory "clip license" request from WBDI and Tesla, as described further below.  (There is no contention by Alcon that SPE engaged in any improper conduct; rather, SPE was properly protective of Alcon's rights.)

**PERSONAL JURISDICTION OVER DEFENDANTS**

17.    Per Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, this Court has personal jurisdiction over any defendant who is subject to the jurisdiction of any California court of general jurisdiction.  California's long arm statute, *Cal. Code Civ. Pro.* § 410.10, allows courts in the state to exercise personal jurisdiction over parties to the full extent permissible under the United States Constitution. Personal jurisdiction over the Defendants here is thus proper if it comports with due process.  It does, including for the following reasons.

///

///

***Personal Jurisdiction Over Tesla***

18.    <u>General Personal Jurisdiction</u>: The Court has general or unlimited personal jurisdiction over Tesla.  Tesla is currently incorporated under the laws of the State of Texas and its principal corporate office or headquarters is in Austin, Texas and has been since about December 2021.  However, California was Tesla's original principal corporate office home state, from Tesla's inception in about 2003 until the December 2021 move to Texas.  Tesla still maintains continuous and systematic contacts with California, including continuing to operate at least two major manufacturing plants in the state.

19.    <u>Specific Personal Jurisdiction</u>: Additionally and/or in the alternative, the Court has specific or limited personal jurisdiction over Tesla.  Alcon's claims arise out of Tesla's purposeful availment of the rights, privileges, and protections of doing business in California, and also arise out of Tesla's commission of tortious activity in California and purposeful direction of tortious conduct toward the forum state.  Tesla committed the acts of infringement alleged herein, or substantial portions of them, in preparation for and during the course of the Event at WBDI's Burbank, California studio lot.  The Event was personally conducted by Musk who is Tesla's founder, principal and Chief Executive Officer.  Tesla's acts of copyright infringement and violations of the Lanham Act all constituted torts directed toward Alcon, a forum resident, and relate to the motion picture industry, which is of compelling interest to the forum state.  Exercise of personal jurisdiction over Tesla also is reasonable and fair.

***Personal Jurisdiction Over Musk***

20.    The Court has at least specific or limited personal jurisdiction over Musk as an individual.  Plaintiff's claims against Musk arise out of his acts of purposeful availment of the benefits and privileges of conducting activities in California, including where he personally conducted the Event from the WBDI lot

in Burbank, California.  Plaintiff's claims also arise out of Musk's commission of tortious acts while physically present in the forum state.  His acts also constituted purposeful direction of tortious conduct to the forum, all for the same specific facts and reasons as described above regarding Tesla personal jurisdiction.  Exercise of personal jurisdiction over Musk as an individual also is reasonable and fair.  Musk has ample personal resources to defend himself in California court.

### *Personal Jurisdiction Over WBDI*

21.     The Court has general or unlimited personal jurisdiction over WBDI. WBDI is incorporated under the laws of the State of Delaware and its principal corporate office or headquarters is in New York.  However, WBDI has continuous and systematic contacts with California, including owning and operating one of Hollywood's oldest major motion picture and television lots: the Warner Bros. Studios lot which is located in Burbank, California.

22.     Additionally and/or in the alternative, the Court has specific or limited personal jurisdiction over WBDI.  Alcon's claims arise out of WBDI's purposeful availment of the rights, privileges, and protections of doing business in California. They also arise out of WBDI's commission of tortious activity in California and purposeful direction of tortious conduct toward the forum state.  WBDI's involvement in acts of copyright infringement constituted torts directed toward Alcon, a forum resident.  They relate to the motion picture industry, an industry in which the forum state has a compelling interest.  Exercise of personal jurisdiction over WBDI also is reasonable and fair.

### **VENUE**

### *28 U.S.C. § 1391(b)(2) Venue as to all Defendants*

23.     Venue is proper as to all Defendants pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Alcon's claims occurred, or a substantial part of the property that is the subject of

7

the action is situated, within this judicial district. The infringed property in question includes Alcon's copyright in BR2049 and ownership of BR2049-related marks and goodwill, which property is all located within this district for venue purposes, where Alcon has its corporate headquarters in Los Angeles, California.

### *Additional Venue Bases*

24. Venue also is proper as to WBDI and Tesla pursuant to 28 U.S.C. §§ 1400(a) and 1391(d). For venue purposes, Tesla and WBDI each reside in or may be found within this district. Tesla and WBDI each have continuous and systematic contacts with the forum state and this district specifically, including sufficient contacts with this district to establish personal jurisdiction in this district, if this district were treated as a separate state.

\*\*\*

25. **Note on the SAC's Information and Belief Pleading and Alternative Theory Pleading Conventions:** Plaintiff had virtually no involvement in the Event or its processes. Plaintiff has not yet had discovery. Plaintiff thus must plead some relevant facts on information and belief, subject to need for discovery. Some information and belief subjects have multiple plausible possibilities as to what happened, based on Plaintiff's information to date. Plaintiff thus makes some information and belief allegations under alternative theories. The SAC adopts the following presentation convention: The alternative theory which Plaintiff presently believes is the most likely alternative theory is labeled as "**[Name of Factual Issue] Alternative Theory 1**" and set forth in plain (non-italics) type. Secondary alternative theories on the same factual issue are labeled accordingly and then set forth in italics: "***[Name of Factual Issue] Alternative Theory 2:*** *[Facts of alternative theory 2]."*

\*\*\*

///

8

# FACTS

### *Alcon Owns BR2049 and Related Elements Exclusively and Also Owns Some Rights in the 1982 Picture*

26.     Alcon and Warner Bros. Pictures have a relationship that involves both the science fiction motion picture "Blade Runner," released in 1982 starring Harrison Ford ("1982 Picture"), BR2049, released in 2017 starring Ryan Gosling, and related elements.  However, except for shared non-exclusive ownership rights in the unregistered word mark "BLADE RUNNER," they each own their respective rights exclusively.  Alcon produced BR2049 and is the ultimate copyright owner of that work.  Alcon also owns the exclusive right to make most types of derivative works of the 1982 Picture.

### *Musk Was a Known High Risk to Disregard Intellectual Property Rights and Established Licensing Norms, Especially in the Marketing Context*

27.     Musk's disdain for intellectual property law is no secret, and it was not in the latter half of 2024, nor is it now.  For instance, in a moment that received significant press coverage, on or about April 11, 2025, Jack Dorsey, the founder of Twitter (bought by Musk and renamed X), made a social media post advocating to "delete all IP law."  Musk publicly endorsed Dorsey's anti-IP law post, responding to it with "I agree."  As one journalist reported, Musk's endorsement of the Jack Dorsey post "drew scorn from the intellectual property community and was followed by posts from U.S. Patent and Trademark Office acting Director Coke Morgan Stewart extolling the virtues of trademark, patent and copyright protections."[1]

///

---

[1] Theresa Schliep, "Musk Supports Deleting IP Law, Attorneys Say Let's Not," *Law360*, Portolio Media, Inc., April 14, 2025, https://www.law360.com/articles/2325003/print?section=ip.

28.     This incident occurred after the Event and filing of this action, but it is consistent with, and indicative of, numerous public expressions by Musk for many years that Musk does not believe IP law should exist or be enforced.  Musk believes that IP law (patent law most specifically) is "for the weak" and restrains business and creative innovation, which Musk believes should be conducted on a kind of survival-of-the-fittest basis.[2]  With respect to copyright law, for example, as recently as 2022, Musk said that copyright law "goes absurdly far beyond protecting the original creator" and some protective aspects of copyright law are a "plague on humanity."[3]

29.     Musk also has an affinity and exceptional talent for non-traditional marketing.  He is a recognized master of communicating in memes, and he highly values them.  "Who controls the memes controls the universe," is a Musk tweet from 2020, for example.[4]  Musk manifests this by leveraging his larger-than-life presence in the global infosphere to amplify interest in a product or topic with sometimes very short or subtle conduct or commentary.  One of the tools Musk consistently uses is creation of unlicensed and often opportunistic public associations with well-known science fiction properties.  For instance, Musk

_____

[2] *See, e.g.,* Nicolas Vega, "Elon Musk says 'patents are for the weak' as he talks Starship rocket, tours SpaceX Starbase with Jay Leno," CNBC.com, September 21, 2022, https://www.cnbc.com/2022/09/21/why-elon-musk-says-patents-are-for-the-weak.html.

[3] *See, e.g.,* Rachel Shin*,* "Elon Musk called copyright a 'plague on humanity' and now he's being sued for $250 million by music publishers who claim Twitter stole their content," Fortune.com, June 15, 2023, https://fortune.com/2023/06/15/twitter-sued-music-copyright-sony-universal-elon-musk-plague-on-humanity/.

[4] *See, e.g.*, Taylor Lorenz, "Elon Musk: Memelord or Memelifter?", *New York Times*, published May 7, 2021, updated November 8, 2021, https://www.nytimes.com/2021/05/07/style/elon-musk-memes.html?searchResultPosition=3.

named SpaceX rocket models "Falcon" after the Millenium Falcon from the "Star Wars" motion pictures, and named other SpaceX vehicles after spaceships or other elements from the *The Culture* series of science fiction novels by Iain M. Banks.[5]

30.    At the same time, Musk is infamous for not paying intellectual property owners for brand affiliation promotional and marketing uses in memes or similar social media material, even for uses where licenses are routinely expected by intellectual property owners and requested and paid for by commercial users other than Musk or his companies.[6]

31.    Musk is well known for having applied all of these tendencies and talents to build Tesla into the largest car company in the world by market capitalization with almost no use of traditional paid advertising, in favor of non-traditional, and often arguably infringing, marketing, including strategic or opportunistic branding.

### *Musk and Tesla Has a Known and Persistent History of Specifically Exploiting Elements of Both the 1982 Picture and BR2049 for Tesla Product Reveals*

32.    As of the latter half of 2024, Musk and Tesla had a known tendency to make unlicensed associations with both the 1982 Picture and BR2049, and blurring the two works, to support strategic marketing of Tesla products.  Musk's and Tesla's marketing playbook includes intentionally selecting product reveal events to take place at locations that naturally tie to one or both of the two motion

---

[5] *See, e.g.,* Elizabeth Howell, "Elon Musk's Cybertruck from Tesla Is Straight Out of Blade Runner and James Bond," News, Space.com, November 23, 2019, https://www.space.com/elon-musk-cybertruck-blade-runner-james-bond-inspiration.html.

[6] *Id.* ("[W]hen a brand uses a meme for marketing purposes, it generally asks for permission to share the image, and credits the owner.  In many cases, the brand also pays.  Mr. Musk, who is both a successful businessman and a freewheeling personal brand, appears to be an exception.")

11

pictures, and then leveraging the association, including by making unauthorized public performances or displays of copyright-protected elements of one or both works.  Until the events at issue here, Musk's literaly copying of copyright protected in this way generally was of elements of the 1982 Picture.

33.    In 2019, Musk and Tesla leveraged elements of both the 1982 Picture and BR2049 in this way to market Tesla's cybertruck.  (*See* Exhibit H [compilation of 2019 Cybertruck marketing campaign posts and public responses and reactions].)  Musk intentionally set the time and location of the cybertruck's reveal event to coincide with a time and location ("Los Angeles November, 2019") strongly associated with the 1982 Picture.  (Exhibit H at H-10 and H-11; Exhibit G at G-1.)

34.    Musk then employed a series of social media posts, some of them incorporating what Alcon believes to be -- absent Warner Bros. Pictures saying it gave Musk a license -- unauthorized literal copies of copyright-protected elements of the 1982 Picture, to frame the association.  (*See, e.g.,* Exhibit H at H-10 and H-11; Exhibit G at G-1 [1982 Picture story card].)  Viral response followed.  (Exhibit H, *passim*.)  Musk stoked the association with the 1982 Picture and BR2049 leading up to and after the reveal event.  (*Id.*)

35.    In the November 2019 cybertruck reveal event itself, Musk had a specific subjective desire to use BR2049 elements to set the cybertruck reveal event's theme.  Through informal discovery processes, Alcon has located witnesses who were personally present during Musk and Tesla's production preparations at the SpaceX facility shortly before the commencement of the November 21, 2019 cybertruck product reveal and its livestream.  Alcon expects one or more of these witnesses will be able to testify that, in conduct that does not appear on the livestream recordings of the cybertruck reveal event available online, Musk did all

///

of the following during the livestream production preparations for the cybertruck reveal event:

    a.  Musk repeatedly directed the live and livestream event production teams to make the cybertruck product reveal look and feel like, and evoke to the audience, a connection to "Blade Runner" (or "bladerunner" as Musk sometimes spells it).  From context, Musk meant both the 1982 Picture and BR2049.

    b.  As part of encouraging and demonstrating to the production team what Musk wanted, Musk put on a trench coat or duster and vamped to the production team, pretending to be a "blade runner" (or, as Musk sometimes incorrectly puts it "the Bladerunner").

    c.  Musk also encouraged his girlfriend at the time (Claire Boucher aka Grimes, who was physically present) to dress in costume reminiscent of BR2049's Joi character.  Musk said he specifically wanted Grimes to do so to set the theme of the event.  She did.  On livestream recordings of the cybertruck reveal event, Grimes can be seen opening the cybertruck product reveal costumed as a female toy-doll or toy-hologram type cyberpunk character reminiscent of Joi.  So costumed, Grimes then introduces Musk as her "creator."  Compare:

///

///

///

///

///

///

///

///

13

SECOND AMENDED COMPLAINT

"Joi" Character in BR2049 at
Runtime 0:43:57-0:44:03

Grimes in 2019 Cybertruck
Product Reveal[7]









   d.  Musk openly commented to the production team to the effect that he

      wanted Grimes do this intentionally to evoke a feel of and goodwill of

      "Blade Runner."  Because Musk and Grimes were talking about the

      Joi character, who appears in BR2049 and not in the 1982 Picture,

      Musk necessarily meant to be referencing BR2049.

   e.  The frequency and intensity of Musk's references to the 1982 Picture

      and BR2049 in the November 2019 cybertruck product reveal

      production planning meetings came across as obsessive; Musk

---

[7] Video of Grimes dressed reminiscently of a dancing hologram version of Joi in
BR2049 to open the 2019 cybertruck reveal can be found online many places,
including here: https://www.youtube.com/watch?v=zfJBm7VTNKE.

behaved as if the importance of evoking a look and feel of the one or both the two motion pictures in the cybertruck reveal was material to his strategy for the event, not merely incidental or optional.

36.    Musk was successful in associating the cybertruck in the reveal event with not only the 1982 Picture, but specifically BR2049: press stories headlined the cybertruck reveal's association with "Blade Runner," with the body of the stories showing that the understood association included BR2049.  (*See, e.g.,* Exhibit H at H-22 to H-24.)

37.    Musk still fans and exploits the association to the present: in a sales promotion for Tesla products with President Trump in front of the White House in March 2025, Musk framed the cybertruck to the watching press corps as being Musk's answer to his own internal question "what kind of truck would Blade Runner [*sic*, "a blade runner"] drive?"[8]

38.    In the White House marketing event, part of the context of why Musk says that he sees the cybertruck as the kind of a truck "blade runner" would drive relates to the cybertruck's steel grey design as an armored, bulletproof vehicle. This sense that the reason a "blade runner" would drive the cybertruck is partly because the cybertruck is a steel-armored, combat-ready vehicle has been a specific focal point of Musk's marketing of the cybertruck since at least late 2023.  (*See, e.g.,* Exhibit I [compilation of materials showing persistence of Cybertruck-marketing association with both the 1982 Picture and BR2049 years after the 2019 cybertruck product reveal event] at I-1.)  As between the 1982 Picture's Deckard and BR2049's K, the sense that one of these two blade runners would be driving such a vehicle only really fits K: in the 1982 Picture, Deckard drives a car called

---

[8] *See, e.g.,* "President Trump promotes struggling Tesla as Elon Watches," news.com.au, March 11, 2025, YouTube https://www.youtube.com/watch?v=uGdd5JmNrFU at 4:42-4:46.

1  the "56 Sedan," which is the futuristic equivalent of a used car that looks dark
2  purple on screen in the movie (and is actually bright orange) and Deckard never
3  takes the car into combat; in BR2049, K's car is steel grey, armed and armored,
4  and K takes it into combat at least twice in BR2049's story.

5      39.    Musk's persistent associations of Tesla and its products with elements
6  of both the 1982 Picture and BR2049 have been effective to move some consumers
7  to purchase Tesla products, including the cybertruck.  For instance, *see* Exhibit I at
8  I-31 (November 1, 2023 X post by a member of the public stating "I'm 55, The
9  Blade Runner movie did influenced me a bit in placing an order for the Cybertruck
10  LOL (I must admit, maybe Mad Max too LOL)").

11      40.    Neither Musk nor Tesla has ever sought any permissions from Alcon
12  for any of the above conduct.  Neither Musk nor Tesla ever paid Alcon for any of
13  it, either.  Tesla thereby effectively achieved, and still enjoys, an unlicensed
14  affiliation between the cybertruck and BR2049 and its elements.  (Exhibit H,
15  *passim*; Exhibit I, *passim*.)

16  ***Alcon Has an Established Business Licensing Automobile Brand Affiliations***
17      ***with BR2049 and K, and WBDI Knew This or Should Have***

18      41.    For the nature and scope of Musk's and Tesla's marketing association
19  of the cybertruck with BR2049 and K, Alcon would have required, and brands
20  would have contracted to pay, substantial amounts to Alcon, or for Alcon's benefit,
21  possibly reaching into the tens of millions of dollars, if Alcon would have been
22  willing to license the association at all (which Alcon would not have been willing
23  to do with Musk or Tesla).

