

July 28, 2026

+1.310.228.3730
kraygor@sheppard.com

**BY EMAIL (RAO_Chambers@cacd.uscourts.gov)**

Ms. Cindy Delgado,
Courtroom Deputy to the Honorable Rozella A. Oliver
Edward R. Roybal Federal Building & United States Courthouse
225 East Temple Street, Courtroom 590, 5th Floor
 Los Angeles, California  90012

Re:    _Alcon Entertainment, LLC v. Tesla, Inc., Elon Musk, Warner Bros. Discovery, Inc._, Case No. 2:24-cv-09033-GW-RAO

Dear Judge Oliver:

Non-parties Automobiles Peugeot S.A. (France) ("**Peugeot**") and Publicis Media France, S.A. ("**Publicis**") submit this letter brief pursuant to ECF 171.

## FACTUAL BACKGROUND

Neither Peugeot nor Publicis are parties to the above-referenced matter pending before this Court (the "**Present Litigation**", filed October 21, 2024).  Plaintiff Alcon Entertainment, LLC ("**Alcon**") in the Present Litigation was a plaintiff and Peugeot and Publicis were defendants in a prior lawsuit that was settled in 2021:  _Alcon Entertainment, LLC v. Automobiles Peugeot SA, Isabel Salas Mendez, Publicis Media France, S.A., Publicis Groupe, S.A., et al_., Case No. 2:19-cv-00245 CJC-AFM (C.D. Cal., filed January 10, 2019) (the "**2019 Action**").

The 2019 Action was dismissed on September 22, 2021 following a settlement of all claims. [_See Order_ (ECF 237 in the 2019 Action), **EXH. A** hereto.]  Tesla, Inc., Elon Musk, and Warner Bros. Discovery were not parties in the 2019 Action.  **_No_** copyright claims were asserted in the 2019 Action.  [_See Third Amended Complaint_ (ECF 170 in the 2019 Action), **EXH. B** hereto.]  Indeed, the word "copyright" appears nowhere in that pleading.  And the **_only_** claims being asserted in the Present Litigation are copyright claims.  [_See Third Amended Complaint_ (ECF 81 in the Present Litigation), **EXH. C** hereto.]

The 2019 Action ended with a settlement between Alcon, Peugeot and Publicis, set forth in a document entitled "Confidential Agreement".  Peugeot and Publicis expressly disclaimed any admission of liability in reaching the settlement, and the parties agreed that its terms would be kept confidential.  There is nothing in the _Confidential Agreement_ that indicates that any consideration was provided for any licenses, copyrights, or other aspects of the film _Blade Runner 2049_.  Instead the only purpose stated in the _Confidential Agreement_ was to end the 2019 Litigation.  Peugeot and Publicis are willing to provide a copy of the _Confidential Agreement_ to the Court for _in camera_ review, provided it is not shared with the defendants in the Present Litigation.

## THE DISCOVERY DISPUTE BEFORE THIS COURT

From the letter briefs filed by Tesla and Alcon in the Present Litigation [ECF 161, 165, and 168], Peugeot and Publicis are informed that Tesla has served the following document request on Alcon, seeking production, among other things, of the _Confidential Agreement_ between Alcon, Peugeot, and Publicis in the 2019 Action:

"REQUEST NO. 26:

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA 90067
T: +1.310.228.3700 | F: +1.310.228.3701

sheppard.com

**-1-**

Page 2

> Documents sufficient to show any efforts You have made to enforce Your alleged copyrights in BR2049, including any cease-and-desist letter(s) sent to third parties, copyright-related litigation, and **settlement agreements concerning Your alleged copyrights in BR2049** [*the film Blade Runner 2049*]."

[ECF 161-1 in the Present Litigation, page 28 of 40 (emphasis added).]  Non-parties Peugeot and Publicis object to the production of the *Confidential Agreement*.

*First*, there were no copyrights at issue in the prior litigation, no cease-and-desist letter(s) were sent, and crucially there were no "settlement agreements concerning Your alleged copyrights in BR2049."  The *Confidential Agreement* is not responsive to Tesla's Request  No. 26 because it does not "concern[] [Alcon's] alleged copyrights in BR2049".

*Second*, Tesla argues that it wants the Court to order Alcon to produce the *Confidential Agreement* "[i]n order to test the merits of Alcon's infringement claim and damages theories, including the factual bases for its hypothetical license theory".  [ECF 161-1 in the Present Litigation, page 2 of 5.]  But the *Confidential Agreement* does not indicate that any consideration was provided for any licenses or similar aspects of the film *Blade Runner 2049*.

*Third*, production of the 2021 *Confidential Agreement* is prohibited by FED. R. EVID. 408 for the purpose asserted by Tesla.  Rule 408 broadly prohibits the introduction of settlement agreement amounts when offered to prove or disprove the validity or amount of a disputed claim.  FED. R. EVID. 408(a) ("Evidence of the following is not admissible — on behalf of any party — either to prove or disprove **the _validity or amount_ of a disputed claim** . . .: (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim . . . .") (emphasis added).  Such evidence is prohibited because there is a public policy favoring the compromise and settlement of disputes and an offer to settle might be motivated by a desire for peace, as opposed to any concession based on the purported merits of the claim.  *See Hudspeth v. Comm'r of Internal Revenue Service*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); *United States v. Contra Costa County Water District*, 678 F.2d 90, 92 (9th Cir. 1982).  This rule is given heightened importance when, like here, a party (*i.e.*, Tesla) in the current litigation (*i.e.*, the Present Litigation) was not a party to the original settlement in a different case with different parties and claims (*i.e.,* the 2019 Action).  *See Contra Costa County Water District*, 678 F.2d at 92 ("we give additional importance to the fact that appellant was not a party to the Hanford litigation or the settlement conferences"); *Hudspeth*, 914 F.2d at 1213 ("Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise.").  *See also County of Maricopa v. Office Depot Inc.*, No. CV-14-01372-PHX-DWL, 2019 WL 5066808 at *10 (D. Ariz. 2019) ("The Ninth Circuit has interpreted Rule 408(a) as prohibiting a party from introducing evidence of a settlement in an unrelated case in which it was not a party.").  The same prohibition applies when a party (*i.e.*, Tesla) attempts to use a settlement in another case (*i.e.*, the 2019 Action) against a party (*i.e.*, Alcon) that compromised that other case.  *See Green v. Baca*, 226 F.R.D. 624, 640 (C.D. Cal. 2005) ("The same [*Rule 408*] prohibition extends to evidence of completed settlements in other cases where the evidence is offered against the compromiser.").

*Fourth*, Peugeot directly completes with Tesla in the sale of electric cars in Europe, the UK, the Middle East, China, Australia, and elsewhere.  *Compare* Find Us | Tesla with Peugeot Electric Vehicles | All Electric Cars & EV Range, Peugeot Electric Vehicles | SUVs & Electric Cars, Electric Car Range | PEUGEOT Australia, Electric car | Peugeot range of full electric vehicles, Stellantis, Dongfeng Ink $1.17 Billion Deal to Make Peugeot, Jeep EVs in China - WSJ.  Disclosing the terms of how Peugeot confidentially resolves litigation-based claims against it to a direct competitor in the e-vehicle market would be extremely prejudicial to Peugeot.

Page 3

Respectfully submitted,

| Kent R. Raygor, Cal. Bar No. 117224<br>SHEPPARD MULLIN RICHTER &<br>HAMPTON LLP<br>1901 Avenue of the Stars, 16th Floor<br>Los Angeles, California 90067<br>Telephone: (310) 228-3700<br>Email: kraygor@sheppard.com<br><br><br>*/s/ Kent R. Raygor* | Michael Dockterman, Ill. Bar No. 3121675<br>Betsy G. Zyrkowski, Ill. Bar No. 6330583<br>McDERMOTT WILL & SCHULTE LLP<br>444 West Lake Street, Suite 4000<br>Chicago, Illinois 60606<br>Telephone: (312) 372-2000<br>Email: mdokterman@mcdermottlaw.com<br>bzyrkowski@mcdermottlaw.com<br><br>*/s/ Michael Dockterman* |
|---|---|
| Counsel for Non-Party<br>AUTOMOBILES PEUGEOT S.A. (FRANCE) | Counsel for Non-Party<br>PUBLICIS MEDIA FRANCE, S.A. |

cc:     Edward M. Anderson, Cal. Bar No. 198183
ANDERSON YEH PC
1055 E. Colorado Boulevard, Suite 500
Pasadena, California 91106
Email:        edward@andersonyehlaw.com

Counsel for Plaintiff ALCON ENTERTAINMENT, LLC

Arwen R. Johnson, Cal. Bar No. 247583
Lennette W. Lee, Cal. Bar No. 263023
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Email:        arwen.johnson@kslaw.com
llee@kslaw.com

Counsel for Defendant TESLA, INC.

-4-

**EXHIBIT A TO PEUGEOT AND PUBLICIS LETTER BRIEF**

JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware limited company, <br><br> Plaintiff, <br><br> v. <br><br> AUTOMOBILES PEUGEOT SA, a France societé anonyme; et al., <br><br> Defendants. | CASE NO. 2:19-cv-00245 CJC (AFMx) <br><br> Hon. Cormac J. Carney – District Judge <br><br> **ORDER DISMISSING WITH PREJUDICE PLAINTIFF'S THIRD AMENDED COMPLAINT AND THE PEUGOET DEFENDANTS' CROSS-CLAIMS PURSUANT TO FED. R. CIV. PRO. 41(a)(1)(A)(ii)** |
| AUTOMOBILES PEUGEOT SA, a France société anonyme; and ISABEL SALAS MENDEZ, an individual, <br><br> Cross-Claimants, <br><br> v. <br><br> PUBLICIS MEDIA FRANCE, S.A., a France société anonyme; and ROES 1-10, inclusive, <br><br> Cross-Defendants. | |

-1-

ORDER

-5-

## ORDER DISMISSING WITH PREJUDICE

## PLAINTIFF'S THIRD AMENDED COMPLAINT

## AND THE PEUGEOT DEFENDANTS' CROSS CLAIMS

Pursuant to the stipulation of the parties, (1) plaintiff Alcon Entertainment, LLC's Third Amended Complaint is hereby dismissed with prejudice, and (2) the Peugeot Defendants' Cross-Claims are hereby dismissed with prejudice. The Court shall retain jurisdiction to enforce the terms of the parties' settlement.

**IT IS SO ORDERED.**

Dated: September 22, 2021

Hon. Cormac J. Carney
United States District Judge

-2-
ORDER

-6-

-7-

**EXHIBIT B TO PEUGEOT AND PUBLICIS LETTER BRIEF**

ANDERSON YEH PC
  Edward M. Anderson (STATE BAR NO. 198183)
  Regina Yeh (STATE BAR NO. 266019)
401 Wilshire Boulevard, 12th Floor
Santa Monica, California  90401
Telephone: (310) 496-4270  Facsimile: (888) 744-0317
edward@andersonyehlaw.com
regina@andersonyehlaw.com

Attorneys for Plaintiff
ALCON ENTERTAINMENT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AUTOMOBILES PEUGEOT SA, a France societe anonyme; ISABEL SALAS MENDEZ, an individual; PUBLICIS MEDIA FRANCE, S.A., a France societe anonyme; PUBLICIS GROUPE, S.A., a France societe anonyme; HERVE MONTRON, an individual; MAMOU SISSOKO, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 2:19-cv-00245 CJC (AFMx)<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>1) **BREACH OF CONTRACT;**<br>2) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>3) **PROMISSORY ESTOPPEL;**<br>4) **BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH;**<br>5) **FRAUD;**<br>6) **REASONABLE VALUE OF SERVICES;**<br>7) **QUANTUM MERUIT;**<br>8) **FRAUD; AND**<br>9) **NEGLIGENT MISREPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Action Filed:  January 10, 2019<br><br>Trial Date:     None Set |

THIRD AMENDED COMPLAINT

**-8-**

Plaintiff ALCON ENTERTAINMENT, LLC ("PLAINTIFF" or "ALCON"), hereby alleges as follows for its Third Amended Complaint ("TAC"):

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

1.     The Court has subject matter diversity jurisdiction of the case or controversy herein pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum of $75,000 exclusive of interests and costs, and is between citizens of a State and citizens or subjects of a foreign state.

2.     PLAINTIFF Alcon Entertainment, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 10390 Santa Monica Blvd. #250, Los Angeles, California 90025.  For purposes of diversity jurisdiction, ALCON, as a limited liability company, is treated as having the citizenship of each of its members, and is further not treated as a citizen of its state of organization, unless one of its members is a citizen of that state. *See, e.g., Johnson v. Columbia Properties Anchorage, LP,* 437 F.3d 894, 899 (9th Cir. 2006); *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1237-1238 (10th Cir. 2015).  ALCON's sole member is Alcon Media Group, LLC, whose members are Frederick W. Smith, Andrew Kosove and Broderick Johnson. Smith is a citizen of the State of Tennessee.  Kosove and Johnson are citizens of the State of California.  None of ALCON'S members are citizens of any foreign state.  For purposes of diversity jurisdiction, ALCON is thus a citizen of the States of California and Tennessee, and not a citizen of any foreign state.

3.     Defendant AUTOMOBILES PEUGEOT SA ("PEUGEOT") is a French societe anonyme, which for purposes of diversity jurisdiction is best treated as the equivalent of a corporation organized under the laws of France and thus as a citizen or subject of France pursuant to 28 U.S.C. § 1332(c)(1).  *See, e.g., Bank Brussells Lambert v. Chase Manhattan Bank, N.A.,* 1996 WL 609439 (S.D.N.Y. 1996); *Rolland v. Smithkline Beckman Corp.*, 1990 WL 69007 (E.D. Pa. 1990);

- 1 -
THIRD AMENDED COMPLAINT

*White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc.*, 647 F.3d 684 (7th Cir. 2011); *Macartney*, 253 F.2d 529 (9th Cir. 1958). PEUGEOT does not have its principal place of business within the United States, and in any event not in the States of California, Delaware, or Tennessee. PEUGEOT'S principal place of business is in Rueil-Malmaison, part of the Paris, France metropolitan area.

4. Defendant ISABEL SALAS MENDEZ ("MENDEZ") is an individual who at all times relevant to the subject matter of this TAC was a citizen and resident of France, for purposes of diversity jurisdiction.

5. Defendants PEUGEOT and MENDEZ are sometimes referenced together as the "PEUGEOT DEFENDANTS."

6. Defendant PUBLICIS MEDIA FRANCE, S.A. ("PMF") is a French societe anonyme, which, as outlined above, for purposes of diversity jurisdiction is best treated as the equivalent of a corporation organized under the laws of France and thus as a citizen or subject of France pursuant to 28 U.S.C. § 1332(c)(1). PMF does not have its principal place of business within the United States, and in any event not in the States of California, Delaware, or Tennessee. PMF's principal place of business is in Paris, France. PMF is the successor-in-interest to The Casablanca Agency ("Casablanca"), a French media agency which PLAINTIFF is informed and believes no longer exists. As used herein, the term "PMF" includes Casablanca.

7. To the extent supplemental jurisdiction is required with respect to any claim for relief, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all such claims. All of PLAINTIFF'S claims for relief arise from a common nucleus of operative facts, such that the claims form part of the same case or controversy under Article III of the United States Constitution.

### *Personal Jurisdiction*

8. California's personal jurisdictional long arm statute, *Cal. Code Civ. Pro.* § 410.10, allows courts in the state to exercise personal jurisdiction over

parties to the full extent permissible under the United States Constitution, meaning personal jurisdiction is permissible if it comports with due process. The Court's exercise of personal jurisdiction over each of the defendants here does. Each of the defendants has minimum contacts with the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.

9. **Personal Jurisdiction Over Peugeot.** The Court has specific personal jurisdiction over PEUGEOT. PLAINTIFF'S claims arise out of PEUGEOT'S acts of purposeful availment of the benefits and privileges of conducting activities in California. PLAINTIFF'S claims also arise out of PEUGEOT'S acts of purposeful direction of tortious conduct to the forum. The exercise of personal jurisdiction over PEUGEOT is also reasonable and fair.

10. **Personal Jurisdiction Over Mendez.** The Court has specific personal jurisdiction over MENDEZ. PLAINTIFF'S claims against MENDEZ arise out of her acts of purposeful direction of tortious conduct to the forum. Exercise of personal jurisdiction over MENDEZ is also reasonable and fair.

11. **Personal Jurisdiction Over PMF.** The Court has specific personal jurisdiction over PMF. PLAINTIFF'S claims arise out of acts of purposeful availment of the benefits and privileges of conducting activities in California by PMF's predecessor-in-interest, Casablanca. PLAINTIFF'S claims also arise out of Casablanca's acts of purposeful direction of tortious conduct to the forum. As Casablanca's successor, PMF is jurisdictionally chargeable with Casablanca's acts. Exercise of personal jurisdiction over PMF is also reasonable and fair.

*Venue*

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1), (b)(2), (b)(3), and (c)(3) and on the grounds that a substantial part of the events and omissions giving rise to the claims herein occurred in this district, or a substantial part of the property that is the subject of the action is situated here; there is no district in which the action may otherwise be brought as provided in section 1391,

and the defendants are subject to the court's personal jurisdiction with respect to the action; and each of the defendants is not resident in the United States and so may be sued in any judicial district. All defendants have also conceded that venue is proper by failing to challenge it.

## SUMMARY OF FACTS AND CLAIMS

13.     ALCON developed and produced the motion picture "Blade Runner 2049" (the "Picture" or "BR2049"). ALCON made a significant brand placement for PEUGEOT in the Picture. In exchange, PEUGEOT was to pay ALCON a placement fee of $500,000 and also execute an international co-promotion with a guaranteed minimum media spend of $30 million to support the Picture's global theatrical release. PMF's predecessor Casablanca served as PEUGEOT's agent in connection with the deal. MENDEZ was the lead PEUGEOT executive on the deal. PEUGEOT never paid or performed. Including in the detailed allegations of a French proceeding filed by PEUGEOT against PMF (an English translation of which is in the record of this action as Dkt. Nos. 68-3 and 68-4), PEUGEOT admits that at a minimum ALCON made a brand placement of significant value. Indeed, PEUGEOT has proudly touted the success of the BR2049 placement on at least one PEUGEOT or PEUGEOT-connected marketing website. (*See* Peugeot UK website capture, in the record as ALCON'S jurisdictional Exhibit 60, Dkt. No. 37-1, pages 89-92.) By the detailed allegations of PEUGEOT'S French proceeding, PEUGEOT also admits (or contends) that PEUGEOT'S agent, Casablanca, defrauded ALCON in BR2049 deal-making. (*See, e.g.,* Dkt. Nos. 68-3 and 68-4.) PEUGEOT nevertheless refuses to make ALCON whole, contending that PMF as Casablanca's successor should be solely responsible. PMF likewise refuses to make ALCON whole, including because PMF denies that Casablanca acted without authority or otherwise engaged in improper conduct, thus contending that Casablanca has no liability and so neither does PMF. ALCON pleads all three defendants are liable to ALCON under one or more sets of claims.

4

THIRD AMENDED COMPLAINT

*Alternative Pleading Theories*

14.     ALCON does not know with certainty what happened among the defendants.  Thus, ALCON pleads alternative facts and theories, some of which are inconsistent.  ALCON identifies the essence of each alternative theory below.  For clarity, ALCON does not contend under any theory that Casablanca was intended itself to be a contracting party to any contract with ALCON (except certain confidentiality or non-disclosure agreements, which are not the direct basis for any contractual liability claims in the TAC).  Rather, under all theories, Casablanca was acting either actually or ostensibly as an agent for PEUGEOT as Casablanca's disclosed principal, such that Casablanca's liability, and thus PMF's, is based on application of *Cal. Civ. Code* § 2343 (including without limitation California common law principles that impose liability on agents for their own tortious conduct, which principles *Cal. Civ. Code* § 2343(3) is interpreted to reference).  Under one theory (Theory 2, below), Casablanca was also acting in part as an actual agent for MENDEZ, but not with MENDEZ as a disclosed principal.  ALCON also pleads that Casablanca, and thus PMF, have liability under Theory 2 for aiding and abetting PEUGEOT and MENDEZ.

15.     MENDEZ likewise was never intended as an individual to be the contracting party with ALCON under any contract (except certain confidentiality or non-disclosure agreements, which are not the direct basis for any contractual liability claims in the TAC).

16.     **Theory 1 - Tortious Conduct by Casablanca Alone.**  Similar to the version of events alleged by PEUGEOT in the French proceeding (*see* Dkt. Nos. 68-3 and 68-4), Theory 1 is that the transaction failed because Casablanca defrauded both PEUGEOT and ALCON (or was grossly negligent with respect to both PEUGEOT and ALCON), or otherwise engaged in tortious or otherwise improper conduct, some or all of which conduct was in excess of Casablanca's agency authority.  Casablanca acted at least in part with the motive to realize a

5

substantial fee. Broadly, under this Theory 1, PEUGEOT has contractual liability; PEUGEOT is also vicariously liable for the torts of its agent Casablanca; PMF is liable as Casablanca's successor, with Casablanca liable pursuant to *Cal. Civ. Code* § 2343(2) and (3) (including California common law principles which subdivision (3) of section 2343 is interpreted to reference); and MENDEZ has no liability.

17. Theory 1 applies to PEUGEOT, as one all alternative, as to all claims for relief except the Fifth Claim for Relief for Fraud (which is pled against PEUGEOT, but not pursuant to Theory 1).

18. Theory 1 applies to Casablanca, and thus to PMF, as one alternative, as to all claims for relief, except: the Fifth Claim for Relief for Fraud (which is pled against PMF, but not pursuant to Theory 1); the Sixth Claim for Relief for Reasonable Value of Services (not pled against PMF under any theory); and the Seventh Claim for Relief for Quantum Meruit (same).

19. **Theory 2 – Tortious Conduct by All Defendants Together.** Theory 2 is that Casablanca was acting entirely within its agency authority, and the PEUGEOT DEFENDANTS and Casablanca together carried out a fraudulent or otherwise tortious scheme against ALCON, masterminded by MENDEZ. The scheme's essence was to cause ALCON to execute a valuable placement for PEUGEOT in BR2049, with all defendants knowing from the outset, or later accepting and ratifying, that PEUGEOT never intended to pay ALCON for it in any manner (or, possibly, intended to try to force ALCON to accept substantially lower consideration than promised). Under Theory 2, PEUGEOT is directly liable in contract and tort, and also vicariously liable for the torts of Casablanca as PEUGEOT's agent. Casablanca is liable under *Cal. Civ. Code* § 2343(3) (including California common law principles which subdivision (3) of section 2343 is interpreted to reference). PMF is thus liable as Casablanca's successor. MENDEZ is individually liable for her own intentionally tortious conduct, for which corporate or employee status provides no individual liability shield under

6

THIRD AMENDED COMPLAINT

California law.  Under motivational variations of Theory 2 not necessarily relevant to liability, MENDEZ kept her fraudulent deal-making from her superiors within PEUGEOT, as a way to hold valuable placements in PEUGEOT's control, while insulating herself from internal corporate risk.  In the alternative, MENDEZ's corporate superiors always knew what she was doing or ratified it.

20.    Theory 2 applies to PEUGEOT, as one alternative, as to all claims for relief except the Eighth Claim for Relief for Fraud (which is pled against PEUGEOT, but not pursuant to Theory 2).

21.    Theory 2 applies to Casablanca, and thus PMF, as to the Third Claim for Relief for Promissory Estoppel, Fifth Claim for Relief for Fraud and the Ninth Claim for Relief for Negligent Misrepresentation.  Under Theory 2, Casablanca, and thus PMF, would not have liability under the other six claims for relief.

22.    Theory 2 applies to MENDEZ as to the Fifth Claim for Relief for Fraud, which is the only claim for relief pled against MENDEZ under any theory.

23.    **Theory 3 – Tortious Conduct by the Peugeot Defendants Only.** Theory 3 is the same as Theory 2, but with Casablanca as an innocent actor, unaware that the PEUGEOT DEFENDANTS were using Casablanca to execute a bad faith scheme against ALCON.  Under Theory 3, PEUGEOT is directly liable in contract and tort; PMF has no liability; and MENDEZ is individually liable for her own intentionally tortious conduct, on the same grounds as Theory 2.

24.    Theory 3 applies to PEUGEOT under all claims for relief, except the Eighth Claim for Relief for Fraud and Ninth Claim for Relief for Negligent Misrepresentation (both of which are pled against PEUGEOT, but not pursuant to Theory 3).

25.    Theory 3 applies to MENDEZ as to the Fifth Claim for Relief for Fraud, which is the only claim for relief pled against MENDEZ under any theory.

26.    **Theory 4 – "Innocent" Breach Only.**  Under Theory 4, none of the defendants were acting tortiously or otherwise in non-contractual (or non-quasi-

7

THIRD AMENDED COMPLAINT

contractual) bad faith toward ALCON at any time.  PEUGEOT failed to perform its contractual obligations to ALCON, simply because it became unable or unwilling to do so after the agreement or agreements were binding.  Under Theory 4, PEUGEOT is liable for breach of contract or similar theories not dependent on any tortious conduct or non-contractual (or non-quasi-contractual) bad faith by PEUGEOT or its agents; PMF has no liability; and MENDEZ has no liability.

27.    For clarity, Theory 4 does not exclude the possibility of PEUGEOT engaging in bad faith after entry into binding contracts with ALCON, such that PEUGEOT would not have tort liability (*e.g.*, would not be liable for fraud), but could still have liability for breach of contractually based, or quasi-contractually-based, good faith obligations to ALCON.

28.    Theory 4 applies to PEUGEOT as to: the First Claim for Relief for Breach of Contract; the Second Claim for Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing; the Third Claim for Relief for Promissory Estoppel; the Fourth Claim for Relief for Duty to Negotiate in Good Faith; the Sixth Claim for Relief for Reasonable Value of Services; and the Seventh Claim for Relief for Quantum Meruit.  Under Theory 4, PEUGEOT does not have liability under the Fifth Claim for Relief for Fraud, the Eighth Claim for Relief for Fraud, or the Ninth Claim for Relief for Negligent Misrepresentation.

29.    Under Theory 4, neither PMF nor MENDEZ have liability under any claim for relief.

### PARTIES

*Plaintiff*

30.    **Alcon Entertainment, LLC:** ALCON is an independent motion picture studio whose products are distributed worldwide.  ALCON is also the assignee of all claims and potential claims that might be made by Columbia TriStar Marketing Group, Inc. ("CTMG") or any other potentially relevant entity in the Sony Pictures Entertainment Inc. family of companies, against any of the

8

THIRD AMENDED COMPLAINT

defendants to this TAC with respect to BR2049.

### *Named Defendants*

31. **Automobiles Peugeot SA:** PEUGEOT is a venerated, but long-troubled automobile manufacturer and distributor. PEUGEOT is famous for its "lion" mark and "triple claw" automobile brake light trade dress. PEUGEOT historically has utilized product or brand placements in Hollywood motion pictures or television properties as a worldwide marketing tool, since as early as the late 1960s and the television series "Columbo."

32. **Isabel Salas Mendez:** MENDEZ was and is a senior marketing executive, officer and employee of PEUGEOT. MENDEZ had either actual or ostensible authority within PEUGEOT to bind PEUGEOT to sponsorships, co-promotional partnerships, and product placements, including in television series and motion pictures. MENDEZ was acting within the course and scope of her employment, agency and authority in dealings with PLAINTIFF and Casablanca, and/or with the permission, consent, authorization, and/or ratification, whether express or implied, of PEUGEOT, or with PEUGEOT'S knowing acceptance of benefits of MENDEZ's improper conduct.

33. **Publicis Media France, S.A.:** PMF is a direct or indirect subsidiary of Publicis Groupe, S.A. ("Publicis Groupe"), one of the largest media companies in the world. PMF's predecessor Casablanca was the agent of PEUGEOT, and, under some alternative theories, also of MENDEZ. Except as specifically alleged herein to the contrary, including on alternative pleading theories, Casablanca was at all times acting within the course and scope of its agency authority in Casablanca's dealings with PLAINTIFF and Branded Entertainment Network, Inc. ("BEN"), and/or with the permission, consent, authorization and/or ratification, whether express or implied, of PEUGEOT, or with PEUGEOT'S knowing acceptance of the benefits of Casablanca conduct.

///

*Significant Non-Parties*

34.    **Herve Montron:** Herve Montron ("Montron") is an individual who was and is a citizen and resident of France. Montron was a principal, managing agent, employee, or other authorized representative of Casablanca. Montron was acting within the course and scope of his employment, agency and authority at Casablanca in Montron's dealings with PLAINTIFF, PEUGEOT, and BEN, and/or with the permission, consent, authorization, and/or ratification, whether express or implied, of PEUGEOT and/or Casablanca, and/or with PEUGEOT'S and/or Casablanca's knowing acceptance of benefits of Montron's conduct.

35.    **Mamou Sissoko:** Mamou Sissoko ("Sissoko") is an individual who was and is a citizen and resident of France. Sissoko was a principal, managing agent, employee, or other authorized representative of Casablanca. Sissoko was acting within the course and scope of his employment, agency and authority at Casablanca in Sissoko's dealings with PLAINTIFF, PEUGEOT, and BEN, and/or with the permission, consent, authorization and/or ratification, whether express or implied, of PEUGEOT and Casablanca, and/or with PEUGEOT'S and/or Casablanca's knowing acceptance of benefits of Sissoko's conduct.

36.    **Branded Entertainment Network, Inc.:** BEN is an entertainment marketing company that regularly works on product placements for motion picture and television properties. BEN has a substantial Los Angeles office. During the first half of 2016, BEN acted as an agent, broker, or other authorized representative or intermediary for Casablanca and PEUGEOT in communications with PLAINTIFF regarding BR2049.

37.    **Sony Pictures Entertainment Inc.:** Sony Pictures Entertainment Inc. ("Sony" or "SPE") is a major Hollywood film and television studio, with its principal place of business in Culver City, California. SPE and/or entities in the SPE family of companies have a co-production, financing and distribution relationship with ALCON for BR2049.

10
THIRD AMENDED COMPLAINT

38.    **Columbia Pictures Industries, Inc.:** Columbia Pictures Industries, Inc. ("CPII") is a direct or indirect subsidiary of SPE, in the business of producing and distributing major motion pictures.  CPII's principal place of business is in Culver City, California.  CPII is a party to the co-production, financing and distribution relationship with ALCON for BR2049.

39.    **Columbia TriStar Marketing Group, Inc.:** CTMG is a product placement, co-promotions and marketing arm of SPE and CPII.  CTMG's principal place of business is in Culver City, California.  CTMG executives were authorized to and did communicate for ALCON with potential partners on BR2049, including for product placement and co-promotional opportunities.  However, as the studio leading production, ALCON initially led, and ultimately was the decision-maker on, brand placements.  Some communications reference CTMG as a party to one or more agreements at issue.  To the extent that CTMG is or was a party to them, or otherwise has claims against any of the defendants as to BR2049, those claims have been assigned by CTMG to ALCON.  The assignment's scope is broad enough to cover claims that might have been held by SPE or CPII.

40.    **BETC:** BETC is a media agency engaged by PEUGEOT to plan and execute the BR2049 co-promotion.