24      42.    Brand associations between major automakers and popular Hollywood
25  motion picture properties are recognized commercially as being both highly
26  valuable and as requiring a license or permission from the relevant rights holder in

27
28

SECOND AMENDED COMPLAINT

the motion picture property used.[9]  Automakers have tried to do it without permission from, or any payment to, the motion picture creators in the past, but the judiciary has quickly shut that down.  *See, e.g., Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F.Supp. 1287 (C.D. Cal. 1995) (granting an injunction against Honda and its ad agency for evoking MGM's James Bond motion pictures in television advertisements for the then-new Honda Del Sol).

43.     Responsible car makers and ad agencies ask permission from studios, or other rights holders, first, and, if permission is granted, negotiate and pay meaningful compensation to the relevant motion picture property rights holders. The dollar value, or other quantified value, of a deal often is determined largely by the number of seconds of direct on-screen association between such things as a specific car or character which appears in the motion picture and the automobile brand paying for the license.  Differences of even a few seconds of such on-screen association might be intensely negotiated for weeks or even months, along with such issues as how many seconds must be consecutive (versus broken up) on screen.

44.     During Alcon's 2016-2017 production of BR2049, there was a bidding process among numerous major automakers worldwide for the right to associate their respective brands with BR2049, K, and K's spinner.  BR2049 features an automotive brand association as a result, including specifically with K and his spinner.  The contract price for that brand association was a $500,000 cash payment from the winning automobile brand to Alcon, plus a $30 million media spend commitment from the automobile maker for a co-promotional marketing campaign for the benefit of BR2049, in exchange for ten (10) non-consecutive

---

[9] *See, e.g.,* M. Graser, "Car Commercials Borrow From Movies to Make Their Own Stories," *Variety*, March 31, 2014
https://variety.com/2014/film/features/1201150512-1201150512/.

SECOND AMENDED COMPLAINT

1  seconds of on-screen brand association time, as the time measure in BR2049 for
2  that deliverable element of the deal.

3      45.    Warner Bros. Pictures was involved in the process of seeking and
4  considering automobile brand association partners during BR2049's production,
5  and knows the importance of the market to Alcon, and knew it in the September
6  2024 to October 2024 time frame relevant herein.  WBDI used Warner Bros.
7  Pictures shared services resources to relate to Tesla, Alcon, and others on the issues
8  raised in this action.  WBDI thus either knew what Warner Bros. Pictures knew
9  about Alcon's automobile brand affiliation licensing business, or WBDI is
10  chargeable with Warner Bros. Pictures' knowledge in that regard.

11      46.    Alcon is still in the automobile brand affiliation licensing market for
12  BR2049, and derivative works of BR2049 or the 1982 Picture, to the present.  As
13  of the latter half of 2024, Alcon was (and currently still is) in production on *Blade*
14  *Runner 2099*, a BR2049-derived sequel or spin-off television series.  As of the
15  September to October 2024 time frame, Alcon was actively engaging with
16  automotive brands for brand partnerships on that television project.

17  ***The Event and Musk and Tesla's Desire to Use Alcon's Exclusive Property In It***

18      47.    Plaintiff makes the allegations of this paragraph 47 on information and
19  belief, subject to need for discovery: In the latter half of 2024, Musk and Tesla
20  approached WBDI about setting what became the Event on Warner Bros. Pictures'
21  legendary Burbank, California studio lot.  A substantial part of Musk and Tesla's
22  subjective purpose in their expression of interest for such a relationship with WBDI
23  was to facilitate repetition and amplification of Tesla's unlicensed association with
24  elements of both the 1982 Picture and BR2049 to promote two new Tesla product
25  lines: the Robotaxi (or cybercab) and Optimus humanoid robots.

26      48.    WBDI is now the legal owner of the Burbank lot, following the 2022
27  corporate merger that created the conglomerate.  In the latter half of 2024, WBDI

28

18

SECOND AMENDED COMPLAINT

(or one or more WBDI subsidiaries as the nominal contracting party or parties) indeed entered into a business relationship with Musk and Tesla for the Event. Tesla agreed to pay and did pay WBDI a substantial monetary amount for the rights to conduct the Event on WBDI's Burbank lot.[10]

49.     Plaintiff makes the allegations in this paragraph 49 on information and belief, subject to need for discovery: Especially considered on an overall basis with all the rights and resources being provided by WBDI to Tesla, and even aggregating all of the monetary payments promised and made by Tesla for all of the rights and resources provided to Tesla by WBDI for the Event, the monetary amount promised and paid by Tesla to WBDI (including all amounts paid by Tesla to WBDI subsidiaries) for the Event was less than what Tesla would have had to pay Alcon for a license to affiliate the Robotaxi with BR2049 and/or K, and still also be able to pay the minimum amount realistically possible for the other resources involved.  In other words, the Event was a significant bargain for Musk and Tesla, at least if and to the extent that it enabled or facilitated Musk and Tesla making a brand affiliation between the Robotaxi and BR2049 or K.

50.     Neither WBDI nor Tesla made any contact with Alcon about the Event, and Alcon knew nothing about it, until WBDI ultimately contacted Alcon about six hours before the Event's scheduled start, as discussed further below.

51.     Plaintiff makes the allegations of paragraphs 51 and 52 on information and belief, subject to need for discovery:  As part of the overall Event relationship terms, WBDI allowed Musk and Tesla effectively to review the WBDI conglomerate's intellectual property ("IP") content library, including Warner Bros. Pictures' IP, in order to pick and choose content they wanted for the Event.

---

[10] Alcon does not know the precise amount with certainty, but there appears to be no dispute by Defendants that there was a such an agreed and performed payment term, and that the amount qualifies as substantial.

52.     Pursuant to this arrangement, Musk and Tesla requested, and WBDI caused one or more of its subsidiaries, to enter into license agreements for Tesla to use elements of the following valuable IP content from the WBDI conglomerate library in the live (in-person, not livestreamed) portion of the Event: (a) "Westworld"; (b) "Mad Max"; (c) the Batmobile; and (d) the "56 Sedan" from the 1982 Picture.  With respect to the Batmobile and the "56 Sedan," the agreement between WBDI (or the relevant WBDI subsidiary) was not just for a license, but for WBDI (or the relevant WBDI subsidiary) physically to provide, or to facilitate the provision from third parties, of the cars themselves to Tesla for the Event.

53.     At some point during this shopping-in-the-WBDI-content-store Event preparation process, Tesla told WBDI that it wanted to use the image in Exhibit A, also shown in-line below, for Musk's keynote speech at the Event:



54.     Exhibit A is an iconic image from BR2049.  It is part of a core sequence in BR2049, additional images from which sequence are in Exhibit B.

55.     WBDI knew or should have known that Tesla's request to use the Exhibit A image in Musk's keynote speech for the Event required rights held exclusively by Alcon.  WBDI also knew or should have known that Alcon would care very much about the response to any BR2049 use request from Musk or Tesla and that Alcon be allowed to address the request on an fully informed basis.

56.     WBDI tasked shared services personnel with handling Tesla's request. As discussed in prior paragraphs, as Alcon's domestic distributor for BR2049, and by virtue of actually being previously involved with Alcon in automobile brand affiliation licensing activities, Warner Bros. Pictures knew that Alcon would consider what Musk and Tesla wanted to do with Exhibit A to be an automobile brand marketing affiliation with BR2049 and its main character K, for which Alcon charges large license fees, if Alcon were willing to allow an affiliation at all.  By well-established course of performance and course of dealing, Warner Bros. Pictures is not allowed even to communicate with an automobile brand about BR2049 brand licenses or affiliations without fully informing Alcon first and seeking Alcon's approval.

57.     Warner Bros. Pictures also generally has been Alcon's domestic distribution partner on over thirty other major motion pictures over a period spanning more than twenty-five (25) years.  Warner Bros. Pictures knows very well that Alcon is careful about product and brand associations: a license which would potentially associate Alcon or its property with a controversial company or person requires that Warner Bros. Pictures consult with Alcon first.  By the latter half of 2024, Musk and Tesla qualified as controversial beyond any doubt, even apart from their history of opportunism with the 1982 Picture and BR2049.

58.     When WBDI and Warner Bros. Pictures received the Exhibit A use request from Tesla, they clearly should have either communicated a firm "no" to Musk and Tesla, or brought Alcon into the process immediately.  Instead, in the terms of the "Tesla-shops-in-the-WBDI-content-store-to-prepare-for-the-Event" analogy suggested above, WBDI did almost the exact opposite.  As discussed below, in the terms of the analogy, WBDI did the equivalent of putting the Exhibit A image into Tesla's shopping cart, and then moving Tesla into the checkout line. WBDI did this by pursuing an ill-advised plan that involved either intentionally or

21

negligently misrepresenting the scope of Warner Bros. Pictures' BR2049 rights to Tesla, which plan crumbled six hours before the scheduled start of the Event.

### *WBDI's Ill-Advised "Clip License" Plan*

59.    As part of Alcon's grant to Warner Bros. Pictures of BR2049 domestic distribution rights, Warner Bros. Pictures has some BR2049 "clip licensing" rights, but the rights could never be the basis to grant Tesla a valid license to use Exhibit A in Musk's Event keynote speech.  "Clip license" rights (sometimes shortened to "clip rights") are sometimes granted by production companies to their distributors as ancillary rights to the overall distribution rights package.  A "clip license" right is generally a right to grant licenses of usually (although not always) small amounts of material from a motion picture or other work (like a single still image from a motion picture) to third parties, for uses that are typically either entirely non-commercial, or at least which will not interfere commercially with other established types of licensing.

60.    As of September and October 2024, Alcon and Warner Bros. Pictures had an at least eight (8) year history of dealing with each other on BR2049 licensing issues.  In all that time, Warner Bros. Pictures has never had or claimed to have authority to negotiate about a potential licensed affiliation by a major automobile brand with BR2049 or K without getting first getting Alcon's fully informed prior permission and approval.  Warner Bros. Pictures has not even claimed the authority to use BR2049 elements without Alcon's permission in just a single paid televised (or livestreamed) advertisement for an automobile brand, without consulting Alcon.  Or, if Warner Bros. Pictures ever has done any of that before, Warner Bros. Pictures knows very well that Alcon does not know of it, and that Alcon would be very surprised and unhappy to learn about it.

61.    Even if Tesla's requested use were not effectively for an automobile brand affiliation license well beyond anything a "clip license" might ever cover,

and even setting aside Alcon's general approval rights discussed above for controversial affiliations, Tesla plainly needed livestreaming and worldwide rights for the requested use. Warner Bros. Pictures "clip licensing" rights on BR2049 do not include livestream or worldwide uses.

62.    Nonetheless, for some unknown period of time, WBDI and Warner Bros. Pictures led Musk and Tesla down a road of expecting to get the Exhibit A image rights for Musk's keynote speech, and without involving Alcon, by WBDI causing Warner Bros. Pictures to work with Tesla to grant Tesla a "clip license" for the use.[11]

63.    Plaintiff makes the allegations of this paragraph 63 on information and belief, subject to need for discovery: As part of the "clip licensing" plan, WBDI (or Warner Bros. Pictures shared services personnel acting for WBDI), intended to charge Tesla a specific amount of money for the "clip license." This was money that neither WBDI nor any WBDI entity would have received by an Alcon licensing arrangement with Tesla for an automobile brand affiliation, had Alcon granted one.[12] The amount of money that WBDI was going to charge Tesla for an

_____

[11] This allegation that WBDI in fact pursued an (improper and ill-advised) "clip license" plan in this way is not speculation by Alcon. Heath told Alcon's legal department that WBDI spent some unknown amount of time pursuing such a "clip license" plan prior to finally contacting Alcon. Heath communicated this to Alcon in telephone calls with Alcon's legal department on October 10, 2024 and October 16, 2024, or in one of the those calls. The telephonic information from Heath in that regard is further supported by partial email chains visible to Alcon. On the day of the Event, as described further below, Heath copied Alcon's legal department into pre-existing email chains showing WBDI-Warner Bros. Pictures shared services personnel (Heath) trying to clear the Exhibit A usage for Tesla without contacting Alcon, and by characterizing the usage (improperly) as only involving "clip licensing" rights.

[12] Brand affiliation licensing money usually goes to the production company (Alcon here), and not to the distributor (Warner Bros. Pictures). In contrast, "clip license"
(footnote continued)

23

SECOND AMENDED COMPLAINT

Exhibit A image "clip license" is unknown to Alcon, but likely was on the order of one percent (1%) or less of what Alcon would have charged Tesla for a brand affiliation license, if Alcon had been willing to grant one at all.[13]

64.    Plaintiff makes the allegations of this paragraph 64 on information and belief, subject to need for discovery: As part of the "clip license" plan, prior to the day of the Event, and prior to any communication with Alcon, WBDI or its representatives transmitted a high resolution digital file of the Exhibit A image to Tesla, for the purpose of Tesla using it in the Event keynote speech, possibly along with other high resolution files of other BR2049 material (such as other still images from BR2049).[14]

65.    Possession of a quality high resolution digital image file was important for what Musk and Tesla wanted to do.  It is not hard to find and make unauthorized copies of the Exhibit A image online in relatively low or moderate resolution.  However, without a quality high resolution digital image file, the resolution of an unauthorized image captured online could easily be too low for the

_____

money paid to the distributor goes into the accounting "waterfall" paid out by the distributor to the production company, with the distributor taking out a percentage distribution fee, essentially, on the "clip license" amount received.

[13] Plaintiff pleads this based on general knowledge of amounts usually associated with true clip licenses, and making the assumption that consistent with characterizing the usage as a clip license, Warner Bros. Pictures set the fee accordingly.  Clip licenses have such fees in the ordinary course (they are not typically granted for free).

[14] Plaintiff bases the allegations of paragraph 64 above in part on email communications from Heath to SPE made on October 10, 2024, which Heath later copied to Alcon.  In those October 10, 2024 emails between WBDI and SPE, WBDI (Heath) tells SPE in essence, *inter alia*, that SPE does not need to provide Tesla with a high resolution digital file of the Exhibit A image, because "[t]hey [Tesla] already have the image (it is an approved still)."  From this, Alcon reasonably infers that Tesla already had it, specifically because WBDI transmitted it to Tesla.

24

high resolution presentation of the image that Musk and Tesla wanted for the Event, including the very large screen size that was actually displayed by all Defendants to the individuals attending the Event in person.

66.     WBDI's choice to spend time on the "clip license" plan rather than immediately informing Alcon of Musk and Tesla's specific expression of interest in using protected elements of BR2049 for the Event, especially combined with WBDI's overall (independently valid but risky) decision to exclude Alcon from Event planning and preparations virtually entirely, caused Alcon reasonably foreseeable prejudice by itself.

67.     Specifically, WBDI's failure to contact Alcon sooner deprived Alcon of the ability to take its own actions to protect itself in a meaningful time frame before Musk and Tesla's planned use of BR2049 elements in the Event.  Actions which Alcon was deprived of taking in any meaningful way included Alcon engaging with Tesla directly about the issue, including so that Alcon could ensure that the BR2049 rights situation as between Alcon and Warner Bros. Pictures was conveyed accurately to Musk and Tesla, and could possibly even have included Alcon seeking an injunction against use of any BR2049 elements or other exclusively owned Alcon property by Musk and Tesla in the Event.

68.     WBDI further exacerbated the situation, and further foreseeably prejudiced Alcon, by its next choices.

***Consumer Expectations Build for Musk and Tesla to Use BR2049 to Set the Theme of the Event Despite Alcon Still Being Excluded from the Process***

69.     At some unknown point in time after the Event had been announced to the public, but before the Event itself, and while WBDI was apparently still holding out the "clip license" plan to Tesla, members of the public came to have a specific expectation that Musk was going to use BR2049 to set the theme of the Event.  For instance, Exhibit J shows an X post and link to a video by a YouTube journalist

25

documenting his October 9, 2024 interview of several men planning to attend the Event the next day, as they all sit together at a restaurant following a meal. The journalist asks each of the men what they expect from the Event the next day (October 10, 2024). The journalist's question/answer exchange with one of the men is:

> Q.  [What are you expecting?]
> A.  Tomorrow, I'm expecting, so Blade Runner 2049 –
> 2049?  Is that how you –
> Other Man Sitting Next to Answering Man: Yes.
> Q.  Is that a movie?
> A.  It is a movie and it's from Warner Brothers.  Warner Brothers, we are going to Warner Brothers Studio, so I'm expecting, like Warner Brothers, like, backdrop and theme of Blade Runner [*sic*] with a cy… with a Robotaxi, which is inspired by the Blade Runner [*sic*] vehicle to show up, so we're going to get that theme of the future.

Exhibit J, https://www.youtube.com/watch?v=KyBFlYFIXcg.

70.    Plaintiff makes the allegations of this paragraph 70 on information and belief, subject to the need for discovery: Musk knows his audience very well, and is attuned to them.  He was aware, and possibly even helped generate, the buzz building as the day of the Event neared that Musk was specifically going to use BR2049 to set the Event's theme.  Musk wants to give his audience what they want and expect in a product reveal.  The fact that WBDI was leading Musk and Tesla down a road of believing that the Exhibit A usage had been licensed by Warner Bros. Pictures, or would be, exacerbated and inflamed Musk's desire and determination to use BR2049 elements to set the theme of the Event.  It contributed to Musk's and Tesla's ultimate decision not to take an alternative course than the one they in fact chose after the "clip license" plan ultimately collapsed.