## AGENCY LIABILITY RELATIVE TO PEUGEOT AND MENDEZ

41.    In addition to direct liability, PEUGEOT is vicariously liable for all tortious acts by Casablanca committed in the course or scope of Casablanca's actual or ostensible agency for PEUGEOT as to BR2049.  Thus, among other theories, to the extent that either ALCON or PEUGEOT are able to prove Theory 1, PEUGEOT is also liable, along with PMF.  PEUGEOT is also liable for all tortious acts committed by MENDEZ in the course or scope of her actual or ostensible agency for PEUGEOT in connection with BR2049.

## AIDING AND ABETTING LIABILITY

42.    ALCON pleads aiding and abetting liability, in addition to direct

11

THIRD AMENDED COMPLAINT

liability, against Casablanca, and thus PMF, with respect to Theory 2: under that Theory, Casablanca's executives Montron and Sissoko had actual knowledge of the PEUGEOT DEFENDANTS' fraud or other bad faith intent and provided substantial assistance in support of it.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *Background Context to the Parties' Negotiations*

### *1982: Blade Runner*

43.    In 1982, ALCON'S predecessors-in-interest in chain of title produced and released the seminal motion picture "Blade Runner" (the "Original Picture"). "Blade Runner" remains a culturally relevant film with an active and appreciative audience, widely recognized as a transcendent work of historical significance.  It is especially acclaimed for its production design.  Among the Original Picture's most resonant design elements are the flying cars, or "spinners," that feature prominently in the "Blade Runner" world.  They are culturally significant in their own right. For example, a physical spinner used in the Original Picture is on permanent exhibit at the Science Fiction Museum and Hall of Fame in Seattle.  For these reasons and others, an opportunity for a spinner placement in a "Blade Runner" story had unusually high value to auto brands.  PEUGEOT also had reason to know in 2016 that the benefits of such a placement might be especially enduring (meaning even more valuable).

### *Circa 1991*

44.    For much of the Twentieth Century, PEUGEOT marketed and distributed vehicles in North America.  But by about 1991, PEUGEOT's resonance with North American consumers had faded.  PEUGEOT abandoned the United States and California automotive markets, among others.  In the decades following, PEUGEOT experienced a series of scandals, financial troubles, and other corporate difficulties that left PEUGEOT unable to re-establish itself here.  By the 2010s, PEUGEOT had been out of the United States and California automotive markets

12

THIRD AMENDED COMPLAINT

for decades, but still hoped at some point to re-enter them.

### *2010 to 2011: Alcon Acquires Blade Runner Rights and Commences Development of a Sequel*

45.    From 1982 until 2017, there were no "Blade Runner" sequels, prequels, television series, or any other motion picture or television extensions of the story.  The fallow period resulted in part because the property's chain of title became complex and divided, obstructing creation of further works.  This fallow period also increased the potential value of placements in a sequel, including due to built-up consumer demand for "Blade Runner" content.

46.    Beginning in 2010 and into 2011, and as further enhanced by subsequent transactions, ALCON identified and acquired rights such that ALCON became and is the ultimate rights holder for all rights relevant to develop, produce and exploit sequels to the Original Picture, including the right to contract for product placements and co-promotional opportunities for such sequels.  ALCON invested significant resources in the project that ultimately became BR2049.

### *2015: Defendants' Pattern of Prior Misconduct Toward the Forum*

47.    By 2015, Casablanca's Montron and Sissoko had an established relationship with PEUGEOT, and specifically MENDEZ, for the purpose of obtaining product and brand placements for PEUGEOT in film and television properties.  Indeed, PLAINTIFF is informed and believes that by 2015, PEUGEOT was Casablanca's biggest client.  PEUGEOT's interest in returning to the California market was growing.  PEUGEOT also generally covets association with the consumer appeal of Hollywood film and television products, including for its international business.  (*See, e.g.,* Peugeot UK website capture, in the record as ALCON'S jurisdictional Exhibit 60, Dkt. No. 37-1, pages 89-92.)

48.    In or about 2015, Montron, Sissoko and MENDEZ began working with BEN on a project basis for automotive placements in Hollywood-produced projects, eventually resulting in three film and television integrations for

13

THIRD AMENDED COMPLAINT

PEUGEOT: 1) in two episodes of the pay television series "Homeland"; 2) in the motion picture "The Circle"; and 3) in the motion picture "Bridget Jones's Baby."

49.     Although BEN considered the "Homeland" and "Bridget Jones's Baby" integrations to meet contractually required deliverables, and considered "The Circle" to be able to meet them if Casablanca and PEUGEOT had cooperated in contractually allowed re-shoots, neither Casablanca nor PEUGEOT paid BEN for the integrations (setting aside any later settlement that may eventually have occurred).  This pattern of non-payment by the Montron-Sissoko-MENDEZ triad is relevant to ALCON's claims for at least two reasons.

50.     First, it shows that this specific marketing teaming (Montron-Sissoko-MENDEZ) had a demonstrable pattern of securing Hollywood brand placements for PEUGEOT without paying for them.  ALCON alleges that the pattern demonstrates intentionality to PEUGEOT and Casablanca's conduct, further supporting that intentionality was also a factor in the BR2049 deal failure.

51.     Second, the pattern shows repeated purposeful direction of tortious conduct by defendants to the forum, supporting exercise of jurisdiction.

### *Opportunity Value and Context at Commencement of Negotiations*
#### *Specific Value Factors*

52.     The BR2049 opportunity was especially valuable for numerous reasons, including: 1) The placement was for branding on the flying car or spinner driven by BR2049's protagonist, "K"; 2) by early 2016, consumer-appealing actor Ryan Gosling had already been cast as K, meaning the placement would be strongly associated with Gosling; 3) K's spinner features prominently throughout the BR2049 story, almost as a character in its own right, meaning once branding of the spinner was established in the story it would effectively carry through to consumers for the entire course of the Picture; and 4) like the Original Picture, physical props of K's spinner, including full-size physical versions with branding, would be made, yielding a real-world vehicle that could actually travel and appear

at experiential marketing events like auto shows and fan conventions, both before and after the Picture's theatrical run, potentially for years into the future.

### *Expected Deal Pricing and Deal Form*

53. ALCON reasonably expected a BR2049 auto brand deal to include both a placement fee and a co-promotion with a large guaranteed media spend. In deals so structured, the placement fee is cash paid directly to the studio. The media spend is typically magnitudes larger and expended to support a co-promotion to benefit the studio's film, but not paid directly to the studio. Here, the co-promotion component was expected subjectively by ALCON and objectively by the placement market to be a significant dollar figure, perhaps in the tens of millions.

### *Known Studio Reliance Factors Going Into Negotiations*

54. A brand commitment to a co-promotional media spend in the tens of millions of dollars substantially bolsters the marketing and advertising of the film, increasing its chances for success. It also reduces the marketing burden that the studio otherwise must finance directly out of its own pocket. Thus, whether such a commitment exists or doesn't affects the entire marketing plan for a film's theatrical release, on a global basis. Once promised, a studio like ALCON relies on the co-promotional commitment heavily, even though the co-promotion spend does not go directly to the studio. The defendants all knew this or should have.

### *Perishable Nature of the Opportunity and Resulting Negotiating Clock*

55. Where a major motion picture with a global day-and-date release will be supported by a placement and co-promotion, brand deal-making and preparation to perform must take place months or even years in advance. The co-promotion itself must be planned and prepared at least several months before the initial theatrical release date. To maximize the value of an auto brand co-promotion, deal-making ideally should be completed on a relatively short time clock. For BR2049, the more that deal-making was delayed or frustrated, the greater the chance that ALCON would suffer prejudice. This was not a novel problem to the

15

THIRD AMENDED COMPLAINT

marketplace, and all sophisticated actors in it understood that it existed for ALCON on BR2049.  All defendants knew this or should have.

56.   BR2049 was subject to the following specific schedule:

a.   Principal photography was scheduled to commence and actually commenced on July 11, 2016.

b.   Principal photography completed on November 22, 2016.

c.   Picture lock was targeted for June 8, 2017 (but did not actually occur as things played out until July 5, 2017).

d.   Picture delivery was planned for and actually occurred between September 25 and September 30, 2017.

e.   October 6, 2017 was the planned and actually executed global day-and-date release of the Picture ("Release Date").

57.   Some form of auto brand deal conceivably might be reached at various times along the above Picture timeline.  However, in the first half of 2016, it was well understood in the marketplace that ALCON's ability to maximize deal value might begin to decline as soon as early summer 2016 (or even earlier), and thus ALCON reasonably expected bidders to respect that clock.  All defendants knew this or should have.

### *The Parties' Initial Negotiations Through BEN*
### *<u>January to February 2016: Discussions Commence</u>*

58.   By as early as June 2015, BEN was pro-actively tracking BR2049 as a project with which to match potential brand clients.  Reiko Porter ("Porter"), a Los Angeles-based BEN executive, was assigned by BEN as the BR2049 lead as early as August 2015.  By January 29, 2016, and before any ALCON contact to BEN or defendants about BR2049, a BEN executive in France (believed to be Paul Morizet or "Morizet") met with Casablanca (Montron and/or Sissoko).  Casablanca expressed interest in a Peugeot integration on BR2049 to BEN.  PLAINTIFF is informed and believes that by January 29, 2016 and perhaps again on February 1,

16

THIRD AMENDED COMPLAINT

2016, Montron and/or Sissoko had specifically communicated to Morizet (likely through either an in-person, telephonic, or email communication with all three men in Paris), that PEUGEOT was specifically interested in placement opportunities where the PEUGEOT brand would be a larger part of the story than just an ordinary placement in the background, including on BR2049.  ALCON is informed and believes that these communications are part of what became the communications described below that made their way to ALCON as False Statement No. 1.

59.    By February 2016, ALCON had met with its Los Angeles-based product placement executive, Josh Ravetch ("Ravetch").  ALCON and Ravetch developed an overall product placement plan for BR2049, including an auto brand opportunity on K's spinner.  Ravetch reached out to numerous agencies seeking expressions of interests in BR2049 placements.  All agencies to which Ravetch reached out about auto placements specifically, were in Los Angeles.  Ravetch communicated with agencies representing numerous auto brands, including at least the following: BMW, Audi, Ford, Volvo, Porsche, VW, Mercedes, Subaru, Kia, GM, and Chrysler.  Multiple brands had interest.

60.    On or about February 22, 2016, Ravetch communicated BR2049 interest in auto brands to BEN, but did not specifically inquire about PEUGEOT. Indeed, by contacting BEN, Ravetch was specifically seeking expressions of interest from a different auto brand.  Ravetch's initial communication to BEN was at least by email, and was to three BEN executives in Los Angeles.

*** False Statement Allegations For Statements That Came Through BEN ***

61.    From this point in the chronology forward, the TAC alleges that under Theories 1 through 3, defendants or some of them made numerous intentionally false, or negligently false, statements to ALCON.  From March 2016 through June 2016, most or all of the false statements were communicated by non-party BEN to ALCON.  For all such BEN statements attributable to defendants, ALCON is

17

THIRD AMENDED COMPLAINT

informed and believes and thereon alleges that Casablanca and/or the PEUGEOT DEFENDANTS caused BEN to make the statements with the intent that the statements reach ALCON such that ALCON would rely on them, and that in fact this happened.  ALCON does not necessarily repeat this causation chain allegation as to each and every statement, to avoid repetition.  Similarly, for the statements in this period communicated by BEN, ALCON generally relied on the truth of the statements in more or less the same manner: ALCON treated Casablanca and BEN as authorized to communicate for and bind PEUGEOT; ALCON treated PEUGEOT as a good faith bidder who could perform its bids if they were successful – including specifically that PEUGEOT had an actual budget to pay for a placement and substantial co-promotion; this included ALCON spending valuable time and resources on PEUGEOT communications while on a perishability clock; and ALCON further adjusted its own relative valuation of the seriousness and competitiveness of other bidders based on PEUGEOT's market-setting bids being, essentially, "real" – ALCON discounted or even abandoned other bidders in favor of PEUGEOT, because PEUGEOT was presenting the highest bids by a significant margin.  To avoid repetition, ALCON does not repeat these reliance allegations after each false statement, but they should be inferred.

### *March 31, 2016: False Statement No. 1*

62.    In or about March 2016, BEN executives contacted Casablanca again about possible PEUGEOT interest in BR2049.  These communications included emails from between Morizet and Sissoko on March 7, 2016.  In these communications, Sissoko expressed to Morizet a belief that PEUGEOT would be interested.  PLAINTIFF is informed and believes that as a direct result, BEN caused Porter to seek further information from Ravetch, including in emails between Porter and Ravetch from March 18 to March 22, 2016.  The Porter-Ravetch emails and related BEN communications show that ALCON communicated that winning the BR2049 auto opportunity would take a substantial

18

THIRD AMENDED COMPLAINT

amount of money, in the "millions."  PLAINTIFF is informed and believes that the information made its way from BEN to Casablanca through the chain, including specifically that only serious clients with "cash" to back up their bids would be considered by ALCON.  So did the information that all auto brand offers should be in by "Mid April."  PLAINTIFF is informed and believes that this information was communicated by BEN to Casablanca by no later than March 30, 2016, and that Casablanca understood it.

63.     PLAINTIFF is informed and believes and thereon alleges that in March 2016, further communications occurred between Casablanca and BEN. Thereby, Casablanca (either Montron or Sissoko or both) communicated to Paul Morizet and/or other BEN executives that PEUGEOT was indeed interested in the BR2049 opportunity, and would bid on it with a good faith intention to perform a winning bid, if given more information by ALCON about the project and allowed to bid.  Casablanca also communicated to BEN that PEUGEOT had the ability to perform (a "budget").  Casablanca so communicated this to BEN with the intention that BEN communicate it to ALCON.

64.     The specific communication chain appears to have been from BEN executives located in Los Angeles (and possibly one or more other U.S. cities) to Morizet in France; then from Morizet to Montron and/or Sissoko and back; then from Morizet back through other BEN executives eventually to Porter.  Among other communications, PLAINTIFF is informed and believes that on or about March 30, 2016, Montron and/or Sissoko expressly communicated to Morizet that PEUGEOT was "very interested" and even gave Morizet a specific monetary figure as to what PEUGEOT's budget for a BR2049 was.  Montron and/or Sissoko intended the thrust of this communication to reach ALCON to cause ALCON to consider PEUGEOT as a genuine good faith bidder, and even to consider PEUGEOT more favorably than other bidders.

65.     As a result of jurisdictional discovery from BEN, all of the defendants

19

THIRD AMENDED COMPLAINT

(or their counsel) have what appear to be the portions of these communications that occurred by email.  These email communications, along with deposition testimony from BEN, further identify the names of additional individual BEN executives involved in the communication chain.  However, where BEN is a non-party and where defendants (or their counsel) possess these email communications, ALCON respectfully submits that the names of these BEN executives do not need to be expressed with further specificity in the TAC in order for defendants to be able to prepare to defend the claims here.  Including for these reasons, ALCON does not in this TAC identify every BEN executive involved by name.

66.     On or about March 31, 2016, Porter communicated the essence of Montron's and/or Sissoko's statements to Ravetch, via email.  The Porter to Ravetch email contains express statements -- clearly relaying the c. March 30, 2016 statement from Montron and/or Sissoko to Morizet -- that PEUGEOT "ha[s] a budget" for the deal.  The March 31, 2016 Porter to Ravetch email even includes a specific dollar amount proposal to Ravetch as to what PEUGEOT would be willing to pay for the placement portion of the opportunity.  Subject to alternative pleading theories, defendants intended the March 31, 2016 Porter to Ravetch email, including specifically that PEUGEOT "has a budget," to communicate to ALCON that PEUGEOT might be interested in bidding on the BR2049 opportunity, and had the financial and other resources to be able to perform a large winning bid, if PEUGEOT was permitted to engage in bidding and won.  Subject to alternative pleading theories, defendants' purpose in communicating this to ALCON was to cause ALCON to treat PEUGEOT as a potential good faith bidder who could actually perform a placement and promotions contract if it entered into one, which necessarily meant ALCON changing its position relative to evaluation of other potential bidders, and ALCON's commitment of resources in exploring bids.  The communication did in fact have this effect.  This communication set is all "False Statement No. 1." ***Alternative Pleading:*** *Under Theory 1, the statements were*

*either intentionally falsely made or caused by Casablanca, in that either PEUGEOT was not interested in bidding on BR2049 at all at that point, and/or had no budget to perform if it won the bidding, or Casablanca made or caused the statements negligently, in that Casablanca did not actually know these things one way or the other.  Under Theory 1, Casablanca made the statements without PEUGEOT's authority.  Under Theory 2, PEUGEOT was not interested in bidding in good faith, and/or had no budget to perform a winning bid, and Casablanca knew these things.  Under Theory 2, Casablanca made or caused the making of the false statements to advance a bad faith agenda by the PEUGEOT DEFENDANTS, and the statements were thus made with authority.  Under Theory 3, the same as Theory 2, but Casablanca did not know that PEUGEOT or MENDEZ had bad faith intent or that PEUGEOT had inability to perform.  Under Theory 4, the statements were not false at the time they were made.*

### *April 1, 2016: False Statement No. 2*

67.    Pursuant to essentially the same communication chain as False Statement No. 1 above, and involving essentially the same individual executives within Casablanca and BEN as that chain, on April 1, 2016, Porter emailed Ravetch and stated, *inter alia*, that PEUGEOT "would be interested in discussing the possibility of a co-promotional campaign to coincide with the release of the movie" (*i.e.*, an express statement, from Casablanca through the communication chain described to Porter and then to Ravetch, that PEUGEOT bids would contemplate not only placement fees, but also the co-promotional component).  Subject to the alternative pleading theories, this statement was intended by defendants to communicate to ALCON that PEUGEOT not only might be, but in fact was, genuinely interested in participating in good faith on the BR2049 opportunity bidding process and had the ability to perform a winning bid, and that ALCON should treat PEUGEOT accordingly.  Further, the statements also specifically communicated that PEUGEOT bids would in fact contemplate a co-

21

THIRD AMENDED COMPLAINT

promotion campaign component, in good faith, and that PEUGEOT could actually perform such a co-promotion financially. The statements were all intended to induce ALCON to treat PEUGEOT as a genuine, good faith bidder, including causing ALCON to begin to adjust its position relative to other actual or potential bidders based on PEUGEOT'S expression of interest. ALCON was in fact so induced and did so. This is "False Statement No. 2." *Alternative Pleading: Same Theory parameters as False Statement No. 1. The additional representations by Casablanca, through Porter to Ravetch, that PEUGEOT would contemplate in good faith making bids that included a co-promotional element, and that PEUGEOT could actually perform a substantial co-promotion if it committed to one has the following relevance, on a theory-by-theory basis: under Theory 1, it was made by Casablanca intentionally falsely or with gross negligence by Casablanca, and without any authority from PEUGEOT; under Theory 2, it was false, but made with PEUGEOT's knowledge or later ratification that it was false; under Theory 3, it was false, but Casablanca did not know it was false; under Theory 4, the statement was not false at the time it was made.*

***Commencement of Estoppel Against Defendants Regarding Value Uncertainties***

68. In or about April 2016, Porter communicated to Ravetch that a second brand, also represented by BEN ("Automotive Brand Z" or "Brand Z"), was highly interested in the BR2049 K spinner opportunity, and wanted to bid. ALCON alleges and contends (and the written communication record supports) that this communication from Porter to Ravetch was not false: Brand Z was in fact highly interested in the BR2049 opportunity and wanted to bid (and in fact as discussed below, Brand Z did participate in the bidding).

69. At about the same time that Porter communicated to Ravetch the existence and specific identity of Brand Z as another interested bidder, competitive to PEUGEOT, BEN executives also communicated this development to Casablanca, although potentially without disclosing the identity of Brand Z to

22

THIRD AMENDED COMPLAINT

Casablanca.  ALCON is informed and believes and thereon alleges that by no later than about April 2016, at least Casablanca knew that serious competitors existed for the K spinner opportunity, including at least Brand Z (possibly without Casablanca actually knowing the specific identity of Brand Z by name).  ALCON contends that if required to do so, ALCON will be able to prove that BEN qualified as an agent for Casablanca or otherwise as acting for Casablanca such that BEN's actual knowledge of the identity of Brand Z must be constructively charged to all defendants.

70.    The communication record between BEN and Casablanca is clear that with the knowledge that there were other highly competitive bidders, defendants resolved to "set the market" for the K spinner opportunity.  This meant using high PEUGEOT bids to put the bidding stakes out of reach of other bidders, eventually including specifically out of reach of Brand Z.  This tainted the bidding process from at least as early as the late March and April 2016 communications by Porter to Ravetch.  Under Theories 1 through 3, defendants (or some of them, depending on the theory) were acting in bad faith and knew or should have known that their conduct would taint the market.  Defendants cannot knowingly create a tainted market and then assert later that ALCON's claims should be compromised by any resulting uncertainty in what that tainted market was or wasn't, outside of PEUGEOT's interest.  Defendants should be estopped from any such argument, and that estoppel effect should apply as early as the time of False Statements Nos. 1 and 2.

### *April 4, 2016: False Statement No. 3*

71.    Pursuant to essentially the same or similar Montron/Sissoko-Morizet-Other BEN executives-Porter-Ravetch communication chain previously described, Casablanca caused Porter to email Ravetch on April 4, 2016.  Porter's April 4, 2016 email further affirmed that PEUGEOT was interested in bidding on the K spinner opportunity, with discussion of specific points of PEUGEOT interest.  The

23

THIRD AMENDED COMPLAINT

April 4, 2016 communication was intended to and actually reaffirmed to ALCON that PEUGEOT was an interested good faith bidder, specifically with the ability actually to perform a winning bid (including specifically with a "budget" to perform) as communicated by False Statements No. 1 and No. 2.  Furthermore, the April 4, 2016 communication was also intended to and did communicate (and, subject to alternative pleadings, defendants intended it to communicate) that, by dealing with whomever was directing BEN (which was at least Casablanca), ALCON was dealing with authorized agents for PEUGEOT.  This is "False Statement No. 3."  ***Alternative Pleading:*** *Same Theory parameters as False Statement Nos. 1 and 2, as to the good faith nature of PEUGEOT's interest and PEUGEOT's ability actually to perform.  In addition, under Theory 1, False Statement No. 3 was false in that Casablanca had no authority to act for PEUGEOT or was exceeding it.  Under Theories 2, 3 and 4 the statement as to Casablanca's authority was not false.*

72.     ALCON relied on False Statement No. 3.  Indeed, on April 12, 2016, Ravetch emailed Porter and informed her that if PEUGEOT was serious about discussing a placement that specifically included a co-promotion, then, contingent on confirmation of mutually consistent ideas about general deal parameters, ALCON "would be ceasing negotiations with other companies" to focus on PEUGEOT.

73.     ALCON is informed and believes and thereon alleges that the above communications by Ravetch were in fact relayed back along the BEN to Casablanca chain, and that Casablanca received them and understood them, including as actual or ostensible agent for PEUGEOT, by no later than about April 18, 2016.

74.     ALCON did in fact change its position in response to False Statement No. 3, including to divert and elevate attention, seriousness, and resources to PEUGEOT.  This was at the expense of ALCON'S full pursuit of other potential

24

THIRD AMENDED COMPLAINT

bidders, as well as of ALCON's ability to evaluate the market and what it would have been without PEUGEOT tainting the bidding process, with corresponding effects on ALCON's ability to plan the overall marketing and distribution strategy and financing for BR2049.

### *April 12 – 28, 2016: False Statement No. 4*

75.    Pursuant to the described BEN-Casablanca communication chain, between April 12, 2016 through April 28, 2016, Casablanca made communications to BEN such that Porter and Ravetch exchanged multiple emails.  In these emails, Porter, speaking for defendants, reaffirmed that PEUGEOT was still an actively interested, good faith bidder, including to bid on a co-promotions component, and, implicitly, that all communications coming through BEN on PEUGEOT's behalf were authorized by PEUGEOT.  These communications are "False Statement No. 4." ***Alternative Pleading:*** *Under Theory 1, the statement was intentionally falsely made or caused by Casablanca in that PEUGEOT was not an interested, good faith bidder, especially not for a co-promotion element, or Casablanca had no reason to believe that the statement was true.  Under Theory 1, the statement was further false in that Casablanca had no authority to act for PEUGEOT or was exceeding it.  Under Theory 2, the statement was intentionally falsely made or caused by all defendants in that PEUGEOT did not intend to bid in good faith, would never perform a co-promotion, and had no budget.  Under Theory 3, the same as Theory 2, but Casablanca did not know that the statement was false. Under Theory 4, the statement was not false at the time it was made.*

### *May 2, 2016: False Statement No. 5*

76.    On or about May 2, 2016, Casablanca emailed an "Agreement in Principle" (also referenced as a "Letter of Intent" or "LOI") to BEN.  In connection therewith, Montron and/or Sissoko also had telephone conversations with Morizet. By these communications, Casablanca intended to and did communicate to both BEN and from there to ALCON, that Casablanca was authorized to act for

25

THIRD AMENDED COMPLAINT

PEUGEOT on BR2049.  Further Casablanca intended to and did communicate to BEN and from there to ALCON, that PEUGEOT had good faith interest in bidding, with Casablanca knowing that bids would require a significant placement fee and a co-promotion commitment.  The import of Casablanca's *circa* May 2, 2016 communications to BEN was further that, if BEN could achieve ALCON engagement with Casablanca, then PEUGEOT would commit to negotiating in good faith with ALCON consistent with the LOI parameters.

77.    PLAINTIFF is informed and believes that as part of the communication chain in connection with Casablanca's transmission to BEN of the May 2, 2016 LOI, Montron and/or Sissoko specifically communicated the following to Morizet, with the intention that it reach ALCON: if ALCON would give PEUGEOT confidential script information and other confidential information about BR2049, then PEUGEOT would reciprocate by committing to a specific bid, including a specific co-promotion component.  Casablanca intended to cause BEN to communicate the thrust of this to ALCON so that ALCON would rely on it. BEN in fact did so, via the chain leading to Porter and then to Ravetch.  ALCON in fact did rely on the communication.  This May 2, 2016 communication and its thrust is "False Statement No. 5."  ***Alternative Pleading:*** *Under Theory 1, the statement was intentionally falsely made and caused by Casablanca, in that PEUGEOT was not a good faith bidder, especially not for a co-promotion component; had no budget or ability to perform a co-promotion; and PEUGEOT had no intention of making a genuine committed bid even if PEUGEOT received confidential projection information -- or Casablanca made and caused all these statements with no reasonable basis for believing them to be true.  Under Theory 1, False Statement No. 5 is further false in that Casablanca had no authority to act for PEUGEOT or was exceeding it.  Under Theory 2, the statement was intentionally false in that PEUGEOT was not acting in good faith and had no intention to pay a placement fee or perform a co-promotion, and no budget for a*

26

THIRD AMENDED COMPLAINT

*co-promotion, and all defendants knew and intended the falsity of the statement.*
*Under Theory 2, the statement that Casablanca was acting within its authority as*
*PEUGEOT's agent was not false.  Under Theory 3, the same as Theory 2, but*
*Casablanca did not know of PEUGEOT bad faith or inability to perform.  Under*
*Theory 4, False Statement No. 5 was not false at the time it was made.*

### *May 4, 2016: False Statement No. 6*

78.    On or about May 4, 2016, Sissoko transmitted a signed "Media Plan Agreement" to BEN (multiple executives including Morizet) via email.  By this communication, Casablanca represented to BEN all of the following, with the intent that the substance would reach ALCON: Casablanca was authorized to act as PEUGEOT's agent to bid and contract on the BR2049 opportunity; Casablanca was in turn authorized to and was conferring authority to do so to BEN; if allowed to participate in the bidding process on BR2049, Casablanca and PEUGEOT would both do so in good faith, including bids that would include a placement fee and significant co-promotion; and PEUGEOT had the ability to perform (*e.g.*, a PEUGEOT budget to execute a committed co-promotion) if PEUGEOT was the winning bidder.  Casablanca intended the import of all this to be communicated by BEN to ALCON, specifically so that Casablanca and PEUGEOT would be permitted by ALCON to go further in the bidding process.  This included intending that ALCON provide confidential BR2049 information to PEUGEOT, and also that ALCON evaluate other potential bidders less favorably, or disregard them altogether.  The essence of these May 4, 2016 communications from Sissoko and Montron to BEN were in fact communicated on from BEN to ALCON.  This was done explicitly or implicitly, by ongoing Porter to Ravetch communications from May 4, 2016 forward (including emails between Porter and Ravetch between May 4, 2016 and May 9, 2016).  This is all "False Statement No. 6." ***Alternative Pleading:*** *Under Theory 1, the statements were all intentionally falsely caused or made by Casablanca, or Casablanca made them and caused them to be made*

27
THIRD AMENDED COMPLAINT

*without any reason for believing them to be true.  Under Theory 1, Casablanca made them without any authority from PEUGEOT.  Under Theory 2, the statements were made with PEUGEOT's authority, but were otherwise intentionally false made or caused by all defendants, in that PEUGEOT was not interested in bidding in good faith, had no co-promotion budget to be able to perform a winning bid, and did not intend actually to perform any such bid even if ALCON provided confidential project information or otherwise changed position to ALCON's detriment.  Under Theory 3, the same as Theory 2, but Casablanca did not know that PEUGEOT had any bad faith or inability to perform.  Under Theory 4, the representations were not false at the time they were made.*

### c. May 6, 2016: False Statement No. 7

79.    In about late April or early May 2016 (perhaps May 6, 2016), Porter and Ravetch had telephone conversations during which Porter communicated to Ravetch that: 1) both PEUGEOT and Brand Z were potentially interested in and able to make BR2049 bids including a) a placement fee of several hundred thousand dollars ($700,000+) and b) a co-promotion with a $15 million minimum guaranteed media spend; and 2) each might do so if each received further confidential information from ALCON.  At least implicit in these conversations between Porter and Ravetch was that PEUGEOT had the ability to fulfill such a bid if it in fact made one (*e.g.,* that PEUGEOT actually had a budget for such a co-promotion), and that PEUGEOT's agents (Casablanca) were acting with PEUGEOT'S authority.  PLAINTIFF is informed and believes and thereon alleges that Casablanca caused the making of Porter's statements to ALCON related to PEUGEOT's intentions, ability to perform, and the authority of Casablanca, via the Sissoko and/or Montron to Morizet, and then through on to Porter, then to Ravetch, chain.  PLAINTIFF is informed and believes and thereon alleges that Casablanca caused the making of the statements by Porter for the purpose of causing ALCON to rely on them to its detriment, and ALCON did so rely.  These Porter to Ravetch

28

THIRD AMENDED COMPLAINT

statements regarding PEUGEOT (but not the statements about Brand Z) are all "False Statement No. 7." ***Alternative Pleading:*** *Under Theory 1, the statements as to PEUGEOT's intentions and ability perform were intentionally false made of caused by Casablanca, or Casablanca made or caused them to be made without any reasonable basis for believing them to be true. Under Theory 1, Casablanca made or caused them to be made without any authority from PEUGEOT. Under Theory 2, the statements were intentionally false, except as to Casablanca's authority, which was a true statement. Under Theory 2, all defendants knew the statements were false and intended that they be made. Under Theory 3, the same as Theory 2, but Casablanca was innocent in the scheme and did not know the statements were false. Under Theory 4, the statements were not false at the time they were made.*

### c. May 9, 2016: False Statement No. 8

80.    PLAINTIFF is informed and believes that through early May 2016 communications to Morizet and BEN, Montron and Sissoko intended to cause Porter actually to send a specific proposal to ALCON through Ravetch, in the form of a "letter of intent" or "LOI." Accordingly, on or about May 9, 2016, Porter emailed one to Ravetch on behalf of PEUGEOT.