///

///

*WBDI Reverses Itself and Tells Musk and Tesla That the "Clip License" Plan Will Not Work Because Tesla Needs International Rights Definitely Not Held by Any WBDI Entity*

71.     At some point near the day of the Event (maybe the morning of, or maybe a few days prior), WBDI abruptly changed course on Musk and Tesla about the Exhibit A image.  In the "Tesla-shops-in-the-WBDI-content-store-to-prepare-for-the-Event" analogy terms, WBDI content store security stopped Tesla from leaving the content store with the BR2049 Exhibit A image use license in Tesla's shopping cart, so that WBDI store security could check Tesla's cart, as it were.

72.     Specifically, WBDI's shared services licensing department told Tesla that Warner Bros. Pictures was now -- very close to the scheduled start of the Event -- not going to be able to license the Exhibit A image to Tesla for Musk's keynote speech as planned.  The reason WBDI gave for the reversal was that WBDI had only just realized that Tesla was going to need international rights, and that Warner Bros. Pictures did not have sufficient BR2049 international rights by itself to grant an Exhibit A image license to Tesla for the required worldwide use.[15]  (WBDI apparently communicated this without telling Tesla about the other shortcomings discussed above as to Warner Bros. Pictures' BR2049 rights.)

73.     Things might have simply ended there, but they did not.  On the morning of the Event, an unidentified person in senior management at WBDI (*i.e.,* an individual in WBDI's senior management whose identity is not yet known to Alcon) made a direct or indirect communication to the individual WBDI shared services licensing executive (Heath) who had made the determination that the "clip license" plan was not legally viable.  The essence of the message from this

---

[15] Heath disclosed this in essence to Alcon's legal department in telephone calls with Alcon's legal department on October 10, 2024 and October 16, 2024, or in one of those calls.

SECOND AMENDED COMPLAINT

unidentified WBDI senior management person to Heath was a direction to Heath that she should help Tesla fix the Exhibit A image licensing problem so that Musk could use Exhibit A in his keynote speech as planned.[16]

74.    Not long after this communication from WBDI senior management to Heath, and shortly after noon on the day of the Event, Heath provided what she believed to be the relevant SPE licensing department contact information to Tesla, and Heath and Tesla proceeded to each separately make coordinated contact with Alcon's international distribution partner, non-party SPE.  The purpose of both of the separate but coordinated contacts by Heath and Tesla to SPE was to try to get international "clip license" rights for Tesla to the Exhibit A image, and without telling Alcon.

75.    First, Heath provided her SPE clip licensing counterpart's direct email address to Tesla representatives so that Tesla could make direct contact with SPE. Second, at 12:11p.m. PDT on October 10, 2024 (about seven hours before the scheduled 7:00 p.m. PDT start of the Event) Heath sent an email "heads up" to the SPE executive that the SPE Executive might be getting an emergency rush basis BR2049 rights permission request for "a Tesla even[t] happening today on our lot (sorry)."

76.    In the same email to the SPE executive, Heath explained that the "emergency" was the result of her shared services department initially but erroneously treating the contemplated Tesla Exhibit A usage as only for an in-person event, with no livestream, but that Heath's department was then told the usage would involve worldwide livestream.  Heath's email further explained that

---

[16] Heath told Alcon that the described communication and direction from WBDI senior management to Heath in fact occurred.  Heath disclosed the essence of this to Alcon in calls with Alcon's legal department on in calls with Alcon's legal department on October 10, 2024 and October 16, 2024 or one of those calls.

the reason for the contact to the SPE executive was a WBDI belief that SPE

"controlled international," and thus implicitly that a combination of "clip license"

permissions from Warner Bros. Pictures and SPE could provide adequate rights

without involving Alcon.

77.    SPE promptly responded to WBDI in writing (in an email sent at

12:49 p.m. PDT on October 10, 2024) that the BR2049 international usage rights

which Tesla desired were beyond the scope of anything that SPE could grant

without Alcon's permission; that Alcon would have to be involved for Tesla to be

granted such rights; and that SPE had already told Tesla by phone that SPE did not

have sufficient rights to grant the international rights being requested without

Alcon involvement.

78.    Tesla appears to have flatly refused to contact Alcon.  For example, in

the same 12:49 p.m. PDT email referenced above, SPE's representative also wrote

to WBDI (Heath): "I just spoke to [Tesla representative] David Adametz and he

said, they need worldwide rights but is not working with Alcon."  Alcon submits

that the facts and circumstances, including Musk's and Tesla's known aversion to

working with or validating the business model of brand affiliation licensors, and

the known facts of how everything actually happened with respect to the Event,

including that Tesla never itself contacted Alcon even a single time, all support that

the meaning of the reported statement by Tesla's Adametz to SPE after learning

that Alcon's permission was required for the international rights requested, was not

"Tesla is not working with Alcon so far (or yet)," but rather "Tesla is not willing to

work with Alcon at all."

***WBDI Contacts Alcon About Six Hours Before The Scheduled Start of the***
***Event, Seeking an Emergency Exhibit A Use License for Tesla***

79.    At 12:54 p.m. PDT on October 10, 2024, Heath contacted Alcon, by

copying Alcon's legal department into the existing chain with SPE, but still trying

29

to characterize the usage requested as only involving a "clip license." This was the first contact by anyone at WBDI to anyone at Alcon about the Event: Alcon knew nothing about the Event until this point.

***Alcon Informs WBDI and SPE That License Permission is Denied With Additional Directions and Objections and WBDI Balks At Communicating Any of the Message to Tesla, Wanting Only SPE to Do So***

80.    After requesting more information than WBDI's Heath provided in her initial emergency request to Alcon, and receiving some from Heath, and after considering the situation at Alcon's CEO level, Alcon's representative communicated back in writing to WBDI (Heath) and SPE as follows, at 1:20 p.m. PDT on October 10, 2024: "I checked with one of Alcon's co-heads, and he <u>does NOT approve</u> of any use of 'Blade Runner 2049' in connection with Tesla and/or X. Please confirm that you have received this email and will not be proceeding with the use of our property at this event. Thanks." (Emphasis in original.)

81.    WBDI and SPE both communicated that this was received. However, WBDI (Heath) balked at being the channel to communicate any of it back to Tesla. Instead, in an email copying Alcon, Heath asked <u>*SPE*</u> to do so, apparently so that WBDI would not have to itself give Musk and Tesla any bad news.

***SPE Communicates the International Rights Licensing Permission Denial to Tesla, But Without Communicating the Full Scope of Alcon's Requested Message to Musk and Tesla***

82.    In response to Heath's request that SPE do the communicating of the bad news, rather than WBDI doing it, SPE reported back to WBDI and Alcon by email at 1:27 p.m. PDT on October 10, 2024 that SPE had communicated back to Tesla that "[SPE] [c]onfirmed use was not granted and thanked them for their interest."

///

SECOND AMENDED COMPLAINT

83.    This reported communication by SPE to Tesla by itself was
significantly less than what Alcon asked to be communicated to Musk and Tesla,
and, if left to stand by itself, was problematic.  If what SPE reported as having been
communicated to Tesla were all that were communicated back to Tesla (*i.e.,* if
more were not said to Tesla, especially by WBDI), it would be potentially
misleading to Musk and Tesla in at least two respects, both of which increased
Alcon's reasonably foreseeable prejudice.

84.    First, by conveying only that the specific Exhibit A usage request at
issue was denied by Alcon, and also conveying a "thank you for your interest," the
SPE communication, if left to stand by itself, carried risk of Musk and Tesla not
understanding the strength and scope of Alcon's position: that Musk and Tesla not
make <u>any</u> use of BR2049 or any other Alcon property for the Event.

85.    Second, if the SPE communication were left to stand by itself with no
further communications by WBDI to Tesla afterward, the combination of
communications by WBDI and SPE to Tesla up to that point potentially created
another serious problem: it was susceptible to an inference by Musk and Tesla that
the <u>only</u> problem, which WBDI as an organization needed Alcon's or SPE's help to
cure, was lack of sufficient <u>international</u> BR2049 rights.

86.    Alcon's legal department saw at least some of these potential
problems and moved quickly to try to correct them, by trying to make sure that
SPE's incomplete communication to Tesla did not stand unsupplemented by more
direct and complete information directly from WBDI to Tesla.

87.    The Event was not SPE's to say anything about.  The larger message
was thus not really for SPE to communicate to Tesla, and Alcon did not necessarily
expect SPE to communicate it to Tesla.  Rather, Alcon reasonably expected <u>WBDI</u>
to do so.  Alcon's legal department did nonetheless make a telephone call to SPE to
note the insufficiency of SPE's communication.  However, more relevant here,

when Alcon saw Heath balk at WBDI itself actually telling Musk and Tesla any bad news, and saw that SPE had not communicated the full message that needed to be communicated, Alcon's representative sent WBDI (Heath) an email requesting a phone call as soon as possible.  Such a call in fact then occurred.

### *Alcon's Event Directions to WBDI*

88.    In the resulting phone call between Alcon's legal department and WBDI's Heath, which took place at around 1:45 p.m. PDT on October 10, 2024 Alcon clearly communicated to Heath all of the following: a) Alcon refused all permissions; b) Alcon was adamantly opposed to Alcon or any Alcon-owned property ever being used by Tesla, Musk, or any Musk-owned company for anything, including because Alcon did not like Musk and was concerned about his increasing political polarity and high brand toxicity; c) Alcon asked and directed WBDI to communicate all of this directly to Musk and Tesla (and specifically not for WBDI to rely only on SPE's Exhibit A international rights denial communication to Tesla); and d) Alcon requested and directed that WBDI also actively police against any Musk and Tesla use of BR2049 or any Alcon property in the Event.  (**"Alcon Event Directions to WBDI"**.)

89.    Alcon understood WBDI's (Heath's) response to mean that WBDI would honor and execute on all of Alcon's Event Directions to WBDI.

### *WBDI Apparently Intentionally Ignores*
### *All of the Alcon Event Directions to WBDI*

90.    What WBDI did or did not do next is still not entirely clear to Alcon. Alcon initially believed that WBDI had followed all of the Alcon Event Directions to WBDI, except that WBDI did not actively police Musk and Tesla against use of BR2049 elements or other Alcon exclusively owned property during the Event.

91.    However, it now unfortunately appears more likely that WBDI did not perform <u>any</u> of Alcon's Event Directions to WBDI.  Instead, it now appears that

32

WBDI decided to rely only on SPE's communication to Tesla that international rights to use Exhibit A had been denied, so that WBDI would not itself have to give Musk or Tesla any bad news – a course of action that Alcon had precisely asked WBDI not to do.

92.    Thus, as Plaintiff's lead alternative theory on the question of what WBDI did or did not do in response to the Alcon Event Directions to WBDI, Plaintiffs pleads on information and belief, subject to discovery, that the answer is "nothing": although WBDI had caused Alcon reasonably to infer that WBDI would perform all of Alcon's Event Directions to WBDI, WBDI instead made an intentional or negligent choice to perform none of Alcon's Event Directions to WBDI.  (**"WBDI Action on Alcon Event Directions to WBDI Alternative Theory 1**.**"**)

93.    If that is what happened, then among other problems, it potentially left uncorrected a misimpression that WBDI had instilled in Musk and Tesla that was unreasonably and foreseeably prejudicial to Alcon.  First, WBDI at least initially gave Musk and Tesla the false impression that Warner Bros. Pictures had sufficient BR2049 rights to grant Tesla an Exhibit A image use license for Musk's keynote speech without any Alcon knowledge or approval.  Later and second, WBDI made an only partial correction to the initial inaccurate representation on the BR2049 rights situation, to the effect that, while there was a deficiency in Warner Bros. BR2049 rights preventing Warner Bros. Pictures from granting Tesla a valid license, the only deficiency was a lack of sufficient international rights.

94.    A corollary (but false) understanding that this potentially created in Musk and Tesla was that Alcon's exclusive rights in BR2049's protected elements were only for the non-domestic territory.  Under WBDI Response to Alcon Event Directions to WBDI Alternative Theory 1, WBDI never corrected this false impression potentially instilled in Musk and Tesla about the scope of Alcon's

BR2049 rights.  Musk and Tesla were thus left by WBDI with the (inaccurate) impression that Alcon did not have the exclusive or blocking rights to BR2049 uses in the domestic territory, including the U.S.  The false impression left by WBDI in Musk and Tesla was instead that Alcon had <u>no</u> U.S. rights in BR2049 and instead Warner Bros. Pictures had them all (or enough); that Warner Bros. Pictures was willing to grant such rights to Tesla; and perhaps even already had purportedly granted such domestic territory rights to Tesla for use of Exhibit A.

95.    This would significantly (but erroneously) change risk assessments for Musk and Tesla: while they might be exposing themselves to Alcon claims under the law of other jurisdictions if they used BR2049 protected elements in Musk's keynote speech without Alcon's permission, they potentially believed that they were effectively immune from <u>U.S. law-based</u> infringement claims by Alcon.  This would have sharply prejudiced Alcon by erasing the deterrent effect on Musk and Tesla of Alcon's exclusive United States copyright rights in BR2049.  As part of WBDI Action on Alcon Event Directions to WBDI Alternative Theory 1, Alcon alleges all of this did happen as a consequence of WBDI's intentional (or negligent) decision not to perform any of Alcon's Event Directions to WBDI.

96.    ***WBDI Action on Alcon Event Directions to WBDI Alternative Theory 2:*** *WBDI performed all of the Alcon Event Directions to WBDI, except that WBDI intentionally or negligently failed actively to police Musk and Tesla's conduct during the Event.  Under this theory, before the Event started, Musk and Tesla had accurate information about Alcon's positions, which information was relayed to Musk and Tesla by or through WBDI, and Musk and Tesla were on clear notice that they would potentially face U.S. law-based claims by Alcon if they chose to use protected elements of BR2049 in the Event.*

///

///

SECOND AMENDED COMPLAINT

***WBDI Fails Actively to Police Musk and Tesla's Conduct During the Event Against Uses of BR2049 Protected Elements or Any Other Alcon Exclusively Owned Property, Contrary to Alcon's Event Directions to WBDI***

97.     Under both of the above alternative theories, WBDI Action on Alcon Directions to WBDI Alternative Theories 1 and 2, WBDI either intentionally or negligently failed to actively police Musk's and Tesla's conduct during the actual Event against Musk and Tesla uses of protected elements of BR2049 or any other property exclusively owned by Alcon.  This failure by WBDI was contrary to what Alcon had requested in the Alcon Event Directions to WBDI, and to what Alcon had reasonably understood WBDI had committed to Alcon to do after WBDI's receipt of the Alcon Event Directions to WBDI.

98.     There appears to be no dispute by Defendants that WBDI in fact did not actively police Musk and Tesla's Event conduct against Musk and Tesla uses of BR2049 or any other property exclusively owned by Alcon.

99.     Infringement followed.

***Musk and Tesla Use an AI Image Generator to Create The Exhibit C Image***

100.   Several hours later, the Event happened.  Musk featured the image attached as Exhibit C, also shown below, prominently in his keynote speech:



SECOND AMENDED COMPLAINT

101.   Musk and Tesla (and/or their agents) created Exhibit C using an artificial-intelligence ("AI")-driven image generator, after communication to Tesla by at least SPE of the Exhibit A licensing denial.  Alcon alleges on information and belief, subject to need for discovery, that the AI image creation process involved literal copying of protected elements of BR2049, possibly including literal copying of the Exhibit A image or of the entire BR2049 work.  Plaintiff does not know exactly what Musk and Tesla did in their admitted use of an AI image generator to create Exhibit C, and pleads two alternative theories.

a. **Exhibit C AI Generation Process Alternative Theory 1:** From Alcon's examination, Exhibit C seems likely to have been generated by Musk and/or Tesla (or someone acting under their control and/or at their direction): a) copying the Exhibit A image and the Exhibit B images (or similar images from BR2049's Las Vegas sequence), or even possibly the full BR2049 motion picture work (or qualitatively significant portions thereof) in audiovisual form, into an AI image generator, and b) then asking an AI image generation engine to make "an image from the K surveying ruined Las Vegas sequence of 'Blade Runner 2049,'" or some closely equivalent input direction.  Alcon alleges that in fact this, or something closely akin to it, is how the Exhibit C image was generated, and for the bad faith intentional purpose of affiliating BR2049 and its goodwill with Tesla's cybercab, over Alcon's denial of permission and express objections.

b. The Exhibit C image was generated in the above way by an employee or agent of Tesla (possibly by Adametz or Lili), or another Musk-owned or -controlled company, or even possibly by Musk himself.  It was done with Musk and Tesla's knowledge of the improper nature and purpose of the image generation request.  It was done by

36

1    individuals subject to the supervision of and under the direction and

2    control of Musk.  Musk and Tesla participated in its creation.