81.    On or about the same day (May 9, 2016), Porter also emailed to Ravetch a separate letter of intent or LOI on behalf of Brand Z. Ravetch reasonably understood by these communications that Porter was reaffirming that both PEUGEOT and Brand Z were each open to, and able to perform, a co-promotion with at least a $15 million media spend. PLAINTIFF is informed and believes and thereon alleges that Casablanca so intended this as to PEUGEOT.

82.    PLAINTIFF is informed and believes that the specific terms of the May 9, 2016 PEUGEOT LOI were approved by Montron and Sissoko to Morizet and other BEN executives, and intended by Montron and Sissoko to be communicated to ALCON via BEN. Or, at the very least, PLAINTIFF alleges that

29

THIRD AMENDED COMPLAINT

the specific terms of the May 9, 2016 PEUGEOT LOI were within the authority that Casablanca had given to BEN for the purpose of causing ALCON to change its position.  Furthermore, PLAINTIFF is informed and believes that Montron and Sissoko specifically intended for BEN to communicate LOI terms on behalf of PEUGEOT that would be competitive with, and indeed superior to, any Brand Z (or other competing brand) terms, for the purpose of eliminating all such other bidders from the competition.

83.    Including as LOI's are understood in the industry, the May 9, 2016 PEUGEOT LOI from Porter to Ravetch communicated in essence that, if ALCON would continue to include PEUGEOT in the bidding process and provide PEUGEOT with confidential information, then PEUGEOT had a good faith interest in negotiating for a contract that would pay ALCON a placement fee of as much as $750,000, and that a co-promotion component was possible, subject to further discussion.  It communicated further that PEUGEOT would commit to good faith negotiating with ALCON along these lines, if ALCON would further commit to negotiating in a focused or even exclusive way with PEUGEOT.  ALCON in fact relied on the statements in this fashion.  Casablanca's statements to BEN causing the May 9, 2016 PEUGEOT LOI to be communicated, and Porter's actual communications of it to Ravetch, are "False Statement No. 8."  *Alternative Pleading: Under Theory 1, the* circa *May 9, 2016 statements as to PEUGEOT were intentionally falsely made or caused by Casablanca in that PEUGEOT had no intention of bidding in good faith, no intention ever to commit to a co-promotion and no budget to perform one, or Casablanca made the statements without any reason for believing them to be true.  Under Theory 1, Casablanca made the statements and caused them to be made without any PEUGEOT authority or exceeding its authority.  Under Theory 2, the statements as to PEUGEOT's intentions and ability to perform were all false and all defendants knew and intended the falsity of the statements.  Under Theory 2, the statement as to*

30

THIRD AMENDED COMPLAINT

*Casablanca's authority was true. Under Theory 3, same as Theory 2, but Casablanca was innocent. Under Theory 4, the representations were not false at the time they were made.*

### *May 11, 2016: False Statement No. 9*

84. PLAINTIFF is informed and believes and thereon alleges that on or about May 11, 2016, Montron, Sissoko and MENDEZ met in person together in Paris. PLAINTIFF is informed and believes and thereon alleges that at this meeting, if they had not done so earlier, Montron and Sissoko informed MENDEZ about the BR2049 opportunity. If they had not earlier, Montron and Sissoko also received directions from MENDEZ to attempt to secure the opportunity for PEUGEOT.

85. PLAINTIFF is informed and believes and thereon alleges that during the meeting, Montron, Sissoko and MENDEZ made statements to each other that were false, and/or agreed to make false statements together, with the false statements intended to reach ALCON. PLAINTIFF does not know what the precise statements were, but the essence intended to reach ALCON was: 1) PEUGEOT knew the BR2049 bidding parameters, including that a several hundred thousand dollar placement fee and a significant co-promotion (in at least the millions) would be required; 2) PEUGEOT authorized Casablanca to make bids for PEUGEOT; 3) PEUGEOT was bidding in good faith; and 4) PEUGEOT had the ability to perform (including a budget to fulfill a co-promotion). Following the May 11, 2016 meeting, Montron and Sissoko then communicated the essence of these statements to BEN, for the purpose of BEN communicating their essence to ALCON, to cause ALCON to change position. The essence of the statements was then communicated by Porter and others at BEN to Ravetch in subsequent days and weeks, either explicitly or implicitly, as Casablanca and/or the PEUGEOT DEFENDANTS intended them to be. ALCON in fact relied on them to focus on PEUGEOT to ALCON's detriment. These May 11, 2016 statements and their

31

THIRD AMENDED COMPLAINT

essence are "False Statement No. 9." ***Alternative Pleading:*** *Under Theory 1, the essence of the May 11, 2016 statements was intentionally falsely caused or made by Casablanca, in that PEUGEOT actually communicated to Casablanca that PEUGEOT had no intention to make any good faith bid; no intention ever to perform any placement fee or co-promotion; and/or no budget to do so as to the co-promotion; or otherwise no intention to perform the bid parameters; and Casablanca alone caused BEN to make the false statements otherwise to Ravetch. Under Theory 1, Casablanca did so either with intentional falsity, or without any reasonable basis for believing the statements to be true. Under Theory 1, Casablanca did all this without authority from PEUGEOT, and indeed possibly in direct contravention of PEUGEOT's instructions. Under Theory 2, except as to any actual or implicit statements as to Casablanca's authority, the statements were all intentionally false, and all defendants knew and intended the intentional falsity and that the statements reach ALCON. Under Theory 3, same as Theory 2, but Casablanca was innocent in the scheme. Under Theory 4, the statements were not false at the time they were made.*

86.    On or about May 18, 2016, Porter and Ravetch engaged in NDA communications.  PLAINTIFF is informed and believes that all defendants were thus on notice by no later than this date that script confidentiality control on BR2049 was extremely strict, and that ALCON would only provide higher script access to serious, good faith bidders.  ALCON in fact provided BEN and Casablanca with script access in reliance on Porter and Sissoko signatures on Alcon NDAs (which NDAs were expressly governed by California law).

### *May 19, 2016: False Statement No. 10*

87.    PLAINTIFF is informed and believes that on May 19, 2016, communications occurred between Montron and/or Sissoko and multiple BEN executives, to the general effect that there were multiple interested bidders in the BR2049 opportunity.  Thus, if PEUGEOT did not make an improved bid to

32

THIRD AMENDED COMPLAINT

ALCON that specifically included an increased co-promotion spend, then PEUGEOT was at significant risk of losing the opportunity.  PLAINTIFF is informed and believes that as a result, on May 19, 2016, Montron and/or Sissoko directed or caused Morizet and/or other BEN executives to communicate a specific improved bid to ALCON, for the express purpose of eliminating competition from other bidders (and specifically Brand Z, whether or not Casablanca itself actually knew Brand Z's actual identity).

88.    Accordingly, at Casablanca's direction or causation through the communication chain, on or about May 19, 2016, Porter emailed Ravetch.  Porter's May 19, 2016 email communicated that PEUGEOT was willing and able to negotiate for a placement fee of $750,000, plus a co-promotion media campaign with "$20 million minimum to $35 million ATL media spend (with potential to rise to $40 million)."  Porter also wrote, "Peugeot is excited about the possibility of partnering on Blade Runner and that this new promotional insight will be the key to moving forward with negotiations."  The intention by Casablanca and actual effect on ALCON was reaffirmation that PEUGEOT was seeking to bid in good faith; that all of the representatives with whom Ravetch was dealing, both directly and indirectly, were authorized by PEUGEOT; that PEUGEOT might offer a guaranteed co-promotion media spend of "up to $40 million" to first exclude other bidders from further negotiations, and then ultimately to secure the opportunity for PEUGEOT by good faith negotiation; and, implicitly, that PEUGEOT could in fact perform such a co-promotion commitment if made.  PLAINTIFF is informed and believes that on or about May 20, 2016, Montron and Sissoko had communications with Morizet that included express statements to Morizet reinforcing that PEUGEOT knew of and was approving everything being done, including specifically that PEUGEOT intended to put a large promotional budget on BR2049 if it won the bidding.  Casablanca's May 19, 2016 directions to BEN, Porter's resulting May 19, 2016 statements to Ravetch, and Casablanca's May 20, 2016

33

THIRD AMENDED COMPLAINT

reinforcement of them to Morizet, are all "False Statement No. 10." *__Alternative Pleading:__ Under Theory 1, the statements were made or caused by Casablanca with intentional falsity, in that PEUGEOT had no intention to make any good faith bid; no intention ever to perform any placement fee or co-promotion; and/or no budget to do so as to the co-promotion; or otherwise no intention to perform the bid parameters; or, Casablanca made and caused the statements with no basis for believing them to be true.  Under Theory 1, Casablanca alone caused BEN to make the false statements to Ravetch without PEUGEOT authority.  Under Theory 2, except as to the statements that Casablanca was acting with PEUGEOT's authority (which statement was true under Theory 2), the statements were all intentionally false and all defendants knowingly caused BEN to make them to Ravetch.  Under Theory 3, the same as Theory 2, except that Casablanca did not know that PEUGEOT had bad faith intent or inability to perform.  Under Theory 4, the statements were not false at the time they were made.*

89.    ALCON in fact relied on False Statement No. 10.  Among other acts, on May 20, 2016, ALCON provided Porter with access to a then-current draft of the highly confidential and closely guarded BR2049 script.  The script was without dialogue or character names, but with scene descriptions and other meaningful information about the BR2049 story, for the purpose of PEUGEOT moving forward on negotiations.  Porter had previously signed an ALCON NDA on or about May 18, 2016.

90.    In further acts of reliance on False Statement No. 10, ALCON discounted the relative value of Brand Z's expression of interest and prior LOI, and generally focused attention on PEUGEOT over Brand Z and other bidders, to ALCON's ultimate detriment.

### *May 24, 2016: False Statement No. 11*

91.    Between about May 20 and May 24, 2016, BEN executives worked with Montron and Sissoko to obtain the signature of one or both of them on an

34

THIRD AMENDED COMPLAINT

ALCON NDA, so that Casablanca could have direct access to the BR2049 script as described above.  On May 24, 2016, Porter emailed to Ravetch an ALCON NDA signed by Sissoko, representing it as "the signed NDA from the Peugeot representative [Sissoko] who will be reviewing the [BR2049] script on behalf of Peugeot." The thrust was that Sissoko and Casablanca were authorized to represent PEUGEOT in the BR2049 bidding, and so was BEN.  This is "False Statement No. 11." ***Alternative Pleading:*** *Under Theory 1, the statement was false in that Casablanca was not authorized to act as PEUGEOT'S agent or was exceeding its authority.  Under Theories 2, 3 and 4, the statement was not false.*

### *May 31, 2016: False Statement No. 12*

92.    PLAINTIFF is informed and believes and thereon alleges that between May 24 and May 31, 2016, Montron and/or Sissoko engaged in multiple email and telephone communications with Morizet and other BEN executives.  PLAINTIFF is informed and believes that in these communications, Montron and/or Sissoko reaffirmed that they were authorized to act for PEUGEOT, that PEUGEOT's interest in BR2049 was very real, and that PEUGEOT's intention to win the bidding and actually perform its bid had been and was genuine.  PLAINTIFF is further informed and believes that as a result of these Casablanca-BEN communications, Montron and/or Sissoko directed or caused Porter, directly or indirectly, to email Ravetch to reaffirm the genuine nature of PEUGEOT's interest and bid.  As a result, on May 31, 2016, Porter emailed Ravetch and reaffirmed two things: 1) that the Brand Z interest for the K spinner placement at a placement fee of at least $700,000 and a $15 million co-promotion was "real"; and 2) so was the bidding by PEUGEOT ("real" - meaning actually authorized by PEUGEOT, and with PEUGEOT acting in good faith and able to perform).  PLAINTIFF is informed and believes and thereon alleges that part 1 was true (the Brand Z bid was "real").  Part 2 of the statement, regarding the "reality" of PEUGEOT's bid and Casablanca's communications between May 24 and May 31, 2016 causing the

35

THIRD AMENDED COMPLAINT

statement to be made, is "False Statement No. 12." ***Alternative Pleading:*** *Under Theory 1, Casablanca made and caused the statement to be made intentionally falsely, in that PEUGEOT's bid was not "real," because PEUGEOT had not been and was not bidding in good faith, PEUGEOT had no intention to perform a co-promotion commitment if PEUGEOT won the bid, and PEUGEOT had no budget to perform one, either; or Casablanca made the statement without any reason to believe that they were true.  Under Theory 1, Casablanca was not authorized to act as PEUGEOT'S agent or was exceeding its authority (further contributing to the situation that the PEUGEOT bid was not "real").  Under Theory 2, the statement was authorized by PEUGEOT, but otherwise false in that PEUGEOT was not bidding in good faith or with an ability to perform a co-promotion, and all defendants intentionally caused the false statement to be made.  Under Theory 3, the same as Theory 2, but Casablanca did not know Peugeot was acting in bad faith or could not perform.  Under Theory 4, the statement was not false at the time it was made.*

### *June 6, 2016: False Statement No. 13*

93.      PLAINTIFF is informed and believes and thereon alleges that between late May and June 6, 2016, further communications occurred between Montron and Sissoko and MENDEZ, and then also between Montron and Sissoko and BEN executives.  PLAINTIFF is informed and believes that the result was a direction or other causation by Casablanca to BEN to communicate an improved and more specific LOI to ALCON.  As a result, on June 6, 2016, Porter emailed Ravetch attaching an "updated Integration Agreement" (*i.e.*, an improved LOI bid) on behalf of PEUGEOT.  Porter's cover email stated, *inter alia*, "I am happy to report that the Peugeot rep [Sissoko] was very pleased with the script and the nature of the vehicle opportunity in Blade Runner."  The June 6, 2016 Peugeot LOI was for a placement fee of $750,000 and a co-promotion media spend commitment of "up to $20,000,000."  The communication reaffirmed that Casablanca and BEN were

36

THIRD AMENDED COMPLAINT

authorized to act for PEUGEOT, and that if PEUGEOT was awarded the bid, it would and could pay a placement fee of as much as $750,000, and would and could commit to a co-promotion of "up to $20,000,000."  This June 6, 2016 communication from Porter to Ravetch and the late May to June 6, 2016 communications involving Montron and Sissoko leading up to it, is "False Statement No. 13." ***Alternative Pleading:*** *The statement was false or not, pursuant to essentially the same theory-by-theory parameters as apply to False Statement No. 12 above, and for the same reasons, but with the following additional factor: under Theories 1, 2 and 3, False Statement No. 13 also constituted a false promise on behalf of PEUGEOT, for the reasons described in paragraph 94 on, below. Under all three of these theories, the promisor was PEUGEOT.  Under Theory 1, Casablanca caused the communication of the false promise without authority from PEUGEOT.  Under Theory 2, Casablanca caused the communication of the false promise on PEUGEOT's behalf, but with PEUGEOT's knowledge and intention that Casablanca do so.  Under Theory 3, Casablanca caused the communication of the false promise, but without knowing that it was a false promise by PEUGEOT. Under Theory 4 it was a promise, but not a false one at the time it was made.*

94.    In the placement business, by industry standards and custom and practice, the June 6, 2016 LOI constituted an offer by PEUGEOT that, if ALCON provided PEUGEOT with further confidential information about the project and otherwise committed to negotiating in good faith with PEUGEOT, then PEUGEOT would bind itself to negotiate in good faith with ALCON to try to close a placement and co-promotion deal consistent with the parameters in the June 6, 2016 LOI.  In particular, PEUGEOT would not move materially backward as to its own proposals, and would not impose radically new conditions going forward. ALCON specifically relied on the truth of False Statement No. 13.  This included displaying highly confidential images of K's spinner to Porter and another BEN executive at an in-person meeting in Studio City on or about June 8, 2016.

37

THIRD AMENDED COMPLAINT

ALCON also otherwise committed to and did move forward to negotiate in good faith with PEUGEOT in response to the June 6, 2016 LOI, including to the neglect or exclusion of other bidders, and to ALCON's general detriment on marketing and distribution release strategy and financing planning.

95.    The June 6, 2016 LOI was an offer by PEUGEOT to enter into a binding contract to negotiate in good faith with ALCON consistently with the terms in the June 6, 2016 LOI; as described above, ALCON accepted this offer, including by conduct; and PEUGEOT became contractually bound by it.  The allegations that False Statement No. 13 were false include that the June 6, 2016 LOI was thus also a false promise, made with no intention to perform by defendants (subject to the alternative Theories 1 through 4).

### *June 8, 2016: False Statement No. 14*

96.    PLAINTIFF is informed and believes that in late May and early June 2016, Montron and Sissoko had communications with MENDEZ, and also separately with BEN executives.  PLAINTIFF is informed and believes and thereon alleges that as a result, Montron and Sissoko directed or caused that BEN should make communications to ALCON to cause ALCON to disclose further highly confidential information to PEUGEOT – specifically, images of the spinner, with the understood bargain that if ALCON did so, PEUGEOT would move further toward a fully binding commitment, including a co-promotion.  As a result, Porter did in fact make such communications to Ravetch.  On or about June 8, 2016, Ravetch had the in-person meeting described in paragraph 94 above, with Porter and another BEN executive.

97.    At that in-person meeting, Ravetch disclosed images of the spinner to Porter and another BEN executive, and PLAINTIFF is informed and believes, also to Montron and/or Sissoko.  PLAINTIFF is informed and believes and thereon alleges that at the meeting, the BEN executives generally made statements which reaffirmed to Ravetch, and even by coming to the meeting reaffirmed to Ravetch

38

THIRD AMENDED COMPLAINT

by conduct, that PEUGEOT's interest was "real." "Real" meant actually authorized by PEUGEOT, with PEUGEOT acting in good faith and able to perform if it won the bidding.  The described statements and conduct leading up to and at the June 8, 2016 meeting are "False Statement No. 14."  ***Alternative Pleading:*** *Under Theory 1, the statements were intentionally falsely made or caused by Casablanca, or negligently made or caused by Casablanca.  Under Theory 1, Casablanca was not authorized to act or was exceeding its authority and none of PEUGEOT's bidding was "real," in the way and for the reasons described previously with respect to similar preceding false statements.  Under Theory 2, the statements were false in that PEUGEOT was not bidding in good faith or with an ability to perform a co-promotion, and all defendants intentionally caused the making of the statements.  Under Theory 3, the same as Theory 2, but Casablanca did not know of any bad faith by PEUGEOT.  Under Theory 4, the statements were not false at the time they were made.*

98.    PLAINTIFF is informed and believes that between about June 8, 2016 and June 20, 2016 (with many communications believed to have occurred specifically on June 20, 2016), Montron and/or Sissoko communicated with MENDEZ and other PEUGEOT executives, and also separately with BEN. PLAINTIFF is informed and believes that pursuant to these communications, all defendants expressly discussed with each other and intentionally determined that PEUGEOT intended to win the bidding; ALCON needed to continue to believe that PEUGEOT would perform a co-promotion commitment in the specific amount of at least $30 million for PEUGEOT to win the bidding; and that PEUGEOT should intentionally conceal or obfuscate from ALCON (and BEN) that PEUGEOT would never perform such a co-promotion (all subject to alternative pleading Theories 1 through 4, including as to defendants' particular states of mind with respect to these communications).

99.    PLAINTIFF is informed and believes that defendants' conduct at this

39
THIRD AMENDED COMPLAINT

juncture was specifically driven in part by the existence and "reality" of Brand Z as a true competitive bidder, and defendants' intention to take Brand Z out of the picture, necessarily meaning depriving PLAINTIFF of that opportunity, or at least tainting it (all subject to alternative pleading Theories 1 through 4, including as to defendants' particular knowledge and states of mind at this time).  PLAINTIFF is informed and believes, including based on sealed internal BEN communications, that as late as June 22, 2016 the Brand Z $700,000 placement fee/$15 million co-promotion bid was a genuine, good faith "still in play" bid, and PLAINTIFF alleges that it was.  PLAINTIFF further alleges that if PEUGEOT had not engaged in improper negotiating conduct, PLAINTIFF would have concluded a deal with Brand Z, or found one or more other bidders willing to pay at least what Brand Z was offering or that would otherwise be of high value.  PLAINTIFF is informed and believes that all of the relevant actors at the time – PEUGEOT, Casablanca, BEN and ALCON – all believed this to be true (subject again to alternative pleading Theories 1 through 4, including as to what information Casablanca was or was not sharing with PEUGEOT).  PLAINTIFF further alleges in the alternative that what would have happened with the Brand Z bid or other bids had defendants not falsely tainted the bidding process is potentially unknowable, and the consequences of any such uncertainty must fall on defendants and not PLAINTIFF.

### *June 23, 2016: False Statement No. 15*

100.   PLAINTIFF is informed and believes that pursuant to the late June 2016 communications between Casablanca and BEN described above, Casablanca made statements to BEN with the intention that BEN should reaffirm to ALCON that PEUGEOT was still interested in the BR2049 opportunity and still intended to win the bidding for it.  PLAINTIFF is informed and believes that, as a result, on June 23, 2016, Porter emailed Ravetch and again reaffirmed two things: 1) the Brand Z interest for the K spinner placement at a placement fee of at least $700,000 and a co-promotion committed minimum media spend of $15 million

40

THIRD AMENDED COMPLAINT

was "real"; and 2) so was the bidding by PEUGEOT ("real"), meaning actually authorized by PEUGEOT, with PEUGEOT acting in good faith and able to perform if it won the bidding.  ALCON in fact relied on these communications. PLAINTIFF is informed and believes and thereon alleges that part 1 was true (the Brand Z bid was "real").  Part 2 of the statement, regarding the "reality" of PEUGEOT's bid, is "False Statement No. 15."  ***Alternative Pleading:*** *Under Theory 1, Casablanca made or caused the statement intentionally falsely, in that PEUGEOT was not a good faith bidder, did not intend to perform if it won the bidding, specifically did not intend to perform any co-promotion, and had no ability to do so; or Casablanca made or caused the statement with no reason to believe the statements were true.  Under Theory 1, Casablanca made the statements without authority or in excess of authority, and possibly even in direct contravention of PEUGEOT'S instructions.  Under Theory 2, all defendants intentionally made or caused the making of the false statements, except as to the statement that Casablanca was acting with PEUGEOT's authority (which was a true statement under Theory 2).  Under Theory 3, the same, but Casablanca did not know of the PEUGEOT DEFENDANTS' bad faith or other bad intent.  Under Theory 4, the statement was not false at the time it was made.*

101.   Throughout all of the BEN communications, Ravetch repeatedly reminded defendants (through communications to Porter that PLAINTIFF alleges were relayed to at least Casablanca) that ALCON was on a deal-making clock such that delay would severely prejudice ALCON.

102.   On June 29, 2016, Porter emailed Ravetch and informed him that PEUGEOT was reneging on its LOI commitments.  Porter further informed Ravetch that PEUGEOT intended to impose new deal conditions now on ALCON, including the impossible condition of approval of final cut on the entire release-ready film before any commitment to a co-promotion.  A few hours later that same day, another BEN executive transmitted an all-new proposal from PEUGEOT that

41

THIRD AMENDED COMPLAINT

included the final cut approval pre-condition to a co-promotion commitment and fee commitment, and sharply reduced the placement fee to $200,000.

103.  By this time, the commencement of principal photography was less than two weeks away.  ALCON had focused its negotiation resources on PEUGEOT for at least several weeks to the exclusion or neglect of other bidders, all as defendants intended and induced ALCON to do (under Theories 1 through 3).  The K spinner opportunity had already started to perish in value.  Despite this sharp prejudice from PEUGEOT's backward movement, ALCON at this point still might have found another brand partner at a relatively high value, and before doing such things as changing production plans and elements to accommodate PEUGEOT.  However, things did not go down such a path, because defendants made or caused further representations to convince ALCON not to abandon deal-making with PEUGEOT, as described below.

### *Casablanca Takes Over Direct Negotiations*

### *Late June/Early July 2016: False Statement No. 16*

104.  As a result of the June 29, 2016 communications from BEN, in late June or early July 2016, PLAINTIFF is informed and believes that one or more CTMG executives (believed to include Ziad Toubassy ("Toubassy") in Culver City and Joelle Francois ("Francois") in Paris) made direct contact with MENDEZ at PEUGEOT.  Their purpose was to determine directly from MENDEZ whether PEUGEOT's interest in BR2049 was real or otherwise what was going on.  PLAINTIFF is informed and believes that in resulting communications between CTMG and one or more defendant representatives (perhaps including telephonic or in-person communications between Francois and MENDEZ in Paris), MENDEZ, Montron and Sissoko stated to CTMG that PEUGEOT was in fact very interested in the BR2049 opportunity, including on substantial placement fee plus co-promotion terms; that the June 29, 2016 communications from BEN were caused by misunderstandings that were the fault of BEN and not defendants; and if

42

THIRD AMENDED COMPLAINT

ALCON would stay at the negotiating table, then PEUGEOT would resume discussions pursuant to the parameters prior to the June 29, 2016 BEN communications.  ALCON in fact relied on these communications to continue further down the path with PEUGEOT, to the neglect of exclusion of other opportunities.  This is all "False Statement No. 16."  ***Alternative Pleading:*** *Under Theory 1, to the extent Montron or Sissoko were somehow the only speakers on defendants' side, Casablanca intentionally made or caused the making of the statements intentionally falsely, in that PEUGEOT was not a good faith bidder and did not intend to perform any bid if it won the bidding, and had no ability to perform; or Casablanca made the statements with no reason to believe they were true.  Further, BEN's June 29, 2016 communications had been accurate, not a BEN misunderstanding.  Under Theory 1, Casablanca made the statements without authority from PEUGEOT, or in excess of authority, or even in direct contravention of PEUGEOT'S instructions.  Under Theory 2, Casablanca was in fact acting with PEUGEOT'S authority, but the statement was otherwise all intentionally falsely made or caused to be made by all defendants.  Further, to the extent MENDEZ was a speaker to CTMG, MENDEZ also had a duty at this time if not earlier, to disclose affirmatively that PEUGEOT had no co-promotion budget if that was true, and MENDEZ did not do so.  Under Theory 3, the same as Theory 2, but Casablanca was only an innocent pawn in the scheme.  Under Theory 4, the statement was not false.*

105.   Including as reinforced by PEUGEOT'S July 12, 2016 Letter of Intent ("July 12, 2016 LOI") discussed further below, ALCON ultimately relied on False Statement No. 16, and related follow-up statements, to move forward with PEUGEOT to the exclusion of all other bidders.

### July 5-11 2016: False Statement No. 17

106.   Between July 5 and 11, 2016, Montron and Toubassy had a series of email exchanges, which are in the record of this action as part of ALCON'S

43

THIRD AMENDED COMPLAINT

jurisdictional Exhibit 23, Dkt. No. 32, pages 76-81.  In these email communications, Montron makes numerous statements to Toubassy, the thrust of which is as follows: 1) Casablanca was indeed authorized to act as PEUGEOT'S agent on BR2049 and all of Casablanca's communications to BEN had been authorized; 2) PEUGEOT was very interested in the BR2049 opportunity; 3) PEUGEOT intended to move forward in good faith on the bid parameters that had been discussed prior to BEN's June 29, 2016 emails and did not have any bad faith intent to move backwards from them; 4) any inference otherwise was the fault of BEN, including BEN improperly manipulating communications; 5) PEUGEOT was willing to submit another LOI to get things back on track (and the emails attach a version of one); 5) affirmation of PEUGEOT willingness to include a minimum $30 million co-promotion media spend, including outlines of a campaign plan; 6) no mention whatsoever that PEUGEOT had no budget for any such co-promotion spend; and 7) suggestion that if ALCON and CTMG would communicate directly with Casablanca and eliminate BEN, then any communication problems would likely be solved.  ALCON in fact relied on all of these statements to move forward with PEUGEOT, to the neglect or exclusion of other bidders.  This is all "False Statement No. 17." ***Alternative Pleading:*** *Under Theory 1, the statements were all made intentionally falsely by Montron (including by omission as to the budget issue) and were essentially all misrepresentations by Montron, without the knowledge of PEUGEOT or MENDEZ, including without limitation as to Montron's affirmation of authorized agency.  Or under Theory 1, all of Montron's affirmative misrepresentations were made without Montron having reason to believe that the statements were true.  Under Theory 2, the statements were all false except that Casablanca was acting within its agency authority, as part of a bad faith scheme by all defendants to defraud or unfairly prejudice ALCON.  Under Theory 3, the same, but Casablanca was an innocent pawn in the scheme.  Under Theory 4, the statements were not false at the time they*

44

THIRD AMENDED COMPLAINT

*were made.*

### *July 12, 2016 LOI: False Statement No. 18*

107.   On or about July 12, 2016, Montron emailed to Toubassy a two-page document entitled "Blade Runner II -- Agreement in Principle" with Casablanca's signature affixed, on behalf of PEUGEOT.  The parties sometimes refer to this document as the "July 12, 2016 Letter of Intent" or "July 12, 2016 LOI."  Including by industry standards and custom and practice, as well as the expressed intention of the parties in communications between Montron and Toubassy, the meaning and thrust of the July 12, 2016 LOI was an offer by PEUGEOT.  By the July 12, 2016 LOI, PEUGEOT (via Casablanca) was offering to bind itself to negotiate in good faith with ALCON to reach a binding placement and co-promotion deal that would include at least a $500,000 placement fee to ALCON and minimum $30 million co-promotion by PEUGEOT, which offer ALCON could accept by moving forward to negotiate in good faith exclusively with PEUGEOT.

108.   The July 12, 2016 LOI contains the following language above Montron's signature: "WARNING: This agreement is not a contract.  It only intends to establish a tangible partnership between Peugeot and the Blade Runner II movie."  The meaning of that language as understood between the parties was and is that the July 12, 2016 LOI is not the actual placement and co-promotion contract, the possible future terms of which are referenced in the July 12, 2016 LOI; however, the language does not mean that the July 12, 2016 was not intended to be a binding offer by Casablanca on PEUGEOT's behalf to negotiate in good faith pursuant to the stated parameters, and it was so intended as an offer (and it became a contract to negotiate in good faith when ALCON accepted it).

109.   Among other omissions, the July 12, 2016 LOI contains no disclosure that PEUGEOT had no budget for any co-promotion, and was otherwise unable to perform a co-promotion.  By the communications leading up to it, the intent of the July 12, 2016 LOI is also to communicate that PEUGEOT will not make any

45

THIRD AMENDED COMPLAINT

further requests for any term to the effect that PEUGEOT's approval of the placement, and commitment to move forward with a co-promotion, were to be dependent on viewing the completed Picture, or anything of the kind.  Indeed, CTMG had expressly communicated that was a deal-breaker and not possible. ALCON relied on the July 12, 2016 LOI, including by accepting it by conduct. The July 12, 2016 LOI and its communication by Montron to Toubassy is "False Statement No. 18." ***Alternative Pleading:*** *Under Theory 1, the statements were intentionally false (including by omission as to the budget issue) and were essentially all misrepresentations by Montron, without the knowledge of PEUGEOT or MENDEZ, including without limitation as to Montron's affirmation of authorized agency.  Or under Theory 1, the affirmative misrepresentations by Montron were all made without Montron having any reason to believe them to be true.  Under Theory 2, the statements were all false except that Casablanca was acting within its agency authority, and all defendants knew they were false and that Montron was making the statements.  Under Theory 3, the same, but Casablanca did not know the statements were false.  Under Theories 1 through 3, the July 12, 2016 LOI was also a form of false promise.  Under Theory 4, the statements were not false.*

110.   ALCON relied on the truth of False Statement No. 18, including that the July 12, 2016 LOI was a genuine offer authorized by PEUGEOT for a binding contract mutually to negotiate in good faith if ALCON accepted it.  ALCON did accept the offer therein, and moved forward to negotiate exclusively with PEUGEOT in good faith, to the exclusion of other bidders and otherwise to ALCON's detriment.