3    c.    ***Exhibit C AI Generation Process Alternative Theory 2:*** *The same*

4    *facts as Exhibit C AI Generation Process Alternative Theory 1, except*

5    *that part of the image generation process included individuals*

6    *involved in the image generation process also selecting or otherwise*

7    *obtaining what Musk and Tesla claim is a "licensed image" as a*

8    *background and then directing an AI image generator to add "Elon*

9    *Musk in a duster in the foreground," or "Elon Musk in a duster*

10    *looking into the city," or similar direction.  However, the AI image*

11    *generator in following the image generation prompts from Musk*

12    *and/or Tesla (or persons acting under their control and/or direction)*

13    *still relied on literal copies of BR2049 in its entirety, or of*

14    *qualitatively significant protected portions of BR2049, to generate the*

15    *image, and, the BR2049 elements in the image generator were placed*

16    *into the image generator by Musk and/or Tesla (or persons acting*

17    *under their control and/or direction).*

18    ***Musk Uses the Exhibit C Image in His Keynote Speech to Set the Event's Theme***

19    102.    The Event was scheduled to begin at 7:00 p.m. PDT on October 10,

20    2024, but did not actually begin until about 8:00 p.m. PDT.  In a brief introduction

21    of a minute or less, a Tesla representative named "Franz" took the stage.  Franz's

22    only substantive remark was the following: "Just want to thank Warner Brothers

23    for hosting us here.  As you know, this is the birthplace of many epic films – many

24    of them depicting a vision of the future."

25    103.    Franz then said: "We're here tonight to experience that future, that is

26    closer than you think.  And who better than Elon, right, to show us that future."

27    The livestream then shifted to a combination of aerial shots and ground cameras

28

37

SECOND AMENDED COMPLAINT

showing a cybercab (or Robotaxi – the terms appear to be interchangeable as far as Plaintiff can tell) arriving at an on-lot theater, some distance away from the presentation stage building.  Musk emerged from the theater and entered the cybercab after silently waving to a small crowd.

104.   The livestream tracked the Musk-bearing cybercab from various camera vantage points as it autonomously rolled him slowly to the presentation stage building at another part of the lot.  Musk exited the cybercab and walked onto the Event stage.  He spent about another minute on welcoming remarks and explaining that there were 20 cybercabs and another 30 fully autonomous and driverless Tesla Model Ys at the Event for attendees to take a ride in.

105.   Then to commence the actual presentation, Musk said: "So you see a lot of sci-fi movies where the future is dark and dismal, where it's not a future you want to be in."  As Musk said this, the Event's global livestream feed changed to a full screen display of a presentation slide with an image of the Earth from space at sunrise, with the words "What Kind of World Do We Want to Live In?"  This first slide stayed on the full-screen livestream feed for less than two seconds.

106.   Then, the livestream full screen display shifted to Musk's second slide, which the livestream displayed for about 11 seconds.  The second slide is an image that looks (on a first initial visual read) like a motion picture still photo (although it isn't) of a male figure seen from behind, with close-cropped hair, wearing a trench coat or duster, standing in almost full silhouette as he surveys the abandoned ruins of a city, all bathed in misty orange light.  In the upper left corner, the words "Not This" appear superimposed on part of the orange sky.  A Tesla logo appears in the lower right corner.  Exhibit C is a screenshot of this second slide image from Musk's presentation.

107.   Alcon submits that, for anyone familiar with BR2049, the Exhibit C image objectively reads visually either as an actual still image from BR2049's

iconic sequence of K exploring the ruined Las Vegas, or as a minimally stylized copy of or illustration of such a still image, or otherwise as an illustration of a scene from BR2049 and specifically its Las Vegas Sequence.

108.   If there were any doubt that Musk and Tesla intended to evoke BR2049 with the Exhibit C image, Alcon submits that Musk effectively erased such doubt with his voiceover comments during the approximately 11 seconds that the infringing Exhibit C image was completely filling the livestream screen.  Musk said: "You know, I love 'Blade Runner,' but I don't know if we want that future.  I believe we want that duster he's wearing, but not the, uh, not the bleak apocalypse."  Alcon submits that this effectively identified the Exhibit C image as an illustration of BR2049, its main character K, and BR2049's iconic Las Vegas Sequence.  The Exhibit C image then disappeared from the screen and Musk segued to talking about how what we all should want is a happier looking future, and how happy and joyful Musk's vision of cities and highways filled with driverless robot cars will be and why.

109.   Musk's Event-opening remarks effectively identified Exhibit C to the audience as an image of or from BR2049 and its main character K.  Musk used Exhibit C and his remarks about it to set the theme of the Event.  The essence of the Event was a commercial call to action to invest in Tesla and to buy Tesla cars and robots.  Musk's presentation occurred to a large live audience on WBDI's lot, using WBDI's infrastructure and resources.  A video feed of it also was displayed over WBDI's systems, and livestreamed worldwide to millions of viewers.

110.   The Event's worldwide livestream X feed, including Musk's BR2049-infused opening, was re-posted by Tesla, Musk, X and others thousands of times, with millions of total views.  The false affiliation between BR2049 and Alcon, on the one hand, and Tesla and Musk, on the other hand, is irreparably entangled in the global media tapestry, as all Defendants knew would inevitably happen.

39

SECOND AMENDED COMPLAINT

111.    Exhibit C and the portion of the recorded Event feed containing it (Exhibit 2 to February 4, 2025 Declaration of Christopher Marchese in Support of Defendants' Motions to Dismiss Original Complaint [Dkt. 24-2] ["Event Recording"]) are substantially similar to copyright-protected elements of BR2049, and infringe Alcon's exclusive copyright rights in BR2049.  *See* Exhibit D (copyright side-by-side comparison).  A side-by-side comparison of Exhibit C against Exhibit A and Exhibit B images from BR2049 is also shown below:

 

 

 

 

112.    Musk and Tesla's conduct also created at least likelihood of confusion about whether there is any licensing association between Alcon, on the one hand,

SECOND AMENDED COMPLAINT

and Musk or Tesla, on the other hand (there is not and never has been). *See* E (sample Alcon BR2049 trade dress images); and F (side-by-side Exhibit C and Alcon trade dress comparison). A side-by-side comparison of Exhibit C against Alcon trade dress images from Exhibit E is also shown below:










SECOND AMENDED COMPLAINT

*Musk's and Tesla's Infringing Conduct Was Intentional*

113.   Plaintiff is informed and believes, and subject to need for discovery, alleges that, although Musk said the words "Blade Runner" without the year number (without "2049"), he subjectively meant to evoke BR2049 rather than the original 1982 Picture, and he was motivated to do so.  The two films are related, but BR2049 has its own distinct brand and secondary meaning, and BR2049's specific goodwill is more relevant to Tesla's and Musk's Robotaxi product.

114.   Although the 1982 Picture does prominently feature flying car "spinners," the cars in the 1982 Picture are not shown to be wholly or even partially autonomous, or even shown to employ artificial intelligence themselves in any way.  None of the cars in the 1982 Picture play any role as a quasi-sentient companion to the Deckard lead character in the 1982 Picture, like K's spinner does for K in BR2049.  Pointedly, then, if you are a company (or own one) specifically trying to market artificially intelligent, wholly or partially autonomous self-driving cars (as Tesla and Musk are), the 1982 Picture has little or no specifically relevant context.  In contrast, BR2049 has extremely relevant context and worldwide goodwill in precisely the areas of artificial intelligence, self-driving capability, and autonomous automotive capability that Tesla and Musk are trying to market.

115.   Musk did successfully evoke BR2049 specifically, including to consumers and potential car maker and car brand customers of Alcon, and that is true even though Musk only said the words "Blade Runner" without adding the year "2049."  For the reasons detailed in the next paragraphs below, Musk's act of displaying the Exhibit C Image -- an image of a man in near-silhouette, with close-cropped hair and wearing a duster, while he surveys an orange-light-bathed ruined and abandoned cityscape --  and displaying it for 11 seconds while Musk talks

///

SECOND AMENDED COMPLAINT

about "Blade Runner" and a specifically "apocalyptic" future – that is all specifically evocative of BR2049, and not of the 1982 Picture.

116.   While both the 1982 Picture and BR2049 show dystopian urban futures, only BR2049 has a specifically apocalyptic setting.  Only BR2049 has an abandoned and ruined city (Las Vegas) that has suffered an event of extreme destruction (the detonation by terrorists of a dirty nuclear device).  The ruined Las Vegas is where the most dramatically charged events of the BR2049 story take place (K's encounter with the long-lost Deckard).  The setting has striking color design, cinematography and other visual elements: it is distinctly bathed in "apocalyptic" misty orange light, just like the Exhibit C Image and which the 1982 Picture does not have in any comparable scene involving any kind of ruined city or post-apocalyptic setting.  Throughout BR2049, there also are general references and story elements about civilization having semi-recently suffered a broader, apocalyptic nuclear conflict in the mid-range past, including electromagnetic pulse activity that destroyed many electronic records, making investigation of the past difficult.

117.   In contrast, the 1982 Picture is set in a dystopian urban landscape of a then-futuristic 2019 Los Angeles, but the 1982 Picture's setting is specifically not apocalyptic.  In the 1982 Picture, there has not been any dirty nuclear device, or nuclear electromagnetic burst which destroyed electronic records, or other apocalypse that has hit Los Angeles or Las Vegas or any other location.

118.   If anything, the urban setting of the 1982 Picture is the opposite of abandoned and ruined: it is overrun with too much ongoing industry and suffering from overpopulation.  It is not a stark, lonely, misty, orange, dry, radiated desert ruin like BR2049's Las Vegas or the Exhibit C Image, but rather is an overcrowded neon urban prison, where the citizens are trapped in constant night plagued by perpetual rain and an ever-present bombardment of consumer

advertising.  In the 1982 Picture, neither the main character nor anyone else ever goes to any orange-colored post-apocalyptic ruined city or any other such location, in a duster or otherwise.  Further, while in BR2049, Deckard is (or was) a "blade runner" who appears in BR2049's Las Vegas Sequence setting, he never wears a duster in BR2049 at all: Musk's voiceover reference to a blade runner wearing a duster in a post-apocalyptic setting while directing the audience to the Exhibit C image, can only be a reference to K (not Deckard).

119.    Plaintiff thus alleges on information and belief, subject to need for discovery, that Musk thus very clearly meant specifically to evoke to the audience including actual and potential purchasers and the consuming public, not the 1982 Picture, but rather BR2049 and everything that goes with it -- including artificially intelligent autonomous cars like the Tesla cybercab being pitched at the event.  He successfully did.

120.    Plaintiff submits that any argument that Musk and Tesla only meant to talk broadly about the general idea of science fiction films and undesirable apocalyptic futures and juxtaposing them with Musk's ostensibly happier robot car future vision, and that they just used BR2049 by chance, without conscious awareness of and intent to appropriate BR2049's special secondary meaning in the context of trying to sell artificially autonomous cars, is not credible.

121.    The art of advertising is at least partially about choosing expressive levers that will quickly and effectively move the audience emotionally, psychologically, and/or intellectually into a state where the seller can more easily influence them to do the thing or things the seller wants them to do.  Here, especially when the entire context of the Event is considered, Plaintiff is informed and believes and, subject to the need for discovery alleges, that part of Musk's and Tesla's goal was to try to convince the audience at the outset of the presentation that the decision that the presentation was going to put to them (whether or not to

44
SECOND AMENDED COMPLAINT

buy or bet on Musk's and Tesla's artificially intelligent car products) was urgent and critical to the future of joint human/AI civilization. Musk also wanted to instill a mood not only of curiosity, but also of fear, anxiety and urgency. Plaintiff pleads on the same basis that Musk also wanted strongly to suggest that there are right and wrong answers to the question, leading to good futures and bad futures (and that doing what Musk wants leads to the good futures).

122.    What Musk did was use the lever of BR2049's protectable elements as Musk's specific vehicle of expression to communicate those themes and moods, to move his audience into the emotional space Musk wanted the audience to be in for the presentation. Whether or not Musk intended that, it was the objective effect. That infringed Alcon's copyright in the BR2049.

123.    Defendants' conduct also violated the Lanham Act, creating actual confusion or a likelihood of it in the relevant marketplaces, about BR2049 branding, including Alcon's marketing efforts with potential auto brand partners on the *Blade Runner 2099* television series, among other marketplace confusion and brand damage.

124.    Among other points creating likelihood of confusion, the Exhibit C image is explicitly misleading as to whether there is any brand association between Alcon or BR2049 and Musk or Tesla. The Exhibit C image is itself very similar to images which Alcon uses for marketing and publicity purposes, including as trade dress, and in creating Exhibit C, Musk and Tesla affixed a Tesla logo in the lower right corner. In a real sense, Musk and Tesla put Alcon's mark or trade dress right next to (literally affixed together to) Tesla's. This is further exacerbated by Musk using the phrase "Blade Runner" when talking about the Exhibit C image, as Alcon does have an ownership interest in that word mark, and it is understood in usage as referencing either the 1982 Picture or BR2049.

///

1    ***Defendants Make No Remedial Efforts Between the Event and Alcon Filing Suit***

2    ***and WBDI Effectively Encourages Musk and Tesla Not To Do So***

3    125.   On October 16, 2024, before filing suit, Alcon contacted WBDI's

4    representative (Heath) by telephone to express Alcon's dissatisfaction and to

5    request information about what happened to have things go so wrong, especially

6    after the Alcon Event Directions to WBDI and Heath's indication to Alcon that

7    WBDI would perform all of them.  WBDI refused to provide any meaningful

8    explanation and did not engage in any remedial conduct, not even an apology to

9    Alcon or public denouncement of Musk and Tesla's conduct as violating Alcon's

10   rights.  WBDI's refusal to remediate encouraged and supported Musk and Tesla not

11   to do so, and indeed all Defendants refused to do so.

12   ## THE 1982 PICTURE

13   126.   Warner Bros. Pictures was the original distributor of the 1982 Picture

14   and still holds distribution rights to it.  Warner Bros. Pictures was not the

15   production entity, legal author or ultimate copyright holder of the 1982 Picture.

16   The 1982 Picture was registered with the Copyright Office on November 16, 1982

17   under registration number PA0000157612, with the original author and copyright

18   claimant being a legal entity named The Blade Runner Partnership.  The Blade

19   Runner Partnership was not a Warner Bros. Pictures entity.  The Blade Runner

20   Partnership subsequently created and registered multiple versions or cuts of the

21   1982 Picture with the Copyright Office.

22   127.   In or about 2011, Alcon acquired a broad set of rights in the 1982

23   Picture and underlying properties, including motion picture, television and other

24   derivative work rights to the 1982 Picture and the original Philip K. Dick "Do

25   Androids Dream of Electric Sheep?" novel, all from a successor entity to The

26   Blade Runner Partnership.

27   ///

28

128.   The rights acquired by Alcon included, and Alcon still owns, a perpetual non-exclusive, irrevocable license to the word mark "BLADE RUNNER."  Warner Bros. Pictures also has non-exclusive, irrevocable rights to the word mark "BLADE RUNNER."

129.   After the 2011 rights acquisition by Alcon, if not before, the essence of Warner Bros. Pictures exclusive rights in the 1982 Picture was and is that Warner Bros. Pictures continues to own the exclusive right to exploit the 1982 Picture as is (with no rights to make meaningful derivative, or new, works). Warner Bros. Pictures as a successor to The Blade Runner Partnership also owns and controls many or even most physical elements of the 1982 Picture (*e.g.*, physical prints of the 1982 Picture, old costumes, props, and the like), including car props (although Warner Bros. Pictures may from time to time sell these props to private parties).  Meaningful rights to make fresh content based on the 1982 Picture belong to Alcon, by virtue of Alcon's sweeping exclusive derivative work rights.

130.   Additional facts about the 1982 Picture are alleged in Appendix 1, including a story overview.

### **BR2049**

131.   <u>BR2049 Is The Copyright Infringed Work</u>.  Alcon produced BR2049 as a sequel to the 1982 Picture, pursuant to Alcon's derivative work rights.  Alcon is the owner and, as to all rights at issue herein, the exclusive copyright holder, of BR2049.  In copyright terms of art, BR2049 is both a "motion picture" and the "infringed work" in this action.  BR2049 has been registered with the United States Copyright Office under registration number PA0002056792 since October 6, 2017.

132.   Warner Bros. Pictures is the original and current (but not perpetual) distributor for BR2049 in the domestic territory (U.S. and Canada), pursuant to a license from Alcon.  SPE is the distributor for BR2049 for the rest of the world, also pursuant to a rights grant from Alcon.

SECOND AMENDED COMPLAINT

133.  <u>Exhibits A and B Relative to the Infringed Work</u>.  The images in Exhibits A and B are not themselves the Copyright Office-registered "infringed work" claimed.  In the terminology of the United States Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*, the images in Exhibits A and B are examples of "still images" from BR2049 – in particular from the core dramatic sequence that appears in BR2049 at runtime 1:36:28-1:37:59, and continuing at 1:40:48-2:01:50 ("Las Vegas Sequence").  The Exhibit A image appears in BR2049 at about 1:37:55 in BR2049's run time.  The Exhibit B images are from run times between 1:36:28-1:37:59, 1:40:48-1:43:35, and 1:51:30-2:01:50.[17]

134.  <u>Exhibit A Image in Story Context</u>.  The Exhibit A image is from shortly after K's arrival in Las Vegas with his spinner, a fully autonomous flying car.  (*See* BR2049 story overview in Appendix 2.).  It is an image positioned from behind K, with his close-cropped hair, garbed in his distinctive trench coat or "duster," as he stands next to his spinner, facing away from the camera lens and audience to survey the devastated orange-light-bathed Las Vegas cityscape.  In the Exhibit A image, K is surveying the ruins as he prepares to set out on the walk through them that will lead him to the long-lost and mysterious Deckard – the most highly anticipated encounter in BR2049.