111.   The July 12, 2016 LOI, and related contemporaneous communication between the parties, reflects that PEUGEOT and ALCON entered a (second) binding contractual agreement to negotiate in good faith to try to reach a binding placement and co-promotion contract that would be no less favorable to ALCON

46

THIRD AMENDED COMPLAINT

then the guideline parameters set forth in the July 12, 2016 LOI.  Most relevant here, those key terms included a $500,000 placement fee and PEUGEOT commitment to a guaranteed co-promotion with a minimum $30 million media spend, with no unreasonable "final cut" review pre-condition or anything similar. The July 12, 2016 LOI did not mean that ALCON had to agree to all of the conditions that the July 12, 2016 LOI is asking potentially of ALCON, for ALCON to have been negotiating in good faith, as PMF sometimes suggests.  Rather, the parameters in the July 12, 2016 LOI are terms to which PEUGEOT was committing not to move backward about, meaning less favorably to ALCON, during good faith negotiation.

112.   On July 15, 2016, Montron and Toubassy exchanged emails in which Toubassy clearly articulated that a rigid breakdown of allocation of visibility seconds (*e.g.*, ten seconds strictly divided in no more than two sequences) was not a negotiating parameter to which ALCON would agree.  Montron accepted on behalf of PEUGEOT in these same emails that it did not need to be to move forward (*i.e.*, strict allocation of the ten seconds was agreed to be eliminated as good faith deal point, in ALCON's favor).

113.   ALCON relied on PEUGEOT's July 12, 2016 LOI commitments, including with the above clarification by Toubassy that rigid breakdowns of visibility seconds was not a deal point, to move forward to negotiate with PEUGEOT to the exclusion of other bidders.

*July and August 2016: Alcon Proceeds in Further Reliance That the Parties Are Dealing With Each Other in Good Faith*

114.   With the July 12, 2016 LOI in place, in or about the latter half of July 2016, PEUGEOT, Casablanca, CTMG and ALCON all worked together to facilitate an in-person visit by PEUGEOT and Casablanca to BR2049's production offices and sets in Budapest, Hungary in late July 2016 (believed to be approximately the week of July 25, 2016).  In connection with the set visit,

47

THIRD AMENDED COMPLAINT

defendants or their representatives signed one or more confidentiality agreements governed by the laws of the State of California, further putting them on notice that they were dealing with a California studio and might be haled into the California forum.

*Late July 2016 Set Visit: False Statement No. 19*

115.   On or about July 27 and July 28, 2016, MENDEZ, PEUGEOT design executive Yang Cai ("Cai"), and Sissoko all traveled to Budapest.  They spent approximately a full day meeting with BR2049's production leads, including Director Denis Villenueve, Production Designer Dennis Gassner, Supervising Art Director Paul Inglis, Executive Producer Bill Carraro, and numerous others. MENDEZ, Cai and Sissoko were all shown both physical and computer models of K's spinner, and were given intimate insights into the creative vision for not only the vehicle, but the overall BR2049 film and its look, feel and tone.  MENDEZ, Cai (and possibly also Sissoko) also shared PEUGEOT'S creative and business needs and wish lists with ALCON.

116.   The visit was expensive for ALCON.  Every day – indeed, every hour – of production time on a major motion picture is tracked, accounted for, and affects the budget of the Picture.  This is common knowledge in the industry, and PEUGEOT, MENDEZ and Casablanca all knew that ALCON was incurring substantial expense.

117.   During and after the set visit, PEUGEOT, MENDEZ, Cai and Sissoko all consistently communicated their high level of enthusiasm for the project to ALCON and ALCON'S representatives, along with PEUGEOT'S commitment and desire to move forward.  At no time during the set visit did MENDEZ ever communicate anything to ALCON that Casablanca was not authorized to act on PEUGEOT'S behalf with respect to the BR2049 deal.  Neither MENDEZ nor Casablanca ever communicated during the set visit that PEUGEOT had no budget for a co-promotion, or intended not to perform one, or that PEUGEOT was going

48

THIRD AMENDED COMPLAINT

to insist on some form of "final cut" review and approval before deciding on any co-promotion commitment.  Indeed, by her statements and conduct, MENDEZ and PEUGEOT instead reaffirmed that Casablanca and Sissoko specifically <u>were</u> expressly authorized agents for PEUGEOT, with full authority to communicate PEUGEOT'S positions and to bind PEUGEOT.  MENDEZ and Sissoko both had a duty at this point to speak affirmatively as to all of these points, to avoid misleading ALCON.  They did not do so.  Sissoko's and MENDEZ's statements and material omissions during and surrounding the late July 2016 set visit are "False Statement No. 19."  ***Alternative Pleading:*** *Under Theory 1, the statements were false and the omissions materially misleading, but all somehow due to Casablanca's tortious manipulation of the situation.  Under Theory 2, the statements were all false and the omissions materially misleading, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together.  Under Theory 3, the same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, the statements were not false and the misleading nature of the omissions was innocent.*

### *Late July and August 2016: Further Refinement of Placement Parameters*

118.   Close in time to the above-referenced set visit (either shortly before or shortly after the visit or both), PEUGEOT designer Cai transmitted proposed designs of his own for the K spinner to ALCON.  PLAINTIFF is informed and believes and on that basis alleges that Cai did so with the knowledge of MENDEZ.

119.   ALCON communicated in late July 2016 or early August 2016 that Cai's proposed designs would not be implemented, for both practical and creative reasons.  ALCON asked PEUGEOT to submit alternatives.

120.   PEUGEOT, MENDEZ and Cai all accepted that ALCON had considered Cai's proposed re-designs in good faith.  PEUGEOT and MENDEZ communicated to ALCON that the deal was still a go.  PEUGEOT, MENDEZ and Cai went back to the drawing board to come up with alternative design notes.

49

THIRD AMENDED COMPLAINT

121.   In late July and/or early August 2016, Cai transmitted four pages of alternative design notes on K's spinner to ALCON, on behalf of PEUGEOT. PLAINTIFF is informed and believes and on that basis alleges, that this transmission by Cai to ALCON was with the knowledge and approval of MENDEZ.  By Cai's notes and in related communications, PEUGEOT proposed and requested to ALCON several specific design changes to K's spinner.

122.   By about the first week of August 2016, ALCON agreed with PEUGEOT that all of Cai's proposed design changes in his second set of notes would be made to K's spinner.  This required ALCON, *inter alia*, to make physical changes to the life-size and other physical versions of the spinner.  The cost of making PEUGEOT'S changes just to the physical versions of the models exceeded $50,000.  They were expensive changes to make and ALCON never would have made them, but for its understanding that the parties were working together on a product placement and co-promotion with a guaranteed media spend in the tens of millions of dollars.  PEUGEOT, MENDEZ and Casablanca all knew this.

123.   By about this same time, PEUGEOT and ALCON also discussed further specific PEUGEOT-branding elements on the spinner that actually ended up in the Picture.  PEUGEOT not only agreed to them, but affirmed that they were "great."

124.   In or about early August 2016, ALCON'S and PEUGEOT'S representatives also discussed and reaffirmed again that ALCON only had to provide a total of ten (10) seconds of visibility branding footage.  They further agreed that both types of visibility footage (on-vehicle badging and background "wall ad" logos) would count toward satisfaction of the ten (10) second agreed minimum.

125.   In the course of all of the above communications and conduct, it was also reaffirmed and made clear to defendants (and custom and practice in the industry also dictates) that while it was agreed that PEUGEOT had a right of

50
THIRD AMENDED COMPLAINT

review and approval of the specific implementation of the ten (10) seconds of branding visibility footage as it would actually appear on screen, PEUGEOT'S review and approval process was to be prompt, and subject to reasonableness and good faith by PEUGEOT.  PEUGEOT'S review and approval also had to be within the creative and artistic parameters of the film, which were in the control of ALCON and not PEUGEOT.

126.   Furthermore, review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture lock, Picture delivery and Release Date, and also such that the co-promotion could be timely planned and executed.  Further, by no later than about August 2016, all defendants knew and understood (including without limitation by custom and practice in the industry), that if upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film.  Further, any such process was to be conducted by PEUGEOT promptly, without unreasonable disruption of the film's schedule, including so that the co-promotion could be timely planned and executed.

***Late July 2016 to August 2016: False Statement No. 20***

127.   The above communications among ALCON, CTMG, Casablanca and PEUGEOT directly, including MENDEZ, were more than sufficient to put all defendants on notice that they had a duty to speak affirmatively to inform ALCON if any of the following were true: 1) Casablanca was not an authorized agent for PEUGEOT or was exceeding its authority; 2) PEUGEOT was displeased with the design changes being made to K's spinner at PEUGEOT's request; 3) PEUGEOT did not intend to pay for the placement or any co-promotion, even if satisfied with the placement; 4) as a condition to any PEUGEOT performance, PEUGEOT

51

THIRD AMENDED COMPLAINT

intended to assert rigorous visibility seconds allocation conditions that had already been rejected; 5) PEUGEOT intended to insist on a right to a "final cut" review and approval of the placement, or a near-equivalent (late stage review of the finished or near-finished Picture as it would appear on-screen) as a condition to PEUGEOT performances, especially of the co-promotion; and 6) PEUGEOT had no co-promotion budget in any event.  None of the defendants did so.  These material omissions are "False Statement No. 20."  *__Alternative Pleading:__ Under Theory 1, the omissions were materially misleading, but all somehow due to Casablanca's tortious manipulation of the situation.  Under Theory 2, the omissions were materially misleading, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together.  Under Theory 3, the same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, any misleading nature of the omissions was innocent.*

128.   By no later than early August 2016, with the knowledge and approval of PEUGEOT and MENDEZ, and in reliance that all of the above terms were agreed, ALCON proceeded to execute the agreed specific implementations of the spinner design, incorporating them into the film's production, including principal photography.  This required ALCON to expend substantial resources that had no other purpose except performing the placement for PEUGEOT.  From about August 2016 and forward, the PEUGEOT placement began to be incorporated into BR2049 in ways that would have been exceedingly expensive to undo.

129.   ALCON would never have incurred any of these expenses or actions if ALCON had known that PEUGEOT would ever take the position that the parties had no enforceable agreement of any kind, or that PEUGEOT and MENDEZ were secretly reserving a purported unilateral right to back out of any PEUGEOT performances if they ever determined it to be personally or corporately expedient for them to do so, or that PEUGEOT had not firmly committed to at least a $30 million media spend upon a satisfactory placement, or that PEUGEOT had no

52

THIRD AMENDED COMPLAINT

budget of its own to make such a spend.

*September 2016 to January 2017: Written Contract Drafting*

130.   By about August 16, 2016, the material terms of the parties' agreement were essentially agreed, and the parties proceeded to negotiate a written memorialization of the deal.  As part of that process, the parties continued to negotiate additional terms and refinements to terms.

131.   CTMG executives sent an initial draft to Casablanca on or about September 24, 2016.  The parties' representatives then exchanged multiple drafts, comments and emails into early January 2017.

132.   During the drafting negotiations, in an email exchange between Casablanca and CTMG executives (Sissoko and Toubassy) on or about October 4 and 5, 2016, the parties agreed on a mutually acceptable specific allocation of the ten (10) seconds of branding visibility footage: six (6) seconds to spinner branding footage across no more than two (2) sequences, and four (4) seconds to the outdoor/wall ad (or "holographic advertisement").  ("October 5, 2016 Writing.")

*September 28, 2016 to January 10, 2017: False Statement No. 21*

133.   Between September 28, 2016 through to at least December 7, 2016, and indeed to January 10, 2017, Sissoko engaged on behalf of PEUGEOT in email and also some telephone communications with a CTMG negotiating team including Ziad Toubassy, Natalie LeVeck and Brandy Carrillo.  The subject was negotiation of a long form written contract to document the parties' placement and co-promotion agreement.  The email record of these communications, at least through December 7, 2016, is in the record as ALCON's jurisdictional Exhibit 2, Dkt. No. 31, pages 28-76, and all of the parties have it (with email communications between December 7, 2016 and January 10, 2017 believed to be in the record in another jurisdictional exhibit).

134.   The relevant essence of Sissoko's referenced communications as to falsity issues is that Sissoko repeatedly reaffirmed, largely by material omissions,

53

THIRD AMENDED COMPLAINT

with some express statements, and including by his very act of conducting the drafting negotiations, that: 1) Casablanca was authorized to act as PEUGEOT's agent and was doing so within its authority, including in written contract negotiation; 2) Sissoko had sufficient fluency with writing and reading English to conduct the negotiations competently; 3) PEUGEOT in fact intended to perform in good faith the written terms to which Sissoko was communicating agreement; 4) PEUGEOT had no intention to renege on the deal; and 5) lack of any notice to ALCON that PEUGEOT had no ability to perform the co-promotion.  This group of drafting negotiation communications by Sissoko is together "False Statement No. 21."  ***Alternative Pleading:*** *Under Theory 1, Sissoko's statements were all false and the omissions were materially misleading, and all essentially because Casablanca was acting in excess of its authority, or even possibly in direct contravention of instructions from PEUGEOT.  Under Theory 2, the statements were false and the omissions were materially misleading, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together, including in a form of promissory fraud.  Under Theory 3, same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, the express statements were not false and any misleading nature of the omissions was innocent, and the promissory nature of the statements was not false at the time they were made.*

135.   ALCON continued to rely on its belief that the parties were dealing with each other in good faith, including in contract negotiations.  If ALCON had known that Sissoko's statements were false or known of the material facts being withheld by omission (including PEUGEOT inability to perform a co-promotion due to lack of any budget), ALCON would not have proceeded as it did.

***September 2016 to January 2017:***

***Alcon Deal Performances and/or Preparations to Perform***

136.   In parallel during this same period (September 2016 to January 2017),

54

THIRD AMENDED COMPLAINT

ALCON and PEUGEOT continued to communicate together to effectuate the placement creatively, and to plan for the co-promotion.

137.   Between August 2016 and through December 2016, and afterward, creative personnel for ALCON and the BR2049 production remained in contact with PEUGEOT creatives, including regarding execution of the Cai design changes.  ALCON and PEUGEOT communications during this approximate time frame (late November 2016) also included another visit to the BR2049 set, at the request of PEUGEOT, Casablanca, for the express purpose of co-promotion preparation and planning.  This second set visit may have specifically been on November 23, 2016.  By around this time, PEUGEOT had also retained BETC to plan and perform the co-promotion, and communicated as much to ALCON, through CTMG.

138.   Principal photography closed on November 22, 2016, with numerous scenes prominently featuring the now Peugeot-badged-and-branded K spinner, including with Gosling in and around it.  ALCON was thus fully ready, willing and able to include the placement in the finished Picture, and had every intention of doing so, and never had any intention not to do so.  Indeed, ALCON was prepared to go above and beyond any contractual minimum visibility timing targets, and generally to engage actively and cooperatively with PEUGEOT, to achieve PEUGEOT'S reasonable and good faith approval of the placement and thereby insure the media spend (and ALCON in fact did all of these things).

139.   By no later than November 28, 2016, PEUGEOT had informed ALCON (through CTMG) that 1) PEUGEOT had hired BETC to help plan and execute the co-promotion and its $30 million media spend, and 2) had designated multiple BETC and internal PEUGEOT executives as script readers, for whom PEUGEOT requested access to the highly confidential BR2049 script.  On or about December 16, 2016, Vincent Behaeghel, Marina Sokolowsky, Olivier Aumard and Henri Tripard, all affiliated with BETC, each signed and delivered to ALCON

55

THIRD AMENDED COMPLAINT

confidentiality agreements pursuant to which they agreed on behalf of themselves and BETC (and PEUGEOT) to treat all BR2049 information as confidential and that the parties' relationship and communications about BR2049 would be governed by the laws of the State of California.  PLAINTIFF is informed and believes and on that basis alleges that BETC signed and delivered the confidentiality agreements to ALCON at MENDEZ'S and PEUGEOT'S direction and/or with MENDEZ'S and PEUGEOT'S knowledge, approval or subsequent ratification.

140.  The individual executives on relevant email communications in this period included at least Sissoko, Francois at CTMG, MENDEZ, and another PEUGEOT executive, Gregoire Armandon.

### *September 2016 to January 2017: False Statement No. 22*

141.  The above deal performance and preparations among ALCON, CTMG, Casablanca, PEUGEOT and BETC, were more than sufficient to put all defendants on notice that they had a duty to speak affirmatively to inform ALCON if any of the following were true: 1) Casablanca was not an authorized agent for PEUGEOT or was exceeding its authority; 2) PEUGEOT was displeased with the design changes being made to K's spinner at PEUGEOT's request; 3) PEUGEOT did not intend to pay for the placement or any co-promotion, even if satisfied with the placement; 4) as a condition to any PEUGEOT performance, PEUGEOT intended to assert rigorous visibility seconds allocation conditions that had already been rejected; 5) PEUGEOT intended to insist on a right to a "final cut" review and approval of the placement, or a near-equivalent (late stage review of the finished or near-finished Picture as it would appear on-screen) as a condition to PEUGEOT performances, especially of the co-promotion; and/or 6) PEUGEOT had no co-promotion budget in any event.  None of the defendants did so.  These material omissions are "False Statement No. 22."  ***Alternative Pleading:*** *Under Theory 1, the omissions were materially misleading, but all somehow due to Casablanca's*

56

THIRD AMENDED COMPLAINT

*tortious manipulation of the situation.  Under Theory 2, the omissions were materially misleading, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together.  Under Theory 3, same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, any misleading nature of the omissions was innocent.*

142.   ALCON materially and reasonably relied on the absence of such statements by defendants in this period.  Indeed, PEUGEOT, MENDEZ and Casablanca gave every indication that they were moving forward and that the deal was a go.  By in or about early January 2017, ALCON, Casablanca, PEUGEOT, MENDEZ, executives from CTMG, and BETC had all made plans to attend a meeting at ALCON'S offices in Los Angeles, scheduled for January 24, 2017.  The meeting's purpose was for ALCON to show placement elements and other creative materials to PEUGEOT, Casablanca and BETC, and otherwise take steps so that work could commence in earnest on the co-promotion.  Indeed, all parties understood the January 24, 2017 meeting to be the co-promotion "kickoff."

***January 2017 to May 4, 2017: Execution of a Written Contract by Defendants, Defendants' Delay of Plaintiff's Countersignature, and Plaintiff's Further Performances and Reliance***

***January 18, 2017: False Statement No. 23***

143.   On or about January 10, 2017, CTMG executives transmitted a proposed execution version of the long-form written documentation of the placement and co-promotion agreement to Casablanca.  On or about January 18, 2017, Casablanca (Sissoko) emailed the document back to CTMG, signed by Casablanca (Montron) as PEUGEOT's agent, stating that it was "final."  ("January 18, 2017 Writing.")  By this, Casablanca meant to communicate to ALCON and CTMG that they rely on the signed document as being fully authorized by PEUGEOT, that PEUGEOT had agreed to all terms and language in that particular writing, and PEUGEOT was promising and/or reaffirming its promises to perform

57

THIRD AMENDED COMPLAINT

(including as modified or interpreted by the October 5, 2016 Writing regarding visibility allocations). This is "False Statement No. 23." ***Alternative Pleading:*** *Under Theory 1, the statements were false and constituted promissory fraud, because Casablanca was acting without authority or in excess of its authority. Under Theory 2, the statements were false and constituted promissory fraud, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together. Under Theory 3, the same, but Casablanca was an innocent actor in the scheme. Under Theory 4, the statements and promises were not false.*

144.   Sissoko copied no PEUGEOT executives on the transmission. ALCON and CTMG decided for the sake of caution to ask for confirmation that the particular draft signed by Casablanca had indeed been shown to PEUGEOT and approved by it. Thus, on or about January 23, 2017, ALCON and CTMG requested that Casablanca expressly so confirm, preferably by having a PEUGEOT executive sign the document directly.

**January 24, 2017 Kickoff Meeting: False Statement No. 24**

145.   The January 24, 2017 BR2049 co-promotional kickoff meeting took place at ALCON'S offices in Los Angeles, attended in person by, *inter alia*, MENDEZ and Sissoko. All of the defendants have been provided with copies of handwritten notes of the January 24, 2017 meeting taken by ALCON marketing executives Angela and Catherine Paura that appear to document all of the individuals who attended the meeting, and ALCON therefore does not list all of the individuals here. At the meeting, MENDEZ and Sissoko, by their statements and conduct, sitting next to each other in person, clearly communicated and reaffirmed to ALCON and CTMG during the meeting that the deal was still on as to both the placement and co-promotion, and that Casablanca continued to be PEUGEOT'S expressly authorized agent. Moreover, BETC executives were also present at the same meeting, in person in the presence of MENDEZ, and were there for the

58

THIRD AMENDED COMPLAINT

express purpose of representing PEUGEOT with respect to PEUGEOT's actual performance of the agreed co-promotion.

146.   During the January 24, 2017 meeting, ALCON distributed a creative deck (PowerPoint or Keynote presentation) laying out film visuals and story elements, and specifically including multiple images of K's spinner tracked to show compliance with PEUGEOT-designer Yang Cai's requested and agreed modifications to the vehicle.  During the January 24, 2017 meeting, MENDEZ, PEUGEOT, Casablanca and BETC all saw and reviewed the deck.  All of them communicated PEUGEOT'S approval of the K spinner badging execution, and commenced moving forward with discussion of the planned co-promotion.

147.   During the January 24, 2017 meeting, no one for PEUGEOT or Casablanca made any statements or otherwise communicated any of the following facts, which they were under a duty to communicate affirmatively if true: 1) Casablanca was not PEUGEOT's authorized agent or had been acting in excess of authority; 2) PEUGEOT did not intend to perform the deal, including either payment of the placement fee or execution of the co-promotion; 3) PEUGEOT had no budget to perform a co-promotion; and/or 4) PEUGEOT intended to assert additional material terms on its performance, including that PEUGEOT be allowed to withhold approvals and performance obligations until late stage review of a "final cut" or near-final cut of the entire Picture.  The defendants' statements, conduct and material omissions at the January 24, 2017 Kickoff Meeting are "False Statement No. 24."  ***Alternative Pleading:*** *Under Theory 1, the statements and conduct were false and constituted promissory fraud, and the omissions materially misleading, all somehow because Casablanca was acting without authority or in excess of its authority.  Under Theory 2, the statements and conduct were false and constituted promissory fraud, and the omissions materially misleading, except that Casablanca was in fact acting within its agency authority, and all defendants were tortiously misleading ALCON together.  Under Theory 3, the same, but Casablanca*

59

THIRD AMENDED COMPLAINT

*was an innocent actor in the scheme.  Under Theory 4, the statements and promises were not false, and any omissions were innocent.*

148.   Including based on the above conduct by the PEUGEOT DEFENDANTS and Casablanca (including the total lack of any hand-raising or other signals by defendants to say "stop"), ALCON reasonably believed that whatever formal deal signature issues remained to be resolved between PEUGEOT and Casablanca, they were confined to the limited issue of whether PEUGEOT and Casablanca were adequately communicating between themselves about the finality of particular written documentation, and that in any event there would be no resulting changes to any material deal terms.  ALCON continued to move forward on deal performances on the agreed terms, and reasonably expected and relied on PEUGEOT to do the same.

### *Late January and Early February 2017: False Statement No. 25*

149.   In late January 2017, to provide ALCON assurance on any signature authority issues related to the long form, Casablanca transmitted to CTMG a document entitled "Delegation of Signature Authority," signed by MENDEZ for PEUGEOT.  It expressly affirmed that "I, the undersigned Isabel Salas Mendez, as Peugeot Marketing and Communication Manager, authorize The Casablanca Agency – Herve Montron and/or Mamou Sissoko, to sign any document related to the *Blade Runner 2049* project, on behalf of Peugeot.  [¶] For this purpose, those persons may sign for Peugeot on its behalf, any form of document required.  They may also require any necessary documents for Peugeot."  Indeed, MENDEZ signed and transmitted the "Delegation of Signature Authority" document twice. The first version of the confirmation of PUBLICIS signature authority signed by MENDEZ was dated effective as of December 7, 2017.  The parties all considered their fundamental deal as having been made no later than August 2016.  Thus, ALCON and CTMG requested to Casablanca that MENDEZ sign the "Delegation of Signature Authority" again, with the effective date expressly going back to August

60

THIRD AMENDED COMPLAINT

16, 2016.

150.   Casablanca and MENDEZ complied; MENDEZ executed the "Delegation of Signature Authority" a second time, with the August 16, 2016 effective date; and CTMG received it from Casablanca on or about February 8, 2017.  Defendants' communications in transmitting the two "Delegations of Signature Authority" are "False Statement No. 25."  ***Alternative Pleading:*** *Under Theory 1, the communications were intended by Casablanca (and only Casablanca) to defraud ALCON by continuing to obscure Casablanca's lack of authority or acts in excess of authority.  Under Theory 2, all defendants were using the delegation of signature authority as a deceitful tool intended to induce ALCON to continue to rely on the existence of a deal, while creating an argument for use later that there was no deal.  Under Theory 3, the same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, the communications were innocent.*

151.   As detailed in subsequent paragraphs, PEUGEOT and Casablanca from here engaged in conduct that delayed ALCON'S and CTMG's affixing and delivery of countersignatures on the January 18, 2017 Writing.  However, it is clear from all the facts and circumstances that ALCON and CTMG did not reject and rather intended to accept the terms therein (including as interpreted by such negotiation communications as the October 5, 2016 Writing).  Thus, the history of communications and conduct clearly shows, that by no later than January 18, 2017, ALCON and PEUGEOT had reached a valid and enforceable agreement ("Promotions License Agreement") including as evidenced by the January 18, 2017 Writing (including as it might be interpreted or modified by the October 5, 2016 Writing).  The meaning of the Promotions License Agreement terms included:

    a.  PLAINTIFF and PEUGEOT would work in close collaboration to integrate PEUGEOT badging and other trade dress into the design of K's spinner.

    b.  Once the K Spinner badging and feature designs were approved by

61

THIRD AMENDED COMPLAINT

PEUGEOT, they would be locked and PEUGEOT would not be able to change or disapprove them later (and the badging and feature designs were actually approved by PEUGEOT no later than January 24, 2017).

c. The finished BR2049 film would include at least ten (10) seconds of footage in which PEUGEOT'S logo and badging would be clearly visible to the audience (although if ALCON for creative or other reasons did not include a PEUGEOT placement, then this was not necessarily a breach by ALCON, but the parties were expected and obligated to negotiate with each other in good faith about what to do in such event).

d. The at least ten (10) seconds of footage was to be apportioned across multiple sequences in the movie (with a clear record that PEUGEOT had it explained to them that a sequence or scene could include more than one camera shot – ALCON and CTMG expressly declined to be bound by measuring timing by single shots, but rather would only agree to "sequences" or "scenes", meaning aggregations of related shots).

e. The at least ten (10) seconds of footage was to be apportioned across two types of sequences: 1) badging on K's spinner, and 2) at least one sequence where the Peugeot logo would appear in the BR2049 world, such as in an outdoor advertisement in the background.

f. Of the two types of sequences, the K spinner badging sequences were more important to PEUGEOT, and the outdoor/wall ad sequences (or "holographic advertisements") were of secondary importance (including meaning that of the ten (10) seconds, more of the time would go to the K spinner badging sequences).

g. At least one mutually acceptable allocation of the ten (10) seconds was about six (6) seconds of visibility footage in two spinner sequences and about (4) seconds to at least one outdoor/wall ad sequence.  It was also

62

THIRD AMENDED COMPLAINT

clear that ALCON was widely flexible and ready, willing and able to perform a different allocation, as long as PEUGEOT communicated its desires clearly with enough time for ALCON to meet them without undue prejudice.  Indeed, ALCON was prepared to over-perform on the visibility deliveries if it had to (and in fact, it did so).

h.  The execution of the ten (10) seconds of placement footage was subject to PEUGEOT'S commercially reasonable and good faith review and approval, which was to be prompt, and within the creative and artistic parameters of the film, which were understood not to be in PEUGEOT'S purview.  PEUGEOT'S review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Film Delivery and Release Date, and also early enough so the co-promotion could be planned and executed.

i.  The Peugeot spinner badging would be associated with Ryan Gosling's character, K.

j.  Ryan Gosling's character, K, would not be associated with any rival automobile brand.

k.  The Peugeot brand would not be presented in a pejorative context. PEUGEOT acknowledged that it had reviewed the BR2049 script and knew, understood and agreed that the BR2049 involved one or more crashes of K's spinner, and that these crashes were agreed as not violative of any term of the parties' agreement.

l.  If upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film, and which was to be

63

THIRD AMENDED COMPLAINT

conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Film Delivery and Release Date.

m. PEUGEOT expressly acknowledged that it had been provided with the opportunity to review the visual depictions of the placement items and had approved them.

n. If ALCON delivered satisfactory placement footage, then PEUGEOT was obligated to pay $500,000 directly to ALCON as a product placement fee, and was also obligated to work with ALCON to plan, finance and execute a global co-promotion media campaign (which could exclude the U.S.) to support the October 6, 2017 day-and-date global theatrical release of the Picture, with PEUGEOT obligated to deliver at least $30 million of paid media.

o. If ALCON failed to deliver satisfactory placement footage even after reasonable and good faith engagement between the parties to attempt to cure reasonable and good faith placement dissatisfactions of PEUGEOT, then the parties would negotiate in good faith about alternative terms that would be fair and reasonable to both sides.

p. Of the $500,000 placement fee, $400,000 was allocated to the spinner placements and $100,000 to the outdoor/wall ad placement.  The parties further agreed and intended that the purpose of setting forth an allocation was to provide a yardstick for potential reduction of the placement fee if an element of the placements was not satisfactory after good faith cooperative attempts to cure were exhausted.

q. The $500,000 placement fee was earned by ALCON and owed by PEUGEOT no later than upon ALCON'S written confirmation to PEUGEOT that the placements would be in the final Picture – while the placement fee could be paid by PEUGEOT after release of the Picture, it was earned by ALCON earlier, on ALCON'S confirmation

64

THIRD AMENDED COMPLAINT

that ALCON intended to perform the placement.

r. The agreed co-promotional period (the time during which the co-promotion would actually be licensed to run) would be from September 1, 2017 to November 30, 2017 (or sixty days after the initial theatrical release date of the Picture, if ALCON had to change the release date of the Picture for any reason).

s. The defined co-promotional territory was the entire world, excluding the United States and Canada and their related territories (but it was understood that PEUGEOT would nonetheless receive the branding and goodwill benefits of the U.S. and Canada release of BR2049, as the PEUGEOT placements would be and were in all versions of the film in all territories).

t. The agreed $30 million guaranteed minimum media spend was to be divided $27 million in Above-The-Line ("ATL") Spend and $3 million in Below-The-Line ("BTL") Spend (with it understood and agreed that the ATL and BTL definitions were the advertising industry standard definitions of these terms – very generally, ATL Spend refers to media that mass targets large audiences, like television and radio and many forms of Internet media; BTL Spend refers to media that more specifically targets a limited set of consumers, like flyers distributed from a particular retail store, or most forms of event marketing, like a fan convention or auto show).

u. ALCON had a review and approval right over the co-promotion's specific executions, on a case-by-case basis.

v. The co-promotion was to include a dedicated presence on PEUGEOT'S website (www.peugeot.fr).

w. PEUGEOT was obligated to create, and the co-promotion was to include, at least one thirty-second television spot, unless Gosling

65

THIRD AMENDED COMPLAINT

refused to approve use of his likeness in the spot, in which case PEUGEOT was relieved of the television spot obligation (but not of the entire co-promotion).  (Gosling agreed in principal to potential use of his likeness in a television spot for PEUGEOT, and PEUGEOT never sought Gosling's review or approval of any proposed spot, including because PEUGEOT never created one.)

    x.  PEUGEOT was to create and produce Below-The-Line spend spots.

    y.  PEUGEOT was to create and issue a press release to the media regarding the co-promotion.