135.  <u>Exhibit B Image in Story Context</u>.  The Exhibit B images are samples of other still images from the Las Vegas Sequence.  They include images from K's walk through the ruins to encounter Deckard, and from when K is in Deckard's aerie looking out the picture windows at the ruined city.  (*See* BR2049 story overview in Appendix 2.)

///

---

[17] Alcon has noted the respective run time references next to each image, directly on Exhibits A and B.

1    136.   Additional facts about BR2049 are alleged in Appendix 2, including a

2    story overview and list of claimed protected elements.

3    **ALCON MARKS AND TRADE DRESS**

4    137.   "BLADE RUNNER" Word Mark.  In actual usage, the words

5    "BLADE RUNNER" can refer to the 1982 Picture, BR2049, or both (as opposed to

6    the words "BLADE RUNNER 2049," which only refer to BR2049).  (*See, e.g.*,

7    Exhibit E at E-3 [use of "BLADE RUNNER" mark on back cover of the Alcon-

8    licensed coffee table art book *The Art and Soul of Blade Runner 2049*]; Exhibit H

9    at H-22 and H-23 [Space.com news article referencing cybertruck as "straight out

10   of Blade Runner" and making clear in body of article that writer is referring to both

11   the 1982 Picture and BR2049 by the headline]; Exhibit J and recorded video

12   interview of Event invitee recorded referenced therein,

13   https://www.youtube.com/watch?v=KyBFlYFIXcg,  [invitee answers journalist's

14   question of what invitee expects from the Event by explicitly referencing "Blade

15   Runner 2049," and by the end of the invitee's answer to the journalist has

16   shortened their usage to just "Blade Runner," even though the invitee appears to be

17   talking about BR2049 in the entire answer, transcribed *supra*,  ¶ 69].)

18   138.   "BLADE RUNNER 2049" Word Mark.  Alcon exclusively owns, and

19   has continuously exclusively owned since prior to 2024, the unregistered trademark

20   word mark "BLADE RUNNER 2049."  The words "Blade Runner 2049" are

21   fanciful, arbitrary or suggestive and thus inherently distinctive.  Even if only

22   descriptive, they have nonetheless achieved secondary meaning through years of

23   continuous use in commerce by Alcon, beginning no later than 2017.

24   139.   Alcon's uses of BLADE RUNNER 2049 include without limitation

25   uses in connection with and to market, promote and advertise motion pictures,

26   DVDs, comic books, video games, and other merchandise items.  As a result, the

27   BLADE RUNNER 2049 mark is widely recognized by the general consuming

28

public of the United States and the rest of the world as a designation of source of the goods and services of Alcon (or of a single source).  As detailed further below, the BLADE RUNNER 2049 mark is also recognized by both the general consuming public and by major car manufacturers and car brands as connoting affiliation with or sponsorship by Alcon when used in connection with automobiles and automobile brands (including both real automobiles and concept automobiles).

140.   <u>BR2049's Main Character K.</u>  The character K, including descriptions of K, and visuals images that look like or evoke the character K and/or that are held out to be the character K, either explicitly or implicitly, are unregistered marks and/or protectable trade dress of Alcon.  They also have achieved secondary meaning as trade dress widely recognized by the general consuming public of the United States and the rest of the world as a designation of source as to the goods and services of Alcon (or a single source) in all categories identified for the BLADE RUNNER 2049 mark.

141.   Including because of the close connection between K and his flying fully autonomous spinner in BR2049, Alcon's K marks and trade dress are especially recognized by both the general consuming public and by major car manufacturers and car brands as having secondary meaning connoting affiliation with or sponsorship by Alcon (or a single source) when used in connection with automobiles and automobile brands (including both real automobiles and concept automobiles).  Sample visual images of K as he appears onscreen in BR2049 can be seen in Exhibits A and B.  Sample visual images of K as he appears in marketing and commercial uses by Alcon appear in Exhibit E.

142.   Uses of K in the above contexts are non-functional.  That an automobile is associated with an image of K has no actual bearing on the function of the automobile, but rather serves only as a source-identifying or source-affiliation function.

143.   <u>Alcon Marketing Uses of Exhibit A</u>.  The Exhibit A image was the
lead visual image used for numerous marketing, promotional and publicity press
pieces about BR2049 preceding BR2049's October 2017 initial theatrical release.
The Exhibit A image, including in the context of these marketing uses, is both
inherently distinctive and also has secondary meaning, including by virtue of the
extensive marketing spend and resulting widespread publicity and association with
BR2049 that the Exhibit A image achieved with the 2017 global release of BR2049
and subsequent uses.  In the context of marketing, promotional and publicity
identification of BR2049, the Exhibit A image is non-functional; for instance, on
the YouTube trailer and other sites, the trailer and sites would still play and operate
without the Exhibit A image.  The Exhibit A image is still to this day the image
that appears as the cover image to the official BR2049 marketing and promotional
trailer as that trailer appears on YouTube and other sites:



(Exhibit E at E-1.)

144.   A slightly modified version of Exhibit A (removing the K character
from the image) is the back cover image for *The Art and Soul of Blade Runner
2049*, the coffee table book celebrating BR2049's visual design elements (K
appears on the back cover image below in banner montage, fourth image from left,
just above the main image of the spinner, and also appears on the front cover of the
same book, as shown further below):

51

SECOND AMENDED COMPLAINT

1

2

3

4

5

6

7

8



9  (Exhibit E at E-3.)  The modified image as used in this context is non-functional

10 and only serves as source identification.  The image does not help bind the pages or

11 make the book cover more durable or more utilitarian in any respect.

12      145.   The Exhibit A image is thus one of the most iconic images from

13 BR2049, and also one of the most commercially significant in a marketing sense.

14 It immediately evokes BR2049 and K by itself, and is strongly associated with both

15 of them in commercial marketing uses.

16      146.   <u>Alcon Marketing and Commercial Uses of Exhibit B Images and</u>

17 <u>Similar Images</u>.  Images from BR2049's same Las Vegas Sequence as the Exhibit

18 A image also have been, and still are, used by Alcon for marketing, promotion and

19 publicity for BR2049.  Exhibit B images that prominently feature a male figure in a

20 trenchcoat or duster moving through a distinctly orange-lit empty wasteland, or

21 wasteland with post-apocalyptic appearing urban ruins, are inherently distinctive,

22 and have also established secondary meaning.  Indeed, when fans want to create

23 fan art images of BR2049, images meeting the foregoing description are one of the

24 most common forms of image they create.  As just one example of an Alcon-

25 licensed use of such an image, the front cover of the same *The Art and Soul of*

26 *Blade Runner 2049* coffee table book referenced above is from the Exhibit B

27 *///*

28

1  images set (K's duster-garbed silhouette moving alone through misty orange-lit

2  desert landscape):



11  (Exhibit E at E-2.)  The image as used in this context is non-functional and only

12  serves as source identification.  The image does not help bind the pages or make

13  the book cover more durable or more utilitarian in any respect.  However, it is very

14  distinctive and has acquired secondary meaning, such that on the book cover image

15  above, if the word mark "Blade Runner 2049" were removed from the cover,

16  consumers would still instantly recognize the book as pertaining to B2049, from

17  the K image alone.

18      147.      Additional Examples of marketing and commercial uses of Exhibit B

19  images and those like them from BR2049's Las Vegas Sequence are in Exhibit E.

20  Exhibit E at E-5 is an art poster created by artist Pablo Olivera pursuant to a license

21  from Alcon, and which art poster was offered for sale and sold commercially:



53

SECOND AMENDED COMPLAINT

(Exhibit E at E-5.)

148.   Exhibit E at E-4 is an image of a one sheet (marketing promotional poster) used by Alcon for the global theatrical release of BR2049:



(Exhibit E at E-4.)

149.   Exhibit B images and those like them from the Las Vegas Sequence -- of a silhouetted trench coat-garbed (or duster-garbed) man moving through a misty orange-colored ruinous urban desert landscape -- are immediately evocative of BR2049 and K, without any other cues or references required.  They are thus inherently distinctive, and have secondary meaning, including through the consumer association between BR2049 and the images built up by extensive Alcon marketing and publicity efforts using the images.

150.   <u>Combinations of Elements Evocative of BR2049</u>.  Alcon also has a protectable Lanham Act interest (mark, brand or trade dress) in combinations of elements which evoke or tend to evoke BR2049 in the eyes of the ordinary consumer, in relevant markets in which Alcon does business or intends to do business, including without limitation licensing affiliation rights or advertising rights to car companies and car brands.  Pertinent here, Alcon's protectable rights in this regard extend to showing images that look like K moving through or

surveying an orange-lit post-apocalyptic ruin, and that are being present in the context of science fiction movies, including the context of autonomous cars. That combination of elements evokes BR2049 under the "total effect of [the infringer's] product and package on the eye of the ordinary purchaser test" applied in cases such as *Warner Bros. Entertainment v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 2012 WL 6951315 at *8 (C.D. Cal. 2012).

151.   Beginning in or about 2011 and on a continuing basis ever since, Alcon expended and continues to expend vast resources to develop, produce and maintain BR2049 and BR2049-associated goodwill. Alcon has expended in excess of $200 million on such efforts to date, from original acquisition of the relevant underlying rights, to development, production, marketing, and distribution of BR2049, to ongoing brand development and active policing of infringements, to development, production and distribution of numerous derivative works, including without limitation television series, comic books, and video games.

152.   Alcon theatrically released BR2049 globally on a day-and-date basis in October 2017. BR2049 received and still has both popular and critical acclaim. BR2049 received an 89% positive audience reaction on well-known film review site Rotten Tomatoes. Among numerous other awards, BR2049 was nominated for five Academy Awards, and it won two: Best Cinematography and Best Visual Effects. IGN gaming website named BR2049 the Best Movie of the Year for 2017, the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie of 2017, and the 2018 Saturn Awards named it the Best Science Fiction film. BR2049 is regularly identified as one of the best science fiction movies of all time on lists of such movies generated by journalists, critics, and consumers.

153.   BR2049 and its brand (including specifically the words "Blade Runner" even without the year "2049," when used in contexts that evoke BR2049 distinct from the 1982 Picture, and specifically including the Exhibit A image and

Exhibit B images) all have especially high resonance as to artificial intelligence,
fully autonomous automotive technology, and the combination of the two.
Especially in these contexts, the Exhibit A image and Exhibit B images are entirely
non-functional – they do nothing to make any autonomous automotive technology
or artificial intelligence function any better.

154.   K's spinner has been recognized culturally as one of the most famous
vehicles in motion picture history.  For example, the Petersen Automotive Museum
in Los Angeles featured one of the full-scale prop models of K's spinner
prominently in the museum's extended run of its "Hollywood Dream Machines:
Vehicles of Science Fiction and Fantasy" special exhibit which ran from 2019 to
2020.  The BR2049 K spinner was one of three vehicles selected to be on the
marketing one-sheet poster for the exhibit, along with the time-traveling DeLorean
from the "Back to the Future" movies and a light cycle from "Tron: Legacy."  The
poster was created pursuant to a license from Alcon:



(Petersen Automotive Museum One Sheet Poster (2019-2020).)

///

## WBDI HAD THE CONTRACTUAL RIGHT AND ACTUAL ABILITY TO POLICE MUSK AND TESLA'S INFRINGING CONDUCT BUT INTENTIONALLY OR NEGLIGENTLY FAILED TO EXERCISE IT

155.   As referenced in prior paragraphs, Alcon's understanding is that there is no dispute that, even after the Alcon Event Directions to WBDI, WBDI did not actively police Musk's and Tesla's Event conduct against uses of BR2049 or any other property exclusively owned by Alcon.  By Alcon's understanding, WBDI's excuse and justification for not having done so is WBDI's contention that WBDI had no contractual right to police Musk and Tesla's Event conduct with respect to IP laws, and that WBDI also had no actual or practical ability to do so, either.  (Musk's and Tesla's positions on both of these issues is silence.)

156.   Alcon disputes WBDI's excuse and justification in both respects.

***Alcon's Sources and Bases for Information and Belief Pleading on WBDI's Contractual Rights to Police IP Law Violations and Actual Ability to Do So***

157.   Plaintiff's sources for its information and belief pleading on WBDI contractual policing rights and actual ability to police include:

a.   Expert Consultation: Plaintiff's counsel hired and consulted with expert professionals in the studio lot event business and live event telecasting and livestreaming business.  These expert consultants reviewed available materials, including Defendants' Exhibits 1 (public redacted version only) and 2 (Event Recording), and applied their own experience and knowledge to assist pleading of the SAC.

b.   Custom and Practice and Industry Standards: The business of studios licensing their lot space and resources and potentially their IP for private events is a regular line of business for studios.  It has recognized customs and practices and industry standards, although the specific policies and practices of each studio can vary to some extent.

The live event telecasting and livestreaming business similarly has its own customs, practices, and industry standards.  The expert consultants provided Plaintiff's counsel with this information.  Plaintiff's counsel is also an experienced content clearance and entertainment industry profit participation attorney.

c. <u>Defendants' Exhibit 2 (Event Recording) and Other Recordings of the Event</u>: This partial documentation of what happened at the Event and how it was conducted is a reasonable source, and one of the best sources, of what the agreed terms of the Event relationship between WBDI and Tesla must have been or likely were.  In addition to the Event Recording, Plaintiff has located other recordings, including Event attendees who posted documentation of what occurred at the Event (videos, photographs, social media text posts) on social media and similar public facing sources.

d. <u>Information from Individual Percipient Witnesses</u>: Individuals with some percipient knowledge of what happened as to Event negotiations, the Event preparations process, and agreed terms and documentation of same are one of Plaintiff's sources of information. This includes WBDI shared services licensing executive Heath, who provided Alcon with information about Event matters prior to the filing of the action, both telephonically, and in communications like email records.

e. <u>Defendants' Exhibit 1</u>: This is an important source, and how Plaintiff applies it is discussed in detail in the sections below.

f. <u>Common Knowledge and Plaintiff's Counsel's Own Actual Knowledge of Certain Matters</u>: This includes subjects like the nature and significance of particular pieces of IP.

g. <u>Independent Factual Research</u>: This includes research on such matters as present ownership and location of the 1982 Picture "56 Sedan," and various other matters

158.   Some overarching principles and observations from the above sources guide Plaintiff's information and belief reasoning for its pleading on the WBDI-Tesla relevant contract terms and WBDI's actual IP policing abilities:

a. <u>Livestreaming Rights Industry Standards and Customs and Practices</u>: In the studio lot event business, livestreaming rights do not necessarily go along with the right to use the physical event space.  If livestreaming rights are granted, they are virtually always documented, including usually with special additional types of insurance the licensee must have (*e.g.,* media liability insurance). They are usually for an additional fee, over and above the live event space fee.  Where they are granted, there will be clearance protocols established.  There will be a production truck or video village set up somewhere on the lot near the event, where a production and direction team will produce and direct the livestream in real time, with ability to make clearance decisions and effect them (*e.g.,* cutting the sound of the livestream, switching off of a camera showing problematic material, replacing the livestream feed with a test pattern if a significant clearance problem arises).  If the production and direction team does not include an embedded clearance professional (from the studio or otherwise), the production and direction team will likely rely on a clearance sheet or other typically written directions or guidance. If they are conducting a livestream from a studio, they will as a practical matter at a minimum be very deferential to and take note of studio clearance instructions and guidance, even if not strictly

SECOND AMENDED COMPLAINT

contractually required to do so.  (It is a relatively small world and making oneself unwelcome at a studio lot is not necessarily good business practice).

b. <u>Interaction Between Livestream Rights and Music</u>: One of the biggest concerns and reasons strong clearance protocols are required if a lot event is livestreamed is proper clearance of music rights and vigilance against unauthorized uses of popular music in particular.  If an event is only live (in-person, no livestream), rights to use songs and sound recordings of songs can usually be handled efficiently and economically, including through blanket licensing societies, like ASCAP.  Livestream music rights, on the other hand, generally require obtaining often very expensive synchronization licenses, and often have to be negotiated work-by-work with particular rights holder(s).

c. <u>Valuable Studio IP Customs and Practices and Industry Standards</u>. Studios are in the business of monetizing their IP content.  Among other concerns, studios have to guard against third party infringement, and also potentially have to answer to profit participants on accounting for money that comes into the studio that might be attributable a particular use.  The Event Recording and social media posts and other public online posts by Event attendees show the following valuable pieces of IP content known to be owned by one or more of WBDI's subsidiaries (the "Valuable WBDI IP In The Event"), and all of which would almost certainly have been done pursuant to a documented license agreement, and on a case-by-case basis (*i.e.,* separate licenses for "Westworld" and for the Batmobile), each with their own attached specific monetary fee:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(i)   "Westworld" motion picture and television property elements.  (*See, e.g.,* Event Recording at 0:42:49-42:51; 0:43:24; 0:47:19-0:47:31.)  The uses appear to include the "Westworld" name and brand, in the live portion of the Event, including on large digital map displays prominent to in-person attendees (although not prominent on the livestream).  On social media posts by Event attendees, "Westworld" branding is also visible on the digital display screens inside the Tesla vehicles at the Event.