***February 2017 to Late April 2017: Defendants Stall Alcon's Affixation and Delivery of Countersignatures While Alcon Continues to Perform***

152.  With these terms all believed agreed, ALCON continued to move forward with its performances.  On or about February 11, 2017 and continuing through February 24, 2017, ALCON and CTMG asked Casablanca to have PEUGEOT executives directly execute the January 18, 2017 Writing.  After some back and forth, Casablanca agreed to obtain PEUGEOT'S direct signature, or to consider doing so.

***February 2017 to April 2017: False Statement No. 26***

153.  At or about this time (in the February 2017 to April 2017 time frame), Anne Platon ("Platon"), an in-house lawyer employed by the larger Publicis Groupe parent entity (or an arm of it), became involved.  Communications occurred in late February and until about May 4, 2017, among Casablanca (Sissoko), Platon and CTMG (Brandy Carrillo) and ALCON (Jeannette Hill).  In them, Casablanca and/or Platon explained that fee-driven mechanics between Casablanca and PEUGEOT, and possibly also a course of dealing between them, had caused Casablanca's reticence to obtain PEUGEOT's direct signature on the January 18, 2017 Writing.  However, there were no issues about Casablanca's authority to act for PEUGEOT.  The thrust of these communications from Platon

66

THIRD AMENDED COMPLAINT

and Sissoko to Carrillo and Hill are "False Statement No. 26." ***Alternative Pleading:*** *Under Theory 1, Platon's and Sissoko's statements were false, driven by that Casablanca was acting without authority or in excess of its authority.  Under Theory 2, the statements and conduct were false and designed to induce ALCON'S continued deal performances and to stall ALCON's signatures in bad faith to create a later argument of "no contract" by defendants, and all defendants were tortiously misleading ALCON together.  Under Theory 3, the same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, the statements and promises were not false, and any omissions were innocent.*

### *February 2017 to April 2017: False Statement No. 27*

154.   Platon also expressed regret to Carrillo and/or Hill that (through no fault of ALCON or CTMG), Montron had signed the January 18, 2017 Writing without running it by the internal Publicis Groupe legal team first.  Publicis Groupe's legal team desired an opportunity to review the document and potentially make some limited comments, including in consultation with PEUGEOT.  In essence, the in-house lawyers servicing Casablanca wanted a limited Mulligan on the long form (not the fundamental deal).  This is "False Statement No. 27."
***Alternative Pleading:*** *Under Theory 1, this was a false stalling tactic by Casablanca to delay or mitigate discovery that it had been acting without authority or in excess of its authority.  Under Theory 2, it was part of a bad faith stalling tactic by all defendants intentionally designed to cloud the deal-making record to allow PEUGEOT to avoid obligations.  Under Theory 3, the same, but Casablanca was an innocent actor in the scheme.  Under Theory 4, the statements and promises were not false.*

155.   Without waiving rights, ALCON and CTMG agreed in good faith potentially to consider additional comments on non-material terms.  In the meantime, ALCON and CTMG marketing executives continued to communicate with PEUGEOT about various specific co-promotional opportunities, including

67

THIRD AMENDED COMPLAINT

opportunities that PEUGEOT could take advantage of if it wanted to do so.  For example, on or around March 30, 2017, ALCON and CTMG executives inquired about what PEUGEOT wanted to do about its branding in connection with consumer products models of K's spinner – whether PEUGEOT wanted to have its branding on them or not.  In these communications and similar such communications, continuing through at least March 30, 2017 and even afterward, PEUGEOT never communicated to ALCON that the deal was off or had never been made, or did not include a co-promotion.

### *April 13, 2017: False Statement No. 28*

156.   On or about April 13, 2017, almost three months after Montron's signature on the January 18, 2017 Writing, Platon emailed a proposed revised draft to ALCON and CTMG executives.  The Platon draft contained proposed additional comments, presumably on PEUGEOT's behalf.  In connection with the transmission, Platon represented that the draft had now with full certainty been reviewed directly by PEUGEOT and approved by PEUGEOT.  This is "False Statement No. 28."  ***Alternative Pleading:*** *Under Theory 1, Platon's statement was false (PEUGEOT had not reviewed or approved the draft) and Platon made the statement on Casablanca's behalf to delay or mitigate discovery that Casablanca had been acting without authority or in excess of authority.  Under Theories 2, 3 and 4, the statement was not false.*

157.   ALCON and CTMG executives reviewed the April 13, 2017 draft and comments in good faith.  At least some of the requested changes appeared to be in bad faith and could not possibly be explained by any internal miscommunication between PUBLICIS and PEUGEOT or any lack of Casablanca internal legal review.  Moreover, comparison of the drafts made it clear that the parties had substantial agreement on all material terms, with the possible exception of PEUGEOT in bad faith attempting in the drafting to build in moving targets or to undo acknowledgement of previously given approvals.

68

THIRD AMENDED COMPLAINT

158. Although ALCON and CTMG did not understand that PEUGEOT was doing so in bad faith at the time, defendants, including by the April 13, 2017 communications, appear in hindsight intentionally in bad faith to have been creating a moving target with respect to exactly how PEUGEOT wanted the agreed ten (10) seconds of visibility footage allocated, so that PEUGEOT could claim justification for PEUGEOT non-performance, no matter what allocation ALCON delivered.

159. ALCON and CTMG were also concerned about timing. For much of the fall of 2016, Casablanca had communicated that PEUGEOT might claim difficulties in performing the co-promotion if the parties were not adequately synchronized about its specific execution by March or April 2017. And now PEUGEOT had wasted almost three months, between January 18, 2017 and April 13, 2017, on a renegotiation request that was to have been limited to non-material drafting issues. After considering all the circumstances, ALCON and CTMG communicated to Casablanca and PEUGEOT (through Platon), that ALCON and CTMG preferred not to re-open the drafting discussions on the proposed long form. ALCON and CTMG requested that PEUGEOT simply sign the January 18, 2017 Writing already signed by Montron. PEUGEOT never did, and indeed ultimately refused ever to put the signature of any PEUGEOT executive on any draft of the long form documentation. ALCON alleges under Theories 2 and 3 that this was in bad faith by PEUGEOT.

*Late April 2017 to May 4, 2017: Peugeot Communicates Material Breach*

160. By late April 2017, it was abundantly clear that ALCON intended to make the placement in full compliance with the intent of the deal, and would work with PEUGEOT until PEUGEOT was reasonably and in good faith satisfied with it, even if that meant overperforming on the number of seconds of onscreen badging visibility. Indeed, ALCON'S internal documents show that as of May 2017, ALCON was prepared and actually able to deliver as many as sixteen (16)

69

THIRD AMENDED COMPLAINT

seconds of branding visibility (where the parties had clearly agreed that ten (10) seconds were sufficient).

### *April 28, 2017: False Statement No. 29*

161.   On or about April 28, 2017, with PEUGEOT still yet to send its more detailed co-promotion plan, and still stalling about providing a long form signature, a CTMG executive (Toubassy) telephoned MENDEZ directly and had a conversation with her.  He asked MENDEZ to deliver PEUGEOT'S more specific co-promotion plans and communicated that ALCON and CTMG were all looking forward to seeing them.

162.   MENDEZ asked Toubassy for any documentation he might have for any such deal.  Toubassy promptly emailed MENDEZ one or more documents, including the July 12, 2016 LOI and the Delegation of Signature Authority documents that MENDEZ had personally executed.  MENDEZ responded essentially that she would get back to him.  The thrust of MENDEZ's statements and conduct were that MENDEZ had until that point been unaware of Casablanca's deal-making conduct on PEUGEOT'S behalf.  MENDEZ's statements and conduct in this April 28, 2017 telephone conversation are "False Statement No. 29."

***Alternative Pleading:*** *Under Theory 1, MENDEZ's statements and conduct were not false, and she was unaware of all of what Casablanca had done.  Under Theory 2, MENDEZ was fully aware of Casablanca's conduct throughout, and her statements and conduct to the contrary were false and designed to perpetuate a bad faith scheme against ALCON or delay its discovery, and all defendants were in on the scheme.  Under Theory 2, the same, except that Casablanca was innocent (and essentially unknowingly playing a "fall guy" role).  Under Theory 4, MENDEZ was somehow innocently ignorant.*

163.   Toubassy followed up on or about May 3, 2017 with an email directly to MENDEZ, asking MENDEZ in writing to deliver PEUGEOT'S more specific co-promotion plans.  On May 4, 2017, MENDEZ emailed back.

70

THIRD AMENDED COMPLAINT

*May 4, 2017: False Statement No. 30*

164.  In her May 4, 2017 email to CTMG, MENDEZ took the following positions:

    a.  Denial of July 12, 2016 LOI. MENDEZ denied that she had ever had any knowledge (prior to CTMG sending it to her directly on or about April 28, 2017) that the July 12, 2016 LOI ever existed: "I was extremely surprised when I found out the existence of this document, you called LOI, entitled 'Blade Runner II – Agreement in principle' since It [sic] was the first time that I ever saw this document."

    b.  Denial that Mendez or Peugeot Had Granted Negotiating and Contracting Authority to Publicis.  MENDEZ denied that the Delegations of Signature Authority were significant and denied that Casablanca had requisite deal-making authority:  "The other document that CASABLANCA asked us to sign, giving them a mandate to be our exclusive interlocutor for the Blade Runner 2 product placement project, was only to assure them that we only worked with them on BLADE RUNNER product placement and not with any others agencies.  We never gave them the right to take any commitment on our behalf, and never intended to do so through this document."

    c.  Denial that MENDEZ or PEUGEOT had ever even discussed a co-promotional aspect to the BR2049 Deal.  "[T]he LOI doesn't reflect at all our discussions with Casablanca.  For us, we agreed only on a product placement for a certain amount that obviously is much higher than the one written in the LOI."  PLAINTIFF understands MENDEZ's statement to be communicating, *inter alia*, a denial by MENDEZ or anyone at PEUGEOT of any awareness of any co-promotional aspect of the deal.

71

THIRD AMENDED COMPLAINT

d. <u>MENDEZ advanced a PEUGEOT performance condition of "final
cut" or other late-stage Picture review that had been repeatedly
rejected</u>.  "[W]e have already paid [to Casablanca] last year 40% of
the full amount [of the placement fee].  We were waiting to see the
proof of the placement during the release of the movie in theaters in
order to pay the rest."

e. <u>Denial of Awareness that PEUGEOT Had Won the Original Bidding
Specifically by Offering a Large Co-Promotion</u>.  "If I had known a
year ago (at the beginning of our discussions) that Sony [*sic*, ALCON]
was expecting a minimum investment on a promotion campaign to
sign a deal, I would had [sic] never agreed with it."

f. <u>Revelation of No PEUGEOT Budget for a Media Spend</u>: "I was very
clear with Casablanca, I CANNOT commit on any budget on Peugeot
subsidiaries' behalves because they are free to manage their own
media budgets."  (All caps emphasis in original.)  PLAINTIFF is
informed and believes and on that basis alleges that MENDEZ meant
that even when PEUGEOT made May 2016 bids, PEUGEOT never
actually had money available to put toward a media spend, and
MENDEZ had never sought any within PEUGEOT.

165.  MENDEZ went on in her May 4, 2017 email to propose a complete re-
negotiation of terms.  The proposed renegotiation terms seemed to be MENDEZ
declaring that 1) PEUGEOT might not acknowledge its satisfaction with the
placement until after the Picture's theatrical release, and was denying the parties
even had a binding placement agreement yet, let alone a co-promotion agreement;
and 2) regardless, and even if the placement were satisfactory, PEUGEOT would
never itself fund a co-promotion media spend for BR2049.

166.  PEUGEOT by then was already under a contractual duty to move

72

THIRD AMENDED COMPLAINT

forward with preparations to execute the co-promotion.  This specifically meant, among other things, sending specific proposed plans to ALCON and CTMG for review and approval.  MENDEZ'S May 4, 2017 email declared that PEUGEOT refused to do so, and instead insisted that the obligations on that point be reversed and that ALCON and CTMG make the media spend plans for PEUGEOT to review and approve.

167.   MENDEZ's May 4, 2017 email constituted actual and/or anticipatory material breaches of the parties' agreements and PEUGEOT'S negotiating duties toward ALCON and CTMG.  Thus, under California law, from MENDEZ'S May 4, 2017 email forward (if not earlier), ALCON (and CTMG) were relieved of making any further performances to PEUGEOT or making any further satisfaction of any conditions of PEUGEOT performances, and could still fully enforce the deal terms against PEUGEOT.

168.   For example, although ALCON did so regardless, and in the utmost good faith, from MENDEZ'S May 4, 2017 email forward, ALCON was no longer bound to include _any_ PEUGEOT branding visibility sequences at all.  And, as long as ALCON did not act in bad faith or commercially unreasonably, ALCON could make no further performances to PEUGEOT whatsoever – including having no branding visibility footage at all in the Picture -- and could still fully enforce the agreement against PEUGEOT.

169.   MENDEZ's May 4, 2017 email is "False Statement No. 30."
***Alternative Pleading***: *Under Theory 1, at least some of MENDEZ's statements were not false because Casablanca had been exceeding its authority.  Under Theory 2, MENDEZ's email was generally filled with false denials, as described in the paragraphs above, for the purpose of advancing the deceitful scheme of all the defendants.  Under Theory 3, the same, but Casablanca was innocent and MENDEZ's statements cannot be attributed to Casablanca.  Under Theory 4, MENDEZ was communicating material breach, but for innocent (or at least non-*

73
THIRD AMENDED COMPLAINT

*intentionally tortious) reasons.*

170. Neither ALCON nor CTMG ever waived any of PEUGEOT'S actual and anticipatory breaches in MENDEZ'S May 4, 2017 email or any others.

171. ALCON and CTMG are professional and reputable companies. At that point, it also would have been exceedingly prejudicial to ALCON to attempt to replace PEUGEOT in the Picture with another brand, or even to attempt just to scrub PEUGEOT from the Picture. Thus, even after May 4, 2017, ALCON and CTMG continued to perform reasonably and in good faith (but without waiver of PEUGEOT'S breaches) and also engaged PEUGEOT to try to change its mind.

***May 4, 2017 through June 2017: Alcon and CTMG Go to Extraordinary Lengths to Attempt to Please Peugeot, Even After***

***Peugeot's Communication of Material Breach***

172. After MENDEZ'S May 4, 2017 email, ALCON and/or CTMG made clear to PEUGEOT that MENDEZ'S statements were inaccurate and deeply troubling, that there was indeed a binding agreement, including for a media spend, and that PEUGEOT was not performing it.

173. Nonetheless, while reserving rights, rather than sue immediately or stop dealing with PEUGEOT, CTMG proposed a specific accord. On May 11, 2017, CTMG executives emailed MENDEZ and proposed that the parties explore the possibility of moving forward with a separate product placement agreement and separate media spend agreement, which was favorable to PEUGEOT, but would still require PEUGEOT to commit to a media spend upon PEUGEOT satisfaction of the placement. CTMG also communicated that If MENDEZ confirmed that the proposed revised terms were agreed as to the placement, then ALCON and CTMG would provide rough proposed visibility footage to PEUGEOT for its review and approval as soon as possible. If, upon review of such footage, PEUGEOT was satisfied, then PEUGEOT would commit to a minimum $30 million media spend.

///

74

THIRD AMENDED COMPLAINT

### *May 17, 2017: False Statement No. 31*

174.   On May 17, 2017, MENDEZ emailed back to CTMG, copying, *inter alia*, Casablanca executives.  In her May 17 email, MENDEZ rejected the above proposed accord on behalf of PEUGEOT, and instead proceeded to attempt to renegotiate the deal almost entirely, using PEUGEOT'S by now extreme leverage.

175.   In her May 17, 2017 email, MENDEZ again denied ever having seen or been aware of any draft of the long form agreement, or even that Casablanca had been negotiating one for PEUGEOT, prior to CTMG'S May 3, 2017 transmission of the January 18, 2017 Writing directly to MENDEZ.  In her May 17, 2017 email, MENDEZ further denied again that Casablanca had any authority to negotiate the placement terms that it negotiated in the draft long forms or as proposed by CTMG'S May 11, 2017 potential accord, or any authority to negotiate any media spend at all.  These statements in MENDEZ's May 17, 2017 email are "False Statement No. 31."  **_Alternative Pleading_**: *Under Theory 1, at least some of MENDEZ's statements were not false because Casablanca had been exceeding its authority.  Under Theory 2, MENDEZ was making false denials for the purpose of advancing the deceitful scheme of all the defendants.  Under Theory 3, the same, but Casablanca was innocent and MENDEZ's statements cannot be attributed to Casablanca.  Under Theory 4, MENDEZ was somehow innocently ignorant of the facts she was denying.*

176.   In her May 17, 2017 email, MENDEZ then proposed the following specific renegotiated terms:

   a. That ALCON afford at least three (3) spinner branding visibility scenes, running at least four (4) seconds each;

   b. That the spinner visibility scenes had to include at least three views of the spinner, including all PEUGEOT branding on it ("FRONT, REAR and INSIDE, the animated one on the inside board you showed us");

   c. That in addition to the above minimum twelve (12) seconds of spinner

75

THIRD AMENDED COMPLAINT

branding visibility, that ALCON also still afford PEUGEOT an additional holographic advertisement in a background scene;

d. That the $500,000 placement fee be allocated $125,000 each to all four (4) above visibility scenes;

e. That if PEUGEOT approved the placement after review, that PEUGEOT'S CEO would then consider approving a co-promotion campaign;

f. But that even if PEUGEOT'S CEO was fully satisfied with both the placement and the planned co-promotion, PEUGEOT would still not ever make any binding commitment to fund any co-promotion at all;

g. At most, PEUGEOT would present the possibility of a co-promotion campaign to its local dealerships by territory, and even as to that PEUGEOT declined to agree even to propose any specific amount of media spend to the local dealerships.

177.   Clearly knowing that MENDEZ'S May 17 email would be (and was) shocking to CTMG, on May 18, 2017, Montron emailed the same group back (copying MENDEZ), and attempted to smooth or "clarify" MENDEZ'S positions. Montron attempted to clarify two points:

a. That ALCON and CTMG were fully committed to BR2049 featuring the PEUGEOT brand, and that it would be a high-value placement to PEUGEOT.

b. That MENDEZ and PEUGEOT meant that if PEUGEOT was satisfied with the placement, then "Peugeot is ready to launch a promotional campaign if Peugeot approves the product(/brand) placement."

178.   The same day, May 18, 2017, MENDEZ responded to the same group (including CTMG) and corrected Montron:

a. "We do want to continue the logo placement but we need to agree on terms" and

76

THIRD AMENDED COMPLAINT

b. "We intend to push a co-promotional campaign but we do not guarantee it all *even if the LOGO placement is confirmed*."

179. It was thus crystal clear that MENDEZ and PEUGEOT were reaffirming their actual and/or anticipatory material breach of the agreement that had been negotiated for over ten months, and further were rejecting even CTMG'S proposed specific accord.

### *Late May 2017 to June 1, 2017: False Statement No. 32*

180. MENDEZ then encouraged CTMG to come to Paris and present in person to PEUGEOT'S CEO (so that maybe PEUGEOT would at least do something on the co-promotion campaign, if it felt like it, after the CEO viewed footage). Without waiving PEUGEOT'S breaches, but with little choice but to attempt mitigation, ALCON and CTMG worked together to prepare a presentation, including rough cut actual footage from the Picture with Peugeot branding. With the active participation and involvement of MENDEZ, and her clear knowledge and awareness of the purpose and intent of the trip, an exceptionally high-level team of CTMG executives, including a President-level promotions and marketing executive within the SPE organization, traveled in person to PEUGEOT'S Paris offices. MENDEZ's representations and promises that if CTMG prepared the presentation and made the trip to Paris, then PEUGEOT and specifically PEUGEOT'S CEO would review the presentation in good faith, are "False Statement No. 32." **_Alternative Pleading_**: *This statement does not appear relevant either way to Theory 1. Under Theory 2, the statement was false, PEUGEOT never intended to review the presentation in good faith, and/or the CEO never intended to do so, and this was all part of the scheme by all defendants for PEUGEOT to avoid performance. Under Theory 3, the same, but Casablanca was innocent and MENDEZ's statements cannot be attributed to Casablanca. Under Theory 4, MENDEZ intended good faith and CEO participation, and the CEO participation did not occur for innocent reasons.*

77

THIRD AMENDED COMPLAINT

181.   On or about June 1, 2017 – the planned and agreed date for PEUGEOT and its CEO to receive the CTMG team -- the CTMG team arrived at PEUGEOT'S Paris offices (with some of them having traveled from California for the specific purpose of the meeting) with the presentation materials, including Picture footage.  By this time, the Picture deadlines to meet the Release Date were at a critical point.

182.   MENDEZ met the CTMG team and informed them that PEUGEOT'S CEO was not in PEUGEOT'S offices that day and would not be meeting with the CTMG team or otherwise reviewing the presentation.  But, MENDEZ said that she and other executives who worked under MENDEZ would meet with CTMG, and if appropriate, communicate later themselves with the CEO about BR2049, without CTMG present.  This was stunning.  The CTMG trip was an extraordinary one, across continents, that had been planned with PEUGEOT (through MENDEZ) for the express purpose of CTMG meeting with and presenting directly to the CEO.

183.   Based on the circumstances that the CTMG team observed while at PEUGEOT'S offices, PLAINTIFF is informed and believes and thereon alleges that MENDEZ'S statements that the PEUGEOT CEO was not in PEUGEOT'S Paris office and was unavailable for the meeting were false.  On the same basis, PLAINTIFF alleges that in fact PEUGEOT'S CEO _was_ physically at the offices that day, and could have met with CTMG.

184.   The CTMG team objected, but had little ability to compel the CEO to come out of his office, and proceeded in good faith as best they could.  CTMG made its presentation.  The footage was more than satisfactory.  CTMG'S team also offered overperformance on seconds of visibility footage -- that ALCON would deliver 12 (twelve) seconds, with no asks from ALCON, except that PEUGEOT actually move forward with the deal as previously agreed.  CTMG'S team also explained that the footage could still be modified if PEUGEOT desired, especially with respect to visibility.  ALCON was prepared to be highly flexible

78

THIRD AMENDED COMPLAINT

with PEUGEOT as to almost any commercially reasonable adjustments to the placement that PEUGEOT might have requested in good faith, both to satisfy PEUGEOT as a partner, and to get the media spend.

185.   During the June 1, 2017 meeting, MENDEZ and her team expressed a generally positive reaction, with industry-ordinary requests and comments for enhanced visibility (for example, better lighting on logos in particular sequences, which were relatively easy things to address).  Far from rejecting the placement or asking it to be redone, MENDEZ thanked the CTMG team and told them that she would make the presentation to her CEO promptly and get back to CTMG right away.  The MENDEZ-PEUGEOT team also said that they would provide some additional PEUGEOT logo samples for possible insertion and/or substitution in the placement (which ALCON was, in fact prepared and able to do if PEUGEOT had indeed desired it).  Further, MENDEZ even promised that she would direct BETC (PEUGEOT'S agency for planning and carrying out the co-promotion) to send over a deck with an updated co-promotion plan.

186.   CTMG returned to the United States optimistically, and both CTMG and ALCON remained ready, willing, able and anxious to perform.

187.   On or about June 5, 2017, one of MENDEZ'S subordinates (Mylene Poncet) emailed the promised additional logo samples to CTMG.  But nothing else.

188.   On June 9, 2017, and with the Picture now past the originally planned Picture lock, CTMG emailed MENDEZ again:

> "We assume you have now shared the campaign ideas with your CEO as promised and urgently need to know his reaction and feedback.
>
> As mentioned in the meeting, we **urgently** need to share these ideas internally next week in order to meet deadlines and would like to know when to expect the revised deck from BETC."
> (Emphasis in original.)

THIRD AMENDED COMPLAINT

### *June 9, 2017: False Statement No. 33*

189.  On June 9, 2017, PEUGEOT responded, in an email from MENDEZ'S subordinate, Poncet.  MENDEZ was openly copied.  PLAINTIFF is informed and believes and on that basis alleges that MENDEZ either substantially drafted or dictated the email herself and had Poncet send it, or that MENDEZ reviewed it and approved it prior to Poncet transmitting it, and indeed directed Poncet to send it.  In the response, Poncet (for MENDEZ) declined to say that the placement met PEUGEOT'S satisfaction and instead communicated that it did not.  The email directed that ALCON re-do it.  Some of the Poncet comments related to such things as lighting which were ordinary kinds of comments in placement review generally, and which MENDEZ had already had explained to her were not a problem and could easily be done.  In the industry, these would not be valid reasons to declare that a placement was unsatisfactory.

190.  Other comments from Poncet (for MENDEZ) were clearly in bad faith, and even directly contrary to prior approvals that PEUGEOT and MENDEZ had already given ALCON and upon which ALCON had relied.  The Poncet email even included comments that were undeniably objectively false and ridiculous.  For example, by the Poncet email, MENDEZ purported to reject the placement on the grounds that the spinner design did not incorporate the Cai design notes, even though the spinner clearly incorporates them essentially exactly as drawn by Cai, and MENDEZ had previously seen them and approved them (including at the January 24, 2017 co-promotion kickoff meeting).  As another example, via the Poncet email, MENDEZ purported to reject the placement on the grounds that the affiliation between Gosling's character K and the Peugeot-branded spinner was not strong enough – even though the affiliation is exceptionally strong.

191.  Worst of all, at the same time that MENDEZ (via the Poncet email) directed ALCON to re-do the placement, she doubled down on her May 4, 2017 denials that there had ever been any deal for a co-promotion, or even any

80

THIRD AMENDED COMPLAINT

discussion of one.  She also expressly reaffirmed her most devastating revelation -- that all attempts to satisfy PEUGEOT on the placement were futile in any event, because PEUGEOT had no intention of funding a co-promotion, and never did, even if the placement were absolutely perfect: "Regarding, this potential promotional campaign, I need to reiterate our position that even if the placement was satisfying we cannot commit on the promotional campaign and/or any figures regarding the campaign."

192.  Further, the June 9, 2017 Poncet email also disclosed that MENDEZ actually had not yet shown the placement presentation to her CEO or even, as PLAINTIFF understands her communication, to any of her corporate superiors.  Rather, the statements of dissatisfaction on behalf of PEUGEOT were entirely from MENDEZ herself (via Poncet), and not from the CEO.  Indeed, MENDEZ disclosed (via the Poncet email) that she would not even be meeting with anyone above her in the PEUGEOT corporate hierarchy about the BR2049 issues until June 14, 2017.  Further, MENDEZ boldly asked that CTMG send over one of its France-based executives to present (again) to PEUGEOT on June 14.

193.  The June 9, 2017 Email is "False Statement No. 33."  In general, the overarching effect of the email is a false, bad faith denial of satisfaction by PEUGEOT and bad faith refusal to communicate approval of the placement or to engage in any approval process in good faith.  It is also a reaffirmation of PEUGEOT's material breach.  ***Alternative Pleading***: *Under Theory 1, at least some of MENDEZ's statements were not false because Casablanca had been exceeding its authority.  The agent authority issue aside, the email is still a false and bad faith denial of satisfaction and approval under all four Theories.*

194.  CTMG responded on June 14, 2017 by communicating essentially that it believed PEUGEOT's denials of satisfaction to be in bad faith, apparently for the purpose of stalling or avoiding PEUGEOT performances.  CTMG's highest level business person involved communicated the end of his patience with the situation

81

THIRD AMENDED COMPLAINT

and the need to turn it over to lawyers.  On or about June 16-19, 2017, ALCON and CTMG executives affixed signatures for ALCON and CTMG to the January 18, 2017 Writing and prepared to send a fully executed copy of it to MENDEZ.

### *June 19, 2017: False Statement No. 34*

195.   Before they actually did, on June 19, 2017, MENDEZ responded to CTMG'S June 14, 2017 email, and repeated yet again all of her bad faith and false denials.  In her June 19, 2017 email MENDEZ did the following:

    a.  Denied again that PEUGEOT had ever given any negotiating or contracting authority to PUBLICIS at all, and falsely denied that the "Delegation of Signature Authority" documents that she had signed twice herself gave PUBLICIS any authority at all on anything.

    b.  Denied ever being aware of the July 12, 2016 LOI.

    c.  Denied that PEUGEOT had ever signed any contract.

    d.  Reiterated that regardless of any solution that might be found as to the placement, PEUGEOT would never finance a co-promotion media spend itself, and that all PEUGEOT would ever pay would be the placement fee.

    e.  MENDEZ repeated that even as to the placement, the CEO'S review and approval was required, and further revealed that MENDEZ had again delayed that -- MENDEZ had cancelled the June 14, 2017 meeting referenced in Poncet's June 9, 2017 email.

    f.  MENDEZ asked CTMG to send a team over again for her CEO to be afforded yet another chance to review the placement footage.  At the same time and in the very next sentence MENDEZ also made crystal clear that such an effort would be futile regardless: "I also reiterate our position that *even if the product placement is approved* it does not mean that there will be a promotional campaign."

196.   MENDEZ's June 19, 2017 Email is "False Statement No. 34."

82

THIRD AMENDED COMPLAINT

***Alternative Pleading****: The main thrust of MENDEZ's email is essentially that everything is Casablanca's fault caused by Casablanca acting without authority and hiding documents from PEUGEOT.  Under Theory 1, the main thrust is essentially true, with the possible exception of the signature delegations.  Under Theory 2, MENDEZ is making false denials to further the deceit scheme by all defendants.  Theory 3 is the same as Theory 2, but with Casablanca as innocent and thus MENDEZ false denials are not attributable to Casablanca.*

197.   On June 20, 2017, a CTMG lawyer responded to MENDEZ via email. The email attached the January 18, 2017 Writing, now with signatures affixed for ALCON and CTMG.  The email also clearly communicated that although ALCON and CTMG were reserving all rights, they both remained ready, willing and able to move forward with the partnership, including if required in satisfaction of all terms as stated in the January 18, 2017 Writing – if PEUGEOT would withdraw its reneging on the co-promotion and commit to actually start doing it.  By this communication, ALCON was again tendering performance.