(ii)  The Batmobile: (*See* Event Recording at 1:15:47-1:15:43.)  The Batmobile is one of the most diligently guarded specific pieces of IP content in the WBDI conglomerate IP library.  It is visible on the lot for in the Event space for the Event.  That is almost certainly not coincidental, and WBDI's decisions about it would have been careful and documented.

(iii) "Mad Max" derivative work poster:  This work is not visible on the Event Recording, but it is clearly visible on social media posts of one more Event attendees who took photos or video on their phones at the Event.  One visible use from such sources is a copy of one of the iconic one sheets for the original 1979 "Mad Max" motion picture featuring the Mad Max character in a face shielded helmet clad in a black leather racing or motorcycle suit and stepping forward on his right leg away from a vehicle while brandishing a gun, all on a

61
SECOND AMENDED COMPLAINT

1     yellow background with red lettering, but in an altered

2     version to make the vehicle behind the lead figure a

3     cybertruck, and changing the one sheet title words

4     from "Mad Max" to "Mad Musk."

5     (iv)  1982 Picture "56 Sedan": This is the orange (when

6     shown in clear lighting) futuristic car driven by

7     Deckard in the 1982 Picture. (Exhibit G at G-2.) It

8     can be seen clearly at the Event in an attendee's social

9     media post (Exhibit K at K-2), and also obliquely in

10     the background of the Event Recording at 1:05:33-

11     1:05:49 and 1:07:03-10.

***WBDI Had the Contractual Right to Police Musk's and Tesla's IP Law Compliance and Contractual Compliance During the Event, or, to the Extent It Failed to Secure Such Contractual Rights, That Was a Departure From and in Violation of WBDI's Own Standard Practices and Policies***

159.   The allegations in paragraphs 160 to 177 below are **WBDI Contractual IP Policing Rights Alternative Theory 1.**

160.   Plaintiff alleges on information and belief, subject to need for discovery, that WBDI in fact did have more than adequate contractual rights to police Musk and Tesla's compliance with IP laws in the course of the Event.

161.   <u>Relevant Definition of Event Contract for Analysis of WBDI Policing Rights and Policing Ability Issues</u>.  As a threshold matter, Plaintiff alleges and contends that, for purposes of issues that depend in whole or in part on what the contractual rights and abilities of WBDI to supervise or police Musk and Tesla were or were not, the "contract" that matter for analyzing such issues is <u>not</u> whatever contract terms may or may not have existed between WBDI and Tesla at some earlier date than the date of the actual Event (as WBDI appears to suggest).

Instead, the relevant "contract" is: the "Event Contract," defined as whatever full set of agreed contractual terms existed between WBDI and Tesla, however manifested, as of the point in time when WBDI had received the Alcon Event Directions to WBDI, or, if better for Alcon, as of the actual commencement of the Event at about 8:00 p.m. PDT on October 10, 2024.

162.   The Event Contract as so defined is not necessarily set forth in any one single written contract document, nor were the full overall contract terms in the Event Contract necessarily reached between WBDI and Tesla all at once, but rather likely at different times, in a kind of progression.  The Event Contract likely looks something like one or more main contractual agreement documents, with multiple addendums and/or additional, but clearly related, side agreements, or supplemental or ancillary agreements.  The Event Contract could also include (and Alcon alleges does include) understandings reached informally between WBDI and Tesla in such communications as emails, or even oral or implied-in-fact understandings between WBDI's and Tesla's respective representatives with authority.

163.   By the Event Contract as used here in the SAC, Alcon means that whole set of agreed terms, however they are manifested, as WBDI and Tesla had agreed to them by about 2:00 p.m. PDT on October 10, 2024 (about the point in time when Alcon communicated the Alcon Event Directions to WBDI), or, if better for Alcon, by about 8:00 p.m. PDT on October 10, 2024 when the Event actually commenced.  Further, in the discussion of Event Contract terms and performances here, unless otherwise noted, "WBDI" means "WBDI or a WBDI subsidiary as the nominal contracting party, but which subsidiary for all issues relevant herein Alcon alleges on information and belief, subject to the need for discovery, was acting at the direction and under the control of WBDI."

164.   <u>The Event Contract Provided WBDI with More Than Adequate Contractual Rights to Police Musk and Tesla Against Violations of Alcon's</u>

Copyright and Lanham Act Rights in the Course of the Event.  Plaintiff makes the allegation of the foregoing underlined heading sentence, and the allegations of paragraphs 164-177 below, on information and belief, subject to need for discovery, including under the following reasoning.

165.   Part of Plaintiff's support for this contention is the language of Defendants' Exhibit 1. (Dkt. No. 32-1 [publicly redacted version]; both the publicly redacted and sealed complete versions are referred to in the SAC as "Defendants' Exhibit 1" or "Exhibit 1.")

166.   Defendants' Exhibit 1 on its face is a letter agreement on "Warner Bros. Studio Operations" letterhead, with attachments, transmitted on September 4, 2024 by an executive at "Warner Bros. Special Events" to an executive at Tesla, for a "Tesla Event" to take place on October 10, 2024 from 7:00 p.m. to 12:00 a.m., with a countersignature by Tesla on September 6, 2024.  WBDI has represented to Plaintiff and the Court that this Exhibit 1 document is a genuine document in WBDI's corporate records.  Further, as Plaintiff understands WBDI's position, WBDI asserts that Defendants' Exhibit 1 is the one and only contractual document between WBDI (or a WBDI subsidiary contracting on WBDI's behalf) and Tesla regarding the Event, and contains all of the contractual terms between WBDI and Tesla about the Event.

167.   Plaintiff was not involved with creating Defendants' Exhibit 1, and has had no opportunity to take discovery about it or anything else.  As a result, Plaintiff pleads two alternative theories about Defendants' Exhibit 1, both of them on an information and belief basis, subject to need for discovery, as follows:

  a. **Nature and Authenticity of Exhibit 1 Alternative Theory 1:**
     Defendants' Exhibit 1 is a genuine document from WBDI's corporate records, and is or was an actual contracting document between WBDI and Tesla regarding the Event.  However, including because Exhibit 1

is dated several weeks before the Event actually occurred, and because
its written terms on their face do not fully match, and sometimes flatly
contradict, the observable evidence about what occurred with the
Event itself, Exhibit 1 is part of, but <u>only</u> part of, the Event Contract.
By the October 10, 2024 date of the actual Event, Exhibit 1 had been
amended, modified, and/or supplemented by other communications
and negotiations between WBDI and Tesla, such that Exhibit 1 only
provides at most partial information about the Event Contract, and
later agreed terms of the Event Contract almost certainly contradict
some of the written terms of Exhibit 1. However, on terms like rights
to police Tesla compliance with IP laws or other contractual or legal
compliance, whatever the full set of Event Contract terms actually
were between WBDI and Tesla regarding the Event, those policing
and compliance terms of the Event Contract were at least as strongly
in favor of WBDI having such rights against Tesla, and Tesla's
employees, agents, contractors and representatives, as appear on the
face of Exhibit 1.

b. ***Nature and Authenticity of Exhibit 1 Alternative Theory 2:***

*Defendants' Exhibit 1 is not a genuine document, including in the
sense of not being any part of the actual contract terms between WBDI
and Tesla regarding the Event.  Exhibit 1 either is not actually what it
appears to be on its face, or, even if it is, or once was, it was
subsequently entirely superseded by other contracting documents, at
the level of a novation or equivalent, such that it is not any part of the
Event Contract.  Even to the extent any of that is true, however,
Plaintiff alleges on information and belief, subject to the need for
discovery, that on all terms in the Event Contract regarding or related*

SECOND AMENDED COMPLAINT

*to WBDI's contractual rights to police Tesla compliance with IP laws or other contractual or legal compliance, those terms were at least as strongly in favor of WBDI having such rights against Tesla, and Tesla's employees, agents, contractors, and representatives, as appear on the face of Exhibit 1.*

168.   Pursuant to both Nature and Authenticity of Defendants' Exhibit 1 Alternative Theories 1 and 2, the Event Contract provided WBDI with at least the level of contractual policing rights and compliance enforcement rights against Tesla regarding compliance with IP laws and contractual obligations as appear on the face of Exhibit 1.

169.   Exhibit 1 on its face has an extremely broad compliance with laws clause, obligating Tesla, as the defined "Client" under Exhibit 1, as follows:

**9.   Compliance with Laws, Rules and Regulations:**

**9.1**     Client's and Client's Visitors' actions and conduct, as well as equipment furnished by Client, will conform to all applicable Federal, State, and City statutes, ordinances, regulations and laws, including, but not limited to, all applicable Occupational Safety and Health Acts.  Such compliance will include the acquisition by Client of all necessary licenses and permits at its own expense.  Studio agrees that its actions and conduct will conform to all applicable Federal, State and City statutes and ordinances, regulations and laws.

(Defendants' Exhibit 1 at page 4, section 9, subsection 9.1, bold in original.)

170.   On its face, this term requires Tesla to comply with all Federal laws, without any exception for copyright law or the Lanham Act, and further requires Tesla to comply with such laws by "the acquisition by [Tesla] of all necessary licenses … at its own expense."

171.   A Tesla failure to comply with these terms by, for instance, Musk or Tesla committing copyright infringement or violating the Lanham Act, would be a

violation of Federal law and thus a contractual breach by Tesla of Exhibit 1.

172.   Defendants' Exhibit 1 on its face gives WBDI extremely broad rights to enforce WBDI's contractual rights against (*i.e.,* police against) breach by Tesla of its legal compliance obligations or any contractual breach by Tesla.  Those rights in WBDI are in section 6.2 of Exhibit 1, which reads:

> 6.2  In the event Client breaches any of the terms or conditions of the Event Letter or these Terms and Conditions, Studio may, in addition to any other rights and remedies available to Studio hereunder or at law or in equity, immediately (i) suspend or cancel activities at the Event, or (ii) cancel the Event in its entirety and these Terms and Conditions at any time thereafter, provided that such breach is material.  In such event, the entire License Fee shall be due and payable by Client to Studio.

(Defendants' Exhibit 1 at page 3, paragraph 6.2.)

173.   On the face of Exhibit 1, then WBDI had the right to "suspend or cancel activities at the Event," including Musk's keynote speech and the livestream of it, for <u>any</u> breach (material or non-material) of the compliance with laws clause, and could cancel the entire Event altogether for a material breach of the clause.

174.   The Event Recording and other available sources about what actually occurred at the Event show that the Event Contract necessarily included livestream rights.

175.   The Event Recording and other available sources located by Plaintiff show the Valuable WBDI IP in the Event, as discussed above.  No responsible Hollywood studio with sophisticated and experienced legal licensing professionals at its disposal would ever agree to a contract for an event that included both of those foregoing types of terms (valuable studio IP rights and actual content, coupled with worldwide livestream rights), and which event contract did not also include a contractual policing right in favor of the studio to make sure that, whatever specific rights had been granted or not granted to the licensee with

respect to the interaction of those two types of terms, the licensee would not engage in any usage beyond the specific scope of the rights granted.

176.   WBDI at least sees itself as a responsible Hollywood studio and it has sophisticated and experienced legal licensing professionals.  It would not have and did not agree to the inclusion of the Valuable WBDI IP Provided to Tesla and the worldwide livestream rights, without WBDI giving itself and requiring Tesla to agree to, policing rights for the Event livestream, including the livestream of Musk's keynote speech, that were at least as strong in favor of WBDI as the policing rights visible on the face of Exhibit 1.

177.   Pursuant to the reasoning and allegations above, Plaintiff alleges on information and belief, subject to need for discovery, that the Event Contract provided WBDI with sufficient contractual rights to supervise, control and otherwise police Musk and Tesla against actual or potential violation of Alcon's rights exclusive rights under at least the Copyright Act in the course of the Event.

178.   ***WBDI Contractual IP Policing Rights Alternative Theory 2:*** *Plaintiff alleges on information and belief, subject to the need for discovery, as an alternative theory, that, to the extent that WBDI failed to secure contractual rights against Tesla to police Musk and Tesla's conduct during the Event against violations of IP law and against Musk and Tesla's breach of contractual obligations, including during the live and livestream of Musk's keynote speech during the Event, that failure was a material departure from and violation of WBDI's own standard practices and policies, to Alcon's reasonably foreseeable and actual prejudice.*

///

///

///

///

*WBDI Had the Practical Ability to Police Musk's and Tesla's IP Law Compliance and Contractual Compliance During the Event And Actually Exercised It, Just Not With Respect to Alcon's Exclusive Property*

179.    For live studio lot events that will include a livestream element, and especially if valuable IP of the studio or a third party is also involved in or connected to the event, then all responsible studios as a matter of entertainment industry standards, custom and practice, and the studios' own practices and policies, implement at least one of the following three protocols for policing or "clearing" livestream content so that the livestream does not result in violations of the studios' or any third party's IP rights in valuable IP content:

    a.  <u>Advance Livestream Script Provision by the Event Licensee</u>.  This is a requirement that the licensee provide a script of the planned livestream content reasonably in advance of the commencement of the Event livestream, so that qualified studio professionals can conduct a policing or "clearance" review, without having such policing or clearance review occur in real time.

    b.  <u>Clearance Sheet and Advance Communication of and Instructions Regarding Same to Production Truck or Video Village Livestream Production and Direction Team</u>.  This is information, usually written, setting out the rules of what can and cannot be shown on the publicly performed or public displayed livestream feed, prepared by the studio and provided to the production and direction team who will staff the livestream production truck or video village, along with additional guidance and instruction those teams from the studio on actual implementation of the clearance rules for the livestream.  This is all for the purpose of the livestream production and direction team in the production truck or video village being able to engage in real time

1      policing or clearance of actual or potential clearance rule violations

2      during the livestream.

3          c.   In-person or Virtual Placement of Studio Clearance Professional(s)

4              with the Livestream Production and Direction Team During the Actual

5              Livestream.  By this protocol, a studio clearance attorney, or other

6              experienced clearance professional from the studio, works in real time

7              with the production and direction team in the production truck or

8              video village, to give clearance advice and directions in real time.

9      180.   There is an additional entertainment industry standard custom and

10  practice and policy of responsible studios to the effect that, if a specific higher risk

11  of infringement of specific piece of IP content is identified prior to the livestream,

12  or if a specific expression of concern and/or request for extra vigilance has been

13  communicated about or received from a particular IP rights holder, that identified

14  higher risk, expression of concern or request for extra vigilance will result in the

15  studio implementing extra precautions to guard against the issue, over and above

16  the three protocols above, or as an enhanced implementation of all of them.  The

17  extra precautions often take the form of instilling heightened awareness of the issue

18  in expected actual or potential performers on the livestream (*e.g.,* people expected

19  to give keynote speeches) and in the production and direction team in the

20  production team or video village.  In essence, the special risk gets "flagged" for

21  attention or put on a "watch list."

22      181.   Plaintiff alleges on information and belief, subject to the need for

23  discovery, that WBDI's standard practices and policies are consistent with

24  entertainment industry standards and customs and practices as described above.

25      182.   The Event Recording, and other sources found and reviewed by

26  Plaintiff as to what actually occurred at the Event, show all of the following:

27          a.   All of the Valuable WBDI IP in the Event was used in the live (in-

28

70

SECOND AMENDED COMPLAINT

person) aspect of the Event, and was viewed by, accessible to, and enjoyed by in-person Event attendees.

b. None of the Valuable WBDI in the Event was used at all in Musk's keynote speech for the Event.

c. Although the livestream Event Recording continues for about 80 additional minutes after Musk finishes his keynote speech, and although the livestream Event Recording spends substantially all of those 80 minutes documenting the Event and what is happening during it, from numerous different camera viewpoints, none of the Valuable WBDI IP in the Event ever appears on the Event Recording as a focal point for any camera view (with the possible single exception of six seconds nearly at the very end of the Event Recording where the Batmobile is arguably a camera focus).

d. All of the Valuable WBDI in the Event only ever appears on camera in the Event Recording incidentally, arguably requiring active indication for a casual viewer even to notice it.

e. Warner Bros. Pictures' trademarked water tower appears for less than a full second on the Event Recording, and there is the distinct sense by abrupt motion of the camera away from it when it does appear, that the camera operator immediately understood that showing the water tower was prohibited and a mistake. (Event Recording at 0:40:00-0:40:01.)

f. The Event Recording one point includes a substantial portion of a very-well known sound recording of Haddaway performing "What Is Love?" audibly performed on the Event Recording's soundtrack. (Event Recording 0:24:20-0:25:46.) However, the Haddaway sound recording is only partially performed on the Event Recording, before all sound on the Event Recording cuts off for a time, then followed by

71

SECOND AMENDED COMPLAINT

nothing even on the visual feed of the Event Recording or screen saver on the Event Recording for an extended period, until the Event Recording eventually resumes both visual images and a soundtrack. However, after it resumes, for the entire remainder of the Event Recording, the Event Recording soundtrack does not include any readily recognizable popular music, and instead features only generic, almost entirely instrumental, electronic dance music.

183.   All of the foregoing, especially the Haddaway sound recording incident identified in 182f above, are telltale signs that active policing clearance efforts had been put in place before the Event, and were effectively being implemented during the entirety of the Event livestream, including during Musk's keynote speech.  The signs specifically are that the policing protocols were actually implemented effectively for the Valuable WBDI IP in the Event, and for at least some valuable third party music content, but just not for any of Alcon's exclusively owned property, including not for BR2049's protected elements.