198.   The next day, June 21, 2017, MENDEZ responded, effectively rejecting ALCON's tender, and repeating her denials of knowledge of any co-promotion deal, and effectively cutting off further discussions.

### *Post-June 2017: Peugeot Receives the Benefit of the Placement without Executing Any Co-Promotion or Paying Any Placement Fee*

199.   After MENDEZ'S and PEUGEOT'S June 21, 2017 abandonment of the Picture and further discussions about it, ALCON and CTMG nonetheless continued to act reasonably and in good faith.  PEUGEOT clearly benefited from ALCON's performances.

200.   In July 2017, a life-size real-world model of K's Peugeot-branded spinner with all of Cai's design notes was the centerpiece of an immersive fan marketing experience at San Diego Comic-Con.  The BR2049 experience at 2017 Comic-Con, with its Peugeot spinner, was recognized as one of the best executed

83

THIRD AMENDED COMPLAINT

and most popular event marketing showings at the convention.

201.   In early August 2017, ALCON made a last attempt and demand on a business basis for PEUGEOT to execute the co-promotion, which MENDEZ again flatly rejected, with her same or similar bad faith denials.  By September 2017, outside litigators for ALCON and PEUGEOT were exchanging correspondence.

202.   As the Picture's release neared, multiple news outlets contacted ALCON wanting to do stories focusing on PEUGEOT'S role in BR2049.  However, these publicity opportunities all passed by, without either ALCON or PEUGEOT able to take advantage of them as had been intended.

203.   The Picture was released theatrically with the placement included.  Peugeot visibility branding sequences run at least twelve (12) seconds.  They include both spinner badging sequences and a prominent outdoor/wall ad Peugeot logo.  Even without the lighting and other enhancements that would have been made to the sequences had PEUGEOT not abandoned the process in bad faith, the placement still clearly marks the spinner as a Peugeot and permanently enshrines PEUGEOT'S brand in the Picture.  Indeed, the truth, far beyond counting seconds, is that Cai's design notes, intended to make the spinner sing with PEUGEOT'S trade dress from almost every angle, are onscreen throughout the Picture.

204.   PEUGEOT also benefited from the film's marketing.  Some of the film's most prominent one sheets (marketing posters) feature Gosling next to the Peugeot spinner.  In fact, the very first one sheet released to a hungry audience, filled with anticipation for the long-dormant "Blade Runner" property, was Gosling standing in fog next to the spinner's red-lit triple-claw Peugeot-trademark brake lights, just as Cai marked them up.

205.   PEUGEOT received positive press recognition worldwide for the placement.  Peugeot also received positive brand recognition in important U.S. media, including in an October 6, 2017 *Bloomberg* story.

206.   In or about May 2019, the Peugeot-branded K spinner was selected by

84

THIRD AMENDED COMPLAINT

the Petersen Automotive Museum in Los Angeles to be featured prominently in a feature exhibition entitled "Hollywood Dream Machines," and it was. K's spinner is one of three "picture cars" (vehicles from movies) featured on the one sheet publicity or souvenir poster for the exhibit (the other two are the time machine DeLorean from "Back to the Future" and the light cycle from "Tron.")

207. PEUGEOT never executed any promotion and the Picture undoubtedly suffered for it. The Picture had at least $30 million less in international media to support the film's release than expected, not to mention lost publicity, short-form video pre-ambles never made or released to consumers to pre-tell the story of K's spinner as a PEUGEOT, and other ways to advance the film with consumers beyond even just paid media, that PEUGEOT should have been part of, and even led.

208. PEUGEOT'S bad faith failure to perform its co-promotional obligations almost certainly negatively affected the Picture's box office performance. But even as the Picture actually performed, without the substantial marketing and promotion support that PEUGEOT was supposed to provide, BR2049 still grossed about $260 million in worldwide box office, meaning that in its initial theatrical release alone, it was seen by over thirty million people. Each consumer who saw the movie was exposed to several minutes of screen time of PEUGEOT trade dress and branding.

209. The Picture also received extraordinarily positive audience response, with an 87% positive audience reaction on Rotten Tomatoes. The critical acclaim for the Picture was even greater. Among numerous other awards, BR2049 was nominated for five Academy Awards, and it won two: Best Cinematography and Best Visual Effects – both arguably the highest recognition a film can receive as to the way the film (including the spinner) looks on the screen. IGN named BR2049 the Best Movie of the Year for 2017, the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie of 2017, and the 2018 Saturn Awards named it the Best

Science Fiction film.  PEUGEOT'S brand is permanently and positively a part of this acclaimed film, forever.

### *Aftermath*

210.   PLAINTIFF is informed and believes and thereon alleges that PEUGEOT is more than satisfied with the placement.  Indeed, during at least some portion of May 2019, PEUGEOT or a PEUGEOT affiliate proudly touted the BR2049 placement on a PEUGEOT or PEUGEOT-affiliate marketing website.  (*See* Peugeot UK website capture, in the record as ALCON'S jurisdictional Exhibit 60, Dkt. No. 37-1, pages 89-92.)

## **TIME BARS AND ESTOPPEL**

211.   The earliest possible point in time on which ALCON was put on any notice that PEUGEOT and MENDEZ were engaged in the improper conduct alleged herein was no earlier than January 18, 2017.  ALCON did not discover and was not aware of and did not suspect, either actually or constructively, nor was ALCON put on any reasonable or actual inquiry notice, of any of the improper conduct alleged herein at any time prior to that January 18, 2017 date at the earliest, including because all defendants actively concealed their improper conduct with the intention of causing ALCON not to discover or suspect it.  To the extent necessary, ALCON is entitled to the benefit of the discovery rule on time bars for all claims as to which the discovery rule is applicable.   Further, all defendants are legally and equitably estopped, and otherwise barred, to claim that any time bars were running at all any earlier than, at the very earliest, January 18, 2017.

212.   Furthermore, ALCON and PMF entered into a tolling agreement, with accompanying extensions, such that all time bars were tolled and ceased to run as to PMF from at least January 8, 2019 until at least February 22, 2019.

213.   Finally as to time bars, between approximately February 8, 2019 and February 22, 2019, ALCON relied on the existence of an agreement in principle with PMF (and Publicis Groupe, Montron and Sissoko) that entailed ALCON not

86

THIRD AMENDED COMPLAINT

filing claims against PMF for an extended period following the expiration of the above tolling agreement, in exchange for identified and agreed considerations.  On the morning of February 22, 2019, PMF communicated to ALCON (through respective counsel) that the Publicis entities were reneging on this agreement in principle, to ALCON'S unexpected detriment, certainly at least as to preparations to file claims against PMF upon expiration of the tolling agreement.  PMF's last minute communication of its reneging and the timing and manner of its delivery was in bad faith as to at least the tolling situation, and PMF is thus also equitably estopped from claiming any running of time bars, for at least the time between PMF's surprise February 22, 2019 disavowal of the agreement in principle, and the days afterward that it took ALCON to prepare and file its First Amended Complaint (the first pleading to name PMF as a defendant).

## FIRST CLAIM FOR RELIEF

### *Breach of Contract*

### *against Automobiles Peugeot SA and Publicis Media France, S.A.*

214.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

215.   To the extent any of the allegations or theories in this First Claim for Relief are inconsistent with other allegations or theories pled in this TAC, they are pled in the alternative.  This claim for relief applies to PEUGEOT liability under all Theories.  It applies to PMF under Theory 1.  It has no application to MENDEZ liability.

216.   PLAINTIFF and defendant PEUGEOT entered into a valid and enforceable partially written, partially oral contract in the form of the Promotions License Agreement.  The contract is evidenced in part by the January 18, 2017 Writing and the October 16, 2016 Writing.  ALCON's interpretation of the meaning of the terms included in the Promotions License Agreement is set forth in

87

THIRD AMENDED COMPLAINT

paragraphs 151a through 151y above, and the contract includes all of those terms.

217. PLAINTIFF completely or substantially performed all conditions, covenants and promises required on its part to be performed in accordance with the Promotions License Agreement, or adequately tendered performance, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible. Any and all conditions precedent to the enforceability of PEUGEOT'S obligations that PLAINTIFF seeks to enforce herein have either been satisfied or waived or otherwise excused.

218. PEUGEOT breached the Promotions License Agreement in at least the following ways:

    a. PEUGEOT denied in bad faith that it had ever made any co-promotion commitment, and clearly communicated that it refused to finance any co-promotion, even if the placement was fully satisfactory.

    b. PEUGEOT refused to make its necessary interim performances to prepare to execute the co-promotion, including failing and refusing to present ALCON and CTMG with co-promotion plans.

    c. PEUGEOT failed and refused to pay anything at all for the placement.

    d. PEUGEOT did not run any co-promotion during the agreed co-promotional period or ever.

    e. PEUGEOT did not make media spend, including no ATL Spend and no BTL Spend.

    f. PEUGEOT failed to include a dedicated BR2049 presence on PEUGEOT'S website (www.peugeot.fr).

    g. PEUGEOT failed and refused to produce the TV spot.

    h. PEUGEOT failed and refused to produce Below-The-Line spend spots.

    i. PEUGEOT failed and refused to issue a press release to the media regarding the co-promotion.

88

THIRD AMENDED COMPLAINT

219.  PEUGEOT'S breaches damaged PLAINTIFF.

220.  PEUGEOT is liable to PLAINTIFF in the amount of at least $30.5 million, exclusive of prejudgment interest, attorneys' fees, costs or other amounts.

221.  The contract is not subject to the Statute of Frauds in *Cal. Civ. Code* § 1624(a)(1) as a contract that cannot be performed within one year by its terms, including because the contract could have been performed within one year under multiple factual scenarios that would not constitute a breach by either party.  As just one example, ALCON could have elected not to include the PEUGEOT brand placement in the Picture for artistic reasons prior to a year from entry into the contract, and the parties' future obligations to each other would have essentially ended without any breach.

222.  Further, in any event the January 18, 2017 Writing and the October 5, 2016 Writing are writings chargeable against PEUGEOT and PMF sufficient to satisfy any Statute of Frauds or writing requirement as to any term that ALCON seeks to enforce against either of them.

223.  Neither PMF nor its predecessor Casablanca are parties to the Promotions License Agreement.  However, under *Cal. Civ. Code* § 2343(2), an agent who enters into a written contract in the name of his principal, without believing, in good faith, that he or it has authority to do so, is liable on the contract as a principal.  Under Theory 1, PMF's predecessor Casablanca (through Montron and Sissoko), purported to enter into a written contract with PLAINTIFF in the name of PEUGEOT (as evidenced by the January 18, 2017 Writing and October 5, 2016 Writing), without believing in good faith that Casablanca had the authority to do so.  Thus, under Theory 1, PMF as Casablanca's successor is liable to the same extent as a principal under said contract.  Under Theory 1, PMF is thus independently liable for PEUGEOT'S breaches of contract as set forth in this claim for relief.

224.  Under Theory 1, Casablanca's conduct also constituted a breach by

89

THIRD AMENDED COMPLAINT

Casablanca of its warranty of agent's authority.  Thus, per *Cal. Civ. Code* § 3318, in addition to PLAINTIFF'S other remedies, PMF is also liable to PLAINTIFF as Casablanca's successor for the costs of legal proceedings, including PLAINTIFF'S reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF

### *Breach of Implied Covenant of Good Faith and Fair Dealing against Automobiles Peugeot SA and Publicis Media France, S.A.*

225.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

226.   To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.  This claim for relief applies to PEUGEOT liability under all Theories.  It applies to PMF under Theory 1.  It has no application to MENDEZ liability.

227.   PLAINTIFF and defendant PEUGEOT entered into a valid and enforceable partially written, partially oral contract in the form of the Promotions License Agreement.  The contract is evidenced in part by the January 18, 2017 Writing and the October 16, 2016 Writing.  ALCON's interpretation of the meaning of the terms included in the Promotions License Agreement is set forth in paragraphs 151a through 151y above, and the contract includes all of those terms.

228.   Like all contracts under the relevant governing law, which is the law of the State of California, the Promotions License Agreement contained an implied covenant of good faith and fair dealing, imposing on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible, by an act of his or her or its own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.

229.   PLAINTIFF completely or substantially performed all conditions,

90

THIRD AMENDED COMPLAINT

covenants and promises required on its part to be performed in accordance with the Promotions License Agreement, and/or adequately tendered performance, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible.  Any and all conditions precedent to the enforceability of PEUGEOT'S obligations that PLAINTIFF seeks to enforce have r been satisfied or waived or otherwise excused.

230.   PEUGEOT breached the contract's implied covenant of good faith and fair dealing in at least the following ways:

a.  PEUGEOT manipulated the negotiation and signature process of long form drafting and withheld its signature on all long form drafts in bad faith, for the purpose of attempting to create a bad faith excuse not to perform any obligation or condition.

b.  PEUGEOT purported in bad faith to deny that it had given final approval over design and badging of K's spinner.

c.  PEUGEOT in bad faith attempted to make the allocation of the ten (10) seconds of visibility a moving target that ALCON could never hit, for the purpose of PEUGEOT holding on to a bad faith excuse for its own non-performance.

d.  PEUGEOT refused and failed to engage in good faith and commercially reasonable review of the visibility footage, for the purpose of PEUGEOT holding on to a bad faith excuse for its own non-performance.

e.  PEUGEOT purported to disapprove the placement even on issues where the placement followed PEUGEOT-created and PEUGEOT-approved design elements (*e.g.*, the spinner's triple-claw brake lights, and the subtlety of a recessed PEUGEOT black letter word logo on the driver's side dashboard).

f.  PEUGEOT refused to conduct its reviews and approvals on a prompt

91
THIRD AMENDED COMPLAINT

basis or at all.

g. PEUGEOT refused to conduct its reviews and approvals on a commercially reasonable and good faith basis.

h. PEUGEOT denied in bad faith that it had ever made any co-promotion commitment, and clearly communicated that it refused to finance any co-promotion, even if the placement was fully satisfactory.

i. PEUGEOT refused to make its necessary interim performances to prepare to execute the co-promotion, including failing and refusing to present ALCON and CTMG with co-promotion plans.

j. PEUGEOT failed and refused to pay anything at all for the placement, based on bad faith denials of satisfaction.

k. PEUGEOT did not run any co-promotion at all during the agreed co-promotional period or ever, based in part on bad faith denials of satisfaction with the placement.

l. PEUGEOT failed and refused to cooperate and coordinate with ALCON on publicity and marketing opportunities that presented themselves as a result of the placement.

m. PEUGEOT manipulated review and approval communications and processes in bad faith, including in ways that caused ALCON and CTMG to incur wasted expenses, including for at least one wasted trip by the CTMG team to Paris, and the preparations for it.

231. PEUGEOT'S breaches damaged PLAINTIFF.

232. PEUGEOT is liable to PLAINTIFF in the amount of at least $30.5 million, exclusive of prejudgment interest, attorneys' fees, costs or other amounts.

233. Neither PMF nor its predecessor Casablanca are parties to the Promotions License Agreement. However, under California Civil Code § 2343(2), an agent who enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so, is liable on the contract as a

92

THIRD AMENDED COMPLAINT

principal.  Under Theory 1, PMF's predecessor Casablanca (through Montron and Sissoko), purported to enter into a written contract with PLAINTIFF in the name of PEUGEOT (as evidenced by the January 18, 2017 Writing and October 5, 2016 Writing), without believing in good faith that it or they had the authority to do so. Thus, under Theory 1, PMF as Casablanca's successor is liable to the same extent as a principal under said contract.  Under Theory 1, PMF is thus independently liable for PEUGEOT'S breaches of contract as set forth in this claim for relief.

234.   Under Theory 1, Casablanca's conduct also constituted a breach by Casablanca of its warranty of agent's authority.  Thus, per *Cal. Civ. Code* § 3318, in addition to PLAINTIFF'S other remedies, PMF is also liable to PLAINTIFF as Casablanca's successor for the costs of legal proceedings, including PLAINTIFF'S reasonable attorney's fees.

## **THIRD CLAIM FOR RELIEF**

### *Promissory Estoppel against*

### *Automobiles Peugeot SA and Publicis Media France, S.A.*

235.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

236.   To the extent any of the allegations or theories in this Third Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.  This claim for relief applies to PEUGEOT liability under all Theories.  It applies to PMF under Theory 1 and Theory 2.  It has no application to MENDEZ liability.

237.   PEUGEOT made clear and unambiguous promises to PLAINTIFF:

    a.  Including by both the June 6, 2016 LOI and the July 12, 2016 LOI, PEUGEOT promised at a minimum to negotiate in good faith with PLAINTIFF for a product placement and co-promotion agreement that would include a guaranteed media spend of "up to $20 million" (by the

June 6, 2016 LOI) and, later, that would be "at least $30 million" (by the July 12, 2016 LOI), including that if PLAINTIFF committed to negotiating in good faith with PEUGEOT, so would PEUGEOT. Subsequently, from August 2016 through and until at least January 18, 2017, PEUGEOT made the following promises:

b. If ALCON committed to a BR2049 Peugeot brand placement plan which PEUGEOT communicated reasonably and in good faith to ALCON was approved as satisfactory, then PEUGEOT would work with ALCON to plan, finance and execute a global co-promotion media campaign (which could exclude the U.S.) to support the October 6, 2017 day-and-date global theatrical release of the Picture, with a guaranteed minimum media spend of $30 million.

c. If ALCON tendered actual performance of delivery of satisfactory placement footage to PEUGEOT and/or offered to cure any good faith and reasonable dissatisfaction by PEUGEOT, then PEUGEOT was obligated to pay $500,000 directly to ALCON upon the film's release as a product placement fee, and was also obligated to actually to execute the above co-promotion.

d. If ALCON failed to deliver satisfactory placement footage even after reasonable and good faith engagement between the parties to attempt to cure, then PEUGEOT promised that the parties would negotiate in good faith about fair and reasonable alternative terms.

238. PLAINTIFF completely or substantially performed all conditions, covenants and promises required on its part to be performed in accordance with the promises, and/or adequately tendered performance, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible, and all conditions precedent to PEUGEOT'S obligations that PLAINTIFF seeks to enforce herein have either been

94

THIRD AMENDED COMPLAINT

satisfied, excused or waived.

239.   Within the last two years, PEUGEOT materially breached its promises to PLAINTIFF in at least the following ways:

a.   Under alternative pleading Theories 1, 2, and 3, PEUGEOT did not negotiate in good faith with ALCON, including intentionally misleading ALCON for almost a year that PEUGEOT was committed to and able to perform a media spend of initially at least $20 million, later moving up to an agreed $30 million, when PEUGEOT never intended to commit to any media spend at all, and was unable to do so.

b.   Under alternative pleading theories 1, 2, and 3, PEUGEOT manipulated the negotiation and signature process of long form drafting and withheld its signature on all long form drafts in bad faith, for the purpose of attempting to create a bad faith excuse not to perform any obligation or condition.

c.   Under all four Theories, even though ALCON committed to a BR2049 Peugeot brand placement plan which PEUGEOT communicated to ALCON was approved as satisfactory (including at the January 24, 2017 kickoff meeting), PEUGEOT refused to make its interim performances to prepare to execute the co-promotion, including failing and refusing to present ALCON and CTMG with co-promotion plans.

d.   Under all four Theories, even though ALCON tendered actual performance of delivery of satisfactory placement footage to PEUGEOT and/or offered to cure any good faith and reasonable dissatisfaction by PEUGEOT, PEUGEOT still failed and refused to pay anything at all for the placement.

e.   Under all four Theories, even though ALCON tendered actual performance of delivery of satisfactory placement footage to PEUGEOT and/or offered to cure any good faith and reasonable

95
THIRD AMENDED COMPLAINT

dissatisfaction by PEUGEOT, PEUGEOT did not run any co-promotion during the agreed co-promotional period or ever.

    f.  Under all four theories, even if ALCON failed to deliver satisfactory placement footage even after reasonable and good cure attempts, PEUGEOT still failed and refused to negotiate in good faith about alternative terms that would be fair and reasonable to both sides.

240.  PLAINTIFF actually relied on PEUGEOT'S promises in changing its position to its detriment, including by:

    a.  Foregoing other placement and co-promotion bids.

    b.  Incurring substantial production expenditures to prepare to perform the placement, including without limitation design changes to K's spinner, and the value of at least one production day in bringing PEUGEOT executives to Budapest, Hungary to move forward with negotiations and to prepare to perform a placement and co-promotion deal.

    c.  Planning an entire marketing strategy to support the October 6, 2017 day-and-date release of the Picture that relied and depended on a PEUGEOT $30 million or more media spend in a co-promotion.

    d.  Creating and distributing marketing materials, including one sheets, that featured the spinner with PEUGEOT badging and/or trade dress.

241.  PLAINTIFF'S reliance on the all of the above promises from PEUGEOT was reasonable and foreseeable, and indeed PEUGEOT made the promises to PLAINTIFF for the intended purpose of causing PLAINTIFF to rely on the promises substantially in the manner that PLAINTIFF did.

242.  PLAINTIFF'S reliance on PEUGEOT'S promises caused PLAINTIFF substantial detriment, including without limitation in the form of losing the value of the $16+ million bid from Automotive Brand Z, and in incurring all of the expenses and lost opportunities set forth immediately above. Had PLAINTIFF not acted in reliance on PEUGEOT'S promises, PLAINTIFF would have entered into a

placement and co-promotion deal with Automotive Brand Z or another bidder. PLAINTIFF would not have planned a global market and promotion strategy for release of the Picture that depended on and relied on a $30 million co-promotion media spend by PEUGEOT. ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set. ALCON also lost time from at least the June 6, 2016 to May 2017 period by PEUGEOT'S bad faith negotiations, to ALCON'S prejudice and detriment. Had this time not been wasted, ALCON and CTMG might have been able to use it better to plan a marketing and promotion strategy for the Picture's release that was less dependent on a media spend from PEUGEOT. ALCON and CTMG also lost the expenses incurred in CTMG'S wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its CEO. By relying on PEUGEOT'S promises, PLAINTIFF incurred these costs and suffered these lost opportunities irrevocably.

243. If PLAINTIFF had known that PEUGEOT would not perform its promises to PLAINTIFF, especially that PEUGEOT never intended to commit to a guaranteed media spend co-promotion under any circumstances and was unable to do so, PLAINTIFF would not have agreed even to negotiate with PEUGEOT at all, or incurred the other referenced detriments.

244. Under these circumstances, injustice can only be avoided by enforcement of PEUGEOT'S promises to PLAINTIFF.

245. As a result of PEUGEOT'S conduct, PEUGEOT is liable to PLAINTIFF for general damages, special damages, prejudgment interest, costs of suit, and such other relief as may be just.

246. Under *Cal. Civ. Code* § 2343(2), an agent who enters into a written contract in the name of his principal, without believing, in good faith, that he or it has authority to do so, is liable on the contract as a principal. Under *Cal. Civ. Code*

97

THIRD AMENDED COMPLAINT

§ 2343(3), an agent whose acts are wrongful in their nature is liable as principal. Under Theory 1, PMF's predecessor Casablanca (through Montron and Sissoko), purported to enter into a written contract with PLAINTIFF in the name of PEUGEOT, without believing in good faith that it or they had the authority to do so. Thus, under Theory 1, PMF as Casablanca's successor is liable to the same extent as a principal under said contract. Under Theory 1, PMF is thus independently liable for PEUGEOT'S failure to perform promises, as set forth in this claim for relief. Alternatively, under Theory 2, PMF's predecessor Casablanca (through Montron and Sissoko), engaged in acts wrongful by their nature toward ALCON. Thus, under Theory 2, PMF as Casablanca's successor is liable to the same extent as a principal under non-contract theories, including promissory estoppel. Under Theory 2, PMF is thus independently liable to ALCON under this claim's theory of relief.

247. Casablanca's conduct under Theory 1 also constituted a breach by Casablanca of its warranty of agent's authority. Thus, under Theory 1, per *Cal. Civ. Code* § 3318, in addition to PLAINTIFF'S other remedies, PMF is also liable to PLAINTIFF as Casablanca's successor for the costs of legal proceedings, including PLAINTIFF'S reasonable attorney's fees.

### FOURTH CLAIM FOR RELIEF

*Breach of Duty to Negotiate in Good Faith*

*against Defendants Automobiles Peugeot SA and Publicis Media France, S.A.*

248. PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

249. To the extent any of the allegations or theories in this Fourth Claim for Relief are inconsistent with other allegations or theories pled in this TAC, they are pled in the alternative. This claim for relief applies to PEUGEOT liability under all Theories. It applies to PMF under Theory 1. It has no application to MENDEZ

98

THIRD AMENDED COMPLAINT

liability.

250.   As set forth in greater detail in paragraphs 93-95 above, PLAINTIFF entered into a valid and enforceable contract with PEUGEOT to negotiate in good faith toward a potential product placement and co-promotion agreement, in the form of the June 6, 2016 LOI.  As set forth in greater detail in paragraphs 107-113 above, PLAINTIFF entered into a valid and enforceable contract with PEUGEOT to negotiate in good faith toward a potential product placement and co-promotion agreement, in the form of the July 12, 2016 LOI.

251.   The terms of the June 6, 2016 LOI and the July 12, 2016 LOI are as more specifically set forth in paragraphs 93-95 and 107-113 respectively, but the material terms of both documents included that PLAINTIFF and PEUGEOT would negotiate with each other in good faith toward a product placement and co-promotion agreement such that ALCON would make a PEUGEOT brand placement in BR2049 associated with K's spinner, and in exchange PEUGEOT would pay a placement fee directly to ALCON of at least several hundred thousand dollars ($750,000 as of the June 6, 2016 LOI and $500,000 as of the July 12, 2016 LOI), and also plan and execute a co-promotion media spend (of "up to $20,000,000" by the June 6, 2016 LOI, and at least $30 million by the July 12, 2016 LOI).

252.   PLAINTIFF completely or substantially performed all conditions, covenants and promises required on its part to be performed in accordance with both LOIs, and/or adequately tendered performance, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible.  Any and all conditions precedent to the enforceability of PEUGEOT'S obligations that PLAINTIFF seeks to enforce herein have either been satisfied or waived or otherwise excused

253.   PEUGEOT breached the above duty to negotiate in good faith with ALCON, including as follows:

    a. PEUGEOT never intended ever to commit any guaranteed media co-

99
THIRD AMENDED COMPLAINT

promotion spend and indeed was unable to do so, and never revealed that to ALCON until at earliest May 4, 2017, by which time ALCON had drastically changed its position to its detriment.

b. PEUGEOT at all times harbored a secret intention to stall and frustrate signature of a PEUGEOT executive on any form of contractual obligation (other than confidentiality agreements), for the intentional and bad faith purpose of controlling the BR2049 opportunity while also claiming it had incurred no obligations itself.

c. PEUGEOT intentionally attempted in bad faith to build in and/or assert satisfaction targets that it would be impossible for ALCON to hit, no matter what ALCON did, for PEUGEOT'S intentional purpose of attempting to maintain bad faith excuses not to perform.

d. PEUGEOT intentionally and falsely denied the existence and scope of authority of its designated agents for negotiation.

e. PEUGEOT falsely and in bad faith led ALCON and CTMG to believe that if PEUGEOT'S CEO were provided an opportunity to review materials, that PEUGEOT might perform at least some parts of the deal, when in fact PEUGEOT (and MENDEZ specifically) had no intention of allowing the CEO to interact directly with ALCON or CTMG, and the CEO ploy was just a further stall.

254. As a result of PEUGEOT'S breach of duty, ALCON suffered damages, including at a minimum the value of the $16 million-plus deal for a BR2049 product placement and co-promotion that was being offered to ALCON by Brand Z, or deals that ALCON might done with other auto brands if ALCON had not focused on negotiating with PEUGEOT. ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set. ALCON also

100

THIRD AMENDED COMPLAINT

lost time from at least the June 6, 2016 to May 2017 period by PEUGEOT'S bad faith negotiations, to ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and CTMG might have been able to use it better to plan a marketing and promotion strategy for the Picture's release that was less dependent on a media spend from PEUGEOT.  ALCON and CTMG also lost the expenses incurred in CTMG'S wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its CEO.

255.   PEUGEOT is thus liable to ALCON for general and/or special damages in an amount to be proven at trial, but at least $16-plus million.

256.   The June 6, 2016 LOI and the July 12, 2016 LOIs are both writings chargeable against PMF sufficient to satisfy any writing requirement of *Cal. Civ. Code* § 2343(2).

257.   Neither PMF nor its predecessor Casablanca are parties to the Promotions License Agreement.  However, under *Cal. Civ. Code* § 2343(2), an agent who enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so, is liable on the contract as a principal.  Under Theory 1, PMF's predecessor Casablanca (through Montron and Sissoko), purported to enter into both LOIs, without believing in good faith that Casablanca had the authority to do so.  Thus, under Theory 1, PMF as Casablanca's successor is liable to the same extent as a PEUGEOT under the LOIs.  Under Theory 1, PMF is thus independently liable for PEUGEOT'S breaches of duty to negotiate in good faith as set forth in this claim for relief.

258.   Under Theory 1, Casablanca's conduct also constituted a breach by Casablanca of its warranty of agent's authority.  Thus, per *Cal. Civ. Code* § 3318, in addition to PLAINTIFF'S other remedies, PMF is also liable to PLAINTIFF as Casablanca's successor for the costs of legal proceedings, including PLAINTIFF'S reasonable attorney's fees.

///

101
THIRD AMENDED COMPLAINT

## FIFTH CLAIM FOR RELIEF

### *Fraud against all Defendants*

259.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

260.   To the extent any of the allegations or theories in this Fifth Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.  This Fifth Claim for Relief sets out a fraud claim based on Theory 2 (a fraud scheme masterminded by MENDEZ in which all defendants knowingly took part) or Theory 3 (a fraud scheme masterminded by MENDEZ in which Casablanca as an innocent actor, or even set up as a "fall guy" or scapegoat).

261.   Pursuant to Theory 2, within the last three years prior to ALCON's filing of suit, MENDEZ herself made the following:

    a.   Affirmative misrepresentations to PLAINTIFF, or intended to reach PLAINTIFF, in the form of False Statement Nos. 9, 16, 24, 25, 29, 30, 31, 32, 33 (via Mylene Poncet) and 34.

    b.   Concealed material facts that MENDEZ or PEUGEOT had a duty to disclose to PLAINTIFF under all the circumstances in the form of False Statement Nos. 16, 19, 20, 22 and 24.

    c.   Made promises to PLAINTIFF on behalf of PEUGEOT without any intention that PEUGEOT would ever perform them, in the form of False Statement Nos. 24 and 32.

262.   Pursuant to Theory 2, PLAINTIFF is informed and believes and on that basis alleges that, as to certain misrepresentations, material omissions, and false promises that MENDEZ did not make directly herself, MENDEZ caused them to be made by Montron, Sissoko, BEN (primarily by Porter, via Sissoko) and Mylene Poncet, as follows:

    a.   Affirmative misrepresentations to PLAINTIFF, or intended to reach

102

THIRD AMENDED COMPLAINT

PLAINTIFF, in the form of False Statement Nos. 1-8, 10, 11-17, 18, 21, 24, 25-28.

    b. Concealed material facts that PEUGEOT had a duty to disclose to PLAINTIFF under all the circumstances in the form of False Statement Nos. 13 (concealment of inability to fund media spend), 14, 16, 18-22, 24.

    c. Made promises to PLAINTIFF on behalf of PEUGEOT without any intention that PEUGEOT would ever perform them, in the form of False Statement Nos. 10, 13, 18, 21, 23.