184.   Plaintiff makes the allegations in paragraph 185 below, including all subparagraphs, as **WBDI Actual Policing of Musk and Tesla During the Event Alternative Theory 1**:

185.   Plaintiff alleges on information and belief, subject to need for discovery, that WBDI had the actual and practical ability to police Musk's and Tesla's IP law compliance and contractual compliance during the Event, including during the live and live-streamed display of Musk's keynote speech, and that WBDI in fact actually did so with respect to separate IP content wholly-owned by WBDI or one or more WBDI subsidiaries, and also with respect to third party IP content; WBDI just either intentionally or negligently failed to do so as to Alcon's exclusively owned property, including BR2049 and K.

///

a. **WBDI Actual Policing of Musk and Tesla During the Event Alternative Theory 1.1:** Plaintiff further alleges on information and belief, subject to the need for discovery, as one specific possibility, that what specifically happened under WBDI Actual Policing of Musk and Tesla During the Event Alternative Theory 1 was as follows:

(i).      The best practice and standard operating procedure for studios conducting live events where there will be a physical (in-person) aspect, a livestream aspect, and aspects of IP shopping rights and granting of IP licenses and provision of actual IP content by studio, as were all involved here, and WBDI's actual standard practice and policy, is that the livestream terms must be finalized and understood before finalization of the IP terms.  Otherwise, if the IP shopping is conducted and IP license agreements are finalized prior to understanding what the livestream rights are or are not (*e.g.,* whether there will or will not be any livestreaming at all, and for what territories), the IP licenses and clearances risk being incorrect and potentially useless.  Different permutations of livestream possibilities require different IP clearances, and on case-by-case basis depending on the particular IP in question.

(ii).    There was a mistake made by WBDI or Tesla, such that for the Event, whether or not previously agreed, the actual livestream terms in the Event Contract were not communicated to WBDI's licensing and clearance professionals tasked with handling the IP shopping and IP licensing issues, until <u>after</u> the IP work had been substantially completed, and not until relatively near the day of the Event.

(iii).  As a result, an emergency situation arose where the Valuable WBDI IP in the Event, and any other IP from third parties, had not been properly cleared for belatedly communicated livestream terms.  WBDI's ability to implement all or some of its usual clearance and policing protocols was also impaired.

(iv).  If the Event partners to WBDI had been someone less important than Tesla and Musk, WBDI might have communicated that there could be no livestream, or that the scope of the livestream would have to be sharply restricted.

(v).  Here, though, WBDI allowed the livestream to go forward, and, as an emergency clearance fix or patch, shortly before the commencement of the Event, WBDI communicated directions to Tesla, and expected performers, including Musk, and the production and direction team in the production truck or video village, that the livestream could go forward, but that Tesla, and all performers, and the production and direction team, were all to understand and take steps such that none of the Valuable WBDI IP in the Event was to be featured in the keynote speech, or publicly performed or displayed on the livestream feed, except incidentally, because some or all of it was not properly cleared for such uses.

(vi).  Further, although WBDI easily could have modified or supplemented the above emergency fix or patch instruction expressly to include BR2049 protected elements and other Alcon exclusive-owned propertyas subject to the same restrictions, WBDI intentionally or negligently failed to do so.

SECOND AMENDED COMPLAINT

186.   ***WBDI Actual Policing of Musk and Tesla During the Event Alternative Theory 2:*** *Plaintiff alleges on information and belief, subject to the need for discovery, as an alternative theory, that, to the extent that WBDI failed to structure the Event or Event Contract to provide WBDI with actual ability to police violation by Tesla or Musk of IP rights of either WBDI or its subsidiaries or any third party, or if WBDI had such actual ability but failed actually to exercise it, such failure or failures was a material departure from and violation of WBDI's own standard practices and policies, to Alcon's reasonably foreseeable and actual prejudice.*

## FIRST CLAIM FOR RELIEF

### Direct Copyright Infringement in Violation of 17 U.S.C. § 501, et seq.
### Against Defendants WBDI, Tesla and Musk

187.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and in each paragraph of this SAC hereafter, as if set forth herein in full.

188.   To the extent any of the allegations or theories in this First Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.

189.   Plaintiff is the author and copyright owner of the motion picture "Blade Runner 2049," registered with the United States Copyright Office on October 6, 2017, registration number PA0002056792.  That is the registered infringed work.

190.   Defendants Tesla and Musk created at least two infringing works: 1) Exhibit C; and 2) the Event Recording, in the record as Exhibit 2 to the February 4, 2025 Omnibus Declaration of Chris Marchese) ("Event Recording").  The specifically infringing portions of the Event Recording are the approximately 11

///

seconds at the opening of the presentation where Exhibit C is displayed and Musk's accompanying voiceover.

191. <u>Musk and Tesla</u>: Defendant Tesla and Musk are direct infringers, in that they violated Plaintiff's exclusive rights in BR2049 in each of the following ways, with the conduct alleged constituting both actual copying and unlawful appropriation in each instance. <u>Defendant WBDI</u>: is a direct infringer in that the violation of Alcon's public display rights as alleged in this SAC and paragraph 191f below was conducted on, and transmitted over, WBDI-owned or WBDI-controlled property, infrastructure and systems (specifically including WBDI livestreaming infrastructure systems), and WBDI engaged in volitional conduct as discussed paragraphs 192-193 below:

    a.  <u>Violation of Reproduction Right, 17 U.S.C. § 106(1)</u>. Defendants Musk and Tesla infringed this exclusive right of Alcon by the conduct alleged in paragraphs 101, 101a and 101b in this SAC: literal copying of the entirety of BR2049 or of protectable elements of BR2049 such as still images like those in Exhibits A and B, or a partial videorecording of BR2049, to an AI image generator. These allegations are made on the same information and belief and alternative pleading theory basis as set forth in paragraphs 101, 101a and 101b. (**Exhibit C AI Generation Process Alternative Theory 1**.)

    b.  <u>Violation of Reproduction Right, 17 U.S.C. § 106(1)</u>. Defendants Musk and Tesla infringed this exclusive right of Alcon by the conduct alleged in paragraphs 101 and 101c in this FAC: literal copying of another work (a "licensed image") as part of the AI image generation process, but the process nonetheless involved an AI image generator engaging in literal copying of the entirety of BR2049 or of protectable elements of BR2049 such as still images like those in Exhibits A and B,

or a partial videorecording of BR2049, to an AI image generator, and put into the image generator by Musk and Tesla, or persons under their direction and control.  These allegations are made on the same information and belief and alternative pleading theory basis as set forth in paragraphs 101 and 101c.  (***Exhibit C AI Generation Process Alternative Theory 2***.)

c. <u>Violation of Reproduction Right, 17 U.S.C. § 106(1)</u>.  Under the law of the Ninth Circuit as usually interpreted, all of the violations of Alcon's right to prepare derivative works are also necessarily violations of Alcon's reproduction rights.

d. <u>Violation of Right to Prepare Derivative Works, 17 U.S.C. § 106(2)</u>.  The Exhibit C image is an unauthorized derivative work of BR2049, which impermissibly incorporates at least the following protected elements of BR2049 (as the protected elements are detailed in Paragraph 13 of Appendix 2 of this SAC): i) Iconic Still Images which Evoke Qualitatively Important Scenes or Sequences of BR2049; ii) the character K; iii) Urgent Human-AI Decision Point Theme; iv) Mood of Anxiety, Fear and Urgency, and specifically about the Human-AI Decision Point; v) Setting; and vi) Selection and Arrangement of elements, as alleged in paragraph 13f of Appendix 2 of this SAC.  <u>See</u> paragraphs 102-122 of this SAC and Exhibits A-D.  Alcon further alleges that the Exhibit C image must be treated as an unauthorized derivative work, because Musk by his commentary during the Event and in the Event Recording effectively represents to the audience that it is either itself a protected still image of BR2049, or a derivative work of BR2049, and that Musk and Tesla should therefore be estopped to contend otherwise.  *Id*.

e.   Violation of Right to Prepare Derivative Works, 17 U.S.C. § 106(2).

The Event Recording is an unauthorized derivative work of BR2049, which impermissibly incorporates at least the following protected elements of BR2049 (as the protected elements are detailed in Paragraph 13 of Appendix 2 of this SAC): i) Iconic Still Images which Evoke Qualitatively Important Scenes or Sequences of BR2049; ii) the character K; iii) Urgent Human-AI Decision Point Theme; iv) Mood of Anxiety, Fear and Urgency, and specifically about the Human-AI Decision Point; v) Setting; and vi) Selection and Arrangement of elements, as alleged in paragraph 13f of Appendix 2 of this SAC.  See paragraphs 102-122 of this SAC and Exhibits A-D.  Alcon further alleges that the Exhibit C image must be treated as an unauthorized derivative work, because Musk by his commentary during the Event and in the Event Recording effectively represents to the audience that it is either itself a protected still image of BR2049, or a derivative work of BR2049, and that Musk and Tesla should therefore be estopped to contend otherwise.  *Id*.

f.   Violation of Right to Display Work Publicly, 17 U.S.C. § 106(5).  The display of Exhibit image both i) at the live Event and ii) during the livestream of the Event in the United States violated Alcon's public display rights in BR2049 and its protected elements, and all three Defendants have direct infringement liability.  Musk and Tesla actively conducted the event resulting in the display, paragraphs 102-122, and the display occurred over WBDI-owned or -controlled systems, to both a large in-person audience, and also to a worldwide audience, including viewers in the United States.  SAC, paragraph 109.

///

192.   WBDI engaged in volitional conduct as that term is used in the context of infringement of the 17 U.S.C. § 106(5) public display right.  The volitional conduct requirement is a term of art that means sufficient facts for a finding of proximate cause, meaning that the defendant was a direct cause of the infringement pursuant to the way that proximate cause is used in the traditional tort context. Within that framework, at least in the context of online servers and similar situations, volitional conduct may be found where the defendant did any of the following: (1) exercised control; (2) selected any material for upload or storage; or (3) instigated any copying, storage or distribution.

193.   Here, WBDI was actively involved and either exercised control and/or instigated copying, storage or distribution of the infringed work, which here is BR2049.  WBDI held itself out to Musk and Tesla as having rights that WBDI does not have, (SAC, ¶¶ 32-36), led Musk and Tesla to believe until very late in the process that Musk and Tesla would be allowed to use Exhibit A in the Event pursuant to a license from Warner Bros. Pictures, (SAC, ¶¶  59-78), caused Warner Bros. Pictures to actually provide a high resolution image of protected elements of BR2049 to Musk and Tesla, (SAC, ¶¶ 64-65), and also engaged in a combination of intentional or negligent representations combined with silence (failure to make corrective speech) that resulted in Musk and Tesla potentially understanding they had U.S. copyright permission to use BR2049 elements, or effective immunity for BR2049 infringement claims under U.S. law.  (SAC, ¶¶ 92-95.)  In addition, given Musk's and Tesla's history with the BR2049 property and how they use it for product reveals, (SAC, ¶¶ 32-36), and Musk's disdain for intellectual property law, (SAC, ¶¶ 27-31), letting Musk and Tesla contract for and conduct the Event while providing content for them, (SAC, ¶¶ 47-54), combined with causing them to anticipate being able to use BR2049 in Musk's keynote warrants a finding of proximate cause, including under the instigation prong.  Plaintiff also contends that

WBDI's intentional or negligent failure actively to police Musk and Tesla, especially after receiving the Alcon Event Directions to WBDI and leading Alcon to believe that WBDI would follow them also contributes to the conclusion that a finding of sufficient active involvement to warrant a proximate cause finding of volitional conduct exists.  (SAC, ¶¶ 88-92, 98, 155-177, 179-185.)

194.  Alcon alleges and contends that where substantial similarity analysis is required, Defendants' acts of infringement above as to the character K are subject to the "story being told," distinct delineation, and/or bodily appropriation tests applicable to characters, and that the character K satisfies them.  Alcon also stands by and advances its derivative work reference leveraging theory articulated in Alcon's Memorandum of Points and Authorities in Opposition to Musk and Tesla's Motion to Dismiss Plaintiff's First Amended Complaint.  Alcon believes that theory is within the parameters of existing copyright case law, but to the extent it is not, Alcon advances it as a novel theory.  Alcon also advances the theory that Musk and Tesla's intentions to infringe must be taken into account in favor of substantial similarity findings and analysis.  Alcon also believes that is within the parameters of existing case law, but to the extent it is not, Alcon advances it as a novel theory.

195.  The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, display, distribute and publicly perform BR2049 and its protectible elements.  Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

196.  Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

197.  Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

198.   Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

199.   Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to impoundment of all materials used to achieve the infringement, and records documenting Defendants' exploitation of their infringements, including without limitation all materials used by Defendants or any image generation tool employed by them to generate the Exhibit C Image.

200.   Plaintiff is entitled to recover and seeks its actual damages and any additional profits of Defendants WBDI, Tesla and Musk attributable to the infringements, under 17 U.S.C. § 504(b).

201.   Plaintiff also is entitled to elect to recover and seek statutory damages under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more than $30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and believes and on that basis alleges that Defendants' acts of copyright infringement, as alleged above, were willful, intentional, and malicious.  Such acts subject Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000 per infringement.

202.   Within the time permitted by law, Plaintiff will make its election between actual damages and profit disgorgement, or statutory damages.

203.   Plaintiff also is entitled to a discretionary award of attorney fees under 17 U.S.C. § 505.

204.   Plaintiff seeks or reserves the right to seek any or all of the above forms of relief, in addition to prejudgment interest to the extent legally available and Plaintiff's costs.

///

///

///

## SECOND CLAIM FOR RELIEF

### *Vicarious Copyright Infringement in Violation of 17 U.S.C. § 501, et seq.*
### *Against Defendants WBDI, Tesla and Musk*

205.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this SAC hereafter, as if set forth herein in full.

206.   To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.

207.   If Defendants WBDI, Tesla and Musk are not each liable as direct infringers of BR2049, they are secondarily liable for the infringements directly committed by individual agents, contractors, or other infringers presently unknown (the "Direct Infringers") under the vicarious infringement doctrine.

208.   Defendants Musk and Tesla.  As to Musk and Tesla, if they are not themselves the direct infringers, it appears highly likely that they are the masters or employers of the direct infringers, or otherwise had the right and ability to supervise and control the Direct infringers, and that the Direct Infringers infringed in the course and scope of their work for Musk and Tesla.  (SAC, ¶¶ 100-122.)  It thus appears highly likely that Musk and Tesla would have liability under traditional respondeat superior doctrine, and Alcon pleads that they do.  The case law on vicarious copyright infringement appears less than entirely clear on whether such traditional theory respondeat superior vicarious liability for copyright infringement is to be pled as a subset of direct infringement, or under a vicarious infringement claim.  Alcon believes that its direct infringement allegations against Musk and Tesla cover the traditional respondeat superior theory, but in the event that theory is more properly placed in a vicarious infringement claim, Alcon pleads it here.  Alcon does not here plead as against Musk and Tesla the "direct financial

benefit" and "right and ability to supervise" vicarious infringement theory crafted for cases not within traditional respondeat superior liability.

209.  <u>Defendant WBDI</u>.  WBDI had the right and ability to supervise the infringing activity that all the Direct Infringers committed.  (SAC, ¶¶ 155-186.) They were also notice actively to exercise their supervisorial rights and powers, both because Musk and Tesla are inherently high risks to infringe against BR2049 in particular, (SAC, ¶¶ 27-31), and because Alcon put WBDI on notice with the Alcon Event Directions to WBDI and WBDI intentionally or negligently failed to follow them, after indicated to Alcon that WBDI would perform them.  (SAC, ¶¶ 88-92, 98.)

210.  WBDI obtained a qualifying level of direct financial benefit from Musk and Tesla and their infringing conduct, and the opportunity to infringe BR2049 was a substantial part of the draw to Musk and Tesla for the monies they paid to WBDI for the overall Event.  (SAC, ¶¶ 32-36, 47-54.)

211.  Alcon also alleges and contends that WBDI took enough actions to pursue the Exhibit A "clip licensing" plan such that, although it was not ultimately consummated, it went far enough that it should be treated as satisfying the draw and directly financial benefit analyses of vicarious copyright infringement law. WBDI held itself out to Musk and Tesla as having rights that WBDI does not have, (SAC, ¶¶ 32-36), led Musk and Tesla to believe until very late in the process that Musk and Tesla would be allowed to use Exhibit A in the Event pursuant to a license from Warner Bros. Pictures, (SAC, ¶¶ 59-78), caused Warner Bros. Pictures to actually provide a high resolution image of protected elements of BR2049 to Musk and Tesla, (SAC, ¶¶ 64-65), set up or proposed an associated payment, (SAC, ¶ 63), and also engaged in a combination of intentional or negligent representations combined with silence (failure to make corrective speech) that resulted in Musk and Tesla potentially understanding they had U.S. copyright

permission to use BR2049 elements, or effective immunity for BR2049 infringement claims under U.S. law. (SAC, ¶¶ 92-95.)

212. Alcon contends that the Ninth Circuit case law on the directness of the tie required between the financial benefit and the infringement is strict enough that it is possible that even the above facts would not be found close enough. To the extent that is the case, Alcon contends and advances that the relationship here between WBDI and Musk and Tesla is close enough to cases like *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (1996), and the underlying fundamental situations and reasons that led to the vicarious infringement doctrine in the first place, that vicarious liability should be imposed on WBDI, even if that might require a relaxation of some Ninth Circuit law on the strictness of the link required between infringement and direct financial benefit.