263. The above misrepresentations, acts of suppression and concealment, and/or false promises were material to PLAINTIFF, essential to the analysis undertaken by PLAINTIFF, and PLAINTIFF would not have acted as it did had MENDEZ (and under Theory 2, Sissoko and Montron) not caused the making of the above statements, acts of suppression and concealment, and/or false promises.

264. The scheme has complexity in the statements, but its essence was simple: to use intentional deception to secure the BR2049 K spinner opportunity for PEUGEOT instead of any other auto brand; then get ALCON to execute the placement without PEUGEOT paying anything for it, unless MENDEZ and PEUGEOT felt like paying something; and keep ALCON from suspecting the scheme for as long as possible.

265. MENDEZ knew at the time that she made or caused the making of the affirmative misrepresentations and false promises to PLAINTIFF that they were false, and MENDEZ knew at the time that she made or caused the suppression or concealment of material facts the effect such suppression or concealment would have. Under Theory 2, Sissoko and Montron also knew and intended the same.

266. MENDEZ made or caused the making of the affirmative representations, false promises, and acts of suppression and concealment of material facts with the intent and for the purpose of causing PLAINTIFF to change its

103

THIRD AMENDED COMPLAINT

position to its detriment.  Under Theory 2, Sissoko and Montron also made or caused the making of the statements or omissions with the same purpose and same intent as MENDEZ.

267.    PLAINTIFF actually and justifiably relied on each of the affirmative misrepresentations, false promises, and the facts as they stood given the suppression and concealment of other material facts, in changing its position to its detriment. That detriment included at a minimum losing the value of the $16+ million bid from Automotive Brand Z.  Had PLAINTIFF not acted in reliance on MENDEZ's deceits, PLAINTIFF would have entered into a placement and co-promotion deal with Automotive Brand Z or another bidder.  PLAINTIFF would not have planned a global market and promotion strategy for release of the Picture that depended on a $30 million co-promotion media spend by PEUGEOT.  ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set.  ALCON also lost time from at least the June 6, 2016 to May 2017 period by PEUGEOT'S bad faith negotiations, to ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and CTMG might have been able to use it better to plan a marketing and promotion strategy for the Picture's release that was less dependent on a media spend from PEUGEOT.  ALCON and CTMG also lost the expenses incurred in CTMG'S wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its CEO.

268.    PLAINTIFF'S reliance on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts was a proximate cause of actual damage to PLAINTIFF.

269.    PLAINTIFF'S reliance on the all of the above promises, representations, and facts as they were understood in light of defendants' material omissions was reasonable and foreseeable, and indeed MENDEZ made or caused

104

THIRD AMENDED COMPLAINT

the making of the false representations, false promises and material omissions for the intended purpose of causing PLAINTIFF to rely on them substantially in the manner that PLAINTIFF did.  Under Theory 2, so did Montron and Sissoko.

270.   Had PLAINTIFF not acted in reliance on the misrepresentations, false promises, and facts as they were understood in light of defendants' material omissions, PLAINTIFF would not have incurred the detriments above.  By relying on defendants' misrepresentations, false promises, and facts as they were understood in light of defendants' material omissions, PLAINTIFF suffered those costs, expenses and lost opportunities irrevocably.

271.   MENDEZ is thus liable to PLAINTIFF for general damages and special damages, as well as costs and other relief, all in amounts to be proven at trial, but not less than $30.5 million.  PEUGEOT is liable to the same degree and extent as MENDEZ, on the grounds that MENDEZ engaged in all of her tortious conduct in the actual or ostensible course and scope of her employment or other agency with PEUGEOT, and/or because MENDEZ acted with the permission, consent, authorization, and/or ratification, whether express or implied, of PEUGEOT, and/or with PEUGEOT'S knowing acceptance of the benefits of MENDEZ's improper conduct.

272.   Under Theory 2, PMF is liable to the same extent as MENDEZ, on multiple grounds.  Under Theory 2, Montron and Sissoko have direct fraud liability, because they engaged in their own fraudulent acts directly.  Under Theory 2, Montron and Sissoko also have aiding and abetting liability.  Montron and Sissoko knew that MENDEZ was executing a fraudulent scheme against ALCON, and Montron and Sissoko knowingly participated in it and actively furthered it and supported it, in numerous ways.  As just one example, under Theory 2, Sissoko knew of MENDEZ'S fraud scheme at the time of the July 2016 and November 2016 Budapest set visits, and also at the time of the January 24, 2017 kickoff meeting, and intentionally stayed silent about it in the presence of ALCON representatives on

105

THIRD AMENDED COMPLAINT

each occasion, for the purpose of advancing the fraud. Montron and Sissoko engaged in all of their conduct within the course and scope of their employment, agency and authority at Casablanca and/or with the permission, consent, authorization, and/or ratification, whether express or implied, of Casablanca, and/or with Casablanca's knowing acceptance of benefits of Montron's and Sissoko's improper conduct. Casablanca would thus be liable for Montron and Sissoko's conduct, and thus now PMF is liable for it as Casablanca's successor.

273. Under Theory 2, all of the defendants, and each of them, did the things herein alleged maliciously, knowingly, willfully and with the deliberate intention of injuring and oppressing PLAINTIFF and with conscious and reckless disregard of PLAINTIFF'S rights. Under Theory 2, all of the defendants' conduct was fraudulent, malicious and oppressive and, by reason thereof, PLAINTIFF is entitled to exemplary and punitive damages in an amount according to proof at trial.

274. Under Theory 3, the PEUGEOT DEFENDANTS are still liable for fraud, including the conduct described in paragraph 273 above. But under Theory 3, Montron, Sissoko and Casablanca were all innocent actors and PMF thus does not have fraud liability under this Fifth Claim for Relief under Theory 3.

## SIXTH CLAIM FOR RELIEF

### *Reasonable Value of Services against Automobiles Peugeot, SA*

275. PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

276. To the extent any of the allegations or theories in this Sixth Claim for Relief are inconsistent with other allegations or theories pled in this TAC, they are pled in the alternative. This claim for relief is applicable to PEUGEOT under all four Theories. It is not applicable to MENDEZ or PMF under any Theory.

277. PLAINTIFF provided valuable services to PEUGEOT at PEUGEOT'S request or with PEUGEOT'S knowledge, and PEUGEOT accepted

106

THIRD AMENDED COMPLAINT

**-114-**

or received the benefit of said services.  The services included PEUGEOT'S brand placement in the Picture, marketing exposure at San Diego Comic-Con, brand exposure on Picture one sheets distributed by ALCON, and positive exposure in cultural repositories such as the Petersen Automotive Museum.

278.   The value of the services that PEUGEOT actually received from PLAINTIFF is at least $10 million.

279.   The value of the services provided by PLAINTIFF to PEUGEOT was agreed between PLAINTIFF to PEUGEOT, and/or reasonably known and determinable including by custom and practice in the industry, and PEUGEOT knew and understood that the services were valuable, or should have known.

280.   PEUGEOT knew and understood that PLAINTIFF expected compensation for rendition of the services.

281.   PLAINTIFF has demanded that PEUGEOT compensate PLAINTIFF for the value of the services and PLAINTIFF has refused.

### SEVENTH CLAIM FOR RELIEF

*Quantum Meruit against Automobiles Peugeot, SA*

282.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

283.   To the extent any of the allegations or theories in this Seventh Claim for Relief are inconsistent with other allegations or theories pled in this TAC, they are pled in the alternative.  A *quantum meruit* claim (also sometimes called unjust enrichment) typically only lies where the parties do not have an enforceable contract between them regarding the subject.  Here, PLAINTIFF alleges that it does have an enforceable contract with PEUGEOT regarding the subject, in the form of the Promotions License Agreement.  Thus, PLAINTIFF pleads this Seventh Claim for Relief only as an alternative backstop, in the event the Promotions License Agreement is found not an enforceable agreement.  This

107
THIRD AMENDED COMPLAINT

Seventh Claim for Relief is in that alternative way applicable to PEUGEOT under all four Theories.  It is not applicable to PMF or MENDEZ under any Theory.

284.   PEUGEOT received benefits provided by PLAINTIFF to PLAINTIFF'S detriment, including PEUGEOT'S brand placement in the Picture, marketing exposure at San Diego Comic-Con, brand exposure on Picture one sheets distributed by ALCON, positive press, positive exposure in cultural repositories such as the Petersen Automotive Museum, and marketing of the placement by PEUGEOT or PEUGEOT affiliates (*See* Peugeot UK website capture, in the record as ALCON'S jurisdictional Exhibit 60, Dkt. No. 37-1, pages 89-92.)  The value of these benefits to PEUGEOT is at least $10 million.

285.   Under the circumstances here, it would be unjust for PEUGEOT to retain the benefits or their value, at PLAINTIFF'S expense.  PEUGEOT should thus make restitution to ALCON in the amount of at least $10 million.

## EIGHTH CLAIM FOR RELIEF

### *Fraud against Publicis Media France, S.A. and Automobiles Peugeot SA*

286.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

287.   To the extent any of the allegations or theories in this Eighth Claim for Relief are inconsistent with other allegations or theories pled in this SAC, they are pled in the alternative.  This Eighth Claim for Relief sets out a fraud claim based on Theory 1 (a fraud scheme whereby Montron and Sissoko essentially masterminded the entire BR2049 deal for PEUGEOT without any actual authority from PEUGEOT to do so, so that Casablanca could enjoy a fee).  Under Theory 1, it applies to PMF and PEUGEOT (because PMF's predecessor Casablanca engaged in the fraud while acting as PEUGEOT'S actual or ostensible agent, making PEUGEOT liable).  It does not apply to MENDEZ under any Theory.

288.   Pursuant to Theory 1, within the last three years prior to ALCON's

108

THIRD AMENDED COMPLAINT

filing of suit, Sissoko himself (or in some cases Montron) made the following:

    a. Affirmative misrepresentations to PLAINTIFF, or intended to reach PLAINTIFF (often via BEN in the first half of 2016), in the form of False Statement Nos. 1-8, 10, 11-17, 18, 21, 24, 25-28.

    b. Concealed material facts that Casablanca or PEUGEOT had a duty to disclose to PLAINTIFF under all the circumstances in the form of False Statement Nos. 9 (concealment of actual direction given by MENDEZ in May 11, 2016 meeting), 13 (concealment of inability to fund media spend), 14, 16, 18-22, 24.

    c. Made promises to PLAINTIFF on behalf of PEUGEOT without any intention that PEUGEOT would ever perform them, in the form of False Statement Nos. 10, 13, 18, 21, 23.

289. The above misrepresentations, acts of suppression and concealment, and/or false promises were material to PLAINTIFF, essential to the analysis undertaken by PLAINTIFF, and PLAINTIFF would not have acted as it did had Montron and Sissoko not caused the making of the above statements, acts of suppression and concealment, and/or false promises.

290. The scheme includes a complex statement pattern, but its essence was basic: use intentional deception to secure the BR2049 K spinner opportunity for PEUGEOT in order to realize a fee for Casablanca, even without any initial authority at all from PEUGEOT; then, after some limited grant of authority from PEUGEOT, exceeding that authority when necessary to keep the deal going (for example, promise a co-promotion so that ALCON would not leave the table); and conceal the scheme for as long as possible from both PEUGEOT and ALCON, and hope it all works out in the end somehow.

291. Montron and Sissoko knew at the time that they made or caused the making of the affirmative misrepresentations and false promises to PLAINTIFF that they were false, and Montron and Sissoko knew at the time that they made or caused

the suppression or concealment of material facts the effect such suppression or concealment would have.

292.   Montron and Sissoko made or caused the making of the affirmative representations, false promises, and acts of suppression and concealment of material facts with the intent and for the purpose of causing PLAINTIFF to change its position to its detriment.

293.   PLAINTIFF actually and justifiably relied on each of the affirmative misrepresentations, false promises, and the facts as they stood given the suppression and concealment of other material facts, in changing its position to its detriment. That detriment included at a minimum losing the value of the $16+ million bid from Automotive Brand Z.  Had PLAINTIFF not acted in reliance on Montron's and Sissoko's deceits, PLAINTIFF would have entered into a deal with Brand Z or another bidder.  PLAINTIFF would not have planned a global marketing strategy for release of the Picture that depended on a $30 million co-promotion media spend by PEUGEOT.  ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set.  ALCON also lost time from at least the June 6, 2016 to May 2017 period by Montron's and Sissoko's deceits, to ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and CTMG might have been able to use it better to plan a marketing and promotion strategy for the Picture's release that was less dependent on a media spend from PEUGEOT.

294.   PLAINTIFF'S reliance on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts was a proximate cause of actual damage to PLAINTIFF.

295.   PLAINTIFF'S reliance on the all of the above promises, representations, and facts as they were understood in light of defendants' material omissions was reasonable and foreseeable, and indeed Montron and Sissoko made

or caused the making of the false representations, false promises and material omissions for the intended purpose of causing PLAINTIFF to rely on them substantially in the manner that PLAINTIFF did.

296.   Had PLAINTIFF not acted in reliance on the misrepresentations, false promises, and facts as they were understood in light of defendants' material omissions, PLAINTIFF would not have incurred the detriments above.  By relying on defendants' misrepresentations, false promises, and facts as they were understood in light of defendants' material omissions, PLAINTIFF suffered those costs, expenses and lost opportunities irrevocably.

297.   Montron and Sissoko thus would be liable to PLAINTIFF for general damages and special damages, as well as costs and other relief, all in amounts to be proven at trial, but not less than $30.5 million.  Casablanca would be liable to the same degree and extent as Montron and Sissoko, on the grounds that Montron and Sissoko engaged in all of their tortious conduct in the actual or ostensible course and scope of their employment or other agency with Casablanca, and/or because they acted with the permission, consent, authorization, and/or ratification, whether express or implied, of Casablanca, and/or with Casablanca's knowing acceptance of the benefits of Casablanca's improper conduct.

298.   Casablanca would thus be liable for Montron and Sissoko's conduct, and thus now PMF is liable for it as Casablanca's successor.

299.   Under Theory 1, Montron and Sissoko did the things herein alleged maliciously, knowingly, willfully and with the deliberate intention of injuring and oppressing PLAINTIFF and with conscious and reckless disregard of PLAINTIFF'S rights.  Their conduct was fraudulent, malicious and oppressive and, by reason thereof, PLAINTIFF is entitled to exemplary and punitive damages in an amount according to proof at trial, with PMF now having inherited that liability.

300.   Under Theory 1, Casablanca engaged in its fraudulent conduct while acting and in the course of acting as at least PEUGEOT's ostensible agent, and to

111
THIRD AMENDED COMPLAINT

at least some extent as PEUGEOT's actual agent.  PEUGEOT is thus liable for Casablanca's fraudulent acts, to the same extent as Casablanca would have been, and thus to the same extent as PMF (except as to *Cal. Civ. Code* § 3318 which does not apply to PEUGEOT).

301.   By the above allegations, Casablanca also breached its warranty of agent's authority.  Thus, under *Cal. Civil Code* § 3318, in addition to PLAINTIFF'S other remedies, PMF as Casablanca's successor is also liable to PLAINTIFF for the costs of legal proceedings, including PLAINTIFF'S reasonable attorney's fees, as a result of Casablanca's breach of warranty of agent's authority.

## NINTH CLAIM FOR RELIEF

*Negligent Misrepresentation against*

*Publicis Media France, S.A. and Automobiles Peugeot SA*

302.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this TAC hereafter, as if set forth herein in full.

303.   To the extent any of the allegations or theories in this Ninth Claim for Relief are inconsistent with other allegations or theories pled in this TAC, they are pled in the alternative.  Based on a negligence variation of Theory 1, this Ninth Claim for Relief sets out essentially the same conduct by Montron and Sissoko, and effect on PLAINTIFF as the Eighth Claim for Relief (a fraud scheme whereby Montron and Sissoko essentially masterminded the entire BR2049 deal for PEUGEOT without any actual authority from PEUGEOT to do so, so that Casablanca could enjoy a fee), but where Montron and Sissoko's behavior is explained by incompetence or carelessness rather than malice.  Under Theory 1, it applies to PMF and PEUGEOT (because PMF's predecessor Casablanca engaged in the fraud while acting as PEUGEOT'S actual or ostensible agent, making PEUGEOT liable).  It does not apply to MENDEZ under any Theory.

304.   Pursuant to Theory 1, within the last three years prior to ALCON's

filing of suit, Sissoko himself (or in some cases Montron) made affirmative misrepresentations to PLAINTIFF, or intended to reach PLAINTIFF (often via BEN in the first half of 2016), in the form of False Statement Nos. 1-8, 10, 11-17, 18, 21, 23, 24, 25-28.

305.   The above misrepresentations were material to PLAINTIFF, essential to the analysis undertaken by PLAINTIFF, and PLAINTIFF would not have acted as it did had Montron and Sissoko not made the above statements or caused them to be made.

306.   The above representations were not true and Montron and Sissoko made the representations without any ground for believing them to be true.

307.   Montron and Sissoko made the affirmative representations or caused them to be made with the intent and for the purpose of causing PLAINTIFF to change its position to its detriment, including so that Casablanca could earn a substantial fee.

308.   PLAINTIFF actually and justifiably relied on the affirmative misrepresentations in its position to its detriment, including by ever negotiating with Casablanca about a PEUGEOT deal rather than deal with Automotive Brand Z or another partner (or another agency for PEUGEOT), and also later by continuing to deal with PEUGEOT and Casablanca on BR2049 through and until May 4, 2017, thereby wasting time between at least March 31, 2016 and May 4, 2017 to make alternative arrangements

309.   PLAINTIFF'S reliance on the affirmative misrepresentations was a proximate cause of actual damage to PLAINTIFF.

310.   PLAINTIFF'S reliance on Montron and Sissoko's misrepresentations was reasonable and foreseeable, and indeed Montron and Sissoko made the untrue representations or caused them to be made for the intended purpose of causing PLAINTIFF to rely on them substantially in the manner that PLAINTIFF did.

113
THIRD AMENDED COMPLAINT

311.   PLAINTIFF'S reliance on Montron and Sissoko's misrepresentations caused PLAINTIFF substantial detriment, including without limitation at a minimum the lost value of the $16 million+ deal for a BR2049 product placement and co-promotion that was being offered to ALCON by Brand Z, or the value that could have been obtained from another auto brand bidder.  From about March 31, 2016 forward, Montron's and Sissoko's affirmative misrepresentations tainted the market for BR2049 auto brand bidding, causing ALCON loss in the form of lost opportunities with other bidders.  ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set.  ALCON also lost the value of time between at least March 31, 2016 and May 4, 2017 for making marketing and advertising plans for the entire global day-and-date release of the Picture that might take into account not having a significant auto brand placement co-promotion, or a different one.  This was all to ALCON'S prejudice and detriment.  Had PLAINTIFF not acted in reliance on Montron and Sissoko's misrepresentations, PLAINTIFF would not have incurred any of the above losses or detriments.  By relying on Montron and Sissoko's misrepresentations, PLAINTIFF suffered the lost costs, expenses and lost opportunities irrevocably.

312.   Montron and Sissoko thus would be liable to PLAINTIFF for general damages and special damages, as well as costs and other relief, all in amounts to be proven at trial, but not less than $30.5 million.  Casablanca would be liable to the same degree and extent as Montron and Sissoko, on the grounds that Montron and Sissoko engaged in all of their tortious conduct in the actual or ostensible course and scope of their employment or other agency with Casablanca, and/or because they acted with the permission, consent, authorization, and/or ratification, whether express or implied, of Casablanca, and/or with Casablanca's knowing acceptance of the benefits of Casablanca's improper conduct.

114

THIRD AMENDED COMPLAINT

313.  Thus, if Casablanca still existed, it would be liable to PLAINTIFF for general damages and special damages, as well as costs and other relief, all in amounts to be proven at trial, but not less than $30.5 million.  As Casablanca's successor, PMF has now inherited that liability.

314.  Under Theory 1, Casablanca engaged in its negligent conduct while acting, and in the course of acting, as at least PEUGEOT's ostensible agent, and to at least some extent as PEUGEOT's actual agent.  PEUGEOT is thus liable for Casablanca's negligence, to the same extent as Casablanca would have been, and thus to the same extent as PMF (except as to *Cal. Civ. Code* § 3318 which does not apply to PEUGEOT).

315.  Casablanca's affirmative misrepresentations constituted a breach of Casablanca's warranty of agent's authority.  Thus, under *Cal. Civ. Code* § 3318, in addition to PLAINTIFF'S other remedies, Casablanca would be liable to PLAINTIFF for costs of legal proceedings, including reasonable attorney's fees, as a result.  PMF as Casablanca's successor is thus also now so liable.

## **Prayer for Relief**

WHEREFORE, PLAINTIFF prays judgment be entered in its favor and against Defendants, and each of them, as follows:

1. On the First Claim for Relief for Breach of Contract Against Automobiles France, SA and Publicis Media France, S.A.:

   a.  For general damages in an amount to be proved at trial, but at least $30.5 million.

   b.  For such other general damages as may be shown by proof at trial.

   c.  For special damages.

   d.  For prejudgment interest at the legal rate from at least October 6, 2017.

   e.  For PLAINTIFF'S costs of suit.

   f.  As to Publicis Media France, S.A. only, attorney fees pursuant to California Civil Code § 3318.

115

THIRD AMENDED COMPLAINT

g. For such further relief as the Court deems just and proper.

2. <u>On the Second Claim for Relief for Breach of Implied Covenant of Good Faith and Fair Dealing Against Automobiles France, SA and Publicis Media France, S.A.</u>:

   a. For general damages in an amount to be proved at trial, but at least $30 million.

   b. For such other general damages as may be shown by proof at trial.

   c. For special damages.

   d. For prejudgment interest at the legal rate from at least October 6, 2017.

   e. For PLAINTIFF'S costs of suit.

   f. As to Publicis Media France, S.A. only, attorney fees pursuant to California Civil Code § 3318.

   g. For such further relief as the Court deems just and proper.

3. <u>On the Third Claim for Relief for Promissory Estoppel Against Automobiles France SA and Publicis Media France, S.A.</u>:

   a. For general damages according to proof at trial.

   b. For prejudgment interest at the legal rate from at least October 6, 2017.

   c. For PLAINTIFF'S costs of suit.

   d. As to Publicis Media France, S.A. only, attorney fees pursuant to California Civil Code § 3318.

   e. For such further relief as the Court deems just and proper.

4. <u>On the Fourth Claim for Relief for Breach of Duty to Negotiate in Good Faith Against Automobiles Peugeot SA and Publicis Media France, S.A.</u>:

   a. For general and/or special damages in an amount to be proved at trial, but at least $16 million.

   b. For prejudgment interest at the legal rate from at least October 6, 2017.

   c. For PLAINTIFF'S costs of suit.

   d. As to Publicis Media France, S.A. only, attorney fees pursuant to

116

THIRD AMENDED COMPLAINT

California Civil Code § 3318.

    e.  For such further relief as the Court deems just and proper.

5. On the Fifth Claim for Relief for Fraud against All Defendants:

    a.  For general damages according to proof at trial.

    b.  For punitive damages.

    c.  For prejudgment interest at the legal rate from at least October 6, 2017.

    d.  For PLAINTIFF'S costs of suit.

    e.  As to Publicis Media France, S.A. only, attorney fees pursuant to California Civil Code § 3318.

    f.  For such further relief as the Court deems just and proper.

6. On the Sixth Claim for Relief for Reasonable Value of Services against Automobiles Peugeot SA:

    a.  For general damages according to proof at trial.

    b.  For prejudgment interest at the legal rate from at least October 6, 2017.

    c.  For PLAINTIFF'S costs of suit.

    d.  For such further relief as the Court deems just and proper.

7. On the Seventh Claim for Relief for Quantum Meruit against Peugeot:

    a.  For general damages and/or restitution according to proof at trial.

    b.  For prejudgment interest at the legal rate from at least October 6, 2017.

    c.  For PLAINTIFF'S costs of suit.

    d.  For such further relief as the Court deems just and proper.

8. On the Eighth Claim for Relief for Fraud against Publicis Media France, S.A. and Automobiles Peugeot SA:

    a.  For general damages according to proof at trial.

    b.  For punitive damages.

    c.  For prejudgment interest at the legal rate from at least October 6, 2017.

    d.  For PLAINTIFF'S costs of suit.

    e.  Attorney fees pursuant to California Civil Code § 3318.

117

THIRD AMENDED COMPLAINT

f.  For such further relief as the Court deems just and proper.

9. <u>On the Ninth Claim for Relief for Negligent Misrepresentation against</u>

<u>Publicis Media France, S.A. and Automobiles Peugeot SA</u>:

a.  For general damages according to proof at trial.

b.  For prejudgment interest at the legal rate from at least October 6, 2017.

c.  For PLAINTIFF'S costs of suit.

d.  Attorney fees pursuant to California Civil Code § 3318.

e.  For such further relief as the Court deems just and proper.

DATED: April 28, 2020                          ANDERSON YEH PC
                                               Edward M. Anderson
                                               Regina Yeh
                                               By
                                               Attorneys for Plaintiff ALCON ENTERTAINMENT,
                                               LLC

118
THIRD AMENDED COMPLAINT

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, on its claims against defendants AUTOMOBILES PEUGEOT SA, ISABEL SALAS MENDEZ and PUBLICIS MEDIA FRANCE, S.A., Plaintiff ALCON ENTERTAINMENT, LLC hereby demands a trial by jury of all matters triable to a jury.

DATED: April 28, 2020                              ANDERSON YEH PC
                                                   Edward M. Anderson
                                                   Regina Yeh

                                                   _____
                                                        Attorneys for Plaintiff
                                                   ALCON ENTERTAINMENT, LLC

---

1
DEMAND FOR JURY TRIAL

-128-

**EXHIBIT C TO PEUGEOT AND PUBLICIS LETTER BRIEF**

ANDERSON YEH PC
  Edward M. Anderson (STATE BAR NO. 198183)
edward@andersonyehlaw.com
  Regina Yeh (STATE BAR NO. 266019)
regina@andersonyehlaw.com
1055 E. Colorado Blvd. Ste 500
Pasadena, California  91106
Telephone: (626) 204-4092  Facsimile: (888) 744-0317

Attorneys for Plaintiff
ALCON ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> TESLA, INC., a Texas Corporation; ELON MUSK, an individual; WARNER BROS. DISCOVERY, INC., a Delaware Corporation; <br><br> Defendants. | CASE NO.  2:24-CV-09033-GW-RAO <br><br> **THIRD AMENDED COMPLAINT FOR:** <br><br> **1) DIRECT COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]** <br><br> **AND** <br><br> **2) CONTRIBUTORY COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Alcon Entertainment, LLC ("Plaintiff" or "Alcon") alleges its Third Amended Complaint ("TAC") against defendants Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI") (together, "Defendants"):

### SUBJECT MATTER JURISDICTION

1. The Court has federal question subject matter jurisdiction per 28 U.S.C. §§ 1331 and 1338(a).  This is a civil action arising under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, *et al.*

1<br>THIRD AMENDED COMPLAINT

## NATURE OF THE ACTION

2.     Alcon produced the motion picture "Blade Runner 2049" ("BR2049") as a sequel to the original 1982 "Blade Runner" motion picture ("1982 Picture"). Alcon is the ultimate sole copyright owner of all rights in BR2049.  Defendants jointly conducted an October 10, 2024 Tesla marketing event from WBDI's studio lot in Burbank, California (the "Event").  Musk and Tesla exploited protected elements of BR2049 for the Event without Alcon's authorization.

3.     WBDI intentionally induced, caused and materially contributed to Musk and Tesla's infringing conduct, with motives to favor Musk and Tesla over Alcon.  Among other acts, WBDI caused its subsidiary and Alcon's BR2049 domestic distributor, non-party WB Studio Enterprises, Inc. dba Warner Bros. Pictures ("WBP"), to authorize, or promise to authorize, Tesla's BR2049 usage for aspects of the Event.  WBDI knew, or should have, that this violated WBP's distribution license from Alcon.  The BR2049 usage occurred on WBDI-owned systems.  WBDI disregarded Alcon's prophylactic and remedial requests.

4.     Alcon brings direct copyright infringement claims against Musk and Tesla and contributory copyright infringement claims against WBDI.

## FACT CHRONOLOGY

5.     ***WBP***.  Non-party WBP, in its current corporate incarnation and prior variations, has been a "major" Hollywood motion picture studio since 1923.

6.     ***The 1982 Picture.***  The 1982 Picture starred Harrison Ford as Deckard, a "blade runner," the 1982 Picture's fictional name not for Ford's character, but rather his character's profession: a hunter and killer of rogue artificially intelligent humanoid robots or "replicants."  WBP was and is the distributor of the 1982 Picture.  It was produced by The Blade Runner Partnership.

7.     ***The Alcon-WBP Relationship***.  Alcon is an independent motion picture and television producer headquartered in Los Angeles, formed in 1997.  At all relevant times, it had robust cash resources.  Between about 1998 and 2019,

2

THIRD AMENDED COMPLAINT

WBP distributed Alcon-produced motion pictures by a contractual arrangement where Alcon received access to WBP's distribution system in exchange for very favorable financial terms from Alcon to WBP, all highly beneficial to both sides.

8.    Under this model, WBP was the original (and in most cases still current) at least domestic distributor for more than thirty Alcon-produced motion pictures, including BR2049 and "The Blind Side."  The Alcon-WBP contract terms for each picture use a common base, making an Alcon-WBP course of dealing and performance about twenty-five (25) years deep as of 2024.  Alcon had and has strong marketing and reputational protections in WBP treatment of Alcon pictures.  WBP actions which might associate Alcon property with a controversial licensee require WBP to consult Alcon first.  Musk qualified as controversial.  Alcon and WBP had a very amicable history, without any litigated disputes before the Event.

9.    ***Alcon, WBP, and 1982 Picture Rights***.  In 2011, Alcon acquired many rights in the 1982 Picture and underlying properties from The Blade Runner Partnership's successor, including exclusive rights to make 1982 Picture derivative works.  By its own transactions, WBP became the ultimate exclusive copyright owner in distribution rights to the 1982 Picture as is.  WBP also became the owner of associated physical chattel, including 1982 Picture prop cars.

10.    ***BR2049.***  BR2049 was theatrically released on October 6, 2017 and registered the same day with the U.S. Copyright Office (registration number PA0002056792), with Alcon as author.  Non-party Sony Pictures Entertainment Inc. ("SPE") was and is the licensed international distributor.  WBP's BR2049 distribution license from Alcon expires in 2029.

11.    BR2049 tells the story of its main character, "K," played by Ryan Gosling.  K is a replicant who is also a "blade runner," tasked with hunting and killing his own kind.  K's human supervisors assign him to find a missing child suspected to be from natural childbirth to a replicant mother, a possibility threatening to the existing human-AI societal power balance.  BR2049 poses an

3

THIRD AMENDED COMPLAINT

existential societal question: "will humans and their AI creations choose to relate to each other in a partnership that creates a mutually beneficial society, or will they reject partnership and invite apocalypse?" K drives an artificially intelligent, autonomously-capable, flying car throughout BR2049.