213. Accordingly, all Defendants had an incentive to permit infringement by the Direct Infringers.

214. The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, and publicly display BR2049 and its protectible elements. Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

215. Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

216. Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

217. Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

218. Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to

impoundment of all materials used to achieve and records documenting Defendants' exploitation of, their infringements, including without limitation all materials used by Defendants or any image generation tool employed by them to generate the Exhibit C Image.

219.   Plaintiff is entitled to recover and seeks its actual damages and any additional profits of Defendants WBDI, Tesla and Musk attributable to the infringements, under 17 U.S.C. § 504(b).

220.   Plaintiff also is entitled to elect to recover and seeks statutory damages under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more than $30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and believes and on that basis alleges that Defendants' acts of copyright infringement, as alleged above, were willful, intentional, and malicious.  Such acts subject Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000 per infringement.

221.   Within the time permitted by law, plaintiff will make its election between actual damages and profit disgorgement, or statutory damages.

222.   Plaintiff also is entitled to a discretionary award of attorney fees under 17 U.S.C. § 505.

223.   Plaintiff seeks or reserves the right to seek any or all of the above forms of relief, in addition to prejudgment interest to the extent legally available and Plaintiff's costs.

## THIRD CLAIM FOR RELIEF

### *Contributory Copyright Infringement in Violation of 17 U.S.C. § 501,* **et seq.**
### *Against Defendants WBDI, Tesla and Musk*

224.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this SAC hereafter, as if set forth herein in full.

225.   To the extent any of the allegations or theories in this Third Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

226.   If Defendants WBDI, Tesla and Musk are not individually liable as direct infringers of BR2049, they are secondarily liable for the infringements committed by the Direct Infringers under the contributory infringement doctrine.

227.   Defendants WBDI, Tesla and Musk had, or should have had, knowledge of the infringements of the Direct Infringers.

228.   <u>Tesla and Musk</u>.  Tesla and Musk plainly intentionally included the Exhibit C image in the October 10, 2024 Tesla presentation, and they could plainly see that it was not an actual still image from BR2049, but rather a stylized copy likely to found infringing.  Under at least one of Alcon's alternative theories, they also all knew that Alcon had refused permission to use BR2049 or any of its elements in the presentation or in connection with it.

229.   <u>WBDI</u>.  WBDI was conducting clearance for the Event and either knew or should have known of the infringing conduct by the Direct Infringers. WBDI was plainly on notice pursuant to the Alcon Event Directions to WBDI to check on and actively police Musk and Tesla against infringement of BR2049, but intentionally or negligently failed to do so when it could, meeting at least a should have known or willful blindness standard of knowledge, even if WBDI did not actually know about Musk's and Tesla's infringement before and at the time of the Event.  Furthermore, regardless, Plaintiff alleges on information and belief, subject to the need for discovery, that WBDI definitely knew when it saw Musk's keynote speech that his and Tesla's actions were infringing, or, at latest, on October 16, 2024 when Alcon complained.

230.   Defendants WBDI, Tesla and Musk either materially contributed to or induced the infringements.  Tesla and Musk materially contributed to the direct

infringements by including the Exhibit C image in Musk's presentation.  Plaintiff is informed and believes and on that basis and subject to the need for discovery alleges that Musk was determined specifically to reference BR2049 and an image from it in the presentation, and his determination induced the direct infringements by the Direct Infringers of creating the infringing Exhibit C image.  Defendant WBDI materially contributed to the direct infringements at the very least in that the event display, distribution and public performance aspects of the infringement occurred at WBDI's Burbank, California studio lot, and with the use and support of WBDI's facilities and technology.

231.   WBDI also materially contributed to, induced, or encouraged infringement by WBDI holding itself out to Musk and Tesla as having rights that WBDI does not have, (SAC, ¶¶ 32-36), led Musk and Tesla to believe until very late in the process that Musk and Tesla would be allowed to use Exhibit A in the Event pursuant to a license from Warner Bros. Pictures, (SAC, ¶¶ 59-78), caused Warner Bros. Pictures to actually provide a high resolution image of protected elements of BR2049 to Musk and Tesla, (SAC, ¶¶ 64-65), and also engaged in a combination of intentional or negligent representations combined with silence (failure to make corrective speech) that resulted in Musk and Tesla potentially understanding they had U.S. copyright permission to use BR2049 elements, or effective immunity for BR2049 infringement claims under U.S. law.  (SAC, ¶¶ 92-95.)  In addition, given Musk's and Tesla's history with the BR2049 property and how they use it for product reveals, (SAC, ¶¶ 32-36), and Musk's disdain for intellectual property law, (SAC, ¶¶ 27-31), letting Musk and Tesla contract for and conduct the Event while providing content for them, (SAC, ¶¶ 47-54), combined with causing them to anticipate being able to use BR2049 in Musk's keynote warrants a finding of encouragement or inducement.

///

SECOND AMENDED COMPLAINT

232.   Furthermore, once WBDI knew of the infringement, which at latest was when Alcon complained on October 16, 2024, WBDI by its silence and failure openly to denounce Musk and Tesla's conduct as infringing has effectively encouraged Musk and Tesla in not remediating, and WBDI is thereby lending support to and/or ratifying the conduct of Musk and Tesla.

233.   The foregoing acts of Defendants WBDI, Tesla and Musk infringed upon the exclusive rights granted to Alcon under 17 U.S.C. § 106 to reproduce, create derivative works, display, distribute and publicly perform BR2049 and its protectible elements.  Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. § 501, *et seq.*

234.   Plaintiff has complied with 17 U.S.C. §§ 101, *et seq.* and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced work in accordance with 17 U.S.C. § 408.

235.   Plaintiff suffered damages as a result of Defendants' unauthorized use of BR2049 and its protectible elements.

236.   Plaintiff is entitled to temporary, preliminary and/or permanent injunctive relief, pursuant to 17 U.S.C. § 502(a).

237.   Pursuant to 17 U.S.C. § 503 and its subdivisions, Plaintiff is entitled to impoundment of all materials used to achieve and records documenting Defendants' exploitation of, their infringements, including without limitation all materials used by Defendants or any image generation tool employed by them to generate the Exhibit C Image.

238.   Plaintiff is entitled to recover and seeks its actual damages and any additional profits of Defendants WBDI, Tesla and Musk attributable to the infringements, under 17 U.S.C. § 504(b).

239.   Plaintiff also is entitled to elect to recover and seeks statutory damages under 17 U.S.C. §§ 512 and 504(c), in an amount of not less than $750 or more

than $30,000 per infringement of BR2049.  Furthermore, Plaintiff is informed and believes and on that basis alleges that Defendants' acts of copyright infringement, as alleged above, were willful, intentional, and malicious.  Such acts subject Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000 per infringement.

240.   Within the time permitted by law, Plaintiff will make its election between actual damages and profit disgorgement, or statutory damages.

241.   Plaintiff also is entitled to a discretionary award of attorney fees under 17 U.S.C. § 505.

242.   Plaintiff seeks or reserves the right to seek any or all of the above forms of relief, in addition to prejudgment interest to the event legally available and Plaintiff's costs.

## FOURTH CLAIM FOR RELIEF

### *False Affiliation and/or False Endorsement*

### *in Violation of 15 U.S.C. § 1125(a)(1)(A) against Defendants Musk and Tesla*

243.   Plaintiff repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this SAC hereafter, as if set forth herein in full.

244.   To the extent any of the allegations or theories in this Fourth Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.

245.   Alcon owns the marks, trade dress and other Lanham Act-protectable interests identified in paragraphs 137-154 (together, "Alcon's Marks"), and has owned them continuously since prior to 2024.

246.   Defendants Tesla and Musk have engaged in false representations which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Tesla and Musk with Alcon or as to the

1  sponsorship or approval of Tesla's or Musk's goods, services, or commercial

2  activities by Alcon.

3      247.  Plaintiff alleges that Tesla and Musk engaged in the following specific

4  conduct that together constituted false statements that constituted false

5  representations of the type described in the foregoing paragraph 246: the conduct

6  and statements made by Tesla and Musk at the October 10, 2024 Tesla-WBDI

7  event as described in paragraphs 102-124 above, and as further distributed and

8  made available to consumers thereafter by the wide dissemination to and ongoing

9  presence and availability of, the Event Recording to consumers.

10     248.  As alleged in detail in paragraphs 102-124 above, in the about eleven

11 seconds of Event presentation on October 10, 2024 which included the Exhibit C

12 image and Musk's accompanying voiceover, Musk and Tesla by their conduct used

13 or evoked all of the following protectable Lanham Act interest of Alcon: a) Alcon's

14 BLADE RUNNER 2049 mark as it is described in paragraph 137; b) Alcon's

15 BLADE RUNNER mark as it is described in paragraph 138; b) Alcon's mark or

16 protectable goodwill in the character K as described in paragraphs 140-142; c)

17 Alcon's protectable trade dress in iconic or recognizable still images from BR2049

18 such as Exhibit A and the Exhibit B images, specifically generating the Exhibit C

19 Image and displaying it with accompanying voiceover by Musk such that it

20 appeared to be either an actual still image from BR2049's Las Vegas Sequence, or

21 a lightly-stylized illustration of K about to enter the irradiated Las Vegas at or near

22 the beginning of the sequence, paragraphs 143-148; and d) a protectable

23 combination as alleged in paragraph 148.

24     249.  Tesla and Musk used Alcon's marks and trade dress to advertise cars

25 and a car company, including in the sense of conveying an association between

26 Tesla and its Robotaxi and Alcon, BR2049 and K, which is the type of association

27 that Alcon licenses, and that consumers and other customers expect to be a licensed

28

association.  The Event presentation was for all intents and purposes a long livestreamed advertisement for Tesla and its products, and it reached a substantial set of the general consuming public in the United States, and of Alcon's potential automobile brand partners on BR2049.  Although Alcon is not a competitor of Tesla in the car business (it is true that Alcon does not itself sell cars), Alcon is in fact in that business of licensing the BR2049 marks and trade dress to car makers for advertising affiliation, and that is sufficiently in the zone of interests for Alcon to be a proper claimant.

250.   Tesla's and Musk's unauthorized use of, and references, to Alcon's BR2049 marks and secondary meaning elements had and have the effect of falsely representing that Tesla's and Musk's goods and services are licensed, sponsored, endorsed, or otherwise authorized by Alcon, and/or is at the very least misleading as to these points, and in a business market (automobile brand marketing partnerships on BR2049) in which Alcon is actually an established player.

251.   Alcon also alleges that Tesla's and Musk's conduct includes explicitly misleading statements, expressions or conduct, within the meaning of *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018), if the test of *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) were applied to the Lanham Act claim here, which Alcon contends would be improper.  (SAC, ¶ 124.)  Alcon advances and maintains all of the arguments against application of Rogers v. Grimaldi that Alcon's counsel set forth on April 7, 2025 at the oral argument opposing Defendants' Motions to Dismiss Plaintiff's First Amended Complaint.

252.   Tesla's and Musk's conduct is likely to cause confusion or mistake and to deceive consumers and/or Alcon's relevant actual and potential business partners as to the endorsement, sponsorship, affiliation, connection, or association of Alcon with Tesla's and Musk's services and products.  In this context, Alcon's relevant business partners include automotive brands with potential interest in

brand affiliations with BR2049, including without limitation with the BR2049-based *Blade Runner 2099* television series currently in production by Alcon.  They also include business partners in the Hollywood talent pool market where Alcon is active on an everyday basis, and which Hollywood talent pool market generally is less likely to deal with Alcon, or parts of the market may be, if they believe or are confused as to whether, Alcon has an affiliation with Tesla or Musk.

253.   Tesla and Musk engaged in the above conduct intentionally and in bad faith, conspiring to and then executing a fraudulent scheme falsely to create a purported justification or excuse to feature Alcon's BR2049 prominently at the outset of Tesla's and Musk's Robotaxi or cybercab product reveal presentation, and without paying Alcon any fee for doing so, for the purpose of using BR2049's goodwill to increase the interest level and cache of the new Tesla product pitch and product.

254.   All of the foregoing false endorsement uses of Alcon's BR2049 marks and goodwill were commercial speech, and not subject to any defense predicated on the nature of the use being a non-commercial use or non-commercial speech. Specifically, some or all of Tesla's and Musk's speech was either (a) core commercial speech in that it proposes a commercial transaction, or in the alternative, (b) was nonetheless commercial for purposes of false endorsement law and Plaintiff's claims herein, in that the communications were advertisements, made reference to a specific product, and the speaker had an economic motivation for the communication, all within the meaning of *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60 (1983) and its progeny.

255.   As a direct and proximate result of Tesla's and Musk's wrongful actions, Alcon has suffered damages in an amount to be proven at trial, but in excess of the jurisdictional minimum.

256.   Alcon further alleges that Tesla's and Musk's unauthorized use of

Alcon's BR2049 marks and secondary meaning elements will continue unless and until Tesla and Musk are enjoined. Alcon has no adequate remedy at law to prevent Tesla and Musk from continuing to wrongfully violate Alcon's rights, and Alcon will suffer irreparable harm unless Defendants are enjoined from continuing their wrongful conduct.

257. Defendants Musk and Tesla both had actual knowledge of the wrongfulness of their conduct and the high probability that such acts would cause injury and/or damage to Plaintiff. Despite their knowledge, Defendants Musk and Tesla intentionally pursued their course of conduct, resulting in injury or damage to Plaintiff.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays judgment be entered in its favor and against Defendants, and each of them, as follows:

1. <u>On the First Claim for Relief for Copyright Infringement</u>:

    a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying, distributing, selling, or offering to sell BR2049 or protectible elements thereof in connection with Tesla or Musk, or making derivative works thereof for such purposes.

    b. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Exhibit C Image and Event Recording and underlying materials used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by the Defendants without Plaintiff's authorization—as well as all related records and documents.

    c. For actual damages and all profits that Defendants derived from the unauthorized use of BR2049 or, where applicable and at Plaintiff's

93

SECOND AMENDED COMPLAINT

election, statutory damages.

d. For an award of attorneys' fees.

e. For an award of pre-judgment interest as allowed by law.

f. For costs of suit.

g. For such further relief as the Court deems just and proper.

2. <u>On the Second Claim for Relief for Vicarious Copyright Infringement:</u>

a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying, distributing, selling, or offering to sell BR2049 or protectible elements thereof in connection with Tesla or Musk, or making derivative works thereof for such purposes.

b. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Exhibit C image, Event Recording, and underlying materials used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by the Defendants without Plaintiff's authorization—as well as all related records and documents.

c. For actual damages and all profits that Defendants derived from the unauthorized use of BR2049 or, where applicable and at Plaintiff's election, statutory damages.

d. For an award of attorneys' fees.

e. For an award of pre-judgment interest as allowed by law.

f. For costs of suit.

g. For such further relief as the Court deems just and proper.

3. <u>On the Third Claim for Relief for Contributory Copyright Infringement:</u>

a. For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying, displaying,

SECOND AMENDED COMPLAINT

1    distributing, selling, or offering to sell BR2049 or protectible elements

2    thereof in connection with Tesla or Musk, or making derivative works

3    thereof for such purposes.

4    b.  As permitted under 17 U.S.C. § 503, for impoundment of all copies of

5    the Exhibit C image, Event Recording, and underlying materials used

6    in violation of Plaintiff's copyrights—including digital copies or any

7    other means by which they could be used again by the Defendants

8    without Plaintiff's authorization—as well as all related records and

9    documents.

10    c.  For actual damages and all profits that Defendants derived from the

11    unauthorized use of BR2049 or, where applicable and at Plaintiff's

12    election, statutory damages.

13    d.  For an award of attorneys' fees.

14    e.  For an award of pre-judgment interest as allowed by law.

15    f.  For costs of suit.

16    g.  For such further relief as the Court deems just and proper.

17    4.  On the Fourth Claim for Relief (False Endorsement in Violation of 15 U.S.C.

18    § 1125(a)(1)(A))

19    a.  For injunctive relief, including without limitation for an order

20    mandating that Defendants Musk and Tesla cease any further

21    promotional or advertising use of BR2049; that Defendants place a

22    corrective notice or disclaimer on the Event Recording and all copies

23    thereof putting viewers on notice that the portions of the event

24    referencing BR2049 false and misleading and that BR2049 and Alcon

25    have no relationship or affiliation with Tesla, Musk or the cybercab

26    product; and an order mandating that Musk and Tesla cease to

27    distribute any further copies of the Event Recording or event livestream

28

95

SECOND AMENDED COMPLAINT

1    that contains the BR2049 references and Exhibit C.

2    b.  For compensatory damages;

3    c.  Defendants' profits;

4    d.  Attorney fees;

5    e.  Costs of suit;

6    f.  Prejudgment Interest; and

7    g.  Such other and further relief as the Court may deem just and proper.

8

9    DATED: June 16, 2025          ANDERSON YEH PC
10                                 Edward M. Anderson
                                   Regina Yeh
11                                 By _____
12                                 Attorneys for Plaintiff
13                                 ALCON ENTERTAINMENT, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

96

SECOND AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, on its claims against Defendants Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI"), Plaintiff Alcon Entertainment, LLC hereby demands a trial by jury of all matters triable to a jury.

DATED: June 16, 2025          ANDERSON YEH PC
                             Edward M. Anderson
                             Regina Yeh
                             By _____
                             Attorneys for Plaintiff
                             ALCON ENTERTAINMENT, LLC