12. BR2049 was and is widely distributed. It received popular and critical acclaim, including numerous awards. It was and is regularly identified as one of the best science fiction movies ever on lists of such things. It was and is available on U.S. streaming and digital rental services. A DVD of BR2049 (with some auto branding from the theatrical release edited out) is in the record (ECF 51).

13. ***BR2049 Auto Brand Licensing.*** There was and is an established market for automobile brands to license from motion picture or TV rights holders the right to use copyright-protected elements of the works to promote car products and brands. Alcon uses this market to monetize its creative works, including BR2049. During BR2049 pre-production and production, car brands bid competitively for licensed affiliation with BR2049. The winning contract price was a $500,000 cash payment from the brand to Alcon, and a promised $30 million media spend by the brand, to co-promote both the brand and BR2049. This was all in exchange for ten (10) non-consecutive seconds BR2049 screen time where the brand would appear, mostly with K and K's car. The number of seconds, their divisibility, and exclusivity, were all fiercely negotiated, as is typical in the market. Non-exclusive licenses are less appealing to brands and command lower prices.

14. WBP's personnel participated in the above bid process. Alcon and WBP had about an eight (8) year history on BR2049 licensing issues by the time of the Event. WBP had never had nor claimed to have authority to communicate with a car brand about a BR2049 license without Alcon's fully informed prior approval. WBP has business affairs executives with deep knowledge of the Alcon-WBP relationship terms and rapid access to Alcon's co-CEOs, and a documentary record of Alcon-WBP past communications on auto brand licensing issues and protocols.

4

THIRD AMENDED COMPLAINT

15. ***Musk, Tesla and Their Pre-Existing Marketing Interest in BR2049.*** Tesla is a developer and manufacturer of electric cars, founded in about 2003. Musk soon became CEO and controlling shareholder. Tesla emphasizes artificial intelligence ("AI")-based autonomous driving capabilities in marketing its cars.

16. Largely due to Tesla stock holdings, Musk is the world's richest man and was at the time of Event. In addition to Tesla, Musk directly or indirectly owns and operates the social media platform X (formerly Twitter), the rocket and satellite company SpaceX, and the AI company X.AI Corp. ("X.AI"), among other ventures. X.AI runs "Grok," an AI system with image generation functions.

17. Musk excels at non-traditional marketing, including through memes and other very short-form communications. Musk frequently markets his companies and their products by opportunistic associations with science fiction properties. Musk had and has a well-known disdain for intellectual property ("IP") law, including copyright law. He was and is infamous for not paying for IP uses in memes or other marketing, even where other commercial parties would and do.

18. Musk was well-known for having applied his above traits to make Tesla the largest car company in the world by market capitalization with almost no use of traditional paid advertising.

19. The 1982 Picture and BR2049 were and are known favorite Tesla marketing tools. For instance, in 2019, Musk made public displays of literal copies of quantitatively small, but qualitatively significant, 1982 Picture elements, for the purpose of linking the real-world time and location which Musk had selected for Tesla's cybertruck product reveal to the 1982 Picture's fictional setting (*i.e.,* "Los Angeles, November 2019"), in order to amplify cybertruck publicity and marketing. In the November 2019 reveal event itself, upon information and belief, Musk intended to reference BR2049 to set that event's theme. The public and press understood him that way. (*See, e.g.,* E. Howell, "Elon Musk's Cybertruck from Tesla Is Straight Out of Blade Runner and James Bond," Space.com, Nov.

5

THIRD AMENDED COMPLAINT

23, 2019, https://www.space.com/elon-musk-cybertruck-blade-runner-james-bond-inspiration.html.)  The words "blade runner" in common parlance are frequently used as a shorthand for BR2049.  Musk is known for imprecise usage of the words, including as to whether he is referring to the 1982 Picture, BR2049, Deckard, or K.

20.    Musk and Tesla never sought or received Alcon's permission for any of the foregoing uses of BR2049 elements.  However, up until the October 2024 Event, to Alcon's knowledge, Musk and Tesla had never engaged in literal copying or actionable substantial similarity copying of BR2049 elements.

21.    *WBDI.*  WBP is an old, established entity as to both Hollywood and Alcon; WBDI is a new and different one in both contexts.  WBDI was formed in April 2022 by merger of Discovery, Inc. with WBP's then-direct or -indirect parent, AT&T, Inc.  The merger resulted in limited WBDI working cash and large debt, which WBDI planned to service partly by disrupting existing Hollywood motion picture and television industry business models, including by using content owned or controlled by WBDI subsidiaries to support the larger WBDI's needs.  The merger resulted in WBDI owning the Burbank studio lot and improvements.

22.    ***Defendants Engage About the Event.***  Sometime before September 6, 2024, Tesla expressed interest to WBDI about the possibility of the Event.  Titled "We Robot," it would and did reveal Tesla's new AI-driven, purportedly fully autonomous robotaxi (or cybercab), and "Optimus" humanoid AI robot products, in order to solicit investment and advertise the new Tesla products to consumers.

23.    Plaintiff alleges paragraph 23 upon information and belief: Musk and Tesla wanted to reveal the new Tesla products on the WBDI studio lot in substantial part to facilitate opportunistic marketing association with Hollywood motion pictures, especially BR2049.  Musk and Tesla were indifferent to obtaining IP licenses.  They would if WBDI required it, but only if such licenses were not priced or characterized as car brand affiliation licenses, a business model which Musk and Tesla refuse to support.

6
THIRD AMENDED COMPLAINT

-134-

24.     The Event had two aspects: 1) an in-person presentation and activities, conducted for physically present attendees numbering in the hundreds; and 2) a livestream of parts of the in-person Event, displayed to a worldwide audience.  A recording of the livestream aspect of the Event is in the record (ECF 25) ("Event Recording").  Upon information and belief, the in-person aspect of the Event was negotiated and planned first, and, until near the actual start time of the Event, separately from the livestream aspect, at least as to the issues herein.

25.     ***WBDI Causes WBP To Authorize, or Promise to Authorize, Tesla to Use BR2049 for the In-Person Event.***  Plaintiff alleges this paragraph 25 upon information and belief: WBDI (or a nominal WBDI contracting entity actively directed by WBDI) and Tesla contracted for the in-person aspect of the Event by September 6, 2024, and spent September 6 through October 10, 2024 planning it together.  **Alternative Theory 1A:** ECF 23-1 [redacted]/ECF 32 [sealed unredacted]) is authentic, and was at least an initial WBDI-Tesla contract for the in-person Event, before or separately from Tesla licensing IP from WBDI or subsidiaries.  **Alternative Theory 1B:** The document is not authentic or was superseded and not a governing contract at the Event time, but WBDI provided at least the level of resources for the in-person Event as in ECF 23-1/ECF 32.

26.     Plaintiff alleges paragraph 26 on information and belief: WBDI allowed Musk and Tesla to review the WBDI conglomerate's IP content library to select content desired for the in-person Event.  Musk and Tesla requested, and WBDI caused one or more of its subsidiaries to enter into IP license agreements with Tesla for in-person Event usage of: (a) "Westworld"; (b) "Mad Max"; (c) the Batmobile; and (d) Deckard's car ("56 Sedan") from the 1982 Picture.  Except "Mad Max," the foregoing IP is visible on the Event Recording; "Mad Max" IP appears on social media of Event attendees.  Studios generally require paid licenses for IP uses and ECF 23-1/32 on its face required written consent for uses of IP from at least the WBDI conglomerate.  (ECF 23-1/32 Terms and Conditions,¶ 12.)

7

THIRD AMENDED COMPLAINT

27.     At some point during this shopping-in-the-WBDI-content-store in-person Event preparation process, Tesla requested use of BR2049 for the in-person Event of at least **Image A** below for Musk's keynote speech:



28.     Image A appears in BR2049 at about run-time 1:37:55.  It is qualitatively significant to BR2049 -- arguably its most recognizable still image.  It was the publicity image for theatrical release promotion, and it is still the cover image to BR2049 trailers on YouTube and other platforms.  It is from BR2049's core "Las Vegas Sequence" (BR2049 at 1:36:28-1:37:59, 1:40:28-2:01:50).  In the sequence, K explores a ruined, radioactive Las Vegas to encounter the long-lost Deckard (reprised by Harrison Ford), the story's dramatic climax.  It has distinctive imagery, with orange lighting, and K often shown duster-clad in silhouette or near-silhouette, surveying or exploring urban ruins.

29.     WBP knew, or had reason to know, that it could not grant the request, and had to reject it or inform Alcon of it immediately.  WBDI used shared services personnel (*i.e.,* personnel who provide services to both WBP and WBDI and do or should know Alcon-WBP relationship terms) to relate to Tesla about the request.  They included Julie Heath ("Heath"), a former WBP employee and Alcon licensing liaison for years prior to WBDI's inception.  By 2024, Heath was a WBDI employee, with a WBDI email address and signature blocks.  Heath told Alcon in phone conversations on October 10 and 16, 2024 that she was being directed by WBDI, and Alcon alleges that she was.  WBDI knew or had reason to

8
THIRD AMENDED COMPLAINT

know what WBP knew about BR2049 rights, or is chargeable with knowing it.

30.    Sometime prior to October 10, 2024, without informing Alcon, WBDI caused WBP either: **Alternative Theory 2A:** to authorize Tesla to use Image A for Musk's in-person Event keynote remarks, or **Alternative Theory 2B:** to promise Tesla that WBP would do so, with an (inaccurate) representation that WBP had sufficient rights to do so, all in a way upon which Tesla relied.  WBDI never contested prior to the action that at least one of these had occurred.  Including from Heath's information to Alcon that by October 10 Tesla had already been provided a high resolution digital copy of Image A (inferentially, by WBDI or WBDI-directed WBP), authorization was not merely promised, but fully given.

31.    ***WBDI's Relative Motivations.***  WBDI had motives to favor Musk and Tesla's interests over Alcon's.  Upon information and belief, Tesla agreed to pay, or actually paid, WBDI substantial money for the Event rights and WBDI resources.  At the time, Musk also was poised to become even more powerful and influential than he already was, by a close relationship with Donald J. Trump preceding the November 2024 U.S. Presidential election.  Based on third party press reports, on information and belief, WBDI's CEO David Zaslav was actively courting a relationship with Musk, including to benefit WBDI, contemporaneously with WBDI-Tesla Event deal-making (*e.g.,* Musk and Zaslav were photographed together at the U.S. Open on September 8, 2024, two days after ECF 23-1/32 was countersigned by Tesla).  Upon information and belief, they discussed the Event and Musk's satisfaction with it was important at the highest levels of WBDI.

32.    At the same time, in the months prior to the Event, significant friction had developed in the WBDI-Alcon relationship.  Alcon had complained about uses of Alcon IP (specifically "The Blind Side") which WBDI and a non-WBP subsidiary had made without Alcon's authorization, to WBDI's benefit and Alcon's detriment, in a way prohibited for WBP itself as Alcon's "The Blind Side" distributor to do.  Alcon also had commenced buying interests in the financially

9

THIRD AMENDED COMPLAINT

troubled Village Roadshow's share of motion picture properties jointly owned by Village Roadshow and WBDI subsidiaries.  WBDI had made clear to Alcon that WBDI did not want Alcon to do that and was hostile to Alcon about the situation.

33.    ***Tesla's International BR2049 Rights Request.***  At a time unknown precisely to Alcon, but very near the Event's scheduled start, Tesla requested that WBDI cause WBP to add rights to use Image A in the worldwide livestream aspect of the Event, or WBDI otherwise learned that Tesla wanted such rights.  That required rights even farther beyond WBP's domestic BR2049 distribution license.

34.    Plaintiff alleges this paragraph 34 on information and belief: WBDI's shared services personnel communicated to Tesla that such rights were beyond what any WBDI entity could grant.  By that time, Musk and Tesla had relied on using Image A in planning the Event, including Musk's keynote.  Heath received a contact from a WBDI senior executive who communicated to Heath in essence that Musk and Tesla's satisfaction was important, such that Heath should help Tesla get international rights.  (Heath told Alcon in an October 10 call, *infra* ¶ 37, that this happened, though Heath declined to name the WBDI senior executive in question.)

35.    As a result, at about noon PDT on October 10, 2024, WBDI (through Heath) and Tesla (separately) first contacted SPE.  The Tesla personnel involved in these communications included David Adametz (a Tesla video production executive) and Shara Lili (a Tesla Manager of Video Content).  Upon information and belief, Adametz and Lili were in direct or indirect contact with Musk, and the October 10 communications which reached Tesla also reached Musk.

36.    SPE directed both WBDI and Tesla to Alcon.  Tesla never contacted Alcon.  Heath did.  At about 1:00 pm PDT on October 10, 2024, Heath disclosed to Alcon that WBDI had caused WBP to authorize, or promise to authorize, Tesla to use Image A for the in-person aspect of the Event, but had just learned that Tesla also wanted international rights for a worldwide livestream.  Heath communicated that WBDI was requesting Alcon to grant Tesla international rights.  WBDI did not

10

THIRD AMENDED COMPLAINT

request that Alcon grant Tesla permission for the in-person Event usage.  (Indeed, Heath argued to Alcon – incorrectly -- in the October 16, 2024 call with Alcon, discussed at ¶ 46 *infra*, that the WBDI-directed WBP did not need any Alcon permission to authorize in-person or livestream BR2049 use by Tesla domestically.)  Heath balked at Alcon's email request to WBDI and SPE that both companies communicate to Tesla that Tesla had no permission for any BR2049 usage, not even for the in-person Event; Heath asked that only SPE communicate a rights denial, with none communicated to Tesla from WBDI.  This Heath response led to an about 2:00 p.m. PDT October 10 phone call between Heath and Alcon.

37.  As a result of all of the foregoing communications: (a) SPE communicated directly to Tesla only that international rights to use Image A were denied; (b) Alcon communicated to WBDI's Heath in the 2:00 p.m. PDT call, that: (i) no BR2049 usage was authorized for any aspect of the Event; (ii) only Alcon could authorize any BR2049 use by Tesla or Musk, and never would, including because Alcon was concerned about Musk's increasing polarity and brand toxicity; (iii) WBDI and WBP must communicate all of the foregoing directly to Musk and Tesla, in clear terms, and not rely only on SPE's communicated denial of international rights; and (iv) WBDI and WBP also should actively guard against any Musk or Tesla usage of BR2049 in any aspect of the Event in any way.

38.  Alcon reasonably understood Heath's response during the 2:00 p.m. phone call to mean that WBDI and WBDI-directed WBP would execute on all of these requests; Heath certainly did not communicate to Alcon that WBDI and WBP would not do so.  After information gained after initial filing of this action and the First Amended Complaint, Alcon is now informed and believes most likely that **Alternative Theory 3A:** WBDI did not comply with any of Alcon's paragraph 37(b)(i)-(iv) requests.  This means, *inter alia*, neither WBDI nor WBDI-directed WBP ever withdrew WBP's invalid Image A in-person Event use authorization, or promised authorization, to Tesla, nor did they communicate to

11

THIRD AMENDED COMPLAINT

Tesla that WBP's rights were insufficient to give it.  Rather, the only information which Musk and Tesla received after the October 10 communications above among Alcon, WBDI, and SPE, was SPE's communicated denial of international rights.  **Alternative Theory 3B:** WBDI and the WBDI-directed WBP complied with Alcon's paragraph 37(b)(i)-(iii) requests, but not 37(b)(iv) (actively guard).

39.     ***Musk and Tesla Use AI to Generate an Alternative Image.***  Musk and Tesla only had five hours or so to adjust their Event plans to the new information above.  They created **Image C** below using an AI image generator:



40.     Plaintiff alleges this paragraph 40 upon information and belief.  **Alternative Theory 4A:** Musk and Tesla (or their employees or agents acting within the scope of their employment or at Musk and Tesla's direction) generated Image C by: (i) copying Image A or even the full BR2049 work (or qualitatively significant portions), into an AI image generator, and (ii) then asking the AI to make "an image from the K surveying ruined Las Vegas sequence of 'Blade Runner 2049,'" or a similar direction.  They did so intentionally to exploit BR2049 in ways they knew were not authorized.  **Alternative Theory 4B:** The same as Alternative Theory 4A, except what Musk and Tesla claim was a "licensed image" not from BR2049 also was given to the AI as an additional ingredient to train the AI or for the AI to use as part of image generation, but the AI still relied on literal copying of BR2049.

12
THIRD AMENDED COMPLAINT

41.    Comparison of Image C to Image A and other images ("Images B") from BR2049's Las Vegas Sequence is below:













42.    BR2049 run-time locations for Images B are: B1 (1:36:53); B2 (1:37:28); B3 (1:41:08); B4 (1:51:39); B5 (1:58:20); B6 (1:58:20).

43.    ***Musk Uses Image C to Set The Event's Theme.***  The Event was scheduled to begin at 7:00 p.m. PDT, but at least the livestream did not begin until about 8:00 p.m. PDT.  In an introduction, Tesla representative "Franz" said: "Just want to thank Warner Brothers for hosting us here.  As you know, this is the birthplace of many epic films – many of them depicting a vision of the future."  He then said: "We're here tonight to experience that future, that is closer than you

13
THIRD AMENDED COMPLAINT

think.  And who better than Elon, right, to show us that future."  The livestream then shifted to Musk using a robotaxi to traverse the WBDI studio lot to the stage.

44.    On stage, Musk spent about a minute on welcoming remarks and explanations of in-person Event activities.  He commenced his keynote by saying: "So you see a lot of sci-fi movies where the future is dark and dismal, where it's not a future you want to be in."  As he spoke, the display changed to a less than two-second image of Earth from space at sunrise, with the words "What Kind of World Do We Want to Live In?"  Then, the display shifted to Image C, displayed for about 11 seconds, during which Musk said: "You know, I love 'Blade Runner,' but I don't know if we want that future.  I believe we want that duster he's wearing, but not the, uh, not the bleak apocalypse."  Image C was replaced by other images, with Musk discussing wanting a happier future, and how happy his vision of cities and highways filled with driverless robot cars would be and why.

45.    The display occurred on the WBDI lot over WBDI systems, to an in-person audience of hundreds, and livestreamed and re-posted by Tesla, Musk, X, and others thousands of times, with millions of total U.S. and international views.

46.    ***Post-Event, Pre-Suit Communications and Defendant Conduct.*** On October 16, 2024, Alcon telephoned Heath to express Alcon's dissatisfaction, and to request information about what happened.  Heath provided further information about what happened leading up to the October 10 communications, but refused to provide any meaningful information about what happened afterward. Alcon is informed and believes that WBDI had at least some information that could assist Alcon in enforcing its rights against Musk and Tesla, but withheld it from Alcon.  WBDI and WBDI-directed WBP failed to do anything remedial at all.

## FIRST CLAIM FOR RELIEF

### *Direct Copyright Infringement Against Defendants Tesla and Musk*

47.    Alcon exclusively owns all relevant copyrights in the registered original work of authorship BR2049.  (¶¶ 2, 9-10.)  Musk was the active and

14

THIRD AMENDED COMPLAINT

conscious force behind the activity herein. Musk and Tesla, or their employees or agents acting within the scope of employment or at Musk or Tesla's direction and control, actually copied BR2049 without Alcon's authorization, (¶¶ 2, 12, 27, 30, 33, 39-42), and their copying constituted unlawful appropriation as follows:

48. ***Literal Copying.*** Violation of Alcon's exclusive reproduction rights under 17 U.S.C. § 106(1) by the conduct alleged in paragraphs 39 and 40.

49. ***Substantial Similarity Copying.*** Creation of (i) Image C and (ii) the Event Recording (the 11 seconds containing Image C) (the "Infringing Works"). (¶¶ 24, 27-28, 30, 33.) Each Infringing Work incorporates the following BR2049 protected elements, in violation of Alcon's exclusive reproduction and derivative work rights under 17 U.S.C. § 106(1) and (2) (¶¶ 10-11, 27-28, 33-34, 39-44):

50. The Character K. K is the "story being told" in BR2049, which is told primarily from his perspective, through the lens of his emotional journey. K goes from an unquestioningly obedient, cold-blooded killer of his own kind, untroubled by his own lack of a soul or moral implications of his actions, through an emotional middle act where he questions everything and believes he might have a soul, to a final act where that possibility is shattered. K makes an existential decision to reject his prior existence and become a disobedient, empathetic, selfless, rebel against the system he once served. K is distinctively delineated, including visually. He is most visually distinctive when depicted as a duster-clad "blade runner" with close-cropped hair viewed in silhouette or near-silhouette, surveying or exploring a post-apocalyptic ruined cityscape bathed in orange light.

51. Urgent Human-AI Relationship Theme. The theme of the societal human-AI relationship being at a critical point, where a choice to partner to build a joint society or not is urgent, and wrong decisions will lead to apocalyptic ruin. BR2049's theme expression in the Las Vegas Sequence juxtaposes orange versus non-orange lighting. Elements of a more happy or hopeful past or future stand out by the absence of orange lighting, either from a fragment of a scene (hologram

15

THIRD AMENDED COMPLAINT

-143-

miniature Sinatra; Deckard's hydroponic garden), or for a full scene (K's fight with Deckard in the ruined hotel casino holo lounge).  More negative present-time or possible futures are expressed in orange lighting, darkening and intensifying as decision urgency increases.  Autonomously capable AI-driven cars take characters alternatively toward and away from right or wrong answers.  (To see the orange/non-orange lighting and cars toward-and-away expressions in the Event Recording, portions of it on either side of the infringing 11 seconds must be considered, *e.g.*, Musk's ride to the stage, the Earth viewed from the moon at sunrise slide before the 11 seconds, and slides of urban parks and greenery after the 11 seconds.)

52.   <u>Mood of Anxiety, Fear and Urgency, Specifically About the Human-AI Relationship Question</u>.  BR2049 uses apocalyptic backstory elements, combined with specific visual elements such as orange lighting, urban ruin, and the K figure in silhouette or near-silhouette surveying or exploring the ruined post-apocalyptic landscape, to create a mood of anxiety, fear, and urgency, around the human-AI relationship question and making the right decisions about it.

53.   <u>Setting</u>.  The setting of a post-apocalyptic urban ruin, specifically as a place that holds answers or important information about the human-AI relationship question, bathed in orange light, and especially one that is about to be explored by a male blade runner in a duster shown in silhouette or near-silhouette, with the blade runner shown in the foreground standing or walking, and skyscrapers shown in the distance in faded, darker orange, moving into browns.

54.   <u>Selection and Arrangement of Elements</u>.  (1) a male blade runner; (2) duster-clad; (3) with close-cropped hair; (4) viewed from behind or nearly so; (5) in silhouette or near-silhouette; (6) shown in the foreground; (7) surveying or exploring a ruined city; (8) the setting is post-apocalyptic; (9) the scene is bathed in orange light; (10) distant skyscrapers are shown in faded, darker orange moving into browns; (11) society faces a critical decision whether humans and AI will

16

THIRD AMENDED COMPLAINT

Case 2:24-cv-09033-GW-RAO   Document 81   Filed 10/02/25   Page 17 of 21   Page ID #:1496

build a joint society or not; and (12) in the science fiction movie genre context.

55. Musk and Tesla, or their employees or agents acting within the scope of employment or at Musk or Tesla's direction and control, violated Alcon's 17 U.S.C. § 106(5) exclusive public display rights in BR2049 by the Infringing Works, (i) to an in-person audience of a substantial number of persons outside of a normal circle of a family and its social acquaintances, and (ii) livestreamed to millions of U.S. viewers. (¶¶ 3, 24-25, 45, Event Recording.)

56. On information and belief, Musk and Tesla intended for the audience to understand Image C, including as presented in the Event Recording, to be an illustration of a scene from BR2049's Las Vegas Sequence, and a substantial part of the audience so understood it. (¶¶ 23, 27-28, 33-34, 39-44.)

57. At the time of the Event, Alcon was producing a BR2049 derivative work limited TV series titled *Blade Runner 2099*, and discussing with a car brand an exclusive licensed affiliation. Musk and Tesla's infringements interfere with Alcon's ability to grant license exclusivity, damaging BR2049's value to Alcon.

58. Musk and Tesla's conduct constitutes copyright infringement in violation of 17 U.S.C. § 501, *et seq*., and was done intentionally, recklessly, or with conscious disregard of Alcon's rights and was willful within the meaning of 17 U.S.C. § 504(c). Alcon is entitled to and seeks the relief in the Prayer.

## SECOND CLAIM FOR RELIEF

### *Contributory Copyright Infringement Against WBDI*

59. There was direct infringement as set forth in the First Claim for Relief. WBDI, knowing of, with reason to know of, where it should have known of, or with willful blindness to, the infringing activity, induced, caused, or materially contributed to the infringing conduct of Musk and Tesla, and WBDI's participation in the infringing conduct was substantial, as follows:

60. WBDI contracted with Tesla, with WBDI providing its studio lot, resources and personnel, to Tesla for at least the in-person aspect of the Event. (¶¶

17

THIRD AMENDED COMPLAINT

-145-

2-3, 21-22, 24-26, 36-38, 45, ECF 23-1/32.)  WBDI knew or had reason to know that Musk and Tesla were known risks to infringe BR2049.  (¶¶ 17-19, 27, 31:24-27, 33-34, 37.)  WBDI knew of, or had reason to know of, Alcon's rights that Musk and Tesla not make unauthorized use of BR2049, especially not through WBP.  (¶¶ 3, 7-10, 13-14, 27-29, 33-37.)  Upon information and belief, WBDI formed a subjective belief of infringing activity and failed to investigate or act, constituting willful blindness, at the following points: a) Tesla's initial Image A request (¶¶ 27-29); b) October 10 communications (¶¶ 34-38); c) Musk's keynote (¶¶ 43-45); and d) October 16 WBDI-Alcon call (¶ 46).  Upon information and belief, WBDI never involved the WBP business affairs executives with Alcon-WBP relationship knowledge, (¶ 14), as those executives would have then contacted Alcon and worked to address the issues, and never did, or checked the Alcon-WBP communication history on auto brand licensing of BR2049.  (*Id.*)

61.    WBDI impermissibly included BR2049 as IP available to Tesla for the Event through WBDI or WBDI-directed WBP.  (¶¶ 3, 7-8, 13-14, 26-29.)  WBDI also caused WBP to authorize, or promise to authorize – to Musk and Tesla's reasonable reliance, including with an inaccurate representation that WBP had the legal right to make the authorization -- Musk and Tesla's use of Image A for the in-person aspect of the Event.  (¶¶ 3, 7-8, 13-14, 24-30, esp. 30.)

62.    Under Alternative Theory 3A, WBDI did not execute Alcon's ¶ 37(b)(i)-(iii) requests, and misled Alcon at least by material omissions that WBDI would do so; Alcon could have and would have acted for itself if WBDI had said that it would not.  (¶¶ 35-38.)  Upon information and belief, this increased infringement risk by, *inter alia*, Musk and Tesla believing that the WBDI-directed WBP controlled rights to authorize all BR2049 domestic usage (including, *e.g.,* derivative works), affecting their risk assessment (*e.g.*, for U.S. infringement, if any, Musk and Tesla would be dealing with the friendly WBDI and not Alcon).

63.    WBDI also failed to take prophylactic steps against Musk and Tesla's

18

THIRD AMENDED COMPLAINT

-146-

possible infringing activity following Alcon's express request that WBDI do so. (¶¶ 3, 37-38.) Even if WBDI's contractual IP enforcement rights were only limited to IP owned by WBDI or subsidiaries, there appears to have been no prohibition, and upon information and belief there was no prohibition, on WBDI at least notifying Musk and Tesla, and the Event display production team (whoever hired and controlled that team) of what Alcon requested in ¶ 37(b)(i) and (ii). Upon information and belief, WBDI-Tesla IP livestreaming terms had not been finalized by the time of the October 10 Alcon-WBDI phone call, and WBDI could have added simple protective contractual terms, such as requiring Tesla to provide a keynote script in advance for WBDI clearance, or that livestream production crew (whoever hired them) follow WBDI clearance directions about BR2049.

64. Under the circumstances here, where WBDI caused WBP to hold itself out to Musk and Tesla as having BR2049 rights which WBP does not have, and ostensibly based on an Alcon-WBP distribution contract that does impose duties on WBP, and one relatively close to expiration; and where WBDI misled Alcon at least by material omission that WBDI would execute Alcon's paragraph 37(b)(i)-(iv) requests, (¶¶ 3, 7-8, 25-30, 37-38), WBDI had a duty to Alcon to take prophylactic and remedial measures at least as described in paragraph 63.

65. It was reasonably foreseeable that WBDI's overall conduct would result in Musk and Tesla infringing BR2049, even if not by Image A use specifically, and substantially contributed to infringement. Infringement occurred on the WBDI studio lot over WBDI-owned systems with use of WBDI resources. (¶¶ 3, 25, 45 and ECF 23-1/32 esp. at ¶¶ 3, 4.4, 4.7 and "Studio Services" and "Production Services" sections at pages 8 and 9 therein; on information and belief, the "Studio Services" and "Production Services" were provided by WBDI.)

66. Post-Event, WBDI refused to provide Alcon with information to assist investigation of the infringement, even though Alcon asked WBDI to do so; further failed to reprove Musk or Tesla, denounce their conduct or do anything else

19

THIRD AMENDED COMPLAINT

Case 2:24-cv-09033-GW-RAO   Document 81   Filed 10/02/25   Page 20 of 21   Page ID #:1499

remedial.  Under the circumstances here, WBDI had a duty to Alcon to do all of the foregoing.  (¶¶ 3, 7-8, 13-14, 21, 26-30, 33-38, 46.)

67.     WBDI acted with motives to favor, and, upon information and belief, intentionally to favor, Musk and Tesla over Alcon.  (¶¶ 3, 15-20, 23, 31-34.)

68.     WBDI's conduct constitutes contributory infringement in violation of 17 U.S.C. § 501, *et seq*., and was intentional, reckless, or willfully blind and in conscious disregard of Alcon's rights, and was willful within the meaning of 17 U.S.C. § 504(c).  Alcon is entitled to and seeks the relief requested in the Prayer.

## Prayer for Relief

Plaintiff prays for judgment against Defendants, and each of them:

a.  For a preliminary and permanent injunction against Defendants and anyone working in concert with them from further copying or publicly displaying BR2049 or protectible elements thereof or making derivative works thereof, without Alcon's authorization.

b.  Per 17 U.S.C. § 503, for impoundment of all copies of Image C, including Event Recording copies containing Image C, and underlying materials used to create Image C, and all related records and documents.

c.  For actual damages and infringement-derived profits, 17 U.S.C. § 504(b), or, at Plaintiff's election, statutory damages, 17 U.S.C. §§ 504(c), 512.

d.  For an award of attorneys' fees per 17 U.S.C. § 505.

e.  For an award of pre-judgment interest as allowed by law.

f.  For costs of suit.

g.  For such further relief as the Court deems just and proper.

DATED: October 2, 2025   ANDERSON YEH PC

By _____

Edward M. Anderson
Attorneys for Plaintiff ALCON ENTERTAINMENT, LLC

20
THIRD AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, on its claims against Defendants Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc. ("WBDI"), Plaintiff Alcon Entertainment, LLC hereby demands a trial by jury of all matters triable to a jury.

DATED: October 2, 2025    ANDERSON YEH PC

By _____
                Edward M. Anderson
Attorneys for Plaintiff ALCON ENTERTAINMENT, LLC